Page 2

```
 1              UNITED STATES DISTRICT COURT
 2              NORTHERN DISTRICT OF ILLINOIS
 3                    EASTERN DIVISION

 4   _____
 5
 6
 7   LANDALE SIGNS AND NEON, LTD.,   )
                                     )
 8              Plaintiff,           )
                                     )  Case No.:  16-cv-07619
 9              -v-                   )
                                     )
10   RUNNION EQUIPMENT CO. and       )
     JOHN DOE,                       )
11                                   )
                Defendants.          )
12                                   )
                                     )
13
14
15          (See attached for appearances)
                _____
16
                    DEPOSITION OF
17                DARRELL ROSS BROWN
               (by Mr. S. P. Polick, Esq.)
18
                  Edmonton, Alberta
19                  July 20, 2018
20                    Volume 1
21          _____
22
23
24
25
```

```
 1   APPEARANCES OF COUNSEL:
 2   FOR THE PLAINTIFF, LANDALE SIGNS AND NEON, LTD.:
     M. Haeberle, Esq.
     Patterson Law Firm
 4   One North LaSalle Street, Suite 2100
     Chicago, IL 60602
 5   312.223.1699
     mhaeberle@pattersonlawfirm.com
 6
     FOR THE DEFENDANT, RUNNION EQUIPMENT CO.:
 7
     Steven P. Polick, Esq.
 8   Steven P. Polick & Associates, P.C.
     155 N. Michigan Avenue, Suite 700
 9   Chicago, IL 60601
     312.729.5414
10   spolick@sbcglobal.net
11   Danielle Harmata, CSR(A)                    Court Reporter
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1      (PROCEEDINGS COMMENCED AT 9:16 A.M.)
 2   DARRELL ROSS BROWN, having been duly sworn, examined by
 3      Mr. S. P. Polick, Esq., testified as follows:
 4   Q  MR. POLICK:       Please state your full name for
 5      the record.
 6   A  Darrell Ross Brown.
 7   Q  All right.  Please have the record reflect that this is
 8      the deposition of Darrell Ross Brown taken pursuant to
 9      notice and set for today's date by agreement of the
10      parties, and it will be taken in accordance with the
11      Federal Rules of Civil Procedure and the local rules of
12      the United States District Court for the Northern
13      District of Illinois, as the rules may apply.
14           Mr. Brown, have you ever been
15      in a proceeding like this before?
16   A  Yes.
17   Q  Okay.  Have you testified in court too or just in
18      depositions?
19   A  No, in court as well.
20   Q  Okay.  Just approximately how many times?
21   A  Oh, goodness.  Very few.  One or two.
22   Q  Okay.  Well, just in terms of some of the ground rules,
23      I'm going to be asking you questions today about the --
24      you know, this lawsuit and the facts giving rise to
25      this lawsuit.  I usually ask general background
```

```
 1      questions initially, and then we get more specific as
 2      to the lawsuit itself, and eventually there will be
 3      some kind of exhibits, those kinds of things.  And when
 4      I'm done, your lawyer can ask you questions too.  And
 5      that's basically how the pattern goes.
 6           The court reporter's going to
 7      make a record of everything that's said here today, so
 8      we have to speak up loud enough so she can take
 9      everything down correctly.  We have to try to avoid
10      talking at the same time, which we do in everyday
11      conversation, and I have a tendency to talk too fast,
12      so I'm going to try and slow it down.
13           And we have to make sure that
14      everything is audible, you know, as opposed to nods of
15      the head and even uh-huhs, which we do all the time
16      too, nonverbal answers, again, so the court reporter
17      can make an accurate record.
18           If at any time I ask you a
19      question that you don't hear, you don't understand, you
20      have any difficulty responding to, you should stop me
21      and let me know the nature of the difficulty so that we
22      can correct it.  Will you do that?
23   A  Yeah.
24   MR. HAEBERLE:         And, Steve, let's go off the
25      record for one second.
```

EXHIBIT A

Page 5

1    MR. POLICK:          Sure.
2          (DISCUSSION OFF THE RECORD)
3  Q MR. POLICK:          Counsel just produced some
4    materials.  He wasn't sure if I had copies of all of
5    these things that apparently we just noticed today --
6    or that counsel saw it today, including -- it basically
7    starts with just a few pieces of paper, I think, that I
8    didn't receive before:  The Edmonton Police Service
9    Witness Statement Form, which is a cover sheet for the
10   most part.  Just shows the date and time.  I don't know
11   if we're going to attach any of this as an exhibit.
12          There's a couple other things
13   in here that I don't know if I saw before from the firm
14   outfit, but other than that, I think the remainder
15   materials were somehow produced as part of the initial
16   disclosure.
17          And then let's go back to what
18   we were talking about.  I think the next thing was to
19   ask you, Mr. Brown, if you have any condition that
20   affects your ability to hear or understand questions?
21 A No.
22 Q Are you on any kind of medication today that would
23   affect your ability to hear and understand questions?
24 A No.
25 Q And, again, you say you've only testified in court

Page 6

1    before, as opposed to, you know, being in a conference
2    room with lawyers?
3  A No, I've been at -- what do they call them -- examination
4    for discoveries here.
5  Q Okay.  I don't know what they call them in Canada, but,
6    yeah, they call them "depositions" in the States.
7          Okay.  If you need to take a
8    break at all, I guess, was my next point -- we don't
9    have to go set any kind of records for stamina -- just
10   take a break, and we'll go off the record, and then
11   come back on.
12          Anyway, what's your address,
13   sir?
14 A 133 Valley Point, 22555, Range Road 530, Sherwood Park.
15 Q And how long have you lived there?
16 A 41 years.
17 Q Just moved in huh?
18 A Yeah.  Fresh.
19 Q What's your date of birth and place of birth?
20 A February 3rd, 1945, Lloydminster, Saskatchewan.
21 Q And I don't know how to spell Lloydminster.  I can take
22   a guess.
23 A L-l-o-y-d-m-i-n-s-t-e-r.
24 Q And what's your age today?
25 A 72.

Page 7

1  Q What's your marital status?
2  A Married.
3  Q And what's your wife's name?
4  A Carol.  Carolyn, I guess.
5  Q And what's the -- here's the tough one.  What's the
6    date of your marriage to Carolyn?
7  A April 1st, 1967, April Fool's Day.
8  Q But you remembered the date immediately.  Some points
9    there.  Do you have any children?
10 A Three.
11 Q And what are their names and ages?
12 A Oh, god, you have to ask their mother.  Jason.  Kyle.
13   Laura.  And I think they're all over 40.
14 Q And do they all still live in the area?
15 A Yes.
16 Q And do any of them work for your company?
17 A No.  Oh, I'm sorry, Laura does, yes.  She runs the place.
18 Q And what's her title?
19 A Her title?
20 Q Yeah.
21 A Vice president, I believe.
22 Q Okay.  All right.
23   MR. POLICK:          And we'll do this off the
24   record.
25          (DISCUSSION OFF THE RECORD)

Page 8

1  Q MR. POLICK:          And, again, I misspoke.  It's
2    actually the social insurance number.  But you
3    understand -- or I understand you don't remember it
4    today, don't have any information with you today?
5  A Right.
6  Q But counsel is going to provide it later.
7  A Right.
8  Q Can you summarize for us your educational background,
9    where you went to school, when you got out?
10 A I went to -- well, I got post-secondary at Northern
11   Alberta Institute of Technology in IT, and that was
12   business.  What was the rest of it?
13 Q I just want some idea as to your educational
14   background, how far you went in school, when you got
15   out, those kinds of things.
16 A I would have graduated in 1966.
17 Q From the Northern Alberta Institute of Technology?
18 A Yes.
19 Q Okay.  And that was some kind of business degree?
20 A Yes.  Business administration.
21 Q Okay.  Any further formal education since that time?
22 A No.
23 Q And just generally what's been your occupation or
24   employment experience since you got out of college?
25 A I worked for eight -- a processing firm, Canada Packers,

Page 9

1  for a while.  I had my own -- I had a store in Slave Lake
2  for a few year -- well, no, one year.  Back here worked
3  for Canada Packers again.  Canada Packers.  I had a
4  backhoe service.  Then I went to work for a company
5  called "Sign Corp."  No, Sign-O-Lite.  I had been in the
6  sign business since -- I was with them a couple of years,
7  with Sign Corp. for a few years, and then I went on my
8  own.  Bought Landale Signs.
9  Q  Okay.  What kind of jobs did you have for
10   Canada Packers?
11  A  I was in sales for a while and an account manager.
12  Q  And then you operated or owned a store in Slave Lake.
13   What did that involve?
14  A  It was an IGA store.  We built the store.  Stocked it.
15   Ran it.  My son had some health issues, so we sold and
16   moved back to Edmonton.
17  Q  Okay.  And I know you said you went back to
18   Canada Packers initially and then had some involvement
19   with a backhoe service?
20  A  Yeah, I had a backhoe service for a short while.
21  Q  Were you the owner?
22  A  I was with a partner, yes.
23  Q  Okay.  I get it.  Okay.  So -- and then you eventually
24   got into the sign business, a Sign-O-Lite?
25  A  Sign-O-Lite was the name of the firm that I was working

Page 10

1  for.
2  Q  L-i-t-e or L-i-g-h --
3  A  Mm-hm.
4  Q  Okay.  I guessed.
5  A  Mm-hm.
6  Q  And then you said you worked for Sign Corporation?
7  A  Mm-hm.
8  Q  And then eventually Landale?
9  A  And I bought Landale.
10  Q  Have you ever been involved in the crane industry at
11   all?
12  A  The crane industry?  No.
13  Q  Okay.  Or, you know, truck-mounted cranes, cranes,
14   things of those sorts?
15  A  Well, I have bought a few.  I have purchased a few, but
16   I'm not in the business.
17  Q  Okay.
18  A  We use them in our business.
19  Q  Yeah, I assume in the sign business you need those
20   kinds of things.
21  A  Mm-hm.
22  Q  And just describe for me what you did for Sign-O-Lite
23   and Sign Corporation before you ended up --
24  A  That was sales.
25  Q  -- buying Landale.

Page 11

1  A  Just sales.
2  Q  When did you buy Landale Signs?
3  A  1995, I believe.
4  Q  And who did you purchase it from?
5  A  Hell, what was his name?
6  Q  If you don't recall, that's okay.
7  A  I just don't recall at the moment.
8  Q  Yeah, if it comes back later, you can mention it.  Were
9   you the only owner involved in the purchase of
10   Landale --
11  A  No.
12  Q  -- back in --
13  A  I had a partner at that time.
14  Q  Okay.  And who went in with you?
15  A  Terry Sherris (phonetic).
16  Q  You have to spell Sherris.
17  A  S-h -- I don't know.  Sorry.
18  Q  We'll take a try at it.  How long was Mr. Sherris
19   involved with you?
20  A  Oh, less than a year.
21  Q  Okay.  So since that time, you've been the principal
22   owner of Landale Signs?
23  A  Yes.
24  Q  And is that incorporated as a business?
25  A  Yes.

Page 12

1  Q  And has it always been?
2  A  Yes.
3  Q  All right.  So you would be one of the officers or
4   principals of the corporation?
5  A  Yeah.
6  Q  And who else are officers in the corporation?
7  A  My wife Carol and my daughter Laura.
8  Q  Okay.  And just generally, what's the business of
9   Landale Signs?
10  A  We manufacture custom signs, on-premise advertising.
11  Q  Okay.  Yeah, I noticed you also reference "Neon" in
12   your name too.  So you do neon signs as well as other
13   forms of signs?
14  A  A little.  I guess we could.  We don't do it anymore.
15  Q  Okay.  But at one time you did those too?
16  A  Mm-hm.
17  Q  You have to say yes or no.
18  A  Yes, sorry.
19  Q  Again, everyone does it.
20       Okay.  So it's signing for --
21   typically for businesses or people who want to put
22   their name out there or their product out there?
23  A  Yes.
24  Q  How many employees do you have at Landale Signs?
25  A  Presently I'm guessing at about 18.  16 or 18.

Page 13

1 Q And just what kind of jobs are there within
2   Landale Signs?
3 A Well, there is design. Printing, digital printing.
4   Accounting, naturally. Sales. And manufacturing.
5   There's welders. There's sheet metal workers.
6 Q Okay. So you make your own product too?
7 A Yes.
8 Q Do you also contract out on occasion to have, you know,
9   certain components made?
10 A Oh, yes.
11 Q So both, little of both?
12 A Yes.
13 Q And where is your facility located?
14 A 8525 Argyll Road, Edmonton.
15 Q And how long have you been at that location?
16 A Over 20 years.
17 Q And what's your title there?
18 A President.
19 Q Do you --
20 A That --
21 Q Yeah.
22 A Probably 18 years. It's not 20. And I stand to be
23   corrected on that exactly.
24 Q Okay. That's fine. Everything today is really to the
25   best of your recollection.

Page 14

1   So you've been at that address
2   for more like 18 years rather than 20 is what you're
3   saying?
4 A I believe so, yes.
5 Q Okay. Where do you find customers? Or how do you find
6   customers?
7 A Through our sales force. They go out and solicit
8   individual businesses.
9 Q Okay. And I'm just trying to envision it. Not that
10   I'm going to start a competing business, but if you do
11   want to get into the sign business, then you obviously
12   have to develop some kind of customer base?
13 A Mm-hm.
14 Q So principally it's your sales force --
15 A Sales force --
16 Q -- that does that?
17 A -- generally. Referrals.
18 Q Okay. A prior customer says, "Hey, did a great job"?
19 A Recommendations by existing customers. As a matter of
20   fact, one time about 90 percent of our business was on
21   referrals and repeat.
22 Q All right. And that's always an endorsement. And then
23   if I'm a salesman for you, how do I, you know, develop
24   new business, I guess, as opposed to existing business
25   or repeat business?

Page 15

1 A Basic, they're out on the street. Look for
2   opportunities. Sign -- new businesses. Businesses that
3   are a little shop worn in their signage and just make a
4   presentation.
5 Q So keep your eyes and ears open. You see an existing
6   business that could use an upgrade or a repair; you sit
7   and have a meeting with them and give them an estimate
8   as to what you can do?
9 A Right. Do a design probably.
10 Q Okay. And then certainly if there's a new business
11   coming in, you have an ear to the rail, so to speak, to
12   find out someone's coming in, they're going to open up
13   whatever? Car dealership, whatever it might be?
14 A Whatever it may be, yeah.
15 Q Yeah, okay.
16 A All businesses are opportunities.
17 Q Got it. All right. And where's your business listed,
18   or, you know, where does this -- are its services
19   listed? Aside from maybe the phone book.
20 A Oh, a website. Where else would they be? I don't know.
21 Q Yeah. Do you advertise anywhere, for example?
22 A No.
23 Q So the website's the principal listing of what your
24   business has and what it does. Right?
25 A Yeah.

Page 16

1 Q And if I call up, do you mail out a brochure if I'm not
2   one of those people that goes online?
3 A We can.
4 Q Okay. So you've got written materials you put out too?
5 A Mm-hm. Yes, we have brochures.
6 Q Okay.
7 A Handouts.
8 Q Okay. You don't make any kind of commercials, for
9   example?
10 A No.
11 Q On TV, radio, things like that?
12 A No, no.
13 Q Okay. And that's been pretty much your business
14   practice since you bought Landale?
15 A Yes.
16 Q All right. Have you ever filed a lawsuit before this
17   one?
18 A Yes.
19 Q How many times?
20 A It would be a pure guess on my part.
21 Q I'll take -- estimate's good.
22 A Half a dozen times.
23 Q Okay. And have all these been filed on behalf of the
24   company?
25 A Yes.

Page 17

1  Q  As opposed to you individually?
2  A  Oh, yes.  I've never had any...
3  Q  So no individual lawsuits?
4  A  No.
5  Q  Everything would have been business related somehow?
6  A  Yes.
7  Q  And are these instances where you filed suit on behalf
8     of the company or the company got sued by somebody
9     else?
10 A  We are suing other people.  Mostly for payment.
11 Q  Okay.  All right.  Yeah, the money --
12 A  It's always an issue.
13 Q  Accounts receivables?
14 A  Yes.
15 Q  That can be an issue everywhere.  You know, to try to
16    avoid that issue, do you hold back a portion of the
17    funds until the -- or, I'm sorry, a portion of the work
18    until the funds are completely delivered or --
19 A  No, we take a deposit.  And when we're finished the work,
20    we want the balance of the -- of our money.
21 Q  Okay.
22 A  They don't pay, we either lien or whatever; and if it
23    goes past that, then it would be a lawsuit we would file.
24 Q  Okay.  So of the six or so lawsuits you've been
25    involved, they all would have been some issue with

Page 18

1     regard to accounts receivable and people not paying?
2  A  Yeah.
3  Q  Got it.  Okay.  Now, what kind of -- I mean, this
4     lawsuit involves a truck-mounted crane.  And so I was
5     curious, I figure you obviously need those in the sign
6     business?
7  A  Yes.
8  Q  Or a similar product.  How long have you utilized any
9     form of a truck-mounted crane in your business?
10 A  23 of the 25 years I would think.  No, I'm sorry, we
11    bought -- when we bought the company, it had a truck, so
12    full 25 years.
13 Q  Okay.  And are they all truck-mounted cranes?
14 A  Yes.
15 Q  Okay.  Similar --
16 A  Well, we got half-ton trucks and stuff like that, but the
17    working trucks are cranes.  And just telelifts, smaller.
18    Like, the -- this one that we were buying was an 85-foot
19    reach on it, and up to that point, our biggest truck was
20    55 feet.
21 Q  Okay.  So the one you were purchasing from Runnion
22    would have had a greater capacity, greater --
23 A  Yes.
24 Q  -- extension --
25 A  Yes.

Page 19

1  Q  -- on the boom?
2  A  Lift capacity, extension, everything.  It was just a
3     heavier-duty truck.
4  Q  Okay, but generally speaking, you've always had some
5     kind of truck-mounted crane in the Landale business?
6  A  Yes.
7  Q  The only difference would be the size of the
8     truck-mounted crane and its capacities?
9  A  Yes.
10 Q  So how many currently do you have with the company?
11 A  Just one.
12 Q  What's the make and model of that one?
13 A  It's an Elliott 55-foot lift.
14 Q  Okay.
15 A  Mounted on a Ford.
16 Q  Okay, so when you contacted Runnion Equipment Company
17    with regard to purchasing a truck-mounted crane, was
18    that to replace the Elliott or the existing Elliott?
19    Or just have a second --
20 A  It was to replace that second -- or the one we had.  We
21    had an 85-foot Elliott before.  I sold it.  And then we
22    were going to replace it with this one.
23 Q  Okay.  But since this transaction did not go through
24    with Runnion, you've otherwise gotten by with this
25    existing 55-foot Elliott mounted on --

Page 20

1  A  We -- yes.
2  Q  -- on a Ford?
3  A  We use our own, plus contract out for bigger -- the
4     bigger lifts.
5  Q  That's true.  You can always rent one?
6  A  Mm-hm.
7  Q  You have to say another yes.
8  A  Yes, sorry.
9  Q  Got it.  Have you operated a truck-mounted crane
10    yourself?
11 A  Yes.
12 Q  All right.  And then how did you happen to come into
13    contact with Runnion Equipment Company?
14 A  I believe they had advertised either through a broker
15    or -- it had to be through a broker.  And then that
16    broker put us directly in touch with Runnion Equipment.
17    I believe that's how it worked.
18 Q  Okay.  Well, did you find Runnion Equipment, or did
19    someone else at your company find --
20 A  No, I found it.
21 Q  Okay.  And I forgot to ask that before when we were
22    talking about businesses.  Is there a trade journal in
23    the sign business?
24 A  Oh, yes.  Lots.
25 Q  Okay.  What are the trade journals?

Page 21

1   A Gosh, Signs of the Times. I'm sorry, that's the only one
2      that comes to mind at this --
3   Q Okay. That's fine. Signs of the Times would be one of
4      the predominant ones in the industry -- or the sign
5      industry?
6   A Yes.
7   Q Okay. And you think -- are there one or two more? Or
8      how many --
9   A Oh, yes. There's several more.
10  Q Okay. So at least a few?
11  A And the reason that -- most of them are online now, and
12     they shoot that stuff to you all the time, so...
13  Q That's true. Yeah, everybody stops with the hard
14     copies. Okay. But there's at least a few of these
15     magazines in the sign industry that you're familiar
16     with --
17  A Yes.
18  Q -- from the time you've been in the sign industry?
19  A Yes.
20  Q All righty. Back to where I was. So you think you
21     found Runnion through one -- a broker?
22  A I believe so.
23  Q Do you remember --
24  A An online broker.
25  Q Okay. And I don't understand what you mean by "an

Page 22

1      online broker."
2   A Well, again, we get inundated with people sending us
3      information. As a matter of fact, I had somebody this
4      morning, I think it's -- who the hell is it? All Equip
5      or something like that. There's a whole bunch of these
6      guys send me stuff because they've got equipment for
7      sale.
8   Q Sure.
9   A I don't know how they get our name, but soon as you hit
10     the "interest" button, it seems like everybody contacts
11     you at that point, I guess.
12  Q Well, that's it --
13  A Well, I shouldn't say everybody. I've got about two --
14     there's two people that -- equipment people that contact
15     me on a regular basis.
16  Q Okay. Have you dealt with them in terms of buying
17     equipment, or they just regularly contact you as a
18     potential customer?
19  A I had bought -- the first 85-foot unit we got was
20     purchased from a company in Roanoke, Virginia, and I
21     believe I found that through a broker as well.
22  Q Okay. And you said an 85-foot unit. Do you mean the
23     pre-existing 55-foot unit?
24  A No.
25  Q So you had --

Page 23

1   A I had an 85.
2   Q I gotcha. Okay. So you actually had a similar
3      capacity truck-mounted crane before you tried to buy
4      this one from Runnion?
5   A Yes.
6   Q All right. And similar transaction there, you found
7      a -- you found a dealer in Roanoke, Virginia, and
8      purchased it from that location?
9   A Yes, I did.
10  Q Okay. All right. But that one's been gone a while?
11  A Yes.
12  Q Okay.
13  A We sold it.
14  Q All right. So was it your intention, then, that the
15     Runnion truck-mounted lift would replace that one you
16     sold?
17  A Yes.
18  Q Okay.
19  A There was a time, maybe a year, maybe a little longer
20     spread, that we didn't have an 85.
21  Q Okay. And you sold the other one just because it was
22     getting too many hours, too many miles?
23  A No. We couldn't find anybody to operate it.
24  Q Okay.
25  A In Alberta, we had that problem for a good number

Page 24

1      of years. People. They were all in the oil patch.
2   Q Okay. Taking your workforce. All right. I think I
3      got it.
4          So one way or the other you
5      find out about Runnion Equipment Company through
6      another broker, and then do you contact Runnion
7      directly yourself?
8   A Yes, I believe I did.
9   Q Okay. And at that point, you pretty much know what you
10     want to -- what you're looking to purchase?
11  A Well, there was a particular unit. Now, that's -- it may
12     have been a different unit. And now I think Pat Runnion
13     may have steered me onto the unit that we were finally
14     dealing on. I can't remember exactly.
15  Q No, and I think I understand what you're saying. You
16     can go online and look. You might say, "Hey, they've
17     got this unit for sale, and here's another one I might
18     be interested in" --
19  A Mm-hm.
20  Q -- so then you end up contacting Pat Runnion, and you
21     talk about what your needs are depending on the
22     particulars of your business, and then eventually you
23     got -- you got targeted where, you know, you decided
24     you wanted to purchase this 85-foot unit?
25  A Yes.

Page 25

1  Q  So have I summarized it generally?  That's kind of how
2    it went?
3  A  Generally, yes.
4  Q  So was your first contact with Runnion then a phone
5    call from you?
6  A  I believe so.
7  Q  And do you remember who you spoke to when you first
8    called over there?
9  A  Probably Pat Runnion.
10  Q  Okay.  It's always good to start with the guy in
11    charge.
12  A  Yeah.
13  Q  Okay.  Do you remember anything about that
14    conversation, what the initial discussion was?
15  A  Not at all.  I mean, it -- I'm sure it went along with
16    we're interested in a piece of equipment and the general
17    discussion that would go with that.  And it would work
18    into whatever he had for sale, and away we go from there.
19  Q  And what might fit your needs?
20  A  Yeah.
21  Q  Obviously it depends on the business you're in as to
22    what kind of truck-mounted crane or -- sometimes you
23    also need some modifications to the crane that make it
24    more specific to your needs.
25  A  Whatever, yes.

Page 26

1  Q  Yeah.  Did that happen in this instance, where you said
2    "I" --
3  A  No.
4  Q  -- "I might need this" or "I'm thinking about that"?
5  A  No.
6  Q  Okay.  So otherwise pretty conforming in terms of what
7    you needed when you first settled on this 85-foot
8    truck-mounted crane from Runnion?
9  A  Yes, it had the things we wanted.  We had talked about
10    the number of hours on the unit, the PTO hours, its
11    general condition, its service records.  Those sorts of
12    things.  This is over a period of time.
13  Q  Right.  And so the record's clear, you know, today, you
14    know, who's ever reading it -- I know you and I
15    understand each other, but basically we're taking -- a
16    crane is being taken and installed onto a truck, and so
17    you obviously want to check the capacity and the
18    history of the crane as well as the truck?
19  A  Yes.
20  Q  So to speak.  You've got two different -- two major
21    components of this tool that you're eventually going to
22    put into use, so you want to check and make sure both
23    are in sound condition, good operating condition,
24    because this is a used unit --
25  A  Yes.

Page 27

1  Q  -- as well.  Just to find out.  And, again, with
2    reference to a crane, it's the number of hours it's
3    been used?
4  A  That has a lot to do with it.
5  Q  Sure.  It's -- yeah, one of the major --
6  A  Hours and miles.
7  Q  Okay.  I'm just saying if someone read the transcript,
8    they're not sure about this, what we're talking about,
9    I understand what you mean.
10          How many times do you think you
11    spoke with Pat Runnion directly?  And part -- let me
12    rephrase that.
13          You've never spoken face to
14    face?
15  A  I've never met him face to face.
16  Q  Yes.  But you've spoken to him on the phone several
17    times?
18  A  Yes.
19  Q  I guess I shouldn't -- you never Skyped?  I don't
20    Skype, but --
21  A  No.
22  Q  That cuts that down.  So the only communications you've
23    had with Pat Runnion in a direct fashion would have
24    been by telephone?
25  MR. HAEBERLE:      Objection.  Vague as to "direct

Page 28

1    fashion."  Do you mean email?
2  MR. POLICK:      The objection's noted.
3  Q  Did you understand my question?
4  A  I've talked to him on the phone and by email.
5  Q  Okay.  But conversations with --
6  A  Conversations by phone.
7  Q  Okay.  And, I'm sorry, approximately how many times
8    have you spoken with Pat Runnion by telephone?
9  A  I really don't recall.  I -- it would be a pure guess on
10    my part, and I would venture to say more than a dozen.
11  Q  Okay.  And on those occasions when you called him,
12    would you always call from your office?
13  A  Yes.
14  Q  As opposed to calling from home?  Or would you call him
15    on your cellphone, anything like that?
16  A  No, I would use the office phone.
17  Q  Okay.  Does your business keep any kind of telephone
18    log?
19  A  I imagine so.  If they don't, the phone company does.
20  Q  Okay.  But I mean aside from the phone records, is
21    there any in-house --
22  A  No.
23  Q  -- record of calls in or calls out?
24  A  No, there's not.
25  Q  Okay.  All right.  Did you speak with anybody else from

Page 29

1    Runnion Equipment Company aside from Pat Runnion?
2  A  Couple other people.  I would call him the "contract
3     man," Willie, and the accountant.
4  Q  Okay.  Willie.  Last name is Messuck, M-e-s-s-u-c-k?
5  A  Yes.  Yes.
6  Q  It's actually William Messuck, but he goes by the
7     nickname Willie?
8  A  Willie.
9  Q  And I forgot his title, but we'll find it later.  It
10    might be the -- I'll find it later.  It's listed on the
11    documents.  How many times did you speak with
12    Willie Messuck?
13  A  Again, it's a pure guess.  I would say two to three
14    times, maybe four.
15  Q  Okay.  Do you remember the gist of any conversations
16    you had with Mr. Messuck?
17  A  He was usually asking me for information I think.  If --
18    and it was about documents, I believe.  I think he's the
19    document man at his end.
20  Q  Okay.  The things that have to be filled out in order
21    to ship the truck-mounted crane from the US to Canada?
22  A  Yes.
23  Q  Okay.  And then you said you spoke with a third person
24    at Runnion.  Who was that?
25  A  Janice I think, is it?

Page 30

1  Q  Oh, yeah.  I think it's Ryce, R-y-c-e.  I believe.
2     Again, it's in the documents somewhere.  She's likely
3     the head of accounting or something?
4  A  Accounting, yes.
5  Q  Okay.  How many times did you speak with Janice Ryce?
6  A  Once or twice.
7  Q  And do you remember what you spoke with Janice about?
8  A  It would have been simply about payment, I'm sure.
9  Q  Okay.  So at the end of the transaction or the almost
10    transaction?
11  A  Yes.
12  Q  Okay.  All right.  Anybody else you remember speaking
13    to from Runnion Equipment Company aside from those
14    three people?
15  A  Seems to me there was one other, but, again, a name
16    doesn't come to mind at this point.
17  Q  Well, if the name doesn't come to mind, how about
18    the -- you know, the topic?  Like you said,
19    Willie Messuck is more involved in preparing the
20    documents for shipping and Janice was accounting.  Do
21    you remember the scope of what you were -- may have
22    been talking to another person about?
23  A  It might have been one of his service people that --
24    checking out the service records and so forth of the
25    truck.

Page 31

1  Q  Okay.  So might have been a technical guy or a crane
2     mechanic telling you what he found in terms of the
3     history on this unit or the inspection on the unit?
4  A  Could have been.
5  Q  All right.  Aside from that --
6  A  It would have been that -- somebody like that, yes.
7  Q  Okay.  So aside from possibly talking to somebody on
8     that topic, anybody else you spoke to at Runnion?
9  A  Nothing comes to mind at this moment.
10  Q  Okay.  Who else was involved from Landale in the
11    efforts to purchase this crane from Runnion?
12  A  I was the only one involved in buying it and so forth.
13    Carol would have organized the money and the broker and
14    so forth and sent the money.  After the fact, our IT guy
15    Neil was involved.
16  Q  Okay.
17  A  But that would probably be -- that was it.
18  Q  But if --
19  A  From our end, from Landale's end.
20  Q  And if I understand correctly then, in terms of the
21    negotiation with Pat Runnion and making the decision as
22    to how the -- you know, how much you're going to pay
23    and "Here's what I want on it," that would all be you?
24  A  That was me.
25  Q  All right.  And then Carol is your wife.  I don't know

Page 32

1     what her title is at work aside from in charge; right?
2  A  Everything.
3  Q  But she -- what is her title at work, or is she -- how
4     was she involved in the Runnion transaction?
5  A  Well, we -- she is the accounting check and balance, if
6     you will.
7  Q  Okay.  Okay.
8  A  I think her title is secretary treasurer, if you want a
9     title, but...
10  Q  Okay.  So she's watching the accounts and the money?
11  A  Yeah.
12  Q  Okay.  And then the other name you mentioned, that's
13    Neil Swindlehurst?
14  A  Swindlehurst, yeah.
15  Q  S-w-i-n-d-l-e-h-u-r-s-t.  If I got it right.
16  A  I believe so.
17  Q  And Neil is N-e-i-l.  Some people change that.  They
18    do.  There's three spellings.  And he's an
19    information technology guy?
20  A  He's our computer guy.
21  Q  Okay.  Now, is he an in-house computer guy?
22  A  No.  He's -- almost like he works for us, but he is an
23    independent outside.
24  Q  So he's a contractor for you, but he works a lot for
25    you?

Page 33

1  A Yes.
2  Q Got it. And how long has Mr. Swindlehurst worked for
3     you as your computer consultant?
4  A 20 plus years.
5  Q Okay. And does he often work at your office?
6  A Well, he has to come to our office to upgrade the
7     computers and install new stuff, whatever computer guys
8     do.
9  Q Yeah, I'm -- I'm at that same level you are in terms of
10    what computer guys do. All right. So he doesn't have
11    a desk or office at your place, but he's often at your
12    place?
13 A Yes.
14 Q And so typically how often does he work at Landale?
15 A I would say he's at our place no less than twice a week.
16    Maybe more. You'd have to ask him exactly, I guess.
17 Q Yeah.
18 A I don't keep track of him.
19 Q That's fine. Just your general recollection's fine.
20    All right. Anyone else at Landale that was involved in
21    the transaction with Runnion that we haven't somehow
22    mentioned?
23 A No.
24 Q Okay.
25    (BRIEF ADJOURNMENT)

Page 34

1  Q MR. POLICK:        We're back on the record after
2     a brief break. Now, aside from the phone conversations
3     with Runnion, the only other -- there were also emails?
4  A Yes.
5  Q Back and forth. Any other forms of communication aside
6     from phone conversations or emails?
7  A No.
8  Q How about -- any hard copies of -- you know, flat mail?
9  A No.
10 Q Any paper mail? Everything was otherwise just scanned
11    and transmitted?
12 A Yes.
13 Q Okay. So those are just the two categories: Telephone
14    conversations or some kind of email or electronic
15    transmission?
16 A Yes. I believe so.
17 MR. HAEBERLE:            Objection. Vague as to -- do
18    you mean fax with "electronic transmission" or --
19 A Oh, I've -- yeah, there's fax in there somewhere.
20 Q MR. POLICK:        Okay. All right, so that --
21 A Wrap them up in the same package, but whatever.
22 Q Yeah, yeah. I think probably electronic too. But that
23    would be it? Phone calls, faxes, email?
24 A Yes.
25 Q Okay. At what point did you realize that some

Page 35

1  unknown -- some criminal had gotten involved and taken
2  the money?
3  A I think we were alerted on a Monday morning. We sent the
4     money Friday. Monday morning. And that was followed up
5     with confirmations and so forth. Monday, Tuesday it was
6     starting to come through the fog. Everybody's looking
7     for the money and so forth. And then it -- you know, a
8     couple days, I would think that would be about a Tuesday,
9     it was like, "Hey, something's wrong here," and that's
10    when we talked to Pat. As a matter of fact, Neil and I
11    talked to Pat at that point. And, you know, what's --
12    this is when he came through with the -- well, he had
13    been through this before, so...
14 Q Okay. So the Monday after the -- and, again, just so
15    the record's clear, your company wire-transferred the
16    purchase price --
17 A Yes.
18 Q -- to some criminal in I think -- I'm going to forget
19    the state, but we'll get to that, but to some other
20    person, and by Monday morning, you started to realize
21    something was wrong. And what was your first notice
22    that something was wrong on Monday morning?
23 A We got a fax from I think -- stand to be corrected here.
24    Without any documents in front of me I can't tell, but I
25    think Willie. We sent an email to him confirming we had

Page 36

1  sent the money, and then he got back to saying they'd
2  received it. And then I think -- I don't know what
3  happened at that point, but somebody's, "Whoa, whoa. You
4  know, we haven't gotten any money." And then the --
5  Q Okay. So somebody from Runnion said, "No, we never
6     received the funds"?
7  A Yes.
8  Q And that was -- that was basically your first notice on
9     the Monday morning after the Friday wire transfer?
10 A I think that was Tuesday.
11 Q Okay.
12 A I don't know for sure. Like, it was --
13 Q Okay.
14 A -- I think we fiddled around Monday trying to sort things
15    out, and then Tuesday would have been -- I believe -- was
16    when we realized there was something amiss.
17 Q Okay. Something seemed a little off on Monday, and
18    then Tuesday, by then you confirmed Runnion said they
19    never got the money?
20 A Yes. I believe that's how it worked.
21 Q All right. And then you said at some point you got on
22    the phone you think with Pat Runnion, and
23    Neil Swindlehurst was in attendance too?
24 A Yes, he was. Neil and I were on a speaker phone to Pat.
25 Q Okay. And so --

Page 37

1   A  I stand to be corrected there too.  I think I spoke to
2       Willie somewhere in there too in that he had said
3       something to me about my address being changed to gmail,
4       and at that point, I said, "It's never been gmail.  It
5       will never be gmail."
6   Q  Right.
7   A  "What are you talking about?"
8   Q  "What are you talking about?"  Okay.  All right.  And
9       so you think that was a phone call with Willie about
10      this -- whether there's a gmail address for you too?
11  A  Well, it wasn't about that.  It was about probably --
12  Q  Where's the money?
13  A  -- where's the money and --
14  Q  Who's got the money?
15  A  -- all this kind of stuff.  And then he was -- you know,
16      everything started to --
17  Q  Come together?
18  A  -- gel.
19  Q  Yeah, all -- from all -- apparently a number of things
20      are all of a sudden being discovered.
21  A  Yeah.
22  Q  All right.
23  A  And then he sent me some emails showing me a gmail
24      address.
25  Q  Gotcha.

Page 38

1   A  Which never showed up on ours, as far as I know.
2   Q  Gotcha.  All right.
3   A  I think he was just proving his point.
4   Q  Yeah.  Back to the -- we were talking about the
5       conversation, and you mentioned that you talked to
6       Pat Runnion.
7   A  Yes, at this --
8   Q  I think it was the Tuesday after the wire transfer.
9   A  I believe it was.
10  Q  And Neil's on the speaker phone at that point.  As best
11      you recall, you know, what was said to you, and what
12      did you say to either of those gentlemen?
13  A  We discussed where is the money, you know, what happened
14      to this.  General conversation about what happened or
15      guessing at what happened, I guess.  What else would be
16      in that conversation?  Oh, at that point, then I think
17      Pat says, "Well, this has happened to me -- this is
18      what's happened to me."  And he started talking about a
19      real estate deal that didn't go through, but he had been
20      alerted by his -- either his lawyer or his real estate
21      agent or somebody that there was something -- again,
22      something wrong with this transaction that was being put
23      together.  And because the guy had talked to Pat
24      directly, the deal never -- like, no money was lost or
25      anything like that, but it was one of those sort of

Page 39

1       things where something --
2                 That's enough for me.  That's
3       enough.
4                 So what else did we discuss?
5       Oh, I think he -- he talked to us about his IT people.  I
6       think he recommended at that point that Neil and his IT
7       person speak.  Whether they did or not, I don't know.
8                 He then, subsequent to that, I
9       think he sent me some information -- I think he gave me
10      his IT person's address and so forth.  And I -- if it was
11      that day or even maybe a day or so later, he sent some
12      information that he said he had about online fraud.  So
13      he emailed this package of stuff.
14                From that, I mean, he didn't
15      know any more than I knew -- did at that point, and I
16      think we kind of backed away and let the IT people have a
17      run at it.  They -- I think they exchanged information --
18      or didn't.  I -- again, that -- you'd have to ask Neil.
19  Q  Okay.  Your last several sentences you mentioned "he
20      said this," "he said that."  You were referring to
21      Pat Runnion?
22  A  Pat Runnion, yes.
23  Q  Okay.  All right.  Did you make any kind of -- strike
24      that.  Let me ask again.
25                So on any of these other phone

Page 40

1       conversations you had with either Pat Runnion,
2       Willie Messuck, or Janice Ryce before you realized
3       there was a -- you know, a fraud, fraudulent guy who
4       intercepted the money, any of those other
5       conversations, was anybody else in attendance by
6       speaker phone?
7   A  Not at my end.
8   Q  Okay.  And that's what I should have, you know, caught
9       on the way in.  So the only time there was a
10      speaker-phone conference was with you and Pat and Neil
11      Tuesday or so after the wire transfer?
12  A  Tuesday after, yes.
13  Q  Gotcha.
14  MR. POLICK:           We can go off the record.
15          (DISCUSSION OFF THE RECORD)
16          Exhibit Number Brown 1:
17          Series of documents, the first page being a
18          cover page with some handwriting saying:
19          "June 28/16.  Dan - this is all that was sent
20          to Chicago"
21  Q  MR. POLICK:           We've marked as Brown Exhibit 1
22      with today's date a series of documents that I believe
23      I received from counsel as part of their initial
24      disclosure.  And just on the cover sheet there, there's
25      a handwriting.  Is that -- it looks like a "DB."  Is

Page 41

1    that your handwriting, Mr. Brown?
2  A  Yes, it is, yeah.
3  Q  Then it's saying (quoted as read):
4        "June 28th of 2016 Dan - this is all that was
5        sent to Chicago."
6    Is that -- did I read it right?
7  A  Yes.
8  Q  Fine.  Can't read my handwriting.  Who is Dan?
9  A  That was a lawyer that my son was working with at the
10    time.
11 Q  I see.
12 A  Dan Morrow (phonetic).
13 Q  Okay.
14 A  I think is his last name.  I don't know what the hell is
15    his last name.
16 Q  All right.  And then the second page of that exhibit,
17    this is "the attachment to the Witness Statement," is
18    what it's entitled.  Then again, it says:  "Dan - copy
19    of police statement."
20 A  Mm-hm.  Yes.
21 Q  So this is basically your recitation of the information
22    you gave to the local police, the Edmonton Police,
23    about this incident?
24 A  Yes.
25 Q  And I should say "the incident" being the theft of

Page 42

1    your -- of the funds.
2  A  Yes.
3  Q  Did you report it to any other agency aside from the
4    Edmonton Police?
5  A  No.
6  Q  On Runnion's end, we reported it immediately to the
7    FBI.  I don't know, what is the equivalent organization
8    in Canada for the FBI?
9  A  RCMP.  I gave it to the Edmonton Police Department.
10    Quite frankly, I had to almost force them to take a
11    statement because they said, "We can't do anything
12    anyway."
13 Q  Yeah.
14 A  And I presume that they would pass it on to the necessary
15    RCMP or whomever.
16 Q  Okay.  Royal Canadian Mounted Police?
17 A  Yes.
18 Q  Okay.  I understand.  Now --
19 A  He was quite disinterested, to be quite honest, quite
20    honestly.
21 Q  "He" being the local --
22 A  The local police guy.
23 Q  -- officer?  All right.  So did the police officer type
24    up this summary?
25 A  I did.

Page 43

1  Q  Okay.  So this is what you've submitted to them and
2    made them take, so to speak?
3  A  Yes.
4  Q  All right.
5  A  They had -- there's a cover sheet that goes with this.
6  Q  Right.  That's one of the materials that was produced
7    earlier.
8  A  Yes.
9  MR. POLICK:                    Oh.
10 MR. HAEBERLE:              Not very exciting.
11 MR. POLICK:                    Yeah.  No, we can try to mark
12    that later if we think it's important enough to include
13    with the transcript.
14 Q  When you typed up this summary yourself, was it off,
15    you know, your own recollection, or were you referring
16    to, you know, written records too?
17 A  My recollection and if there was -- if I needed support
18    for that, it was available.
19 Q  Okay.  So if you had to check a date, was it off the
20    top of your head, or you say, "Wait a second, let me
21    look in my written record"?
22 A  I would say I, for the most part, would have checked it.
23 Q  Okay.  All right.  So this is as accurate a summary as
24    you can make, and it's dated May 19, 2016?
25 A  Yes.

Page 44

1  Q  At the top.  So I assume that was as accurate as you
2    could make it at that time?
3  A  Yes.
4  Q  All right.  Let me just take a quick minute to run
5    through it.  Okay.  So according to the bottom portion
6    of this report to the police, it was on Wednesday,
7    May 18 that you called Willie to ask what the holdup
8    was about shipping the crane.
9  A  Yeah.
10 Q  You see that third paragraph from the bottom?
11 A  Yes.
12 Q  And that's when it started coming to light, where
13    Willie said, "We didn't get the money" or "It hadn't
14    cleared"?
15 A  Yes.
16 Q  And then you spoke to Janice Ryce?
17 A  Yes.
18 Q  All right.  And that's when you got Neil -- last
19    paragraph said then you got Neil Swindlehurst involved
20    to check the routing on the messages.
21 A  Yes.
22 Q  All right.  And you mentioned here that Neil said it
23    appeared Runnion's system had been compromised.
24 A  Yes.
25 Q  Is that what he told you back on -- back in --

LANDALE SIGNS AND NEON vs.
RUNNION EQUIPMENT and JOHN DOE

Case 1:18-cv-06321 Document #: 93-1 Filed: 11/26/18 Page 12 of 159 PageID #:362

Darrell Ross Brown - 1
July 20, 2018

Page 45

1 A Yeah, that was his immediate -- he checked the routing
2 and so forth. And the way our computers are set up, he
3 said it's virtually -- it's, I guess, not impossible, but
4 it's very unlikely our computer was compromised.
5 Q Did he mention any basis as to why he thought Runnion
6 would have -- had to be compromised as opposed to
7 saying "It's not our system"?
8 A He gave me a rundown on what it was, and the technical
9 stuff, I'm sorry, you'll have to ask Neil that. I --
10 Q I wouldn't understand it either. But what's your
11 understanding of what he told you?
12 A As I understand it, our computer system is direct, and
13 that goes to -- when I send a message or any information,
14 it goes directly to a router, if you -- I don't know if
15 that's the right term.
16 Q I think it is. Are you -- a router, yeah.
17 A We have no means to change anything. It's -- when it's
18 sent, it's sent. No time delays, no nothing like that.
19 And then it's -- from there, it's sent on to the
20 receiver, I guess. With that in mind, I guess, we can't
21 interfere with it in any way, and nobody can interfere
22 with us, as I understand it.
23 Q Okay.
24 A Coming back -- well, of course we don't understand what
25 their computer system is either. I don't, at least.

Page 46

1 Maybe Neil has a better understanding of it. Because the
2 information that was coming to us -- I guess at this
3 point we knew that an address has been changed from --
4 Q You mean an email address?
5 A Yes. And there was time delays, which was just brought
6 to our attention at that time when -- with this Willie
7 conversation. So we didn't know anything about that, but
8 they did. So he says it must -- you know, in Neil's
9 understanding, he felt very strongly that it was their
10 computer system that had been compromised, and he will
11 give you a better description of what that means. I have
12 no real idea what all that's about.
13 Q Yeah, well, no, you've summed up your understanding of
14 it, which is all I was looking for.
15 What is -- what's the issue as
16 to a delay on an email?
17 A I --
18 Q Do you have any idea why that might affect things or
19 not?
20 A Well, only that if -- we have -- we never experienced
21 that kind of thing going out, I guess -- or at least we
22 didn't. I've never experienced that. I never even look
23 at those to be quite honest: When it comes, when it
24 goes, whatever. Time delay didn't mean much to me. I --
25 Neil pointed out that that's an issue once we started

Page 47

1 discovering what it was and so forth. But to me, it
2 didn't mean a hell of a lot.
3 Q Okay.
4 MR. POLICK: Ms. Reporter, would you mark
5 this as Exhibit 2 before I forget.
6 Exhibit Number Brown 2:
7 Document entitled "Landale's Responses to
8 Runnion's First Set of Interrogatories"
9 (DISCUSSION OFF THE RECORD)
10 Q MR. POLICK: Just briefly before I forget,
11 we marked as Exhibit 2 for identification -- or
12 Brown 2. It's entitled "Landale's Responses to
13 Runnion's First Set of Interrogatories." Do you have
14 that in front of you there?
15 A Yes, I do.
16 Q Okay. And "interrogatories" is just a clumsy word for
17 written questions, you know, under oath. I don't know
18 who started that, but it is what it is.
19 If you look at just the first
20 page or two, basically in terms of identifying the
21 person who answered these interrogatories, for example,
22 Question 1, you know, person with the most knowledge,
23 those kinds of things, it's all Darrell Brown,
24 president. You see that there?
25 A Oh, yes, I'm sorry.

Page 48

1 Q Yes. No, that's okay. It was just a quick observation
2 on that. So you eventually reviewed these answers to
3 these written questions?
4 A Yes.
5 Q And I think at the very last page you -- there's a
6 verification. Do you see that?
7 A Yes.
8 Q And is that your signature?
9 A Yes, it is.
10 Q Okay. It's not dated, but the preceding page is dated
11 October 12, 2017. You see that --
12 A Yes.
13 Q -- where it's signed off on by one of your attorneys?
14 So I assume it would have been on or about that same
15 day?
16 A Yes. I presume.
17 Q All right. And when you did that, you confirmed that
18 the answers to these questions were true and correct?
19 A Yes.
20 Q Okay.
21 MR. POLICK: Let's just take...
22 (DISCUSSION OFF THE RECORD)
23 Exhibit Number Brown 3:
24 Copy of the Third Amended Complaint filed by
25 Landale against Runnion Equipment Company

1 Q MR. POLICK:        We marked as Exhibit 3 for
2    identification a copy of the Third Amended Complaint
3    filed by Landale against Runnion Equipment Company.
4 A Yes.
5 Q Have you -- you've seen that before, I take it?
6 A Yes.
7 Q Now I want to shift and go back to Exhibit 1. Sorry to
8    move around, but I... I don't know.
9           All right. In this -- right,
10    you're turning to some of the title documents and
11    stuff. We're back in Exhibit 1. We went through the
12    summary to me. And then there's a page that's
13    marked 3 "A." Yeah, that's entitled the "Sales Order -
14    Signature Page"?
15 A Yes.
16 Q And does your signature appear on that document?
17 A Yes, it does.
18 Q All right. So it then looks like Pat Runnion signed it
19    on April 11 and you signed it on April 12 of 2016.
20 A Yes.
21 Q Okay. And then the next page -- I think it's actually
22    the first page or the front of the document we just
23    looked at. It's entitled the "Sales Order"?
24 A Yes.
25 Q And this again just lists -- and for the record, it's

1    marked "A" 4. But this lists the capacity of the
2    truck-mounted crane as well as the truck.
3 A Yes.
4 Q And that continues on, I guess, to page 5, where
5    there's the negotiated purchase price.
6 A Yes.
7 Q Which at that point was $88,000?
8 A Yes.
9 Q And that's marked as "A" 5 if I didn't say so. The
10    following page is "B," and that's a photograph of the
11    unit in question.
12 A Yes.
13 Q And then there is a couple of title certificates, I
14    guess, initially on the truck itself coming out of
15    Wisconsin. And then there's documents, I guess,
16    generated by Livingston. And what was Livingston's
17    involvement in this attempted purchase with Runnion?
18 A They're a customs broker, so they would have handled the
19    transaction at the border.
20 Q Okay.
21 A For us.
22 Q So generally speaking, Runnion gets it to the border,
23    and then from the border, you -- and it gets to you,
24    but you use Livingston to facilitate the transfer?
25 A Yes.

1 Q The physical transfer of the unit?
2 A The documentation, yes.
3 Q Right. Got to gather the paperwork. Okay. How long
4    have you used Livingston?
5 A For quite a few years.
6 Q So what, more than ten, or the entire time you've been
7    in business?
8 A I would say more than ten.
9 Q Do you have a principal person you work with over at
10    Livingston?
11 A No.
12 Q My understanding is you recommended that Livingston be
13    utilized for the transaction with Runnion too; is that
14    correct?
15 A That's right.
16 Q So if we run through the -- some more of these
17    documents, in Exhibit 1 -- and it's numbered "B" 5,
18    "B" 6. These are the kinds of things that -- "B" 7.
19    These are the things that are generated by Livingston?
20 A Yes.
21 Q Okay. Now, who is the -- and I thought I just asked,
22    but I wasn't sure. Who is the principal contact you
23    worked with at Livingston?
24 A I believe the guy I was talking with through this was Ken
25    something.

1 Q Yeah, I saw a couple names. Actually, they'll come --
2    they'll come back to --
3 A I worked with several people at Livingston because they
4    couldn't give me definitive answers. Because it was an
5    international transaction, it took some people in the
6    States and here to work together. I believe that's how
7    it worked.
8 Q Yeah, I saw a couple of those names. A
9    Michael Maciolek, M-a-c-i-o-l-e-k. Is that one of the
10    Livingston people?
11 A Could be.
12 Q And the Ken is a Ken Ginther, G-i-n-t-h-e-r?
13 A Yeah, that was the guy I talked to most.
14 Q Okay.
15 A And I believe he's here in Edmonton.
16 Q Okay. Do we know where Mike Maciolek is or no?
17 A No, I don't.
18 Q Okay. Now, after we get by those Livingston documents
19    in Brown Exhibit 1, we come to an email. You're a few
20    pages ahead of me. You're working ahead.
21 MR. HAEBERLE:        There? Yeah.
22 MR. POLICK:        Is that the one?
23 MR. HAEBERLE:        Yeah, it's "C."
24 MR. POLICK:        It's marked 1 "C" in handwriting
25    in the lower right side.

Page 53

1    Q   We on the same document? I believe --
2    A   Yes.
3    Q   -- so.
4    A   Yes, we are.
5    Q   Okay. Now this is apparently an email you received
6     from a Jennifer Molina. Had you ever dealt with her
7     before this email, to your knowledge?
8    A   There was two ladies from Living --
9    Q   Runnion?
10   A   Runnion. Jennifer, and what was the other one, Janice?
11   Q   Janice.
12   A   I don't believe so, that I -- this is probably my first
13     contact with Jennifer, but I don't -- again, I can't
14     remember exactly.
15   Q   Okay. And this email is dated April 18, 2016, at
16     1:02 p.m. to you. It says "darrell@landalesigns.com."
17   A   Yes.
18   Q   That's your email address?
19   A   Yes.
20   Q   And basically it's an "enclosed, please find." It says
21     (quoted as read):
22        "See the attached wire instructions.
23         Sincerely, Jennifer Molina."
24   A   Yes.
25   Q   And of course there's some handwriting on here too that

Page 54

1     says: "1st instructions with routing."
2     You see that --
3    A   Yes.
4    Q   -- at the top?
5    A   Yes, I do.
6    Q   Do you know whose handwriting that is?
7    A   I believe that's Neil.
8    Q   Okay. Because then there's handwriting with an arrow
9     pointed towards that that says: "Landale notes.
10     May 18/16."
11   A   Yes. I -- that's my writing, and I didn't want to mix up
12     where information was going or coming to or whatever.
13   Q   Okay.
14   A   Just to clarify it.
15   Q   All right. So you think Neil wrote the stuff above the
16     line, and you wrote the line with the arrow?
17   A   Yes.
18   Q   Got it. And how about the rest of this handwriting:
19     "'C' 6 pages"? And this is page 1 of "C."
20   A   That looks like my writing. I don't know what "C" means
21     at this point, I'm sorry.
22   Q   Okay. All righty. If we stay on this page for a
23     minute then, again, you got -- obviously you look at
24     the first line with Jennifer Molina's address. And it
25     says "jmolina@runnionequipment" company?

Page 55

1    A   Ah, yes.
2    Q   Where they spell it e-q-u-p-m-e-n-t --
3    A   Yes.
4    Q   -- dot com.
5    A   Yes. Oh, yeah.
6    Q   It's obviously something, if you're reading
7     quickly, you might not notice, but --
8    A   I never read those, unfortunately, I guess.
9    Q   Yes, but the --
10   A   And I don't think I would have caught that anyway. I
11     don't know.
12   Q   Yeah, no, I understand. No, I'm just -- I understand.
13        All right. But the attachment,
14     then, to this email is the next -- no, it's not the
15     next page. That's the -- the next page is actually
16     again the description of the unit, the invoice.
17   A   Yes.
18   Q   For 88,125. Now, I thought at some point the price was
19     revised because you had a NAFTA charge?
20   A   No, it was -- the price was changed because I was -- I
21     think back here it's written right on there, isn't it?
22     On the --
23   Q   One of the preceding pages? Maybe that's what I'm
24     thinking of.
25   A   Where is that invoice, that first --

Page 56

1    Q   It's "A" 5. You mean the sales order with the price on
2     it?
3    A   Yeah. "A" 5 you say?
4    MR. HAEBERLE:        "A" 5. Here, I'll --
5    THE WITNESS:        Oh, whoops.
6    MR. HAEBERLE:        Right here.
7    A   Yes. That's where it's revised $88,000. And I put in
8     two -- he said -- they agreed that the freight to
9     North Portal not to exceed $2,000, so I put that "2,000"
10     in.
11   Q   MR. POLICK:        Okay.
12   A   Amount's $88,000 and F.O.B - Portal North Dakota.
13   Q   Okay. And then back on to "2" C, there actually is
14     listed $88,125 for apparently a document fee that is
15     listed in the --
16   A   Oh, yeah.
17   Q   -- the invoice?
18   A   Yeah.
19   Q   Okay.
20   A   Added some little tick.
21   Q   I think there's a later document where Pat actually
22     took 500 off because of some NAFTA charge, but we'll
23     come to that. That's what I was --
24   A   They couldn't -- if my memory serves me correctly, they
25     couldn't produce the NAFTA document that we required to

Page 57

1   get it across the border without paying duty.
2   Q   Okay.
3   A   And I think that was going to cost me a bunch of money.
4   Q   Okay.
5   A   And he offered $500 -- I think it was -- I think our cost
6       was going to be 7,000, and he offered 500.
7   Q   $500 credit?  Okay.
8   A   Something.
9   Q   I know I saw it somewhere there.  Okay.  And NAFTA is
10      the North American Free Trade Agreement just --
11  A   Yeah.
12  MR. POLICK:          Off the record.
13          (DISCUSSION OFF THE RECORD)
14  Q   MR. POLICK:       Remaining in the "C" category,
15      we get to "C" 3.  And this is where it comes down to
16      this -- this is the first set of wiring instructions
17      you received.
18  A   Yes.
19  Q   And this says -- in the upper left hand there,
20      somebody -- they have the logo that says "Runnion,"
21      R-u-n-n-i-o-n, "Equipment Company."  And it's kind of
22      close to it, not centred, but it's got their street
23      address in Lyons, Illinois, which is a suburb of
24      Chicago.  And on the website there, it says
25      "www.runnionequipment.com."  Then when you get down to

Page 58

1   the wire-transfer information, the account name says
2   "Michael Mitch LLC."  I mean, I assume you don't know a
3   Michael Mitch LLC or --
4   A   No idea.
5   Q   -- anybody with that name being involved in this
6       transaction?
7   A   No, I do not.
8   Q   But this is the first set of wiring instructions that
9       you received from someone saying they were
10      Jennifer Molina?
11  A   Yes.
12  Q   Okay.  And then if we continue on with these wiring
13      instructions, it directs the routing of the wire or the
14      funds to a bank in Cary, North Carolina, for the
15      beneficiary, being Michael Mitch LLC.  And after that,
16      they change the address or they list the address of
17      Runnion in suburban Chicago, 7950 West 47th Street.
18              Have I -- I've summarized it
19      correctly?
20  A   Yes, that's what it reads.
21  Q   Okay.  And then the last line there says asterisk --
22      although, which usually -- it's kind of funny.  I don't
23      know where the -- you know, the asterisk says look
24      above from where it comes.  But there's an asterisk
25      that says:  "Please note there are wire fees apply-"

Page 59

1   A   Mm-hm.
2   Q   They're missing a word there.  I would assume they
3       meant wire fees that apply.  But, again, the --
4   A   Or applicable or...
5   Q   But the language is --
6   A   Yes.
7   Q   -- not accurate, and the punctuation's even worse.  But
8       then you get to the next few pages after that, and this
9       may have been what you're saying we need to ask Neil
10      about.
11  A   Yes.
12  Q   This looks like a routing saying where this -- follow
13      this email, where'd it come from, or where'd it go,
14      and --
15  A   I believe that's what Neil pulled up.  This is at a later
16      date, of course.
17  Q   Okay.  But, yeah, just so -- we understand each other,
18      but so the record's clear, this again would relate to
19      this first set of routing and wiring instructions?
20  A   Yes.
21  Q   So then we finally get to "D," "D" 1?
22  A   1 "D," yes.
23  Q   Yeah.  Well, they -- and then they change it back the
24      next page to 2 "D."  They're just trying to keep us on
25      our toes.  And this again is an email that has been

Page 60

1   directed to you, and this -- apparently coming from
2   Willie Messuck but, again, Willie Messuck's address is
3   runnionequipment.com.
4   A   Yeah.
5   Q   Yeah, do you see that --
6   A   Yes.
7   Q   -- on the first line?  And this is dated May 12, 2016,
8       at 2 o'clock p.m.  So evidently the thief sleeps in,
9       because everything he sends you is in the afternoon.
10  A   Mm-hm.
11  Q   To Darrell Brown about a final revised invoice and
12      updated wire.  And now at the top of this, the
13      handwritten -- the handwriting at the top of 1 "D":
14      "Changed bank info.  2nd instructions.  See routing."
15      And then an arrow says "Landale notes."
16  A   Yes.
17  Q   Who's -- what part's your writing?
18  A   "Landale notes of May 18/16" is my handwriting.  And in
19      the bottom right-hand, it says:  "DB copied May 18th from
20      email file," whatever that means.  I presume we took it
21      off.
22  Q   I gotcha.  And then -- but who wrote the "Changed bank
23      info.  2nd instructions"?
24  A   That's Neil's.  I believe that's Neil's.  You'd have to
25      ask him.  I think that is.

Page 61

1  Q  Okay.
2  A  Pretty sure that's his.
3  Q  And, again, the substance of this email basically says
4     see the attached invoice and updating wire
5     instructions.  And so then we go to 2 "D."  And now --
6     yeah, here's where the $500 credit came in --
7  A  Oh, yes.
8  Q  -- that I was thinking before.  So now the price is
9     $87,625.
10 A  Yes.
11 Q  And then we go to "D" 3, as they switch the order
12    again.  This is another wire transfer.  It says:  "Wire
13    Transfer Information?"
14 A  Yes.
15 Q  And I don't know why it came out sideways, but, again,
16    in the upper -- or the left-hand side, it's got the
17    Runnion logo or -- and their street address.
18 A  Yes.
19 Q  And then underneath "Runnion Equipment Company,"
20    somebody typed in or it's printed underneath it
21    "Prime C. Contractors."  You see that in there?
22 A  Oh, yes.
23 Q  And then underneath that, it again has the address for
24    Runnion's website?
25 A  Yes.

Page 62

1  Q  All right.  Did you ever know anything about an outfit
2     called "Prime C. Contractors" being involved at all in
3     this kind of -- in this transaction?
4  A  Throughout the negotiations with Pat, he had indicated
5     that he owned this piece of equipment with a partner,
6     whatever that meant.  Somebody else was involved in it
7     besides him.  And at one point he -- when I was trying to
8     get a better price, he says, "I'll have to run that by my
9     partner," sort of thing like that.
10          So was there somebody else
11    involved?  I -- if this wouldn't have -- wouldn't have --
12    if I had have noticed it -- I never noticed it.  It's the
13    first time I've even noticed that, but...  Because there
14    was -- he indicated somebody else was involved with the
15    ownership of the truck, I -- "Okay."  That's why the --
16    getting instructions that were different never twigged
17    for me either because it -- okay, maybe he's sending the
18    money to his partner.
19 Q  Okay.  Well, and in terms of the ownership of the
20    truck, frankly, the title documents that we just kind
21    of passed over quickly show the truck itself came out
22    of a Wisconsin title.
23 A  Yeah.
24 Q  As you recall.  And, actually, the back of the title
25    shows -- and I've forgot the name of the outfit, but

Page 63

1     it's not -- it's not Prime C. Contractors.  It's some
2     other outfit that owned the truck and conveyed it to
3     Runnion, and then Runnion conveyed the truck title to
4     you.
5  A  I never looked at it that close, but I guess.
6  Q  But how --
7  A  You say so, yeah.
8  Q  Actually, we ran over it here a little quick.  Let's go
9     back and find it.
10 A  He told me that the truck had been previously used by one
11    of the states.  It was a state-owned vehicle, so...
12 Q  So a tollway authority or something.  Yeah.  Yeah,
13    it's -- actually, it's "B" 3, I think.
14 A  PME Equipment, okay.
15 Q  Yeah, out of Appleton, Wisconsin, to Runnion, and then
16    from Runnion to Landale Signs And Neon Limited.
17 A  Gotcha, yes.
18 Q  So, again, do you know if this was -- so the title --
19    and this is all -- they're all dated the same day at or
20    about, right, all April 11, about the date of your
21    contract?
22 A  Yes.
23 Q  So at that point, Runnion's receiving the title.  I
24    don't know if they had it on consignment or how they're
25    purchasing this vehicle in order to place a crane on

Page 64

1     it.
2  A  No, no, the crane was already on it.  It came from the
3     factory with a crane on it.
4  Q  Well, I mean in terms of -- well, yeah, let me just
5     stick with the car title for a minute.  The point is
6     the car title came out of Wisconsin on April 11 to
7     Runnion on April 11, and then it was being transferred
8     over to you soon after, even though it's not dated
9     there at the very bottom.  See there's no dates on the
10    bottom part of "B" 3?
11 MR. HAEBERLE:              Objection.  Compound.
12 THE WITNESS:              I'm sorry, what?
13 MR. HAEBERLE:              Objection.  Compound.  Two
14    questions both asking if that's what it describes and if
15    there's no date on it.
16 Q  MR. POLICK:          Do you understand what I asked,
17    or you want me --
18 A  Sorry, I guess I -- got me confused now.
19 Q  That's okay.  This is -- we're looking at "B" 3.  It's
20    the back of a title --
21 A  Yes.
22 Q  -- of the vehicle.  And that's where it says it's
23    coming out of Appleton, Wisconsin, dated April 11, '16.
24 A  Okay.  Yes.
25 Q  Purchaser is identified as "Runnion Equipment Company,"

Page 65

1    April 11, '16.
2  A  Yes.
3  Q  And then underneath that --
4  A  Yes.
5  Q  -- it also lists Runnion Equipment Company, signature
6     of it looks like Willie Messuck?
7  A  Yes.
8  Q  And it's going to be -- and then Landale Signs And Neon
9     Limited is listed to the immediate left?
10 A  Yes.
11 Q  Okay.  That's all I was asking.  And then at some point
12    we're going to go back to that second set of wiring
13    instructions.  And we left off in the upper left-hand
14    corner where you said you never noticed this Prime C.
15    Contractors listing up there before I brought it to
16    your attention.
17 A  Yes.
18 Q  But then you said, "Well, I don't know if it would have
19    made a difference because I know Pat mentioned he had
20    some kind of -- somebody he had to check with."
21 A  Yes.
22 Q  And a check about the price?  Was that the issue?
23 A  Well, whether they'd accept less money or not.
24 Q  Yeah, right, something to do with price?
25 A  Something to do with negotiating the final numbers.

Page 66

1  Q  Okay.  But Pat never mentioned who he had to ask about
2     the --
3  A  No.
4  Q  -- money?
5  A  He didn't give me a name.
6  Q  So you don't know if it was somebody in-house, his
7     money man, or --
8  A  Quite frankly, it didn't -- none of my business.  I don't
9     care.
10 Q  Right.  No, I just want to make it clear for the
11    record.  But at no point did Pat ever reference
12    Prime C. Contractors?
13 A  No, just that it was somebody else.
14 Q  Then we get down to the meat of the wire-transfer
15    information.  Now, this has an account name.  We left
16    off with Michael Mitch.  Now we've got Prime C.
17    Contractors.  And the bank is Sun Trust Bank down in
18    Alexandria, Virginia.  Beneficiary is Prime C.
19    Contractors.
20 A  Yes.
21 Q  And then again they pirated Runnion's office or yard,
22    business address.  And then at the very bottom again,
23    even though it's a different bank and different
24    wire instructions, it says again:  "*Please note there
25    are Wire Fees apply-"

Page 67

1  A  Mm-hm.
2  Q  So the same poor punctuation, asterisk, and language as
3     the first wiring instructions?
4  A  Yes.
5  Q  So similar but obviously different, different
6     beneficiaries, different banks, different states:
7     North Carolina; now we're in Virginia.  And then after
8     the second set of instructions, I guess at "D" 4,
9     "D" 5, "D" 6, these again are the -- this is the
10    routing on this second set of instructions that I
11    understand Neil came up with.
12 A  Yes.
13 Q  Or found or tracked, whatever the term is.  I'll ask
14    Neil about that later.
15          All right.  Then there's some
16    emails that start right after that.  Again, from
17    Willie Messuck.  And this one again says
18    "runnionequpment" company, where they drop the "i," dot
19    com.  This is May 12, 2016, at 3:16 p.m. directed to
20    Darrell Brown.  And then a -- this thread of the email
21    talks about a note from you.  Just take a second to
22    read that and confirm if that was sent by you to
23    Willie Messuck on May 13.  Or is that dated?
24 A  I'm sorry, I'm not with you.
25 MR. HAEBERLE:          So do you mean the second chain

Page 68

1     that --
2  MR. POLICK:            The thread, yes, where it starts
3     with --
4  MR. HAEBERLE:           At 2:39 --
5  MR. POLICK:            -- Willie.
6  MR. HAEBERLE:          Yeah.
7  Q  MR. POLICK:          And just take a moment to
8     review that.
9  A  Okay.  What is it?
10 Q  I just want to know if you've sent this, if this is
11    your narrative to Willie.  It starts on Willie, and
12    then the last line finishes off saying (quoted):
13          "Sounds easy, what are the odds of this
14          coming off just like that?"
15    Is that something you sent to Willie?
16 A  I believe that was -- I could have sent that.  Probably
17    did, yeah.
18 Q  Okay.  Well, I'm just trying to be clear.
19 A  I think what I was trying to do was organize it so that
20    they would have the clearance 72 hours ahead of the truck
21    arriving at the border.
22 Q  I understand.  All right.  And then the response --
23    well, and, again, this would have been typed by you as
24    a reply to Willie's note of May 12, if I -- am I
25    understanding correctly?

LANDALE SIGNS AND NEONS vs.
RUNNION EQUIPMENT and JOHN DOE

Case 1:18-cv-00612 Document #: 93-1 Filed: 11/26/18 Page 18 of 159 PageID #:868

Darrell Ross Brown - 1
July 20, 2018

Page 69

1  A  I guess so, yes.
2  Q  Okay.  Let's go on to the next page then, which is
3     marked as "E" 1.
4  A  Yes.
5  Q  And this again is -- this is May 16.  And before we get
6     to even the body of that, so I understand the timeline,
7     if May 13 was a Friday, that's when you -- you wired
8     the money you think?
9  A  If that's -- we wired on a Friday, yes.  Friday the 13th.
10 Q  There you go.  Because then it's the next Wednesday, on
11    May 18, where there's conversations back and forth and
12    communications back and forth with Willie and with
13    Pat Runnion and your company --
14 A  Yes.
15 Q  -- and Neil; everybody's involved at that point.  Okay.
16    Just for the timeline, so...
17              This note that's -- this email
18    of "E" -- designated as "E" 1 is apparently from
19    Willie Messuck but, again, it doesn't say
20    Runnion Equipment, it says "runnionequpment.com."
21 A  Yeah.
22 Q  So this is May 16, so that would be Monday at
23    12:03 p.m.  Again, the thief sleeps in.
24 A  Mm-hm.
25 Q  Saying:  "Darrell, we received your wire."  Which I

Page 70

1     assume means the funds?
2  A  Yeah.  I guess.
3  Q  Saying there was a (quoted):
4              "...mix up from our accounting.  I will let
5              you know when i hear from Mike."
6     Do you know who Mike is?
7  A  Mike was one of these people from Livingston, I think.
8  Q  Okay.
9  A  I think.
10 Q  I'm sorry.  Perhaps -- okay.  And that's sent from --
11    sent from -- all right.  This is "Sent from my iPhone."
12    So you wrote this note to Willie (quoted):
13              "Attached is our money brokers document that
14              track the entire transaction."
15 A  Well, "Sent from my iPhone" isn't part of that, is it?
16    Because I can't send anything from my iPhone.  I --
17 Q  Yeah, well, that's --
18 A  -- never have.  I don't know.
19 Q  Well, this transaction -- that's why I'm checking.  But
20    anyway --
21    MR. HAEBERLE:          You're talking about the top or
22    the bottom part of the email?
23    MR. POLICK:          Well, right now we're in the
24    middle of the page where it starts on May 16.
25    MR. HAEBERLE:          Okay, so below sent on my

Page 71

1     iPhone.
2  A  Okay.  I don't know what that "Sent from my iPhone" is,
3     because I -- I can't.  I presume I -- if I would have
4     seen this, Willie would have sent it from his iPhone.
5  Q  MR. POLICK:          Okay.
6  A  Okay?  Now, the next one, May 16 --
7  Q  Right.  That little paragraph there -- four lines?
8  A  Yeah.  And this is when I'm telling him -- 16th, that
9     would have been -- is that Monday?
10 Q  Yeah.
11 A  Yeah.
12 Q  Right.
13 A  (Quoted as read):
14              "Attached is our money brokers document to
15              track the entire transaction.  Your bank had
16              the money since Friday.  Call if you don't
17              have clearance, this should be handled the
18              same day, no delay."
19    That was from me, yes.
20 Q  Yes, this is where you somehow alluded that there's a
21    problem, where Runnion says, "We don't have the money,"
22    and then you go and double-check and say, "Look, my
23    bank sent it, and it was received by" --
24 A  Yeah.  I --
25 Q  -- "I think your bank, but -- and here's the routing

Page 72

1     from my bank."
2              All right.  And then you get
3     this note back from the -- the fraudulent Willie
4     saying:  "We received your wire."  We received your
5     funds.  So, again, this is the crook --
6  A  Yes.
7  Q  -- buying time?
8  A  Yes, I presume.
9  Q  Okay.
10 A  And now we can figure out after, but...
11 Q  All right.  Now, that's what we -- by the end -- and
12    that's why I ask on some of these if you sent it or --
13    you know, because I don't know if the crook's sending
14    some of this stuff.  But the handwriting note on top of
15    "E" 1 says:  "Probably not from Runnion."
16 A  "Email" --
17 Q  "Email header attached?"  Whose writing is that?
18 A  That's Neil's.  The question mark is mine, I believe.
19 Q  Okay.  All right.
20 A  "See routing attached" is mine.  "Landale notes
21    May 18th," that's mine.
22 Q  Okay.
23 A  I don't know what the question mark is about.
24 Q  That's fine.  The next page or two again goes to some
25    of these tracking of emails, I guess, that we'll ask

Page 73

1    Neil about later.  And then we're down to 1 "F," which
2    is -- this is again directed to Darrell Brown from
3    Willie Messuck at runnionequpment.com.  It's an email
4    dated May 16, 2016, at 8:26 a.m.  So this is early in
5    the morning on Monday.
6  A  Yeah.
7  Q  Okay.  Now, this is somebody saying (quoted):
8            "Mike, any update on the export paperwork,
9            Thanks."
10      So we assume that's Mike at Livingston, you think?
11 A  Well, it says -- looking at this, it says Darrell -- to
12    Darrell Brown and M. --
13 Q  Oh, yeah.
14 A  -- Maciolek, or whatever.
15 Q  Yeah.
16 A  Livingston@yahoo --
17 Q  Yahoo.com.  I gotcha.  All right.  So this note was
18    sent from the false Willie Messuck to Darrell Brown and
19    to Mike Maciolek, M-a-c-i-o-l-e-k, is how I'm
20    pronouncing it, at Livingston.  And it looks like
21    supposed to be international, i-n-t-l, at yahoo.com.
22    And the subject is a "Price Correction."
23              Anyways, so this is early
24    Monday morning.  Handwriting on the top:  Refer to
25    Mike -- "Ref to Mike."  Whose handwriting is --

Page 74

1  A  That's Neil's handwriting.
2  Q  Okay.  And what part is your handwriting?
3  A  "Landale notes May 18th."
4  Q  Do you have any other handwriting --
5  A  Yeah, May -- below it says (quoted as read):
6            "May 18/16.  D. Brown received email from
7            Willie of Runnion.  C.C. Livingston
8            - Note:  Yahoo address (probably hacked)."
9      And that's, again, my writing, and it's after the fact.
10 Q  Okay.  And at the very top here it also says:
11    "Livingstonintl" not a yahoo.com or "not @yahoo.com.
12    See routing."  And is that Neil's handwriting?
13 A  Well, yeah, and I don't know what that means.  I'm
14    assuming that he says the yahoo is not a Livingston
15    address.  I'm assuming that's what he is meaning there.
16 Q  Yeah, no, that's how I would read it too.  And that's
17    why you probably wrote -- you wrote at the bottom here:
18    "Note:  Yahoo address," or yay-hoo (phonetic) address,
19    "(probably hacked)"?
20 A  Yeah.  That's mine.
21 Q  Okay.  So that's Monday morning.  And after that page,
22    we again have this routing -- three-page routing of the
23    emails.  That was what Neil did.  And, again, we'll
24    have him interpret that, but presumably says that
25    Livingston doesn't have a yahoo address.  And now we're

Page 75

1    down to 1 "G."
2              And we'll take a break when
3    we're done with this exhibit.  We're not far off.
4              This is directed to you from
5    Janice Ryce, R-y-c-e.  And her email address is
6    jaryce@runnionequipment.com.  All right.  Spelled
7    correctly.  This is May 18.  So this is Wednesday at 10
8    in the morning.
9  A  Yeah.
10 Q  About wire instructions.  And the handwriting at the
11    top here says:  "3rd instructions - See Routing."  Is
12    that Neil's writing again?
13 A  That's Neil's, I believe.
14 Q  Okay.  And then "Landale notes of May 18/16" --
15 A  That's mine.
16 Q  Okay.  And "3rd Banking info - different from first 2"?
17 A  That's mine.
18 Q  And your initials, "DB."
19 A  Okay.
20 Q  All right.  And then after that, are they -- the
21    Runnion wire instructions, which are certainly more
22    detailed than the two prior wiring instructions you
23    received previously?
24 A  Yes, they are.
25 Q  And certainly appear to be more professionally done?

Page 76

1  A  Yes.
2  Q  In terms of language, punctuation, format?
3  A  Yes.
4  Q  And so this list, Runnion's wire-transfer instructions,
5    whether domestic or international, banks in question,
6    things of that nature, and then also at the bottom says
7    direct inquiries to their principal bank.  They name a
8    person there, Sue Doering --
9  A  Yes.
10 Q  -- D-o-e-r-i-n-g, phone number, and her email address.
11    And the other one says direct inquiries to Runnion?
12 A  Yes.
13 Q  Janice Ryce; her contact information too.
14              And this is the third set of
15    wiring instructions you received with reference to this
16    transaction?
17 A  I believe this was after the fact again because of what
18    had transpired.  She now is going to send the proper
19    information.
20 Q  Right, the accurate ones.  And this one they even note
21    their addition of their wiring instructions at the very
22    top, that it was updated December 19, 2014.
23 A  Yes.
24 Q  Okay.  Yeah, but I agree, you're -- it's a good point.
25    You're saying this is after the fraud was committed.

Page 77

1   It's May 18.  This is the Wednesday after when we all
2     know the money was taken last Friday?
3   A  Yes.
4   Q  And now we've got I think another two and a half or
5     three pages of tracking, and then we come to what's
6     marked "H."  And this is where we start seeing this
7     gmail thing you mentioned before.  It's circled in the
8     lower left-hand quadrant there.  "Darrell," almost
9     looks like a dot, "landalesigns@gmail.com."  You see
10    the circled part there?  Lower, yeah, left-hand
11    quadrant.
12  A  Yes, yes, yes.
13  Q  Yeah, and that's where you took issue, said, "Geez, I
14    don't have a gmail address"?
15  A  Well, this was after my conversation with Willie.
16  Q  Okay.
17  A  And I said -- he said, "Well, you've -- we've been
18    sending stuff to gmail for some time.  When did your --
19    you know, your address change?"  I said, "Like hell it
20    has."
21  Q  Yeah.
22  A  "It's never been changed.  My address has been the same
23    forever."  And that's when he sent this to prove to me
24    that I was wrong, I guess.  And we had never changed to
25    gmail.

Page 78

1   Q  I understand that.
2   A  He was just proving his point.
3   Q  He said, "Yeah, I thought -- you know, I thought it was
4     you."  The handwriting on top of this -- well, first
5     it's got a -- it shows it was sent over by fax --
6   A  Yeah.
7   Q  -- from Runnion.
8   A  I think at this point, this is when we faxed a bit,
9     because I believe at this point we realized that there
10    was a problem, and the only secure way to send it would
11    be through fax.
12  Q  Right.  More -- yeah, more secure than emails.
13  A  Yeah.
14  Q  All right.  Says:  "May 18 by fax."  Well, whose
15    handwriting is whose on this sheet?
16  A  (Quoted):
17        "May 18 by fax.  Other email with spoofed
18        address.  Faxed direct from Runnion."
19    That's Neil.  "Landale notes from May 18," that's mine.
20    The rest of that (quoted):
21        "This was sent by fax from Runnion - Willie
22        kept insisting my email" --
23  Q  Included?
24  A  (Quoted):
25        -- "included a gmail address."

Page 79

1   Q  A gmail address?
2   A  Yes.
3   Q  And then your signature is D --
4   A  "He then sent, faxed to show me this..."
5   Q  Yeah.  "...as my copies do not have the gmail," and a
6     "D" for --
7   A  That's just my --
8   Q  Yeah, quick signature.
9              Okay.  So the rest of
10    Exhibit "H" is again some examples of emails that were
11    sent to Willie Messuck from Darrell Brown gmail.
12  A  Yes.
13  Q  And that's why it's circled on pages "H" 2 and "H" 3?
14  A  Yes.
15  Q  And, actually, now we get to, I guess, Exhibit "I," six
16    pages.  And this is an email from Pat talking about
17    he's sending back the signed order from a gmail
18    account.
19              So this goes right -- I mean,
20    you signed -- the contract was originally signed by
21    Runnion on April 11, and you signed it by April 12.
22  A  Mm-hm.
23  Q  So this is right as the deal was being struck.
24  A  This --
25  Q  Pat Runnion gets an email from Darrell at

Page 80

1     landalesigns@gmail.com and at the very bottom of this
2     page.  So that's certainly not from you.
3   A  That's right.
4   Q  Correct?
5   A  That's my writing.  It says:  "First time 'gmail' showed
6     up at Runnion."
7   Q  Yeah.
8   A  That's my note saying that, like, Pat -- this is the
9     first time Pat noticed, I guess.
10  Q  Okay.  Well, I'm -- and I understand you didn't send
11    these.  You don't have a gmail account.  You didn't
12    send these gmail notes.
13  A  That's right.
14  Q  I guess my observation or my question is that
15    apparently this guy is right on it on April 13th, two
16    days after this deal's been signed.
17              And then the exhibits or the
18    attachments thereafter, "I" 2, where it says (quoted as
19    read):
20        "Pat, I have signed and attached the 3 pages
21        of the sale order and a copy of my memo to
22        you,"
23    Do you see that?
24  A  What page are you on?
25  MR. HAEBERLE:          Right there.

Page 81

1   A  Oh, okay.  Sorry.
2   Q  MR. POLICK:          Yeah, just take a second to
3      read the body of that.
4   A  Yeah.  That's mine.
5   Q  Okay.  So you did send this note, you just never used
6      it via gmail.  That's what I'm -- I'm trying to figure
7      out how in the world the crook would have gotten ahold
8      of this note and gmailed it to Pat on April 13.
9   A  Ask somebody else.  I have no idea.
10  Q  No, I don't either, but I'm just saying.
11  A  Yeah.
12  Q  But this is the note that you had that accompanied the
13     signed sale order.  It's --
14  A  This is what Pat faxed back to me, is it not?
15  Q  No.  The very bottom it says --
16  MR. HAEBERLE:          Email do you mean?
17  Q  MR. POLICK:          Just read the bottom.  It says,
18     "Pat, I've signed these" --
19  A  Oh, this.  Okay.  I'm sorry.
20  Q  Yeah.
21  A  But isn't this the stuff that Pat faxed back to me?
22     After the fact?
23  Q  I'm not certain.  That's why I was just trying to
24     figure out --
25  A  Well, this is all stuff about --

Page 82

1   Q  It might have been part of everything he faxed to
2      you --
3   A  Yeah.
4   Q  -- the Wednesday or so after the --
5   A  Yeah.
6   Q  -- wire transfer.
7   A  So back to this.
8   Q  Yeah, just as -- and now I'm reading it upsidedown.
9      But 2 "I," this note at the bottom of that page --
10  A  Yes.
11  Q  -- did you generate that note?
12  A  It looks like my writing, but, again, all of these "A,"
13     "B," "C," "I," "A," "B" -- you know, and page numbers
14     I -- you know, I wouldn't have done that, but --
15  Q  Well, in terms of the -- in terms of the page numbers
16     at the bottom, those were done by your counsel to kind
17     of keep these straight.
18  A  Oh, okay.
19  Q  Because there were categories.  This is part of the
20     initial disclosure where the court rules say, "Give a
21     list of witnesses to each other and preliminary
22     information to each other."  So that's how I got this.
23  A  Okay.
24  Q  And so it came categorized under "A," "B," "C," "D."
25  A  Okay.

Page 83

1   Q  So that's where that came from.
2   A  So I can quit guessing where it came from.
3   Q  Yes, I'm sorry.  I should have cleared that up at the
4      beginning.  But I'm just trying to figure out if you
5      authored the note at the bottom of that page that said,
6      "Pat, I've signed these materials.  Thanks again,
7      regards, Darrell."
8   MR. HAEBERLE:          He's asking about "2" I, about
9      whether you generated 2 "I."
10  A  I signed it.
11  Q  MR. POLICK:          So that is your signature.
12     Okay.
13  A  Yeah, that's my signature.
14  Q  Okay.  All right.  We're almost done with Exhibit 1.
15     And then this is also the -- remainder of this, of
16     "I," which runs up to I think, what, five pages, or is
17     it six?  Six pages.
18  A  Six I have.
19  Q  This includes an email back and forth from Pat Runnion
20     at Runnion Equipment Company and Darrell Brown at
21     Darrell, landalesigns.com talking about what's on the
22     unit.  You want to know if there's controls in the
23     basket, that kind of stuff.  These are genuine
24     communications between you and Pat?
25  A  Yes.

Page 84

1   Q  And then the attachments after that again are the sales
2      order itself.
3         (DISCUSSION OFF THE RECORD)
4   Q  MR. POLICK:          We were completing this
5      Exhibit "I."  But, again, the remaining pages are again
6      the original sales order, including the signature page,
7      which is "I" 6.
8   A  Yes.
9   Q  Okay.  So when you did eventually -- it wasn't
10     eventually.  You signed it the next day.  I mean, Pat
11     signed his end of the contract on April 11.
12  A  Mm-hm.
13  Q  And then you signed for Landale on April 12th.
14  A  Yes.
15  Q  So then -- I know you didn't use the gmail account to
16     send it over to Patrick Runnion.  How did you send the
17     final signed agreement to Pat Runnion?
18  A  Well, this looks like a fax cover sheet.
19  Q  Okay.
20  A  Facsimile transmittal.  So I could have --
21  Q  That was probably it?
22  A  I presume I faxed that.
23  Q  Okay.  Those are all the questions I have with
24     reference to Exhibit 1.  If you want to take a break
25     and walk around.

Page 85

1    (BRIEF ADJOURNMENT)
2  Q  MR. POLICK:        We're back on the record.  How
3    many other times have you purchased truck-mounted
4    cranes?
5  A  I've purchased probably four or five, but only one other
6    internationally.
7  Q  Okay.  I know one came with the business you said.
8  A  Yeah.
9  Q  And then so you purchased another few?
10  A  I've got small ones, medium-size ones.  Yeah, we purchase
11    locally.
12  Q  And that other big one is the one you purchased from --
13    internationally from -- I forget where it came from.
14  A  Roanoke, Virginia.
15  Q  Roanoke, Virginia.  Okay.
16  A  But we buy internationally all the time.  Other
17    equipment.
18  Q  Right.  I assume you use a number of vendors and --
19  A  Yeah.
20  Q  Not just in Canada, but also internationally?
21  A  Yes.
22  Q  Now, in terms of the wiring instructions, who makes the
23    decision to send the money in response to these wiring
24    instructions?
25  A  Well, I would have handed the instructions to my wife,

Page 86

1    who would have then arranged to send the money out.
2  Q  Okay.  And I have to check my notes again, and that hit
3    the microphone, but the first set of wiring
4    instructions were to this Michael Mitch in Cary,
5    North Carolina, dated April 18, 2016, claiming to be
6    Jennifer Molina; right?
7  A  Yes.
8  Q  You remember that?  Did you do anything in response to
9    those wiring instructions at that point?
10  A  I don't believe so, because the deal wasn't finalized.
11  Q  So the reason was you were still waiting for some
12    paperwork to be generated?
13  A  Yes.
14  Q  To get the machine ready for delivery?
15  A  Yes, I believe so.
16  Q  Okay.  So then the second set of instructions came,
17    like, three and a half weeks later, on May 12 of 2016,
18    and this is the one that lists Prime C. Contractors,
19    LLC, and the Sun Trust Bank in Alexandria, Virginia?
20  A  Yes.
21  Q  And this again came -- presumably was coming from
22    Willie Messuck, but it was not.  But this is the one
23    you actually issued the funds in response to?
24  A  I believe so.
25  Q  Okay.  So the people who would have been involved in

Page 87

1    that situation or that decision would have been -- is
2    it just you?
3  A  Yep.
4  Q  Okay.  So then you would just transmit it to Carol and
5    say, "Carol, you have -- get this completed," or
6    whatever you need to do?
7  A  Yeah.
8  Q  And that's what was done back on May 13 of 2016?
9  A  Yes.
10  Q  I was just trying to figure out who else was involved
11    in the process.  I know you did a -- had it here a
12    minute ago.  When you first heard from Willie Messuck
13    that the money had not been received, that's when you
14    contacted your bank, I believe.  And these are some of
15    the materials that were given to me today on a wire
16    confirmation.
17            And I guess I should mark it as
18    an exhibit since we're looking at it.
19  MR. HAEBERLE:        You're going to mark this whole
20    package as an exhibit or --
21  MR. POLICK:        No, no, just this.  Heaven
22    forbid.  Most of that's contained in Exhibit 1 anyway.
23  Q  We're up to Exhibit 4.  We're going to mark those.  I
24    think it's four pages.  It's four.  You can look at it,
25    and the reporter will mark it as soon as we're done.

Page 88

1    And I didn't read every line of it, but basically it's
2    just confirming that the money left your bank and was
3    sent to the Sun Trust Bank in Virginia.
4  A  I presume so.  Yes.
5  Q  Okay.  So that's part of your preliminary investigation
6    to try to figure out what happened to it?
7  A  Yes.
8  Q  That fair?
9  A  I imagine Carol did this.
10  Q  Okay, yeah.  She's the money lady.  All right.  Let's
11    give that to the court reporter so she can mark it.
12          Exhibit Number Brown 4:
13          Four pages confirming the wire transfer of
14          money from Landale's bank to the Sun Trust
15          Bank in Virginia
16  Q  MR. POLICK:        I might as well throw this on
17    to the -- we'll mark that as an exhibit too.  But
18    that's the cover sheet for your -- that's your police
19    report.
20  A  That's the cover sheet for the police report.
21  Q  Right.  You did all the work.  I was going to say, you
22    typed everything.
23  A  Yeah, he wasn't about to do much of anything.
24          Exhibit Number Brown 5:
25          Document entitled "Edmonton Police Service

Page 89

1    Witness Statement Form," the cover sheet the
2    police prepared for Mr. Brown's report.
3 Q MR. POLICK:         All right.  And to explain that
4    on the record, Exhibit 5 is actually the -- it's
5    entitled "Edmonton Police Service Witness Statement
6    Form."  But this is the part the police prepared for
7    your report?
8 A Yes.
9 Q And this was the cover sheet to your typewritten
10    narrative as to what happened?
11 A Yes.
12 Q And the wire confirmation showed that the money went to
13    Sun Trust Bank in Alexandria, Virginia, for the benefit
14    of Prime C. Contractors.  Did you ever contact that
15    bank?
16 A I believe Carol did.  I didn't.
17 Q Okay.
18 A Somebody I think contacted them, yes.
19 Q Do you know the results of what Carol or someone at
20    Landale found?
21 A I believe that they said the money was transferred out
22    immediately.  They get a hit and --
23 Q Move on?
24 A Moved on.  And I stand to be corrected on that, but
25    that's what I'm -- imagine that's what happened.

Page 90

1 Q Okay.  Did anybody try to contact an outfit or any --
2    or find if there is an outfit named
3    Prime Contractors -- what's the rest of it -- Prime C.
4    Contractors?
5 A I did not.
6       (DISCUSSION OFF THE RECORD)
7 Q MR. POLICK:         At some point a subpoena was
8    issued by your attorneys to Sun Trust Bank in
9    Alexandria, Virginia.  Were you aware of that?
10 A I wasn't.  I'm not aware.  I --
11 MR. HAEBERLE:         Whatever the instructions, to
12    not describe any conversations, the substance of any
13    conversations we had.  So don't discuss any conversations
14    we had.  You can testify about your knowledge, but don't
15    describe any of the conversations.
16 THE WITNESS:         Okay.
17 Q MR. POLICK:         He's referencing the
18    attorney-client privilege which goes to any kind of
19    legal advice you might get from counsel.  But it
20    doesn't get to, like, factual basis.  Were you ever
21    made aware of the fact that a subpoena was issued to
22    Sun Trust Bank?
23 A I don't recall.
24 Q Are you aware of any of the results of the subpoena to
25    Sun Trust?

Page 91

1 A Again, I'm only guessing.  I'm surmising that the money
2    touched down and was bounced out again, and where that
3    information came from, I don't know.
4 Q Okay.  Now I have to mark another exhibit.  I'm sorry
5    to keep doing this.  We can get some of these pages out
6    of the way.
7 MR. POLICK:         And we can do this off the
8    record.
9       (DISCUSSION OFF THE RECORD)
10       Exhibit Number Brown 6:
11       Materials received from the plaintiff's
12       lawyers about what they received in response
13       to a subpoena they issued to Sun Trust and
14       contains a certification from Sun Trust Bank
15       as to the complete business record but shows
16       the account being opened for Prime Controls
17       Contractors, LLC, with an address out of
18       Duluth, Georgia
19 Q MR. POLICK:         This is my only copy, but this
20    has some of the materials I received from your lawyers
21    about what they received in response to a subpoena they
22    issued to Sun Trust that I think we just marked as
23    Exhibit 6 for today's deposition.
24       (DISCUSSION OFF THE RECORD)
25 Q MR. POLICK:         We're back on the record.  I

Page 92

1    note Mr. Brown just had a cursory review of Exhibit 6,
2    which again has a certification from Sun Trust Bank as
3    to their -- it's got a certification as to, you know,
4    the complete business record.  But it shows the account
5    being opened for Prime Controls Contractors, LLC, with
6    a listed address out of Duluth, Georgia.
7             Okay.  At page -- and the
8    pages in the lower right-hand corner are page numbers
9    that I do to keep it straight for me.  So these start
10    with page 54 that's circled.  So it's page 56 that
11    identifies Prime Control Contractors, LLC out of
12    Duluth, Georgia.  And that's the page I think I
13    referenced off the record, where it says (quoted):
14       "Do Not Call.  Do Not Mail.  Do Not Fax.  Do
15       Not Email."
16    So this bank has opened an account with someone who
17    never wants to be contacted, which I -- that's what it
18    says.
19 A Mm-hm.
20 Q There is also in this exhibit -- Prime Control
21    Contractors, LLC is listed as a limited liability
22    company.  It's got their taxpayer identification
23    number.  And then it's got the principal of the
24    company, the officer/owner person, Jeffrey,
25    J-e-f-f-r-e-y, Gensemer, G-e-n-s-e-m-e-r.  His title is

Page 93

1 Member, and it's got a signature. And that's at the
2 page 59. And Gensemer signs it on the next page, 60,
3 which is dated February 16 of 2016. So the account was
4 open, what, a couple months before he defrauded you?
5 A Okay.
6 Q It appears date-wise.
7 A Okay.
8 Q And then the rest of it is a signature card, but,
9 again, several pages signed by Jeffrey Gensemer, and
10 then the last portion is just the typical statement.
11 Do you know any Jeffrey Gensemer?
12 A No, I don't.
13 Q And I know you mentioned we had -- before you said you
14 never heard of Prime C. Contractors, LLC previously?
15 A That's right.
16 Q Okay. Did you have any kind of insurance with a
17 company that would apply to this loss?
18 A We had a small amount. As I recall, $10,000.
19 Q All right. Did you make a claim under that policy?
20 A As far as I know, we did, yes.
21 Q Do you have a note what insurance company it is?
22 A The broker is Drayton Insurance. Who the insurance
23 company is, I don't know.
24 Q That's okay. Was the claim paid?
25 A I believe it was.

Page 94

1 Q Okay. So you got a partial -- some reimbursement
2 anyway?
3 A Mm-hm.
4 Q Yes?
5 A Yes.
6 Q Do you know what -- any other information that
7 Neil Swindlehurst has either discovered or any other
8 opinions he's had that he's told you that we haven't
9 already discussed?
10 A No. Not at all.
11 Q Did Neil ever -- do you remember Neil ever telling you
12 he could track the location of where this fraudulent
13 guy started the electronic communications?
14 A If he did, I didn't probably understand it. I think that
15 he, through this tracking information, was able to
16 discern quite a bit of information. Exactly what, I
17 don't know.
18 Q Well, I'm not sure either, but I thought it had
19 something about the British Virgin Islands. Did you
20 ever hear that before? No?
21 A If I did, I can't remember.
22 Q Okay. Now, in terms of when you -- when you realized,
23 you know, that there had been a fraudulent interference
24 with your transaction with Runnion, what did you do to
25 try to, you know, mitigate your damages? I know you

Page 95

1 file an insurance claim.
2 A Yes.
3 Q And "mitigate" means kind of lessen your damages.
4 Legal term.
5 So you filed an insurance claim
6 to try to lessen your damages. And what else did you
7 do to try to make an adjustment or recover from this --
8 A Well --
9 Q -- this fraudulent involvement?
10 MR. HAEBERLE: Asked and answered to the extent
11 we've already talked about a police report.
12 THE WITNESS: Sorry?
13 MR. HAEBERLE: You can answer.
14 A Yes, but I'm just trying to think --
15 Q MR. POLICK: Yes, I can --
16 A -- what the hell did we do. What can we do? We lost our
17 money. The only think we could do was we hit the
18 insurance company and see what we're covered under. I
19 think we asked Pat if he had insurance for that sort of
20 thing. I don't know whether he responded. That's about
21 all we could do.
22 Q Okay.
23 A And do what we did to try and get whatever information we
24 could.
25 Q And counsel made the observation too. You also made a

Page 96

1 police report with Edmonton Police?
2 A Yes.
3 Q You made an insurance claim?
4 A Yes.
5 Q Try to help things there.
6 A Yes.
7 Q You asked Pat if he could do anything. And then you
8 also -- I know you said you made adjustments with the
9 existing crane or put it back in service?
10 A Oh, yeah, well, we had no choice. At that point, the
11 truck was -- it was one we wanted to retire. And at that
12 point, we had to fix it up and get it back on the road,
13 which we're still using today.
14 Q Okay. So you took the existing truck-mounted crane,
15 got it back up to code, so to speak?
16 A Yeah.
17 Q So you could continue to keep it in service?
18 A Yes. And then we continued on to use outside contractors
19 to do our heavy work, the heavy lifting.
20 Q Okay. And then you -- and Carol also you believe
21 contacted Sun Trust in an effort to find out what
22 happened down there, the bank?
23 A I -- I imagine she did.
24 Q Okay.
25 A I'm pretty sure she did. We contacted the -- our money

Page 97

1    broker to see what they could do, and I think they just
2    closed the door. They said the transaction's over, it's
3    over. We have nothing to do with it at that point.
4  Q Yeah. Okay. Did you ever make any inquiry of
5    Livingston, of Mr. Maciolek or Mr. Ginther?
6  A In what way?
7  Q Well, there's an indication in, you know, some of the
8    handwritten notes in Exhibit 1 that suggest that rather
9    than your company being hacked or Runnion being hacked,
10   evidently Livingston was hacked under that yahoo --
11 A Well, that was a question mark. You know, did we ever
12   contact them about it? I never asked specifically about
13   being hacked, no.
14 Q Okay. And you never contacted the Federal Bureau of
15   Investigation in the US?
16 A No.
17 Q Did anyone ever recommend that you do so?
18 A Well, I assumed our lawyers would do whatever was
19   supposed to be done at that point.
20 Q Okay. All right. And today's the first day you heard
21   about Jeffrey Gensemer?
22 A Yes.
23 Q Okay. All right. You did in fact file the original
24   complaint against Runnion Equipment Company and
25   John Doe?

Page 98

1  A Yes.
2  Q And I take it that the original complaint was filed
3    after you reviewed it and authorized it?
4  A Yes.
5  Q All right. And the same would follow for the First
6    Amended Complaint, the Second Amended Complaint, and I
7    know we got an exhibit here marked as the Third Amended
8    Complaint?
9  A I presume so, yes. I reviewed it --
10 Q Right.
11 A -- approved it, and sent it on, yes.
12 Q And the John Doe is just a handle to put on someone --
13   it's the fraudulent person who --
14 A Unidentifiable.
15 Q -- took the money. Right. And the Third Amended
16   Complaint I believe was filed in February of 2017. I
17   think middle of the month. There might be a date on it
18   when I find it. All right, but you haven't sued
19   Livingston?
20 A I don't think so.
21 Q Well, you'd know.
22 A Well, the lawyer's looking after it. I'm not a lawyer.
23   So I don't know what the hell they're doing. I do, but,
24   you know, I am -- all we're doing is trying to sort this
25   out. Does it go past that? I don't believe so.

Page 99

1  Q Okay. You haven't sued Livingston; you haven't sued
2    Ken Ginther or Mike Maciolek of Livingston?
3  A No. No.
4  Q Okay. You haven't filed suit against Sun Trust Bank?
5  A No.
6  Q You haven't filed suit against Prime C. Contractors,
7    LLC?
8  A No.
9  Q And I know you didn't learn of them until today, but
10   you haven't filed suit against Jeffrey Gensemer?
11 A That's right.
12 Q Okay. But you did file suit against Runnion Equipment
13   Company as the only identifiable defendant when you
14   filed the original suit?
15 A Yes.
16 Q Okay. But despite all the other amended complaints,
17   you haven't named anybody other than Runnion as an
18   identifiable defendant?
19 MR. HAEBERLE:        Asked and answered. But you can
20   answer again.
21 A No.
22 MR. POLICK:          Let's go off the record real
23   quick.
24       (DISCUSSION OFF THE RECORD)
25 Q MR. POLICK:        Exhibit 3 for identification

Page 100

1    was the Third Amended Complaint we looked at some time
2    ago. And what I'm going to do is --
3  MR. HAEBERLE:        If you can't find yours, I think
4    I may have an extra.
5  MR. POLICK:          I've got one right here. I'm
6    okay.
7  Q Under the heading "Nature of the Action" --
8  A Yes.
9  Q -- it talks about -- well, and it's -- again, it's a
10   truck-mounted crane, but it's -- the allegation is it's
11   a vehicle. You had claimed that Runnion negligently
12   allowed John Doe to intercept sensitive information
13   related to the transaction. What's the basis for that
14   claim? Factual basis?
15 MR. HAEBERLE:        And I would object to the extent
16   it's a legal conclusion as to negligence, but you can
17   answer as to fact -- as the factual basis.
18 A We're relying on information received from Neil.
19 Q MR. POLICK:        Okay. And any other factual
20   basis for the allegation, aside from what Neil may have
21   said?
22 A Factual information. No.
23 Q Okay. And now, what do you mean by "sensitive
24   information"?
25 A Sensitive information.

Page 101

1  Q  Yeah.
2  A  Any information that we would give to somebody we're
3     doing business with, is personal, and it's within our --
4     should be kept -- should be kept -- what word do I use --
5     should be kept under cover, if you will.  Sensitive
6     information -- we assume that they're going to have a
7     security protocol within their company to protect
8     information that we would send to them.
9  Q  Yes, and I understand what you're saying in a general
10    sense, that, you know, we would like certain things to
11    be kept in reasonable confidence, I guess would be the
12    term.
13 A  Yeah.
14 Q  You said "under cover."  But in terms of this
15    transaction with Runnion, what specifically was the
16    sensitive information that you believed was somehow
17    taken from Runnion?
18 A  Well, I believe that their computer was hacked and the
19    information we're sending back and forth has been
20    manipulated so that we believe that we're dealing with
21    Runnion; in fact, we're not.  And this was made available
22    to the hacker, I guess, through Runnion, not --
23 Q  Well, and, again, aside from what Neil may have told
24    you, there hasn't really been any indication that in
25    fact Runnion was at fault.  If anything else, it

Page 102

1     says -- looks like Mike Maciolek was hacked at yahoo,
2     or yay-hoo, some other source.  But I just want to know
3     what is the sensitive information?  Is it, you know,
4     your middle name?  What is the specific sensitive
5     information that can't be let out?
6  MR. HAEBERLE:              Asked and answered.  You can
7     answer again.
8  A  There is no particular personal information that is
9     sensitive.
10 Q  MR. POLICK:        Well, and I just gave it as an
11    example.  Like, you know, some guys have a middle name
12    of Orville and they hate it.  You know, so I was making
13    just a general example.  But for this transaction, you
14    got information as to the unit itself, the purchase
15    price, your email address.
16 A  Mm-hm.  Mm-hm.
17 Q  Runnion's email address.  That's the nuts and bolts of
18    the information that's being discussed and ultimately
19    exchanged between you and Pat.  So what part of this
20    transaction is sensitive?
21 A  There's no, as I say, personal sensitivity.  There is a
22    certain amount of -- what will I say?  We expect that our
23    information, our deal back and forth, is to be kept
24    between Runnion and ourselves.  It's not to be general
25    information to anybody out there.  That obviously didn't

Page 103

1     happen.
2  Q  All right, but I'm just saying sensitive -- like, for
3     example, I know you have a website, and certainly you
4     can find out these days, you know, beyond the website;
5     but I can find the name of your company, I can find out
6     your position in the company, I can find out your
7     address, I can find out your email address, contact
8     information of other people in your company.  We can do
9     that, take a break and go online and find all that
10    stuff out now.
11 A  Mm-hm.
12 Q  True?
13 A  True.
14 Q  And we can do the same for Runnion?
15 A  Yes.
16 Q  Their address; their name, location; their stuff.  So
17    somebody could take a copy of your letterhead, for
18    example, or your logo and slap it on a piece of paper,
19    and we can try to, you know, sell something to somebody
20    else or get somebody to pay us?
21 A  Yes.
22 Q  Saying that, "Hey, I'm Landale, and here's my invoice"?
23 A  That's true.
24 Q  If we were bad guys.
25 A  Mm-hm.

Page 104

1  Q  So that's what I'm trying to figure out.  What is the
2     information that is solely unobtainable that you gave
3     to Runnion?  Everything else here seems to be --
4  A  Well, it's not the information that has been --
5  Q  -- readily discoverable.
6  MR. HAEBERLE:              And I'd object.  Asked and
7     answered.  You can answer.
8  A  There is -- there is this -- sensitivity.  There is no
9     sensitivity from that standpoint.  What I'm -- I guess
10    what I'm interpreting as being sensitive is the business
11    deal itself.
12 Q  MR. POLICK:        Okay.  The fact that there was a
13    negotiation and a deal going on?
14 A  Yes.
15 Q  Okay.
16 A  If that deal wasn't going on, there would be no sensitive
17    information.  The deal went on, and somebody was able to
18    hack into it and intercept, redirect, or do whatever to
19    get -- pick my pocket.  And I believe that was made
20    available because they don't have enough security or
21    whatever at Runnion's end.  That's -- and I have no basis
22    for that on my own.
23 Q  Right.  And I don't know if anybody told you, but
24    Runnion does have safeguards.
25 A  Oh, I'm sure they do.

1 Q This hasn't happened before or since.

2 A Well, we were told it had happened, and that was by Pat

3    himself, so...

4 Q Yeah, that's curious, but we'll get back to that. All

5    right. Well, that's it. I wanted some kind of

6    understanding as to what you meant by "sensitive

7    information," and you're saying the fact that this

8    transaction is coming together --

9 A Yes.

10 Q -- going forward?

11            And the people legitimately

12    knowing about that would have been Landale and Runnion?

13 A Yes.

14 Q And Livingston?

15 A Yes.

16 Q Anybody else that legitimately knew all this was

17    happening aside from those three entities?

18 A No.

19 Q There is a number of remaining allegations in the

20    complaint -- I'm not going to go into them -- basically

21    saying -- you know, this question was Landale hacked,

22    was Runnion hacked, you know, each one denies. You

23    don't believe your system was hacked?

24 A That's right.

25 Q And Runnion, of course, told you they don't think their

1    system was hacked. I guess in paragraph 21, it says

2    (quoted as read):

3            "During the negotiations with Pat Runnion,

4            Darrell Brown noticed there was a delay in

5            receiving emails from Pat Runnion."

6 A No. I...

7 Q Yeah, just take a moment to find it, review it. It's

8    paragraph 21.

9 A Yeah. I don't agree with that. I heard from Willie, Pat

10    that there was delays. I don't read times and stuff on

11    the emails, so --

12 Q So it's not --

13 A -- it sure never came to my attention before, before

14    the -- before this happened.

15 Q Before the theft?

16 A Yeah.

17 Q Yeah. That's what I'm getting at. During the

18    negotiations, you never noticed a delay in receiving

19    emails?

20 A No, I never.

21 Q But after the fact is when that was discussed, Neil

22    brought it up, and -- after the theft occurred?

23 A Well, Willie brought it up.

24 Q Okay.

25 A And then Neil -- everybody got involved in it at that

1    point.

2 Q Okay. But, again, all after the theft?

3 A Yep.

4 Q Okay. And then paragraph 24 is where you say that

5    Pat Runnion told you that Pat was aware of potential

6    interference in his email account.

7 A Yes.

8 Q And now, this again, I know you referenced it some time

9    ago, but you think this was a phone conversation the

10    Tuesday or Wednesday after the wire transfer and theft

11    of the money?

12 A Yes, that was a call between myself, Pat, and Neil.

13 Q And I know Pat said something about a real estate

14    transaction --

15 A I believe that's what he said.

16 Q Did he differentiate if it was a real estate

17    transaction for Runnion or --

18 A No, I think it was just personal.

19 Q Or him personally? Real estate?

20 A It could have been through the business. As with me, he

21    owns the business. Where does the line separate, I

22    guess? Could have been for the business. I don't know.

23 Q Okay. Well, no, that's what --

24 A I don't think that was his -- I don't think that was

25    specific to it. Maybe it was.

1 Q But you think he definitely said it was a real estate

2    transaction?

3 A Yeah, it could have been a condo deal or something like

4    that.

5 Q Okay.

6 A It was a deal that never went through anyway because he

7    obviously caught it before it -- before it got too far.

8 Q When you get down to Count IV, which is the breach of

9    contract, paragraph 54 says -- has your claim that

10    (quoted):

11            "Every contract includes an implied duty of

12            good faith and fair dealing."

13    Do you see that?

14 A Which one?

15 Q Paragraph 54.

16 A Yes.

17 Q What's your understanding of that allegation?

18 MR. HAEBERLE:        Object to the extent it's a

19    legal conclusion, but you can testify to your

20    understanding. Or object to the extent it calls for a

21    legal opinion. But a factual statement is fine.

22 A If we didn't feel that people we're doing business with

23    wouldn't handle our affairs, whatever they may be, in

24    good faith and in a fair deal, we wouldn't do business

25    with them. I think every businessman out there feels the

Page 109

1   same way. It's an implied, taken-for-granted implication
2   that you're going to do the best thing you can for your
3   customers.
4   **Q MR. POLICK:         Well, and you proceeded in good**
5   **faith --**
6   A  Yes, we did.
7   **Q -- in your dealings with Patrick Runnion?**
8   A  I think he's --
9   **Q Runnion Equipment?**
10  A  -- a good guy.
11  **Q Well, and that's my next question.  Do you believe**
12  **Pat Runnion proceeded in good faith with you on behalf**
13  **of Runnion Equipment?**
14  A  Absolutely.  I think that everything we did up to the
15     point of where the money disappeared was done in good
16     faith.  That I think he's a decent guy.  I wouldn't have
17     proceeded with a deal if I didn't have a comfort in that
18     regard.
19  **Q And I assume you also agree, I mean, he didn't take a**
20  **loss to the extent you took a loss, but he also was**
21  **defrauded as part of this transaction because he lost**
22  **the deal?**
23  A  He still has a truck and still could make the deal, so he
24     didn't lose anything.  But I'm -- did he sell the truck?
25  **Q I'd have to double-check and see, which, you know, on**

Page 110

1   **that point, they held it forever because**
2   **Alexander Passo, one of your attorneys, kept telling me**
3   **''Hold it,'' you still wanted to buy it.  So I think we**
4   **held that thing for months and months and months and**
5   **months based on counsel's request.  And I kept asking**
6   **him in writing, ''Do you still want it?  Do you still --**
7   **they still want it?  We're still holding it.  You know,**
8   **it's sitting at'' --**
9   A  If we could have sorted this stuff out, we would have
10     still bought it.
11  **Q All right.  Well, I will tell -- there was -- again,**
12  **it's not the loss that you sustained, but there was a**
13  **loss that Runnion sustained as a result of being**
14  **defrauded by this Gensemer guy as well.**
15  A  Did he sell it a second time to somebody else or
16     somebody --
17  **Q I didn't --**
18  A  -- didn't pay?
19  **Q I have no idea if it's still sitting on the lot or**
20  **whether it's sold or not.  I can find out and let you**
21  **know.**
22          **And paragraph 55 again says**
23  **there's an implied agreement to maintain**
24  **confidentiality over sensitive information.  That's**
25  **similar to your original allegation, I guess, on the**

Page 111

1   **general paragraphs of the complaint, and the sensitive**
2   **information is the fact that the transaction's going**
3   **on?**
4   A  Yes.
5   **Q I guess --**
6   A  The transaction is.  It's nothing personal.  It's the
7     transaction.  That's --
8   **Q And the timing of the transaction perhaps too can be a**
9   **factor?  Or no?**
10  A  Well, I really don't know.  I mean, I expect the
11     information that we're passing back and forth is between
12     he and I.  And obviously it wasn't.
13  **Q I guess, you know, my point is a lot of this stuff can**
14  **be found out, and we know there's at least three**
15  **legitimate entities that was in on all this information**
16  **and transaction and when it's going to happen.  But,**
17  **again, any bad person can find out this information**
18  **without being told.**
19  A  What, about the --
20  MR. HAEBERLE:           Objection.  Foundation.
21  A  I don't think so.
22  THE WITNESS:            I'm sorry, what?
23  MR. HAEBERLE:           Foundation.  You can answer.
24  A  The thing is, is that he -- nobody knew about our
25     transaction until the deal was intercepted.  Livingston

Page 112

1   or anybody else.  Livingston was brought in when the deal
2   was finalized.  And that's the only time they'd ever be
3   involved.  They're not interested in much of anything on
4   the deal, just do the paperwork.
5   **Q MR. POLICK:         Right.  Get their commission**
6   **and go to the next deal?**
7   A  Yeah.  The hacker, on the other hand, there's the guy
8     that stands to gain.  If we hadn't had a hacker, we would
9     have had a truck; Pat would have been happy; I would have
10     been happy; everybody would have been great.
11  **Q No, you're -- yeah, you're preaching to the choir on**
12  **that one.  The hacker obviously was the one who caused**
13  **all this to occur -- I mean all the negative things to**
14  **occur.**
15          **Are you familiar with the**
16  **custom and -- the standard custom dealing within the**
17  **crane industry, truck-mounted crane industry?**
18  A  What is the standard?
19  **Q That's what I mean.  Do you have any -- do you have any**
20  **factual knowledge as to the course of dealing and any**
21  **standards that apply to the crane industry or the**
22  **truck-mounted crane industry?**
23  MR. HAEBERLE:           Objection.  Vague.  You just
24     mean specifically the truck-mounted crane industry to the
25     extent that exists?

Page 113

1  MR. POLICK:                No, I said cranes too.
2  A  I guess I really don't -- could you narrow that a bit?
3     What is it that you're looking for?
4  Q  Do you know anything about the custom and practice in
5     the course of dealing in the crane industry?
6  A  No different than any other business deal.
7  Q  What --
8  A  That I'm aware of.
9  Q  Well, no, I mean what's the specific information and --
10    that you are aware of --
11 A  That I wanted --
12 Q  -- that applies --
13 A  I wanted to know the --
14 Q  No, I'm sorry.  Let me finish.
15                -- that applies, you know,
16    specifically to the crane industry or truck-mounted
17    crane industry?
18 MR. HAEBERLE:                Objection.  Vague.  You can
19    answer --
20 A  I don't understand what you're asking about, I guess.
21    I'm sorry.
22 Q  MR. POLICK:        Okay.  And I think we touched on
23    this before, but any phone calls you made to anyone at
24    Runnion would all have been made through your office
25    phone?

Page 114

1  A  Yes.
2  Q  Not your cellphone?  Not a home phone?
3  A  That's right.
4  Q  All right.  And then from the other end, did you ever
5     contact Pat Runnion on his cellphone or any other
6     phones aside from their general business number?
7  A  Gosh.  I don't think so.  I stand to be corrected on
8     that, but I don't think so.
9  Q  Okay.  On Landale's end, how many employees were aware
10    of this transaction?
11 MR. HAEBERLE:                Foundation as to -- objection.
12    Timeframe?  Before the transaction?  During the
13    transaction?  After the transaction?
14 MR. POLICK:                Any time.
15 A  Oh, after.  I mean, it became general knowledge.  It --
16    there was a deal, and it went sideways.
17 Q  How about before the theft?
18 A  Before the theft it would have been myself, my daughter,
19    my wife.  Maybe the plant manager.  I doubt it, but
20    maybe.
21 Q  Who is the plant manager?
22 A  At that time, would have been Kevin MacKay.
23 Q  Okay.  Is he still with you?
24 A  Yes, he is.  He went away, and he's back.
25 Q  Okay.  Anybody else at Landale who would have been

Page 115

1     familiar with this transaction before the theft
2     happened?
3  A  No.  Wouldn't have been of interest to anybody.
4  Q  Who else accesses your email account at Landale?
5  A  My wife and my daughter can.  They don't, but they can.
6  Q  Okay, so I'm --
7  A  Oh, and Neil, I guess.  He would be able to, I'm sure,
8     because he fixes it every once in a while.
9  Q  Okay.  So then for your email address, it's you, Carol,
10    Laura, Neil?
11 A  As far as I know, yeah.
12 Q  Okay.  I know you said you believed the two computer
13    consultants talked to each other at some point in time.
14 A  I think they did, and I -- again, you'll have to ask
15    Neil.
16 Q  So you don't know the results of whatever they
17    discussed or what they thought?
18 A  No.
19 Q  So Neil never gave you any kind of summary or a report?
20 A  Not on that.
21 Q  Has he given you any other summaries or reports aside
22    from what we've looked at in some of these exhibits
23    today?
24 A  General discussion and stuff he brought up.
25 Q  Okay.  In terms of any other general discussion or

Page 116

1     conclusions that Neil reached, have we touched on all
2     those today too?
3  A  I guess so.  I -- he talks in a different language when
4     he gets into that computer stuff, and I -- you can lose
5     me pretty fast.
6  Q  I understand.  Me too.
7                In your complaint, you allege
8     that Landale -- strike it.  Let me ask it this way.
9                In your complaint, you allege
10    that the Runnion Equipment Company owed Landale a
11    fiduciary duty.  What did you mean by that?
12 MR. HAEBERLE:                Objection to the extent it calls
13    for a legal opinion or conclusion.  You can answer if you
14    can.
15 A  Fiduciary duty.  Well, that's to keep things -- to keep
16    our deal confidential, I guess.  Follow through with the
17    things that we're supposed to follow through with and
18    finish the deal.  I don't...
19 Q  MR. POLICK:                Do you have any --
20 A  Is there anything else you --
21 Q  Yeah, there's a bunch.  But, I mean, that's your
22    understanding of what you believe is a fiduciary
23    obligation or fiduciary duty?
24 A  Well, to supply us with the information we need and -- in
25    order to complete the deal.  Normal business deal.

LANDALE SIGNS AND NEONS vs.
RUNNION EQUIPMENT and JOHN DOE

Case: 93-1 Filed: 11/26/18 Page 30 of 159 PageID #: 889

Document #: 93-1

Darrell Ross Brown - 1
July 20, 2018

Page 117

Page 118

1 Q  You never had any prior dealings with Runnion Equipment
2    Company?
3 A  No.
4 Q  Do you have any other factual basis as to why your
5    complaint alleges a fiduciary duty on the part of
6    Runnion aside from what you've just described?
7 MR. HAEBERLE:          Same objections as I had before.
8    You can answer.
9 A  No.
10 Q  MR. POLICK:          Have you ever accessed the
11    court file on our case yourself?
12 Q  Myself?
13 Q  Yes.
14 A  No.
15 Q  Or anybody at Landale?
16 A  Not to my knowledge.
17 Q  Do you have any lawyers in the family?
18 A  Yeah.
19 Q  Who?
20 A  My son.
21 Q  Which one?
22 A  Jason.
23 Q  Okay.
24 A  Is that good or bad?
25 MR. POLICK:          Off the record.

1          (DISCUSSION OFF THE RECORD)
2 MR. POLICK:          We're back on the record.  We've
3    been joined by another attorney who is here actually
4    by -- more as a family member too, but welcome.
5 Q  And just a couple other things here so we can finish
6    up.  I want to put these exhibits over there so I don't
7    knock them into the microphone again.
8          Even though we haven't
9    expressly stated it, you agree that Runnion never was
10    paid for the truck-mounted crane?
11 A  I don't think he got the money.
12 Q  Yeah.
13 A  I hope he never.
14 Q  What I gather is actually a colour -- I won't mark
15    that.
16          Exhibit Number Brown 7:
17          Eleven pages, a better copy of the original
18          contract, the first two pages being a document
19          titled "Sales Order"
20 Q  MR. POLICK:          Exhibit 7 for identification.
21    This is actually just a better copy of the original
22    contract itself.  And now that I -- I've tendered it to
23    you.  But basically the first two pages are -- again,
24    it says -- what's the title again?  Service Order on
25    the top?

Page 119

Page 120

1 A  "Sales Order."
2 Q  "Sales Order."  And it describes the unit or, you know,
3    the truck unit as well as the --
4 A  Yes, and the crane.
5 Q  -- crane unit, and the second page does the same.
6 A  This is further information.
7 Q  Right.  More -- and the capacities, for example, that
8    kind of stuff.  And then I believe the purchase price
9    is also on that second page?
10 A  Yes, it is.
11 Q  And then the bottom of both those pages say the -- you
12    know, there's a little notation -- a printed notation
13    that says the back -- the back of this document is also
14    part of the agreement.  And it's not the back of either
15    one or two, but it's actually the third page of that
16    exhibit, which is the signature page for the contract.
17    And we've seen poorer copies of that before in other
18    exhibits, but that's -- that's the agreement itself
19    that you signed and that Pat Runnion signed?
20 A  Yes.
21 Q  April 11 and April 12 of 2016?
22 A  Yes.
23 Q  All right.  And then the remaining pages I think are
24    more just details as to the unit and how it's going to
25    be -- I know there's another copy of that Wisconsin

1    title in there, those kinds of things.  Just take a
2    moment to go through there.  You know, other supporting
3    documentation about the units in question.  And I think
4    it finishes up with a nice colour photo of the unit.
5 A  Yes.
6 Q  Okay.  So that's generally what the rest of that
7    exhibit is?
8 A  Yes.
9 Q  But in terms of the actual agreement itself, it's those
10    first three pages?
11 A  Yes.
12 Q  Okay.
13 MR. HAEBERLE:          Do you want to clip that so we
14    don't --
15 MR. POLICK:          Yes.
16 MR. HAEBERLE:          -- because you talked about
17    order.
18 MR. POLICK:          Thank you, sir.  Glad that you
19    came along.
20 MR. HAEBERLE:          Try to be useful.
21 MR. POLICK:          You're here to help.
22 MR. HAEBERLE:          Yes.
23 Q  MR. POLICK:          As we've talked here today,
24    have you given us a complete, you know, summary of your
25    understanding and your knowledge of all the facts in

Page 121

1    support of your Third Amended Complaint?
2    MR. HAEBERLE:           Objection.  Vague, to the extent
3    you can answer.
4    A I believe so.
5    Q MR. POLICK:          Okay.  And, again, most of it's
6    predicated upon what Neil told you?
7    A Yes.  A lot of it, yes.
8    Q Any other people aside from Neil that provided you with
9    any conclusions?
10   A No.
11   Q Okay.  And you haven't consulted -- have you consulted
12   any kind of outside experts?
13   A Only my lunch pals who are all experts in everything you
14   can talk about.
15   Q Okay.  I'm going to take one more look at my notes, but
16   I think I don't have any further questions at this
17   point, sir.  Thank you.
18        (DISCUSSION OFF THE RECORD)
19   Q MR. POLICK:          Just back on the record for a
20   few more questions.  And of course he's sitting here,
21   but aside from being your son and an attorney, does Jay
22   have any factual knowledge about anything related to
23   this transaction?
24   A I don't think so.
25   Q And if he did, it's all stuff that everybody learned

Page 122

1    after the fact that we've all somehow discussed?
2    A Yeah.
3    Q How about this Daniel Mol, M-o-l?
4    A No, I don't think he has -- I sent him this information
5    just for his review.
6    Q Okay.
7    A And his recommendation was that we get somebody --
8    MR. HAEBERLE:           Objection.  Don't -- he's acting
9    as your attorney.  Don't disclose any conversations with
10   him.
11   THE WITNESS:           Okay.
12   MR. HAEBERLE:           He is in fact -- he is your
13   attorney.
14   A Okay.  So...
15   Q MR. POLICK:          And I take it as part of your
16   experience in your business, you enter into a number of
17   purchases and contracts?
18   A Lots of.
19   Q Okay.  And I assume you also -- does anybody else
20   review the contracts for you before you sign them?
21   A In this fashion, no.  In our business, absolutely.  In
22   our daily business.
23   Q Customers?
24   A Customers.
25   Q Gotcha.

Page 123

1    A We deal in contracts daily.
2    Q Okay.  I guess back -- well, let's just start with this
3    Runnion transaction.  You reviewed the contract before
4    you signed it?
5    A Yes.
6    Q Did you have anybody else at Landale review it too?
7    A No.
8    Q Because, again, you're the decisionmaker, and, again,
9    you've signed a number of contracts over the years?
10   A You betcha.
11   Q Okay.  All right.  And I want to -- I know we touched
12   on it a couple of times.  I just want to make sure I
13   got all of the details out of this conversation you had
14   with Pat Runnion the Tuesday or Wednesday or so after
15   the Friday the 13th theft.  And it's a conversation
16   over the phone where -- something about a real estate
17   transaction?
18   A Yes.
19   Q And I -- you have summarized some of it or a bunch of
20   it before.  I just want to make sure, have we got a
21   complete summary of what was said to you and what you
22   said to him during the conversation?
23   A What I can recall, yes.
24   Q And is that the only time this real estate transaction
25   was ever discussed by you and Pat Runnion?

Page 124

1    A As far as I know.  Like I say, Neil might have some more
2    to add to that.  He might remember different parts of the
3    conversation that I've glossed over.
4    Q Okay.  All right, sir, have you heard and understood
5    all of the questions I asked you today?
6    A I believe so.
7    Q Okay.  Thank you for your time.  I don't have any
8    further questions.
9    MR. HAEBERLE:           I have nothing else.  We'll
10   reserve, please.
11        (DISCUSSION OFF THE RECORD)
12   MR. HAEBERLE:           Since reserving is not a common
13   thing in Canada, apparently, what it means is we are
14   taking the opportunity to review the transcript and
15   determine whether there were any errors in transcription,
16   and to submit any corrections as needed.  So after the
17   transcript is prepared, we will review it, determine
18   whether it's accurate, and submit any changes.
19   MR. POLICK:           And in terms of changes, you
20   wouldn't be rewriting the transcript.  You're only
21   checking the court reporter's accuracy based on her years
22   of experience and expertise.  Most times they don't make
23   a mistake, but he's saying check the math anyway.
24   MR. HAEBERLE:           Correct.  Thank you.
25        (PROCEEDINGS ADJOURNED AT 12:25 P.M.)

Page 125

1   Certificate of Transcript

2

3       I, the undersigned, hereby certify that the foregoing

4   pages 1 to 125 is a complete and accurate transcript of

5   the proceedings taken down by me in shorthand and

6   transcribed from my shorthand notes to the best of my

7   skill and ability.

8                           Dated at the City of Edmonton,

9   Province of Alberta, this 26th day of July, A.D. 2018.

10

11

12

13

14

15

16                          Danielle Harmata, CSR(A)

17                          Official Court Reporter

18

19

20

21

22

23

24

25

Page 126

1                               INDEX

2   DARRELL ROSS BROWN
    July 20, 2018

3   Our File Number 9385-2
    Volume 1

4

5   (Undertakings are inserted and indexed by your court
    reporter as a courtesy service to be utilized at the

6   discretion of counsel)

7   UNDERTAKING(S)                              PAGE

8

9   No undertakings requested.

10

11  EXHIBIT(S)                                  PAGE

12

13  Exhibit Number Brown 1:                      40

14      Series of documents, the first page being a

15      cover page with some handwriting saying:

16      "June 28/16.  Dan - this is all that was sent

17      to Chicago"

18  Exhibit Number Brown 2:                      47

19      Document entitled "Landale's Responses to

20      Runnion's First Set of Interrogatories"

21  Exhibit Number Brown 3:                      48

22      Copy of the Third Amended Complaint filed by

23      Landale against Runnion Equipment Company

24  Exhibit Number Brown 4:                      88

25      Four pages confirming the wire transfer of

26      money from Landale's bank to the Sun Trust Bank

27      in Virginia

Page 127

www.indreporters.com

1   Exhibit Number Brown 5:                      88

2       Document entitled "Edmonton Police Service

3       Witness Statement Form," the cover sheet the

4       police prepared for Mr. Brown's report

5   Exhibit Number Brown 6:                      91

6       Materials received from the plaintiff's lawyers

7       about what they received in response to a

8       subpoena they issued to Sun Trust and contains

9       a certification from Sun Trust Bank as to the

10      complete business record but shows the account

11      being opened for Prime Controls Contractors,

12      LLC, with an address out of Duluth, Georgia

13  Exhibit Number Brown 7:                     118

14      Eleven pages, a better copy of the original

15      contract, the first two pages being a document

16      titled "Sales Order"

17

18

19          * * * * * * * * * * * * * * * *

20

21

22

23

24

25

26

27

Page 128

www.indreporters.com

1   SIGNATURE OF WITNESS

2   I, (DARRELL ROSS BROWN), the witness in the above
    deposition, have read the within transcript of my testimony,

3   I have made _____ changes in said testimony, and have
    stated such changes (if any) and the reason for each change

4   on a separate sheet attached hereto.

5

    My testimony as given herein is true and correct, to the

6   best of my knowledge and belief.

7

8   _____

    (DARRELL ROSS BROWN)

9

    Subscribed and sworn to before me this _____ day of

10  _____, AD, 2018.

11

12  _____

13

14

15

16

17

18

19

20

21

22

23

24

25

    403.265.2550        www.indreporters.com        780.488.1464

Page 129

```
 1   TRANSCRIPT CHANGES
 2   Page  Line   Change
 3   ____  ____   _____
 4   ____  ____   _____
 5   ____  ____   _____
 6   ____  ____   _____
 7   ____  ____   _____
 8   ____  ____   _____
 9   ____  ____   _____
10   ____  ____   _____
11   ____  ____   _____
12   ____  ____   _____
13   ____  ____   _____
14   ____  ____   _____
15   ____  ____   _____
16   ____  ____   _____
17   ____  ____   _____
18   ____  ____   _____
19   ____  ____   _____
20   ____  ____   _____
21   ____  ____   _____
22   ____  ____   _____
23   ____  ____   _____
24   ____  ____   _____
25   ____  ____   _____
```

403.265.2550        www.indreporters.com        780.488.1464

---

**$**

---

**$10,000** 93:18

**$2,000** 56:9

**$500** 57:5,7 61:6

**$87,625** 61:9

**$88,000** 50:7 56:7, 12

**$88,125** 56:14

---

**1**

---

**1** 40:16,21 47:22 49:7,11 51:17 52:19, 24 54:19 59:21,22 60:13 69:3,18 72:15 73:1 75:1 83:14 84:24 87:22 97:8

**10** 75:7

**11** 49:19 63:20 64:6, 7,23 65:1 79:21 84:11 119:21

**12** 48:11 49:19 60:7 67:19 68:24 79:21 86:17 119:21

**12:03** 69:23

**12th** 84:13

**13** 67:23 69:7 81:8 87:8

**133** 6:14

**13th** 69:9 80:15 123:15

**16** 12:25 64:23 65:1 69:5,22 70:24 71:6 73:4 93:3

**16th** 71:8

**18** 12:25 13:22 14:2 44:7 53:15 69:11 75:7 77:1 78:14,17, 19 86:5

**18/16** 54:10 60:18 74:6 75:14

**18th** 60:19 72:21 74:3

**19** 43:24 76:22

**1945** 6:20

**1966** 8:16

**1967** 7:7

**1995** 11:3

**1:02** 53:16

**1st** 7:7 54:1

---

**2**

---

**2** 47:5,6,11,12 56:13 59:24 60:8 61:5 75:16 79:13 80:18 82:9 83:8,9

**2,000** 56:9

**20** 13:16,22 14:2 33:4

**2014** 76:22

**2016** 41:4 43:24 49:19 53:15 60:7 67:19 73:4 86:5,17 87:8 93:3 119:21

**2017** 48:11 98:16

**21** 106:1,8

**22555** 6:14

**23** 18:10

**24** 107:4

**25** 18:10,12

**28/16** 40:19

**28th** 41:4

**2:39** 68:4

**2nd** 60:14,23

---

**3**

---

**3** 48:23 49:1,13 57:15 61:11 63:13 64:10,19 79:13 80:20 99:25

**3:16** 67:19

**3rd** 6:20 75:11,16

---

**4**

---

**4** 50:1 67:8 87:23 88:12

**40** 7:13

**41** 6:16

**47th** 58:17

---

**5**

---

**5** 50:4,9 51:17 56:1, 3,4 67:9 88:24 89:4

**500** 56:22 57:6

**530** 6:14

**54** 92:10 108:9,15

**55** 18:20 110:22

**55-foot** 19:13,25 22:23

**56** 92:10

**59** 93:2

---

**6**

---

**6** 51:18 54:19 67:9 84:7 91:10,23 92:1

**60** 93:2

---

**7**

---

**7** 51:18 118:16,20

**7,000** 57:6

**72** 6:25 68:20

**7950** 58:17

---

**8**

---

**85** 23:1,20

**85-foot** 18:18 19:21 22:19,22 24:24 26:7

**8525** 13:14

**88,125** 55:18

**8:26** 73:4

---

**9**

---

**90** 14:20

**9:16** 3:1

---

**@**

---

**@yahoo.com**

---

**74:11**

---

**A**

---

**a.m.** 3:1 73:4

**ability** 5:20,23

**absolutely** 109:14 122:21

**accept** 65:23

**accessed** 117:10

**accesses** 115:4

**accompanied** 81:12

**accordance** 3:10

**account** 9:11 58:1 66:15 79:18 80:11 84:15 91:16 92:4,16 93:3 107:6 115:4

**accountant** 29:3

**accounting** 13:4 30:3,4,20 32:5 70:4

**accounts** 17:13 18:1 32:10

**accurate** 4:17 43:23 44:1 59:7 76:20

**acting** 122:8

**Action** 100:7

**actual** 120:9

**Added** 56:20

**addition** 76:21

**address** 6:12 14:1 37:3,10,24 39:10 46:3,4 53:18 54:24 57:23 58:16 60:2 61:17,23 66:22 74:8, 15,18,25 75:5 76:10 77:14,19,22 78:18, 25 79:1 91:17 92:6 102:15,17 103:7,16 115:9

**ADJOURNMENT** 33:25 85:1

**adjustment** 95:7

**adjustments** 96:8

**administration** 8:20

**advertise** 15:21

**advertised** 20:14

**advertising** 12:10

**advice** 90:19

**affairs** 108:23

**affect** 5:23 46:18

**affects** 5:20

**afternoon** 60:9

**age** 6:24

**agency** 42:3

**agent** 38:21

**ages** 7:11

**agree** 76:24 106:9 109:19 118:9

**agreed** 56:8

**agreement** 3:9 57:10 84:17 110:23 119:14,18 120:9

**ahead** 52:20 68:20

**ahold** 81:7

**Alberta** 8:11,17 23:25

**alerted** 35:3 38:20

**Alexander** 110:2

**Alexandria** 66:18 86:19 89:13 90:9

**allegation** 100:10, 20 108:17 110:25

**allegations** 105:19

**allege** 116:7,9

**alleges** 117:5

**allowed** 100:12

**alluded** 71:20

**amended** 48:24 49:2 98:6,7,15 99:16 100:1 121:1

**American** 57:10

**amiss** 36:16

**amount** 93:18 102:22

**Amount's** 56:12

**answers** 4:16 48:2,

18 52:4

**anymore** 12:14

**apparently** 5:5
37:19 53:5 56:14
60:1 69:18 80:15

**appeared** 44:23

**appears** 93:6

**Appleton** 63:15
64:23

**applicable** 59:4

**applies** 113:12,15

**apply** 3:13 59:3
90:20 93:17 112:21

**apply-** 58:25 66:25

**approved** 98:11

**approximately**
3:20 28:7

**April** 7:7 49:19
53:15 63:20 64:6,7,
23 65:1 79:21 80:15
81:8 84:11,13 86:5
119:21

**area** 7:14

**Argyll** 13:14

**arranged** 86:1

**arriving** 68:21

**arrow** 54:8,16 60:15

**assume** 10:19 44:1
48:14 58:2 59:2 70:1
73:10 85:18 101:6
109:19 122:19

**assumed** 97:18

**assuming** 74:14,15

**asterisk** 58:21,23,
24 67:2

**attach** 5:11

**attached** 53:22 61:4
70:13 71:14 72:17,
20 80:20

**attachment** 41:17
55:13

**attachments** 80:18
84:1

**attempted** 50:17

**attendance** 36:23

40:5

**attention** 46:6
65:16 106:13

**attorney** 118:3
121:21 122:9,13

**attorney-client**
90:18

**attorneys** 48:13
90:8 110:2

**audible** 4:14

**authored** 83:5

**authority** 63:12

**authorized** 98:3

**avoid** 4:9 17:16

**aware** 90:9,10,21,24
107:5 113:8,10
114:9

---

**B**

**back** 5:17 6:11 9:2,
16,17 11:8,12 17:16
21:20 34:1,5 36:1
38:4 44:25 45:24
49:7,11 52:2 55:21
56:13 59:23 62:24
63:9 64:20 65:12
69:11,12 72:3 79:17
81:14,21 82:7 83:19
85:2 87:8 91:25
96:9,12,15 101:19
102:23 105:4 111:11
114:24 118:2
119:13,14 121:19
123:2

**backed** 39:16

**background** 3:25
8:8,14

**backhoe** 9:4,19,20

**bad** 103:24 111:17
117:24

**balance** 17:20 32:5

**bank** 58:14 60:14,22
66:17,23 71:15,23,
25 72:1 76:7 86:19
87:14 88:2,3,14,15
89:13,15 90:8,22
91:14 92:2,16 96:22
99:4

**Banking** 75:16

**banks** 67:6 76:5

**base** 14:12

**based** 110:5

**Basic** 15:1

**basically** 4:5 5:6
26:15 36:8 41:21
47:20 53:20 61:3
88:1 105:20 118:23

**basis** 22:15 45:5
90:20 100:13,14,17,
20 104:21 117:4

**basket** 83:23

**beginning** 83:4

**behalf** 16:23 17:7
109:12

**believed** 101:16
115:12

**beneficiaries** 67:6

**beneficiary** 58:15
66:18

**benefit** 89:13

**betcha** 123:10

**big** 85:12

**bigger** 20:3,4

**biggest** 18:19

**birth** 6:19

**bit** 78:8 94:16 113:2

**body** 69:6 81:3

**bolts** 102:17

**book** 15:19

**boom** 19:1

**border** 50:19,22,23
57:1 68:21

**bottom** 44:5,10
60:19 64:9,10 66:22
70:22 74:17 76:6
80:1 81:15,17 82:9,
16 83:5 119:11

**bought** 9:8 10:9,15
16:14 18:11 22:19
110:10

**bounced** 91:2

**breach** 108:8

**break** 6:8,10 34:2
75:2 84:24 103:9

**briefly** 47:10

**British** 94:19

**brochure** 16:1

**brochures** 16:5

**broker** 20:14,15,16
21:21,24 22:1,21
24:6 31:13 50:18
93:22 97:1

**brokers** 70:13
71:14

**brought** 46:5 65:15
106:22,23 112:1
115:24

**Brown** 3:2,6,8,14
5:19 40:16,21 41:1
47:6,12,23 48:23
52:19 60:11 67:20
73:2,12,18 74:6
79:11 83:20 88:12,
24 91:10 92:1 106:4
118:16

**Brown's** 89:2

**built** 9:14

**bunch** 22:5 57:3
116:21 123:19

**Bureau** 97:14

**business** 8:12,19,
20 9:6,24 10:16,18,
19 11:24 12:8 14:10,
11,20,24,25 15:6,10,
17,24 16:13 17:5
18:6,9 19:5 20:23
24:22 25:21 28:17
51:7 66:8,22 85:7
91:15 92:4 101:3
104:10 107:20,21,22
108:22,24 113:6
114:6 116:25
122:16,21,22

**businesses** 12:21
14:8 15:2,16 20:22

**businessman**
108:25

**button** 22:10

**buy** 11:2 23:3 85:16
110:3

**buying** 10:25 18:18
22:16 31:12 72:7

---

**C**

**C'** 54:19

**C.C.** 74:7

**call** 6:3,5,6 16:1
25:5 28:12,14 29:2
37:9 71:16 92:14
107:12

**called** 9:5 25:8
28:11 44:7 62:2

**calling** 28:14

**calls** 28:23 34:23
108:20 113:23
116:12

**Canada** 6:5 8:25
9:3,10,18 29:21 42:8
85:20

**Canadian** 42:16

**capacities** 19:8
119:7

**capacity** 18:22 19:2
23:3 26:17 50:1

**car** 15:13 64:5,6

**card** 93:8

**care** 66:9

**Carol** 7:4 12:7
31:13,25 87:4,5 88:9
89:16,19 96:20
115:9

**Carolina** 58:14 67:7
86:5

**Carolyn** 7:4,6

**Cary** 58:14 86:4

**case** 117:11

**categories** 34:13
82:19

**categorized** 82:24

**category** 57:14

**caught** 40:8 55:10
108:7

**caused** 112:12

**cellphone** 28:15
114:2,5

**centred** 57:22

certificates 50:13

certification 91:14 92:2,3

chain 67:25

change 32:17 45:17 58:16 59:23 77:19

changed 37:3 46:3 55:20 60:14,22 77:22,24

charge 25:11 32:1 55:19 56:22

check 26:17,22 32:5 43:19 44:20 65:20, 22 86:2

checked 43:22 45:1

checking 30:24 70:19

Chicago 40:20 41:5 57:24 58:17

children 7:9

choice 96:10

choir 112:11

circled 77:7,10 79:13 92:10

Civil 3:11

claim 93:19,24 95:1, 5 96:3 100:14 108:9

claimed 100:11

claiming 86:5

clarify 54:14

clear 26:13 35:15 59:18 66:10 68:18

clearance 68:20 71:17

cleared 44:14 83:3

clip 120:13

close 57:22 63:5

closed 97:2

clumsy 47:16

code 96:15

college 8:24

colour 118:14 120:4

comfort 109:17

COMMENCED 3:1

commercials 16:8

commission 112:5

committed 76:25

communication 34:5

communications 27:22 69:12 83:24 94:13

company 7:16 9:4 16:24 17:8 18:11 19:10,16 20:13,19 22:20 24:5 28:19 29:1 30:13 35:15 48:25 49:3 54:25 57:21 61:19 64:25 65:5 67:18 69:13 83:20 92:22,24 93:17,21,23 95:18 97:9,24 99:13 101:7 103:5,6,8 116:10 117:2

competing 14:10

complaint 48:24 49:2 97:24 98:2,6,8, 16 100:1 105:20 111:1 116:7,9 117:5 121:1

complaints 99:16

complete 91:15 92:4 116:25 120:24 123:21

completed 87:5

completely 17:18

completing 84:4

components 13:9 26:21

Compound 64:11, 13

compromised 44:23 45:4,6 46:10

computer 32:20,21 33:3,7,10 45:4,12,25 46:10 101:18 115:12 116:4

computers 33:7 45:2

conclusion 100:16 108:19 116:13

conclusions 116:1 121:9

condition 5:19 26:11,23

condo 108:3

conference 6:1 40:10

confidence 101:11

confidential 116:16

confidentiality 110:24

confirm 67:22

confirmation 87:16 89:12

confirmations 35:5

confirmed 36:18 48:17

confirming 35:25 88:2,13

conforming 26:6

confused 64:18

consignment 63:24

consultant 33:3

consultants 115:13

consulted 121:11

contact 20:13 22:14,17 24:6 25:4 51:22 53:13 76:13 89:14 90:1 97:12 103:7 114:5

contacted 19:16 87:14 89:18 92:17 96:21,25 97:14

contacting 24:20

contacts 22:10

contained 87:22

continue 58:12 96:17

continued 96:18

continues 50:4

contract 13:8 20:3 29:2 63:21 79:20 84:11 108:9,11 118:18,22 119:16 123:3

contractor 32:24

contractors 61:21 62:2 63:1 65:15 66:12,17,19 86:18 89:14 90:3,4 91:17 92:5,11,21 93:14 96:18 99:6

contracts 122:17, 20 123:1,9

Control 92:11,20

controls 83:22 91:16 92:5

conversation 4:11 25:14 38:5,14,16 46:7 77:15 107:9 123:13,15,22

conversations 28:5,6 29:15 34:2,6, 14 40:1,5 69:11 90:12,13,15 122:9

conveyed 63:2,3

copied 60:19

copies 5:4 21:14 34:8 79:5 119:17

copy 41:18 48:24 49:2 80:21 91:19 103:17 118:17,21 119:25

corner 65:14 92:8

Corp 9:5,7

corporation 10:6, 23 12:4,6

correct 4:22 48:18 51:14 80:4

corrected 13:23 35:23 37:1 89:24 114:7

Correction 73:22

correctly 4:9 31:20 56:24 58:19 68:25 75:7

cost 57:3,5

counsel 5:3,6 8:6 40:23 82:16 90:19 95:25

counsel's 110:5

Count 108:8

contractor 32:24

couple 5:12 9:6 29:2 35:8 50:13 52:1,8 93:4 118:5 123:12

court 3:12,17,19 4:6,16 5:25 82:20 88:11 117:11

cover 5:9 40:18,24 43:5 84:18 88:18,20 89:1,9 101:5,14

covered 118:5

crane 10:10,12 18:4,9 19:5,8,17 20:9 23:3 25:22,23 26:8,16,18 27:2 29:21 31:1,11 44:8 50:2 63:25 64:2,3 96:9,14 100:10 112:17,21,22,24 113:5,16,17 118:10 119:4,5

cranes 10:13 18:13, 17 85:4 113:1

credit 57:7 61:6

criminal 35:1,18

crook 72:5 81:7

crook's 72:13

curious 18:5 105:4

cursory 92:1

custom 12:10 112:16 113:4

customer 14:12,18 22:18

customers 14:5,6, 19 109:3 122:23,24

customs 50:18

cuts 27:22

D

D-O-E-R-I-N-G 76:10

daily 122:22 123:1

Dakota 56:12

damages 94:25 95:3,6

Dan 40:19 41:4,8,12, 18

**Daniel** 122:3

**Darrell** 3:2,6,8
47:23 60:11 67:20
69:25 73:2,11,12,18
77:8 79:11,25 83:7,
20,21 106:4

**darrell@
landalesigns.com.**
53:16

**date** 3:9 5:10 6:19
7:6,8 40:22 43:19
59:16 63:20 64:15
98:17

**date-wise** 93:6

**dated** 43:24 48:10
53:15 60:7 63:19
64:8,23 67:23 73:4
86:5 93:3

**dates** 64:9

**daughter** 12:7
114:18 115:5

**day** 7:7 39:11 48:15
63:19 71:18 84:10
97:20

**days** 35:8 80:16
103:4

**DB** 40:25 60:19
75:18

**deal** 38:19,24 79:23
86:10 102:23
104:11,13,16,17
108:3,6,24 109:17,
22,23 111:25 112:1,
4,6 113:6 114:16
116:16,18,25 123:1

**deal's** 80:16

**dealer** 23:7

**dealership** 15:13

**dealing** 24:14
101:20 108:12
112:16,20 113:5

**dealings** 109:7
117:1

**dealt** 22:16 53:6

**December** 76:22

**decent** 109:16

**decided** 24:23

**decision** 31:21

85:23 87:1

**decisionmaker**
123:8

**defendant** 99:13,18

**definitive** 52:4

**defrauded** 93:4
109:21 110:14

**degree** 8:19

**delay** 46:16,24
71:18 106:4,18

**delays** 45:18 46:5
106:10

**delivered** 17:18

**delivery** 86:14

**denies** 105:22

**Department** 42:9

**depending** 24:21

**depends** 25:21

**deposit** 17:19

**deposition** 3:8
91:23

**depositions** 3:18
6:6

**describe** 10:22
90:12,15

**describes** 64:14
119:2

**description** 46:11
55:16

**design** 13:3 15:9

**designated** 69:18

**desk** 33:11

**detailed** 75:22

**details** 119:24
123:13

**develop** 14:12,23

**difference** 19:7
65:19

**differentiate**
107:16

**difficulty** 4:20,21

**digital** 13:3

**direct** 27:23,25

45:12 76:7,11 78:18

**directed** 60:1 67:19
73:2 75:4

**directly** 20:16 24:7
27:11 38:24 45:14

**directs** 58:13

**disappeared**
109:15

**discern** 94:16

**disclose** 122:9

**disclosure** 5:16
40:24 82:20

**discoverable** 104:5

**discovered** 37:20
94:7

**discoveries** 6:4

**discovering** 47:1

**discuss** 39:4 90:13

**discussed** 38:13
94:9 102:18 106:21
115:17 122:1 123:25

**discussion** 5:2
7:25 25:14,17 40:15
47:9 48:22 57:13
84:3 90:6 91:9,24
99:24 115:24,25
118:1 121:18

**disinterested**
42:19

**District** 3:12,13

**document** 29:19
47:7 49:16,22 53:1
56:14,21,25 70:13
71:14 88:25 118:18
119:13

**documentation**
51:2 120:3

**documents** 29:11,
18 30:2,20 35:24
40:17,22 49:10
50:15 51:17 52:18
62:20

**Doe** 97:25 98:12
100:12

**Doering** 76:8

**domestic** 76:5

**door** 97:2

**dot** 55:4 67:18 77:9

**double-check**
71:22 109:25

**doubt** 114:19

**dozen** 16:22 28:10

**Drayton** 93:22

**drop** 67:18

**Duluth** 91:18 92:6,
12

**duly** 3:2

**duty** 57:1 108:11
116:11,15,23 117:5

---

### E

**e-q-u-p-m-e-n-t**
55:2

**ear** 15:11

**earlier** 43:7

**early** 73:4,23

**ears** 15:5

**easy** 68:13

**Edmonton** 5:8 9:16
13:14 41:22 42:4,9
52:15 88:25 89:5
96:1

**education** 8:21

**educational** 8:8,13

**effort** 96:21

**efforts** 31:11

**electronic** 34:14,
18,22 94:13

**Eleven** 118:17

**Elliott** 19:13,18,21,
25

**email** 28:1,4 34:14,
23 35:25 46:4,16
52:19 53:5,7,15,18
55:14 59:13,25
60:20 61:3 67:20
69:17 70:22 72:16,
17 73:3 74:6 75:5
76:10 78:17,22
79:16,25 81:16
83:19 92:15 102:15,
17 103:7 107:6
115:4,9

**emailed** 39:13

**emails** 34:3,6 37:23
67:16 72:25 74:23
78:12 79:10 106:5,
11,19

**employees** 12:24
114:9

**employment** 8:24

**enclosed** 53:20

**end** 14:20 29:19
30:9 31:19 40:7 42:6
72:11 84:11 104:21
114:4,9

**ended** 10:23

**endorsement**
14:22

**enter** 122:16

**entire** 51:6 70:14
71:15

**entities** 105:17
111:15

**entitled** 41:18 47:7,
12 49:13,23 88:25
89:5

**envision** 14:9

**Equip** 22:4

**equipment** 19:16
20:13,16,18 22:6,14,
17 24:5 25:16 29:1
30:13 48:25 49:3
57:21 61:19 62:5
63:14 64:25 65:5
69:20 83:20 85:17
97:24 99:12 109:9,
13 116:10 117:1

**equivalent** 42:7

**Esq** 3:3

**estate** 38:19,20
107:13,16,19 108:1
123:16,24

**estimate** 15:7

**estimate's** 16:21

**eventually** 4:2 9:23
10:8 24:22 26:21
48:2 84:9,10

**everybody's** 35:6
69:15

**everyday** 4:10

**evidently** 60:8 97:10

**examination** 6:3

**examined** 3:2

**examples** 79:10

**exceed** 56:9

**exchanged** 39:17 102:19

**exciting** 43:10

**exhibit** 5:11 40:16, 21 41:16 47:5,6,11 48:23 49:1,7,11 51:17 52:19 75:3 79:10,15 83:14 84:5, 24 87:18,20,22,23 88:12,17,24 89:4 91:4,10,23 92:1,20 97:8 98:7 99:25 118:16,20 119:16 120:7

**exhibits** 4:3 80:17 115:22 118:6 119:18

**existing** 14:19,24 15:5 19:18,25 96:9, 14

**exists** 112:25

**expect** 102:22 111:10

**experience** 8:24 122:16

**experienced** 46:20, 22

**experts** 121:12,13

**explain** 89:3

**export** 73:8

**expressly** 118:9

**extension** 18:24 19:2

**extent** 95:10 100:15 108:18,20 109:20 112:25 116:12 121:2

**extra** 100:4

**eyes** 15:5

---

**F**

---

**F.o.b** 56:12

**face** 27:13,14,15

**facilitate** 50:24

**facility** 13:13

**Facsimile** 84:20

**fact** 14:20 22:3 31:14 35:10 74:9 76:17 81:22 90:21 97:23 100:17 101:21,25 104:12 105:7 106:21 111:2 122:1,12

**factor** 111:9

**factory** 64:3

**facts** 3:24 120:25

**factual** 90:20 100:14,17,19,22 108:21 112:20 117:4 121:22

**fair** 88:8 108:12,24

**faith** 108:12,24 109:5,12,16

**false** 73:18

**familiar** 21:15 112:15 115:1

**family** 117:17 118:4

**fashion** 27:23 28:1 122:21

**fast** 4:11 116:5

**fault** 101:25

**fax** 34:18,19 35:23 78:5,11,14,17,21 84:18 92:14

**faxed** 78:8,18 79:4 81:14,21 82:1 84:22

**faxes** 34:23

**FBI** 42:7,8

**February** 6:20 93:3 98:16

**Federal** 3:11 97:14

**fee** 56:14

**feel** 108:22

**feels** 108:25

**fees** 58:25 59:3 66:25

**feet** 18:20

**felt** 46:9

**fiddled** 36:14

**fiduciary** 116:11, 15,22,23 117:5

**figure** 18:5 72:10 81:6,24 83:4 87:10 88:6 104:1

**file** 17:23 60:20 95:1 97:23 99:12 117:11

**filed** 16:16,23 17:7 48:24 49:3 95:5 98:2,16 99:4,6,10,14

**filled** 29:20

**final** 60:11 65:25 84:17

**finalized** 86:10 112:2

**finally** 24:13 59:21

**find** 14:5 15:12 20:18,19 23:23 24:5 27:1 29:9,10 53:20 63:9 90:2 96:21 98:18 100:3 103:4,5, 6,7,9 106:7 110:20 111:17

**fine** 13:24 21:3 33:19 41:8 72:24 108:21

**finish** 113:14 116:18 118:5

**finished** 17:19

**finishes** 68:12 120:4

**firm** 5:13 8:25 9:25

**fit** 25:19

**fix** 96:12

**fixes** 115:8

**flat** 34:8

**fog** 35:6

**follow** 59:12 98:5 116:16,17

**Fool's** 7:7

**forbid** 87:22

**force** 14:7,14,15 42:10

**Ford** 19:15 20:2

**forever** 77:23 110:1

**forget** 35:18 47:5,10 85:13

**forgot** 20:21 29:9 62:25

**form** 5:9 18:9 89:1,6

**formal** 8:21

**format** 76:2

**forms** 12:13 34:5

**forward** 105:10

**found** 20:20 21:21 22:21 23:6,7 31:2 67:13 89:20 111:14

**Foundation** 111:20,23 114:11

**frankly** 42:10 62:20 66:8

**fraud** 39:12 40:3 76:25

**fraudulent** 40:3 72:3 94:12,23 95:9 98:13

**Free** 57:10

**freight** 56:8

**Fresh** 6:18

**Friday** 35:4 36:9 69:7,9 71:16 77:2 123:15

**front** 35:24 47:14 49:22

**full** 3:4 18:12

**funds** 17:17,18 36:6 42:1 58:14 70:1 72:5 86:23

**funny** 58:22

---

**G**

---

**G-E-N-S-E-M-E-R** 92:25

**G-I-N-T-H-E-R** 52:12

**gain** 112:8

**gather** 51:3 118:14

**gave** 39:9 41:22 42:9 45:8 102:10 104:2 115:19

**Geez** 77:13

**gel** 37:18

**general** 3:25 25:16 26:11 33:19 38:14 101:9 102:13,24 111:1 114:6,15 115:24,25

**generally** 8:23 12:8 14:17 19:4 25:1,3 50:22 120:6

**generate** 82:11

**generated** 50:16 51:19 83:9 86:12

**Gensemer** 92:25 93:2,9,11 97:21 99:10 110:14

**gentlemen** 38:12

**genuine** 83:23

**Georgia** 91:18 92:6, 12

**Ginther** 52:12 97:5 99:2

**gist** 29:15

**give** 15:7 46:11 52:4 66:5 82:20 88:11 101:2

**giving** 3:24

**Glad** 120:18

**gmail** 37:3,4,5,10,23 77:7,14,18,25 78:25 79:1,5,11,17 80:5, 11,12 81:6 84:15

**gmailed** 81:8

**god** 7:12

**good** 16:21 23:25 25:10 26:23 76:24 108:12,24 109:4,10, 12,15 117:24

**goodness** 3:21

**Gosh** 21:1 114:7

**gotcha** 23:2 37:25 38:2 40:13 60:22

63:17 73:17 122:25

**graduated** 8:16

**great** 14:18 112:10

**greater** 18:22

**ground** 3:22

**guess** 6:8,22 7:4
12:14 14:24 16:20
22:11 27:19 28:9
29:13 33:16 38:15
45:3,20 46:2,21
50:4,14,15 55:8 63:5
64:18 67:8 69:1 70:2
72:25 77:24 79:15
80:9,14 87:17
101:11,22 104:9
106:1 107:22 110:25
111:5,13 113:2,20
115:7 116:3,16
123:2

**guessed** 10:4

**guessing** 12:25
38:15 83:2 91:1

**guy** 25:10 31:1,14
32:19,20,21 38:23
40:3 42:22 51:24
52:13 80:15 94:13
109:10,16 110:14
112:7

**guys** 22:6 33:7,10
102:11 103:24

———————

**H**

**hack** 104:18

**hacked** 74:8,19
97:9,10,13 101:18
102:1 105:21,22,23
106:1

**hacker** 101:22
112:7,8,12

**HAEBERLE** 4:24
27:25 34:17 43:10
52:21,23 56:4,6
64:11,13 67:25 68:4,
6 70:21,25 80:25
81:16 83:8 87:19
90:11 95:10,13
99:19 100:3,15
102:6 104:6 108:18
111:20,23 112:23
113:18 114:11
116:12 117:7

**half** 16:22 77:4
86:17

**half-ton** 18:16

**hand** 57:19 112:7

**handed** 85:25

**handle** 98:12
108:23

**handled** 50:18
71:17

**Handouts** 16:7

**handwriting** 40:18,
25 41:1,8 52:24
53:25 54:6,8,18
60:13,18 72:14
73:24,25 74:1,2,4,12
75:10 78:4,15

**handwritten** 60:13
97:8

**happen** 20:12 26:1
103:1 111:16

**happened** 36:3
38:13,14,15,17,18
88:6 89:10,25 96:22
105:1,2 106:14
115:2

**happening** 105:17

**happy** 112:9,10

**hard** 21:13 34:8

**hate** 102:12

**head** 4:15 30:3
43:20

**header** 72:17

**heading** 100:7

**health** 9:15

**hear** 4:19 5:20,23
70:5 94:20

**heard** 87:12 93:14
97:20 106:9

**Heaven** 87:21

**heavier-duty** 19:3

**heavy** 96:19

**held** 110:1,4

**hell** 11:5 22:4 41:14
47:2 77:19 95:16

98:23

**Hey** 14:18 24:16
35:9 103:22

**history** 26:18 31:3

**hit** 22:9 86:2 89:22
95:17

**hold** 17:16 110:3

**holding** 110:7

**holdup** 44:7

**home** 28:14 114:2

**honest** 42:19 46:23

**honestly** 42:20

**hope** 118:13

**hours** 23:22 26:10
27:2,6 68:20

———————

**I**

**i-n-t-l** 73:21

**idea** 8:13 46:12,18
58:4 81:9 110:19

**identifiable** 99:13,
18

**identification**
47:11 49:2 92:22
99:25 118:20

**identified** 64:25

**identifies** 92:11

**identifying** 47:20

**IGA** 9:14

**Illinois** 3:13 57:23

**imagine** 28:19 88:9
89:25 96:23

**immediately** 7:8
42:6 89:22

**implication** 109:1

**implied** 108:11
109:1 110:23

**important** 43:12

**impossible** 45:3

**in-house** 28:21
32:21 66:6

**incident** 41:23,25

**include** 43:12

**included** 78:23,25

**includes** 83:19
108:11

**including** 5:6 84:6

**incorporated** 11:24

**independent** 32:23

**indication** 97:7
101:24

**individual** 14:8
17:3

**individually** 17:1

**industry** 10:10,12
21:4,5,15,18 112:17,
21,22,24 113:5,16,
17

**info** 60:14,23 75:16

**information** 8:4
22:3 29:17 32:19
39:9,12,17 41:21
45:13 46:2 54:12
58:1 61:13 66:15
76:13,19 82:22 91:3
94:6,15,16 95:23
100:12,18,22,24,25
101:2,6,8,16,19
102:3,5,8,14,18,23,
25 103:8 104:2,4,17
105:7 110:24 111:2,
11,15,17 113:9
116:24 119:6 122:4

**initial** 5:15 25:14
40:23 82:20

**initially** 4:1 9:18
50:14

**initials** 75:18

**inquiries** 76:7,11

**inquiry** 97:4

**insisting** 78:22

**inspection** 31:3

**install** 33:7

**installed** 26:16

**instance** 26:1

**instances** 17:7

**Institute** 8:11,17

**instructions** 53:22
54:1 57:16 58:8,13

59:19 60:14,23 61:5
62:16 65:13 66:24
67:3,8,10 75:10,11,
21,22 76:4,15,21
85:22,24,25 86:4,9,
16 90:11

**insurance** 8:2
93:16,21,22 95:1,5,
18,19 96:3

**intention** 23:14

**intercept** 100:12
104:18

**intercepted** 40:4
111:25

**interest** 22:10 115:3

**interested** 24:18
25:16 112:3

**interfere** 45:21

**interference** 94:23
107:6

**international** 52:5
73:21 76:5

**internationally**
85:6,13,16,20

**interpret** 74:24

**interpreting** 104:10

**interrogatories**
47:8,13,16,21

**inundated** 22:2

**investigation** 88:5
97:15

**invoice** 55:16,25
56:17 60:11 61:4
103:22

**involve** 9:13

**involved** 10:10
11:9,19 17:25 30:19
31:10,12,15 32:4
33:20 35:1 44:19
58:5 62:2,6,11,14
69:15 86:25 87:10
106:25 112:3

**involvement** 9:18
50:17 95:9

**involves** 18:4

**iphone** 70:11,15,16
71:1,2,4

**Islands** 94:19

**issue** 17:12,15,16, 25 46:15,25 65:22 77:13

**issued** 86:23 90:8, 21 91:13,22

**issues** 9:15

**IV** 108:8

---

**J**

**J-E-F-F-R-E-Y** 92:25

**Janice** 29:25 30:5,7, 20 40:2 44:16 53:10, 11 75:5 76:13

**jaryce@ runnionequipment .com.** 75:6

**Jason** 7:12 117:22

**Jay** 121:21

**Jeffrey** 92:24 93:9, 11 97:21 99:10

**Jennifer** 53:6,10,13, 23 54:24 58:10 86:6

**jmolina@ runnionequpment** 54:25

**job** 14:18

**jobs** 9:9 13:1

**John** 97:25 98:12 100:12

**joined** 118:3

**journal** 20:22

**journals** 20:25

**June** 40:19 41:4

---

**K**

**Ken** 51:24 52:12 99:2

**Kevin** 114:22

**kind** 4:3 5:22 6:9 8:19 9:9 13:1 14:12 16:8 18:3 19:5 25:1, 22 28:17 34:14 37:15 39:16,23

46:21 57:21 58:22 62:3,20 65:20 82:16 83:23 90:18 93:16 95:3 105:5 115:19 119:8 121:12

**kinds** 4:3 8:15 10:20 47:23 51:18 120:1

**knew** 39:15 46:3 105:16 111:24

**knock** 118:7

**knowing** 105:12

**knowledge** 47:22 53:7 90:14 112:20 114:15 117:16 120:25 121:22

**Kyle** 7:12

---

**L**

**L-I-G-H** 10:2

**L-I-T-E** 10:2

**L-L-O-Y-D-M-I-N-S-T-E-R** 6:23

**ladies** 53:8

**lady** 88:10

**Lake** 9:1,12

**Landale** 9:8 10:8,9, 25 11:2,10,22 12:9, 24 13:2 16:14 19:5 31:10 33:14,20 48:25 49:3 54:9 60:15,18 63:16 65:8 72:20 74:3 75:14 78:19 84:13 89:20 103:22 105:12,21 114:25 115:4 116:8, 10 117:15 123:6

**Landale's** 31:19 47:7,12 88:14 114:9

**landalesigns.com** 83:21

**landalesigns@ gmail.com** 80:1

**landalesigns@ gmail.com.** 77:9

**language** 59:5 67:2 76:2 116:3

**Laura** 7:13,17 12:7 115:10

**lawsuit** 3:24,25 4:2 16:16 17:23 18:4

**lawsuits** 17:3,24

**lawyer** 4:4 38:20 41:9 98:22

**lawyer's** 98:22

**lawyers** 6:2 91:12, 20 97:18 117:17

**learn** 99:9

**learned** 121:25

**left** 57:19 65:9,13 66:15 88:2

**left-hand** 61:16 65:13 77:8,10

**legal** 90:19 95:4 100:16 108:19,21 116:13

**legitimate** 111:15

**legitimately** 105:11,16

**lessen** 95:3,6

**letterhead** 103:17

**level** 33:9

**liability** 92:21

**lien** 17:22

**lift** 19:2,13 23:15

**lifting** 96:19

**lifts** 20:4

**light** 44:12

**limited** 63:16 65:9 92:21

**lines** 71:7

**list** 58:16 76:4 82:21

**listed** 15:17,19 29:10 56:14,15 65:9 92:6,21

**listing** 15:23 65:15

**lists** 49:25 50:1 65:5 86:18

**live** 7:14

**lived** 6:15

**Living** 53:8

**Livingston** 50:16,

24 51:4,10,12,19,23 52:3,10,18 70:7 73:10,20 74:7,14,25 97:5,10 98:19 99:1,2 105:14 111:25 112:1

**Livingston's** 50:16

**Livingston@ yahoo** 73:16

**Livingstonintl** 74:11

**LLC** 58:2,3,15 86:19 91:17 92:5,11,21 93:14 99:7

**Lloydminster** 6:20, 21

**local** 3:11 41:22 42:21,22

**locally** 85:11

**located** 13:13

**location** 13:15 23:8 94:12 103:16

**log** 28:18

**logo** 57:20 61:17 103:18

**long** 6:15 11:18 13:15 18:8 33:2 51:3

**longer** 23:19

**looked** 49:23 63:5 100:1 115:22

**lose** 109:24 116:4

**loss** 93:17 109:20 110:12,13

**lost** 38:24 95:16 109:21

**lot** 27:4 32:24 47:2 110:19 111:13 121:7

**Lots** 20:24 122:18

**loud** 4:8

**lower** 52:25 77:8,10 92:8

**lunch** 121:13

**Lyons** 57:23

---

**M**

**M-A-C-I-O-L-E-K**

24 51:4,10,12,19,23

52:9 73:19

**M-E-S-S-U-C-K** 29:4

**M-O-L** 122:3

**machine** 86:14

**Maciolek** 52:9,16 73:14,19 97:5 99:2 102:1

**Mackay** 114:22

**made** 13:9 43:2 65:19 90:21 95:25 96:3,8 101:21 104:19 113:23,24

**magazines** 21:15

**mail** 16:1 34:8,10 92:14

**maintain** 110:23

**major** 26:20 27:5

**make** 4:7,13,17 13:6 15:3 16:8 19:12 25:23 26:22 39:23 43:24 44:2 66:10 93:19 95:7 97:4 109:23 123:12,20

**makes** 85:22

**making** 31:21 102:12

**man** 29:3,19 66:7

**manager** 9:11 114:19,21

**manipulated** 101:20

**manufacture** 12:10

**manufacturing** 13:4

**marital** 7:1

**mark** 43:11 47:4 72:18,23 87:17,19, 23,25 88:11,17 91:4 97:11 118:14

**marked** 40:21 47:11 49:1,13 50:1,9 52:24 69:3 77:6 91:22 98:7

**marriage** 7:6

**Married** 7:2

**materials** 5:4,15 16:4 43:6 83:6 87:15

91:11,20

**matter** 14:19 22:3
35:10

**meaning** 74:15

**means** 45:17 46:11
54:20 60:20 70:1
74:13 95:3

**meant** 59:3 62:6
105:6

**meat** 66:14

**mechanic** 31:2

**medication** 5:22

**medium-size** 85:10

**meeting** 15:7

**member** 93:1 118:4

**memo** 80:21

**memory** 56:24

**mention** 11:8 45:5

**mentioned** 32:12
33:22 38:5 39:19
44:22 65:19 66:1
77:7 93:13

**message** 45:13

**messages** 44:20

**Messuck** 29:4,6,12,
16 30:19 40:2 60:2
65:6 67:17,23 69:19
73:3,18 79:11 86:22
87:12

**Messuck's** 60:2

**met** 27:15

**metal** 13:5

**Michael** 52:9 58:2,
3,15 66:16 86:4

**microphone** 86:3
118:7

**middle** 70:24 98:17
102:4,11

**Mike** 52:16 70:5,6,7
73:8,10,19,25 99:2
102:1

**miles** 23:22 27:6

**mind** 21:2 30:16,17
31:9 45:20

**mine** 72:18,20,21

**matter** 14:19 22:3
35:10

74:20 75:15,17
78:19 81:4

**minute** 44:4 54:23
64:5 87:12

**missing** 59:2

**misspoke** 8:1

**Mitch** 58:2,3,15
66:16 86:4

**mitigate** 94:25 95:3

**mix** 54:11 70:4

**Mm-hm** 10:3,5,7,21
12:16 14:13 16:5
20:6 24:19 41:20
59:1 60:10 67:1
69:24 79:22 84:12
92:19 94:3 102:16
103:11,25

**model** 19:12

**modifications**
25:23

**Mol** 122:3

**Molina** 53:6,23
58:10 86:6

**Molina's** 54:24

**moment** 11:7 31:9
68:7 106:7 120:2

**Monday** 35:3,4,5,
14,20,22 36:9,14,17
69:22 71:9 73:5,24
74:21

**money** 17:11,20
31:13,14 32:10 35:2,
4,7 36:1,4,19 37:12,
13,14 38:13,24 40:4
44:13 57:3 62:18
65:23 66:4,7 69:8
70:13 71:14,16,21
77:2 85:23 86:1
87:13 88:2,10,14
89:12,21 91:1 95:17
96:25 98:15 107:11
109:15 118:11

**month** 98:17

**months** 93:4 110:4,
5

**morning** 22:4 35:3,
4,20,22 36:9 73:5,24
74:21 75:8

**Morrow** 41:12

**mother** 7:12

**mounted** 19:15,25
42:16

**move** 49:8 89:23

**moved** 6:17 9:16
89:24

---

**N**

**N-E-I-L** 32:17

**NAFTA** 55:19 56:22,
25 57:9

**named** 90:2 99:17

**names** 7:11 52:1,8

**narrative** 68:11
89:10

**narrow** 113:2

**naturally** 13:4

**nature** 4:21 76:6
100:7

**needed** 26:7 43:17

**negative** 112:13

**negligence** 100:16

**negligently** 100:11

**negotiated** 50:5

**negotiating** 65:25

**negotiation** 31:21
104:13

**negotiations** 62:4
106:3,18

**Neil** 31:15 32:13,17
35:10 36:23,24 39:6,
18 40:10 44:18,19,
22 45:9 46:1,25
54:7,15 59:9,15
67:11,14 69:15 73:1
74:23 78:19 94:7,11
100:18,20 101:23
106:21,25 107:12
115:7,10,15,19
116:1 121:6,8

**Neil's** 38:10 46:8
60:24 72:18 74:1,12
75:12,13

**neon** 12:11,12 63:16
65:8

**nice** 120:4

**nickname** 29:7

**nods** 4:14

**nonverbal** 4:16

**Normal** 116:25

**North** 56:9,12 57:10
58:14 67:7 86:5

**Northern** 3:12 8:10,
17

**notation** 119:12

**note** 58:25 66:24
67:21 68:24 69:17
70:12 72:3,14 73:17
74:8,18 76:20 80:8
81:5,8,12 82:9,11
83:5 92:1 93:21

**noted** 28:2

**notes** 54:9 60:15,18
72:20 74:3 75:14
78:19 80:12 86:2
97:8 121:15

**notice** 3:9 35:21
36:8 55:7

**noticed** 5:5 12:11
62:12,13 65:14 80:9
106:4,18

**number** 8:2 23:25
26:10 27:2 37:19
40:16 47:6 48:23
76:10 85:18 88:12,
24 91:10 92:23
105:19 114:6 118:16
122:16 123:9

**numbered** 51:17

**numbers** 65:25
82:13,15 92:8

**nuts** 102:17

---

**O**

**oath** 47:17

**object** 100:15 104:6
108:18,20

**objection** 27:25
34:17 64:11,13
111:20 112:23
113:18 114:11
116:12 121:2 122:8

**objection's** 28:2

**objections** 117:7

**obligation** 116:23

**observation** 48:1
80:14 95:25

**occasion** 13:8

**occasions** 28:11

**occupation** 8:23

**occur** 112:13,14

**occurred** 106:22

**October** 48:11

**odds** 68:13

**offered** 57:5,6

**office** 28:12,16
33:5,6,11 66:21
113:24

**officer** 42:23

**officer/owner**
92:24

**officers** 12:3,6

**oil** 24:1

**on-premise** 12:10

**one's** 23:10

**online** 16:2 21:11,
24 22:1 24:16 39:12
103:9

**open** 15:5,12 93:4

**opened** 91:16 92:5,
16

**operate** 23:23

**operated** 9:12 20:9

**operating** 26:23

**opinion** 108:21
116:13

**opinions** 94:8

**opportunities** 15:2,
16

**opposed** 4:14 6:1
14:24 17:1 28:14
45:6

**order** 29:20 49:13,
23 56:1 61:11 63:25
79:17 80:21 81:13
84:2,6 116:25

LANDALE SIGNS AND NEONS vs
RUNNION EQUIPMENT and JOHN DOE

LANDALE SIGNS AND NEONS Document #: 93-1 Filed: 11/26/18 Page 42 of 159 PageID #:809
Darren Ross Brown - 1
July 20, 2018

118:19,24 119:1,2
120:17

**organization** 42:7

**organize** 68:19

**organized** 31:13

**original** 84:6 97:23
98:2 99:14 110:25
118:17,21

**originally** 79:20

**Orville** 102:12

**outfit** 5:14 62:1,25
63:2 90:1,2

**owed** 116:10

**owned** 9:12 62:5
63:2

**owner** 9:21 11:9,22

**ownership** 62:15,
19

**owns** 107:21

_____

**P**

**p.m.** 53:16 60:8
67:19 69:23

**package** 34:21
39:13 87:20

**Packers** 8:25 9:3,
10,18

**pages** 52:20 54:19
55:23 59:8 77:5
79:13,16 80:20
83:16,17 84:5 87:24
88:13 91:5 92:8 93:9
118:17,18,23
119:11,23 120:10

**paid** 93:24 118:10

**pals** 121:13

**paper** 5:7 34:10
103:18

**paperwork** 51:3
73:8 86:12 112:4

**paragraph** 44:10,19
71:7 106:1,8 107:4
108:9,15 110:22

**paragraphs** 111:1

**Park** 6:14

**part** 5:10,15 16:20
27:11 28:10 40:23
43:22 64:10 70:15,
22 74:2 77:10 82:1,
19 88:5 89:6 102:19
109:21 117:5 119:14
122:15

**part's** 60:17

**partial** 94:1

**particulars** 24:22

**parties** 3:10

**partner** 9:22 11:13
62:5,9,18

**pass** 42:14

**passed** 62:21

**passing** 111:11

**Passo** 110:2

**past** 17:23 98:25

**Pat** 24:12,20 25:9
27:11,23 28:8 29:1
31:21 35:10,11
36:22,24 38:6,17,23
39:21,22 40:1,10
49:18 56:21 62:4
65:19 66:1,11 69:13
79:16,25 80:8,9,20
81:8,14,18,21 83:6,
19,24 84:10,17
95:19 96:7 102:19
105:2 106:3,5,9
107:5,12,13 109:12
112:9 114:5 119:19
123:14,25

**patch** 24:1

**Patrick** 84:16 109:7

**pattern** 4:5

**pay** 17:22 31:22
103:20 110:18

**paying** 18:1 57:1

**payment** 17:10 30:8

**people** 12:21 16:2
17:10 18:1 22:2,14
24:1 29:2 30:14,23
32:17 39:5,16 52:3,
5,10 70:7 86:25
103:8 105:11 108:22
121:8

**percent** 14:20

**period** 26:12

**person** 29:23 30:22
35:20 39:7 47:21,22
51:9 76:8 92:24
98:13 111:17

**person's** 39:10

**personal** 101:3
102:8,21 107:18
111:6

**personally** 107:19

**phone** 15:19 25:4
27:16 28:4,6,16,19,
20 34:2,6,23 36:22,
24 37:9 38:10 39:25
40:6 76:10 107:9
113:23,25 114:2
123:16

**phones** 114:6

**phonetic** 11:15
41:12 74:18

**photo** 120:4

**photograph** 50:10

**physical** 51:1

**pick** 104:19

**piece** 25:16 62:5
103:18

**pieces** 5:7

**pirated** 66:21

**place** 6:19 7:17
33:11,12,15 63:25

**plaintiff's** 91:11

**plant** 14:19,21

**PME** 63:14

**pocket** 104:19

**point** 6:8,14 18:19
22:11 24:9 30:16
34:25 35:11 36:3,21
37:4 38:3,10,16
39:6,15 46:3 50:7
54:21 55:18 62:7
63:23 64:5 65:11
66:11 69:15 76:24
78:2,8,9 86:9 90:7
96:10,12 97:3,19
107:1 109:15 110:1
111:13 115:13
121:17

**pointed** 46:25 54:9

**points** 7:8

**police** 5:8 41:19,22
42:4,9,16,22,23 44:6
49:12 88:18,20,25
89:2,5,6 95:11 96:1

**Polick** 3:3,4 5:1,3
7:23 8:1 28:2 34:1,
20 40:14,21 43:9,11
47:4,10 48:21 49:1
52:22,24 56:11
57:12,14 64:16 68:2,
5,7 70:23 71:5 81:2,
17 83:11 84:4 85:2
87:21 88:16 89:3
90:7,17 91:7,19,25
95:15 99:22,25
100:5,19 102:10
104:12 109:4 112:5
113:1,22 114:14
116:19 117:10,25
118:2,20 120:15,18,
21,23 121:5,19
122:15

**policy** 93:19

**poor** 67:2

**poorer** 119:17

**Portal** 56:9,12

**portion** 17:16,17
44:5 93:10

**position** 103:6

**possibly** 31:7

**post-secondary**
8:10

**potential** 22:18
107:5

**practice** 16:14
113:4

**pre-existing** 22:23

**preaching** 112:11

**preceding** 48:10
55:23

**predicated** 121:6

**predominant** 21:4

**preliminary** 82:21
88:5

**prepared** 89:2,6

**preparing** 30:19

**presentation** 15:4

**Presently** 12:25

**president** 7:21
13:18 47:24

**presume** 42:14
48:16 60:20 71:3
72:8 84:22 88:4 98:9

**pretty** 16:13 24:9
26:6 61:2 96:25
116:5

**previously** 63:10
75:23 93:14

**price** 35:16 50:5
55:18,20 56:1 61:8
62:8 65:22,24 73:22
102:15 119:8

**Prime** 61:21 62:2
63:1 65:14 66:12,16,
18 86:18 89:14 90:3
91:16 92:5,11,20
93:14 99:6

**principal** 11:21
15:23 51:9,22 76:7
92:23

**principally** 14:14

**principals** 12:4

**printed** 61:20
119:12

**printing** 13:3

**prior** 14:18 75:22
117:1

**privilege** 90:18

**problem** 23:25
71:21 78:10

**Procedure** 3:11

**proceeded** 109:4,
12,17

**proceeding** 3:15

**PROCEEDINGS**
3:1

**process** 87:11

**processing** 8:25

**produce** 56:25

**produced** 5:3,15
43:6

**product** 12:22 13:6
18:8

Calgary/Edmonton Independent Reporters
www.indreporters.com
9 Index: organization–product

**professionally** 75:25

**pronouncing** 73:20

**proper** 76:18

**protect** 101:7

**protocol** 101:7

**prove** 77:23

**provide** 8:6

**provided** 121:8

**proving** 38:3 78:2

**PTO** 26:10

**pulled** 59:15

**punctuation** 67:2 76:2

**punctuation's** 59:7

**purchase** 11:4,9 24:10,24 31:11 35:16 50:5,17 85:10 102:14 119:8

**purchased** 10:15 22:20 23:8 85:3,5,9, 12

**Purchaser** 64:25

**purchases** 122:17

**purchasing** 18:21 19:17 63:25

**pure** 16:20 28:9 29:13

**pursuant** 3:8

**put** 12:21 16:4 20:16 26:22 38:22 56:7,9 96:9 98:12 118:6

---

**Q**

**quadrant** 77:8,11

**question** 4:19 28:3 47:22 50:11 72:18, 23 76:5 80:14 97:11 105:21 109:11 120:3

**questions** 3:23 4:1, 4 5:20,23 47:17 48:3,18 64:14 84:23 121:16,20

**quick** 44:4 48:1 63:8 79:8 99:23

**quickly** 55:7 62:21

**quit** 83:2

**quoted** 41:3 53:21 68:12 70:3,12 71:13 73:7 74:5 78:16,20, 24 80:18 92:13 106:2 108:10

---

**R**

**R-U-N-N-I-O-N** 57:21

**R-Y-C-E** 30:1 75:5

**radio** 16:11

**rail** 15:11

**ran** 9:15 63:8

**Range** 6:14

**RCMP** 42:9,15

**reach** 18:19

**reached** 116:1

**read** 27:7 41:3,6,8 53:21 55:8 67:22 71:13 74:5,16 80:19 81:3,17 88:1 106:2, 10

**readily** 104:5

**reading** 26:14 55:6 82:8

**reads** 58:20

**ready** 86:14

**real** 38:19,20 46:12 99:22 107:13,16,19 108:1 123:16,24

**realize** 34:25 35:20

**realized** 36:16 40:2 78:9 94:22

**reason** 21:11 86:11

**reasonable** 101:11

**recall** 11:6,7 28:9 38:11 62:24 90:23 93:18 123:23

**receivable** 18:1

**receivables** 17:13

**receive** 5:8

**received** 36:2,6

40:23 53:5 57:17 58:9 69:25 71:23 72:4 74:6 75:23 76:15 87:13 91:11, 12,20,21 100:18

**receiver** 45:20

**receiving** 63:23 106:5,18

**recitation** 41:21

**recollection** 13:25 43:15,17

**recollection's** 33:19

**recommend** 97:17

**recommendation** 122:7

**Recommendations** 14:19

**recommended** 39:6 51:12

**record** 3:5,7 4:7,17, 25 5:2 6:10 7:24,25 28:23 34:1 40:14,15 43:21 47:9 48:22 49:25 57:12,13 66:11 84:3 85:2 89:4 90:6 91:8,9,15,24,25 92:4,13 99:22,24 117:25 118:1,2 121:18,19

**record's** 26:13 35:15 59:18

**records** 6:9 26:11 28:20 30:24 43:16

**recover** 95:7

**redirect** 104:18

**Ref** 73:25

**Refer** 73:24

**reference** 12:11 27:2 66:11 76:15 84:24

**referenced** 92:13 107:8

**referencing** 90:17

**referrals** 14:17,21

**referring** 39:20 43:15

**reflect** 3:7

**regard** 18:1 19:17 109:18

**regular** 22:15

**regularly** 22:17

**reimbursement** 94:1

**relate** 59:18

**related** 17:5 100:13 121:22

**relying** 100:18

**remainder** 5:14 83:15

**remaining** 57:14 84:5 105:19 119:23

**remember** 8:3 21:23 24:14 25:7,13 29:15 30:7,12,21 53:14 86:8 94:11,21

**remembered** 7:8

**rent** 20:5

**repair** 15:6

**repeat** 14:21,25

**rephrase** 27:12

**replace** 19:18,20,22 23:15

**reply** 68:24

**report** 42:3 44:6 88:19,20 89:2,7 95:11 96:1 115:19

**reported** 42:6

**reporter** 4:16 47:4 87:25 88:11

**reporter's** 4:6

**reports** 115:21

**request** 110:5

**required** 56:25

**responded** 95:20

**responding** 4:20

**response** 68:22 85:23 86:8,23 91:12, 21

**Responses** 47:7,12

**rest** 8:12 54:18 78:20 79:9 90:3 93:8 120:6

**result** 110:13

**results** 89:19 90:24 115:16

**retire** 96:11

**review** 68:8 92:1 106:7 122:5,20 123:6

**reviewed** 48:2 98:3, 9 123:3

**revised** 55:19 56:7 60:11

**right-hand** 60:19 92:8

**righty** 21:20 54:22

**rise** 3:24

**road** 6:14 13:14 96:12

**Roanoke** 22:20 23:7 85:14,15

**room** 6:2

**Ross** 3:2,6,8

**router** 45:14,16

**routing** 44:20 45:1 54:1 58:13 59:12,19 60:14 67:10 71:25 72:20 74:12,22 75:11

**Royal** 42:16

**rules** 3:11,13,22 82:20

**run** 39:17 44:4 51:16 62:8

**rundown** 45:8

**Runnion** 18:21 19:16,24 20:13,16, 18 21:21 23:4,15 24:5,6,12,20 25:4,9 26:8 27:11,23 28:8 29:1,24 30:13 31:8, 11,21 32:4 33:21 34:3 36:5,18,22 38:6 39:21,22 40:1 45:5 48:25 49:3,18 50:17, 22 51:13 53:9,10 57:20 58:17 61:17, 19 63:3,15,16 64:7,

25 65:5 69:13,20
71:21 72:15 74:7
75:21 76:11 78:7,18,
21 79:21,25 80:6
83:19,20 84:16,17
94:24 97:9,24 99:12,
17 100:11 101:15,
17,21,22,25 102:24
103:14 104:3,24
105:12,22,25 106:3,
5 107:5,17 109:7,9,
12,13 110:13 113:24
114:5 116:10 117:1,
6 118:9 119:19
123:3,14,25

**Runnion's** 42:6
44:23 47:8,13 61:24
63:23 66:21 76:4
102:17 104:21

**runnionequpment**
67:18

**runnionequpment.
com.** 60:3 69:20
73:3

**runs** 7:17 83:16

**Ryce** 30:1,5 40:2
44:16 75:5 76:13

---

**S**

**S-H** 11:17

**S-W-I-N-D-L-E-H-
U-R-S-T** 32:15

**safeguards** 104:24

**sale** 22:7 24:17
25:18 80:21 81:13

**sales** 9:11 10:24
11:1 13:4 14:7,14,15
49:13,23 56:1 84:1,6
118:19 119:1,2

**salesman** 14:23

**Saskatchewan**
6:20

**scanned** 34:10

**school** 8:9,14

**scope** 30:21

**secretary** 32:8

**secure** 78:10,12

**security** 101:7

104:20

**sell** 103:19 109:24
110:15

**send** 22:6 45:13
70:16 76:18 78:10
80:10,12 81:5 84:16
85:23 86:1 101:8

**sending** 22:2 62:17
72:13 77:18 79:17
101:19

**sends** 60:9

**sense** 101:10

**sensitive** 100:12,
23,25 101:5,16
102:3,4,9,20 103:2
104:10,16 105:6
110:24 111:1

**sensitivity** 102:21
104:8,9

**sentences** 39:19

**separate** 107:21

**series** 40:17,22

**serves** 56:24

**service** 5:8 9:4,19,
20 26:11 30:23,24
88:25 89:5 96:9,17
118:24

**services** 15:18

**set** 3:9 6:9 45:2
47:8,13 57:16 58:8
59:19 65:12 67:8,10
76:14 86:3,16

**settled** 26:7

**sheet** 5:9 13:5 40:24
43:5 78:15 84:18
88:18,20 89:1,9

**Sherris** 11:15,16,18

**Sherwood** 6:14

**shift** 49:7

**ship** 29:21

**shipping** 30:20
44:8

**shoot** 21:12

**shop** 15:3

**short** 9:20

**show** 62:21 79:4

**showed** 38:1 80:5
89:12

**showing** 37:23

**shows** 5:10 62:25
78:5 91:15 92:4

**side** 52:25 61:16

**sideways** 61:15
114:16

**sign** 9:5,6,7,24 10:6,
19,23 14:11 15:2
18:5 20:23 21:4,15,
18 122:20

**Sign-o-lite** 9:5,24,
25 10:22

**signage** 15:3

**signature** 48:8
49:14,16 65:5 79:3,8
83:11,13 84:6 93:1,8
119:16

**signed** 48:13 49:18,
19 79:17,20,21
80:16,20 81:13,18
83:6,10 84:10,11,13,
17 93:9 119:19
123:4,9

**signing** 12:20

**signs** 9:8 11:2,22
12:9,10,12,13,24
13:2 21:1,3 63:16
65:8 93:2

**similar** 18:8,15
23:2,6 67:5 110:25

**simply** 30:8

**Sincerely** 53:23

**sir** 6:13 120:18
121:17

**sit** 15:6

**sitting** 110:8,19
121:20

**situation** 87:1

**size** 19:7

**Skype** 27:20

**Skyped** 27:19

**slap** 103:18

**Slave** 9:1,12

**sleeps** 60:8 69:23

**slow** 4:12

**small** 85:10 93:18

**smaller** 18:17

**social** 8:2

**sold** 9:15 19:21
23:13,16,21 110:20

**solely** 104:2

**solicit** 14:7

**somebody's** 36:3

**someone's** 15:12

**something's** 35:9

**son** 9:15 41:9
117:20 121:21

**sort** 36:14 38:25
62:9 95:19 98:24

**sorted** 110:9

**sorts** 10:14 26:11

**sound** 26:23

**Sounds** 68:13

**source** 102:2

**speak** 4:8 15:11
26:20 28:25 29:11
30:5 39:7 43:2 96:15

**speaker** 36:24
38:10 40:6

**speaker-phone**
40:10

**speaking** 19:4
30:12 50:22

**specific** 4:1 25:24
102:4 107:25 113:9

**specifically** 97:12
101:15 112:24
113:16

**spell** 6:21 11:16
55:2

**Spelled** 75:6

**spellings** 32:18

**spoke** 25:7 27:11
29:23 30:7 31:8 37:1
44:16

**spoken** 27:13,16
28:8

**spoofed** 78:17

**spread** 23:20

**stamina** 6:9

**stand** 13:22 35:23
37:1 89:24 114:7

**standard** 112:16,18

**standards** 112:21

**standpoint** 104:9

**stands** 112:8

**start** 14:10 25:10
67:16 77:6 92:9
123:2

**started** 35:20 37:16
38:18 44:12 46:25
47:18 94:13

**starting** 35:6

**starts** 5:7 68:2,11
70:24

**state** 3:4 35:19

**state-owned** 63:11

**stated** 118:9

**statement** 5:9
41:17,19 42:11 89:1,
5 93:10 108:21

**states** 3:12 6:6 52:6
63:11 67:6

**status** 7:1

**stay** 54:22

**steered** 24:13

**Steve** 4:24

**stick** 64:5

**Stocked** 9:14

**stop** 4:20

**stops** 21:13

**store** 9:1,12,14

**straight** 82:17 92:9

**street** 15:1 57:22
58:17 61:17

**strike** 39:23 116:8

**strongly** 46:9

**struck** 79:23

**stuff** 18:16 21:12
22:6 33:7 37:15
39:13 45:9 49:11

54:15 72:14 77:18
81:21,25 83:23
103:10,16 106:10
110:9 111:13 115:24
116:4 119:8 121:25

**subject** 73:22

**submitted** 43:1

**subpoena** 90:7,21,
24 91:13,21

**subsequent** 39:8

**substance** 61:3
90:12

**suburb** 57:23

**suburban** 58:17

**sudden** 37:20

**Sue** 76:8

**sued** 17:8 98:18
99:1

**suggest** 97:8

**suing** 17:10

**suit** 17:7 99:4,6,10,
12,14

**summaries** 115:21

**summarize** 8:8

**summarized** 25:1
58:18 123:19

**summary** 42:24
43:14,23 49:12
115:19 120:24
123:21

**summed** 46:13

**Sun** 66:17 86:19
88:3,14 89:13 90:8,
22,25 91:13,14,22
92:2 96:21 99:4

**supply** 116:24

**support** 43:17
121:1

**supporting** 120:2

**supposed** 73:21
97:19 116:17

**surmising** 91:1

**sustained** 110:12,
13

**Swindlehurst**
32:13,14 33:2 36:23

44:19 94:7

**switch** 61:11

**sworn** 3:2

**system** 44:23 45:7,
12,25 46:10 105:23
106:1

---

**T**

**taken-for-granted**
109:1

**taking** 24:2 26:15

**talk** 4:11 24:21
121:14

**talked** 26:9 28:4
35:10,11 38:5,23
39:5 52:13 95:11
115:13 120:16,23

**talking** 4:10 5:18
20:22 27:8 30:22
31:7 37:7,8 38:4,18
51:24 70:21 79:16
83:21

**talks** 67:21 100:9
116:3

**targeted** 24:23

**taxpayer** 92:22

**technical** 31:1 45:8

**technology** 8:11,17
32:19

**telelifts** 18:17

**telephone** 27:24
28:8,17 34:13

**telling** 31:2 71:8
94:11 110:2

**ten** 51:6,8

**tendency** 4:11

**tendered** 118:22

**term** 45:15 67:13
95:4 101:12

**terms** 3:22 22:16
26:6 31:2,20 33:9
47:20 62:19 64:4
76:2 82:15 85:22
94:22 101:14 115:25
120:9

**Terry** 11:15

**testified** 3:3,17 5:25

**testify** 90:14 108:19

**theft** 41:25 106:15,
22 107:2,10 114:17,
18 115:1 123:15

**thief** 60:8 69:23

**thing** 5:18 46:21
62:9 77:7 95:20
109:2 110:4 111:24

**things** 4:3 5:5,12
8:15 10:14,20 16:11
26:9,12 29:20 36:14
37:19 39:1 46:18
47:23 51:18,19 76:6
96:5 101:10 112:13
116:15,17 118:5
120:1

**thinking** 26:4 55:24
61:8

**thought** 45:5 51:21
55:18 78:3 94:18
115:17

**thread** 67:20 68:2

**three-page** 74:22

**throw** 88:16

**tick** 56:20

**time** 4:10,15,18 5:10
8:21 11:13,21 12:15
14:20 21:12,18
23:19 26:12 40:9
41:10 44:2 45:18
46:5,6,24 51:6 62:13
72:7 77:18 80:5,9
85:16 100:1 107:8
110:15 112:2
114:14,22 115:13
123:24

**Timeframe** 114:12

**timeline** 69:6,16

**times** 3:20 16:19,22
21:1,3 27:10,17 28:7
29:11,14 30:5 85:3
106:10 123:12

**timing** 111:8

**title** 7:18,19 13:17
29:9 32:1,3,8,9
49:10 50:13 62:20,
22,24 63:3,18,23
64:5,6,20 92:25
118:24 120:1

**titled** 118:19

**today** 3:23 4:7 5:5,
6,22 6:24 8:4 13:24
26:13 87:15 96:13
99:9 115:23 116:2
120:23

**today's** 3:9 40:22
91:23 97:20

**toes** 59:25

**told** 44:25 45:11
63:10 94:8 101:23
104:23 105:2,25
107:5 111:18 121:6

**tollway** 63:12

**tool** 26:21

**top** 43:20 44:1 54:4
60:12,13 70:21
72:14 73:24 74:10
75:11 76:22 78:4
118:25

**topic** 30:18 31:8

**touch** 20:16

**touched** 91:2
113:22 116:1 123:11

**tough** 7:5

**track** 33:18 70:14
71:15 94:12

**tracked** 67:13

**tracking** 72:25 77:5
94:15

**trade** 20:22,25
57:10

**transaction** 19:23
23:6 30:9,10 32:4
33:21 38:22 50:19
51:13 52:5 58:6 62:3
70:14,19 71:15
76:16 94:24 100:13
101:15 102:13,20
105:8 107:14,17
108:2 109:21 111:6,
7,8,16,25 114:10,12,
13 115:1 121:23
123:3,17,24

**transaction's** 97:2
111:2

**transcript** 27:7
43:13

**transfer** 36:9 38:8

40:11 50:24 51:1
61:12,13 82:6 88:13
107:10

**transferred** 64:7
89:21

**transmission**
34:15,18

**transmit** 87:4

**transmittal** 84:20

**transmitted** 34:11

**transpired** 76:18

**treasurer** 32:8

**truck** 18:11,19 19:3
26:16,18 30:25 50:2,
14 62:15,20,21 63:2,
3,10 68:20 96:11
109:23,24 112:9
119:3

**truck-mounted**
10:13 18:4,9,13
19:5,8,17 20:9 23:3,
15 25:22 26:8 29:21
50:2 85:3 96:14
100:10 112:17,22,24
113:16 118:10

**trucks** 18:16,17

**true** 20:5 21:13
48:18 103:12,13,23

**Trust** 66:17 86:19
88:3,14 89:13 90:8,
22,25 91:13,14,22
92:2 96:21 99:4

**Tuesday** 35:5,8
36:10,15,18 38:8
40:11,12 107:10
123:14

**turning** 49:10

**TV** 16:11

**twigged** 62:16

**type** 42:23

**typed** 43:14 61:20
68:23 88:22

**typewritten** 89:9

**typical** 93:10

**typically** 12:21
33:14

LANDALE SIGNS AND NEONS v.                Discovery of Ross Brown - 1
RUNNION EQUIPMENT and JOHN DOE                        July 20, 2018
Case 1:18-cv-... Document #: 93-1 Filed: 11/26/18 Page 46 of 159 PageID #:898

## U

**uh-huhs** 4:15

**ultimately** 102:18

**underneath** 61:19, 20,23 65:3

**understand** 4:19 5:20,23 8:3 21:25 24:15 26:15 27:9 28:3 31:20 42:18 45:10,12,22,24 55:12 59:17 64:16 67:11 68:22 69:6 78:1 80:10 94:14 101:9 113:20 116:6

**understanding** 45:11 46:1,9,13 51:12 68:25 105:6 108:17,20 116:22 120:25

**Unidentifiable** 98:14

**unit** 22:19,22,23 24:11,12,13,17,24 26:10,24 31:3 50:11 51:1 55:16 83:22 102:14 119:2,3,5,24 120:4

**United** 3:12

**units** 120:3

**unknown** 35:1

**unobtainable** 104:2

**update** 73:8

**updated** 60:12 76:22

**updating** 61:4

**upgrade** 15:6 33:6

**upper** 57:19 61:16 65:13

**upsidedown** 82:8

**utilized** 18:8 51:13

## V

**Vague** 27:25 34:17 112:23 113:18 121:2

**Valley** 6:14

**vehicle** 63:11,25 64:22 100:11

**vendors** 85:18

**venture** 28:10

**verification** 48:6

**Vice** 7:21

**Virgin** 94:19

**Virginia** 22:20 23:7 66:18 67:7 85:14,15 86:19 88:3,15 89:13 90:9

**virtually** 45:3

## W

**Wait** 43:20

**waiting** 86:11

**walk** 84:25

**wanted** 24:24 26:9 96:11 105:5 110:3 113:11,13

**watching** 32:10

**website** 15:20 57:24 61:24 103:3,4

**website's** 15:23

**Wednesday** 44:6 69:10 75:7 77:1 82:4 107:10 123:14

**week** 33:15

**weeks** 86:17

**welders** 13:5

**West** 58:17

**where'd** 59:13

**whoa** 36:3

**whomever** 42:15

**whoops** 56:5

**wife** 12:7 31:25 85:25 114:19 115:5

**wife's** 7:3

**William** 29:6

**Willie** 29:3,4,7,8,12 30:19 35:25 37:2,9 40:2 44:7,13 46:6

60:2 65:6 67:17,23 68:5,11,15 69:12,19 70:12 71:4 72:3 73:3,18 74:7 77:15 78:21 79:11 86:22 87:12 106:9,23

**Willie's** 68:24

**wire** 36:9 38:8 40:11 53:22 58:13,25 59:3 60:12 61:4,12 66:24, 25 69:25 72:4 75:10, 21 82:6 87:15 88:13 89:12 107:10

**wire-transfer** 58:1 66:14 76:4

**wire-transferred** 35:15

**wired** 69:7,9

**wiring** 57:16 58:8, 12 59:19 65:12 67:3 75:22 76:15,21 85:22,23 86:3,9

**Wisconsin** 50:15 62:22 63:15 64:6,23 119:25

**witnesses** 82:21

**word** 47:16 59:2 101:4

**work** 7:16 9:4 17:17, 19 25:17 32:1,3 33:5,14 51:9 52:6 88:21 96:19

**worked** 8:25 9:2 10:6 20:17 33:2 36:20 51:23 52:3,7

**workers** 13:5

**workforce** 24:2

**working** 9:25 18:17 41:9 52:20

**works** 32:22,24

**world** 81:7

**worn** 15:3

**worse** 59:7

**Wrap** 34:21

**writing** 54:11,20 60:17 72:17 74:9 75:12 80:5 82:12 110:6

**written** 16:4 43:16, 21 47:17 48:3 55:21

**wrong** 35:9,21,22 38:22 77:24

**wrote** 54:15,16 60:22 70:12 74:17

**www. runnionequipment .com.** 57:25

## Y

**yahoo** 74:8,14,18, 25 97:10 102:1

**yahoo.com** 74:11

**yahoo.com.** 73:17, 21

**yard** 66:21

**yay-hoo** 74:18 102:2

**year** 9:2 11:20 23:19

**years** 6:16 9:6,7 13:16,22 14:2 18:10, 12 24:1 33:4 51:5 123:9



# ◢ LANDALE SIGNS.

8525 ARGYLL ROAD
EDMONTON, AB  T6C 4B2
PH (780)437-3730  FAX (780)435-9285
WWW.LANDALESIGNS.COM

## TRANSMITTAL SHEET

| TO: ALEX PASSO | FROM: Darrell Brown |
|---|---|
| COMPANY: Patterson Law Firm | DATE: 19/16 MAY 18/16 |
| FAX NUMBER: E-mail apasso@pattersonlawfirm.com | TOTAL NO. OF PAGES INCLUDING COVER: 48 |
| PHONE NUMBER: Cell # 780 717-2699 Office # 780 437-3730 | SENDER'S REFERENCE NUMBER: |
| RE: Runnion Equipment Company | YOUR REFERENCE NUMBER: |

X URGENT  ☐ FOR REVIEW  ☐ PLEASE COMMENT  ☐ PLEASE REPLY  ☐ PLEASE RECYCLE

NOTES/COMMENTS:

Alex
The attached are documents sent between Runnion and Landale Signs .
There are more than this but this seems to be the most pertinent .
Call me and I'll give you my credit card number.
As we discussed we need to move quickly to secure a lien or whatever instrument you feel is best to
secure  the equipment.

Thanks
Darrell

*June 28/16
DAN - this is all that
was sent to Chicago.*



EXHIBIT
Brown 1
July 20, 2018

This is an attachment to the Witness Statement Form for the Edmonton Police Service

STATEMENT May 19, 2016

As President of Landale Signs & Neon Ltd., I Darrell R. Brown want to register a complaint regarding the e-transfer of funds to purchase equipment in the United States.

Landale searched the internet and found a 2005 Sterling 8500 truck with an 85 foot crane. The unit was for sale by RUNNION EQUIPMENT COMPANY of Lyons, Ill. I Darrell Brown on behalf of Landale Signs Ltd.,contacted Pat Runnion of Runnion Equipment regarding this unit. After many e-mails with Pat sorting out the purchase/sale of the equipment an agreement was reached regarding price.

An agreement was signed by both Runnion Equipment (Pat Runnion) on April 11th, 2016, and Landale Signs (Darrell Brown) on April 12th, 2016, re: quote 4952 consisting of a Sales Order Signature page with a 2 page Sales Order with the details and price of the equipment.

At this point Pat Runnion turned the order over to his Rental Co-coordinator Willie Messuck to handle the documentation necessary to export the equipment to Canada.

The documents required were:
1. Certificate of Title
2. NAFTA clearance
3. ITN number
4. Certificate of recall clearance.

I received a signed Certificate of Title from Runnion for the unit naming Landale Signs & Neon Ltd as the purchaser of the unit on April 11, 2016. The final documentation, the ITN number, was being handled by Willie. As he still had not received the ITN number. I received information via e-mail April 18th, 2016 from Jennifer Molina of Runnion giving details of the 1st set of payment instructions.

Willie got in touch with Livingston in the United States and proceeded to deal with Michael Maciolek, of Livingston.

On Wednesday May 18th, I called Willie to find out what the holdup was, as I had received an e-mail from him on May 16th with all the documentation regarding the transfer, and received a reply saying he had the money.

He then advised me on the 18th that our money had not cleared yet. At this point Willie asked me to call Runnions accounting person. I phoned and spoke to Janice Ryce and she asked me where we sent the money. I advised her where the money was sent, she then sent me an e-mail with the banking information she wanted me to use (3rd set of banking instructions). This was not the banking information I received from Jennifer Molina on April 18th. Nor the banking information change I received from Willie on May 12th.

This is when I realized we had a problem. Our IT person at Landale Signs, Neil Swindlehurst then took off the "routing" for the messages and advised that it appeared Runnion Equipment's computer system had been compromised.

*Copy of
Title and
Sales order contract.
Signed April 11 - Ranason
April 12 - Randall*

*Title
Document
Title 1
"A" 5 Pages*

# WISCONSIN CERTIFICATE OF TITLE

3794

| Vehicle Identification Number | Year | Make |
|---|---|---|
| 2FZHCHDCX5AU20059 | 2005 | STERLING INDUSTRIAL CORP |

| Title Number | Issue Date | Chassis Type | Odometer Reading | Odometer Status | Odometer Date |
|---|---|---|---|---|---|
| 16102Q1015-2 | 04/11/2016 | TRUK | | EXEMPT | |

| Product Number | Body Style | Color | Fleet No. |
|---|---|---|---|
| 14081161027 | UNKNOWN | WHITE | |

**Titled Owner(s)**

PME EQUIPMENT INC
500 RANDOLPH DR
APPLETON, WI 54913-9293

The person, firm or corporation named on this Title is the lawful owner of the vehicle described, subject to any Security Interest (liens) shown. The order in which the Lien Holders appear on this Title does not necessarily represent their priority. The Wisconsin Department of Transportation will not be responsible for false or fraudulent odometer statements made in the assignment of the Certificate of Title or for errors in reporting mileage, brand disclosures or the history of the vehicle. The department has no actual knowledge about the history of the vehicle and makes no warranty that the title brands or mileage disclosures on prior titles have been carried forward onto this document.

**Lien Holder(s)**

NONE.

2FZHCHDCX5AU20059

**Additional Vehicle Detail**

PREVIOUSLY TITLED IN: IA

**SELLER:** When the vehicle is sold, complete the ASSIGNMENT OF CERTIFICATE OF TITLE on the top back of this title and deliver the title to the purchaser with the vehicle. You may wish to retain a copy of this title with the purchaser's information and signature as proof of sale for your records.

**PURCHASER:** Apply for a new title with the Wisconsin Division of Motor Vehicles immediately. To legally operate this vehicle, you are required to register it with the Division of Motor Vehicles.

MAIL ADDRESS:
Wisconsin Department of Transportation
PO Box 7949, Madison, WI 53707-7949

15 - 1 - 0890435

QUESTIONS:
Contact the Division of Motor Vehicles at:
414-266-1000, 608-266-1466
wisconsindmv.gov



Title
Document
Side 2

The seller is required to state the mileage and provide written vehicle disclosure in connection with the transfer of ownership. Failure to complete a mileage statement or providing a false statement may result in fines and/or imprisonment and may make you liable for damages to the purchaser. See Federal 49 USC and Ch. 342 Wisconsin laws.

I the seller certify that to the best of my knowledge the information contained on this document is true and correct and that I have entered the vehicle odometer reading, brand disclosure, and selling price in compliance with federal and state law as referenced above. For value received, I sell, assign or transfer the vehicle described on this document and warrant title to purchaser.

ODOMETER NOW READS the Tenths     | 8 | 0 | 6 | 5 | 3 |

☐ The odometer reading reflects the amount of mileage in excess of its mechanical limit
☐ The odometer reading is NOT actual mileage. WARNING ODOMETER DISCREPANCY

Selling Price

BRAND DISCLOSURE (only as printed on future titles) Check all that apply
☐ Salvage vehicle   ☐ Flood damaged   ☐ Hail damaged   ☐ Previous police vehicle   ☐ Previous taxicab

Print Purchaser Name
RUNNION EQUIPMENT COMPANY

Print Seller Name
P M E EQUIPMENT INC

Print Purchaser Address: City, State, ZIP Code
7950 47th ST   LYONS, IL 60534

Print Seller Address: City, State, ZIP Code
500 RANDOLF DR. APPLETON, WI 54913

Signature of Purchaser
X  Will Messuck / Agent    Date 4/11/16

Signature of Seller(s) – See below
X  Peter Mule    Date 4/11/16

Seller(s) – If joint ownership, with "or", only one seller's signature is required, with "and" all sellers signatures are required.

Sections 2–3 For Dealer Use Only
Dealer: Photocopy front and back for your records – Federal 49 CFR 580.8

Print Name of Auction Dealer if used or Consigning Salvage Pool (if applicable)

Auction or Salvage Pool Dealer Number

Sale Date

---

ODOMETER NOW READS the Tenths     | 8 | 1 | 0 | 6 | 5 | 3 |

☐ The odometer reading reflects the amount of mileage in excess of its mechanical limit
☐ The odometer reading is NOT actual mileage. WARNING ODOMETER DISCREPANCY

BRAND DISCLOSURE (only as printed on future titles) Check all that apply
☐ Salvage vehicle   ☐ Flood damaged   ☐ Hail damaged   ☐ Previous police vehicle   ☐ Previous taxicab   ☐ Manufacturer buyback

Print Purchaser Name
Landale Signs And Neon LTD

Print Selling Dealer Name
Runnion Equipment Company

Print Purchaser Address, City, State, ZIP Code
8525 Argyll RD. NW   Edmonton, AB T6C 4B2

Print Seller Address, City, State, ZIP Code

Print Name of Purchaser's Authorized Agent Signing Below
William Messuck/ Agent

Print Name of Selling Dealer's Authorized Agent Signing Below
Wikkiam Messuck / Agent

Signature of Purchaser's Authorized Agent
X  Will Messuck / Agent    Date

Signature of Selling Dealer's Authorized Agent
X  Will Messuck / Agent    Date

Print Name of Purchasing Auction Dealer if used or Consigning Salvage Pool (if applicable)

Auction or Salvage Pool Dealer Number

Sale Date

---

ODOMETER NOW READS (the Tenths)     | | | | | | |

☐ The odometer reading reflects the amount of mileage in excess of its mechanical limit
☐ The odometer reading is NOT actual mileage. WARNING ODOMETER DISCREPANCY

BRAND DISCLOSURE (only as printed on future titles) Check all that apply
☐ Salvage vehicle   ☐ Flood damaged   ☐ Hail damaged   ☐ Previous police vehicle   ☐ Previous taxicab   ☐ Manufacturer buyback

Print Purchaser Name

Print Selling Dealer Name

Print Purchaser Address, City, State, ZIP Code

Print Seller Address, City, State, ZIP Code

Print Name of Purchaser's Authorized Agent Signing Below

Print Name of Selling Dealer's Authorized Agent Signing Below

Signature of Purchaser's Authorized Agent    Date

Signature of Selling Dealer's Authorized Agent    Date

NO additional dealer reassignments permitted


② "A"

SALES ORDER – SIGNATURE PAGE

 **RUNNION EQUIPMENT COMPANY**
7950 WEST 47th STREET • LYONS ILLINOIS 60534 PHONE • (708) 447-3169
1-800-824-6704     FAX (708) 447-3730     www.runnionequipment.com

Sold To: *LAndale Signs & Neon*

Address:

Date: 4-11-16

Quote No. 4952

### SALES ORDER - TERMS AND CONDITIONS OF SALE

This document contains the terms of sale. The entire contract between Seller and Buyer is contained in this Sales Order; no alleged oral promises or conditions not set forth herein shall be binding upon Seller or Buyer, and any prior negotiations between the parties are merged into the terms of this document.

Prices quoted are subject to change without notice in conformity with the Manufacturer's Price List effective at the time of delivery. Prices do not include taxes. Any tax, impost, levy, duty or other charge hereinafter imposed by any government or other authority on this sale will be added to the purchase price as herein noted or any later revision of the purchase price, and will be paid by Buyer unless Buyer provides Seller with a proper tax exemption certificate.

Upon acceptance of this order by Seller, if Buyer fails to perform the terms and conditions hereof, or refuses to accept delivery of the equipment, accessories or other items ordered within ten (10) days after notification that same are ready for delivery, the Seller, at its option may retain as liquidated damages all money, trade-ins or other property delivered to Seller by Buyer as down payment hereunder. Buyer will pay any cost of collection for any amount owed to Sellers, including, without limitation, reasonable attorney's fees, court costs and interest in the amount of 1% per month (12% per annum), from the date the amount is due.

Payment is due Seller from the date when Seller is prepared to make delivery. All equipment and material is delivered FOB Seller's plant and title and liability for loss or damage passes to Buyer upon Seller's delivery of the goods to a carrier for shipment to Buyer and any loss or damage thereafter shall not relieve Buyer from any obligation hereunder. Risk of loss for goods shall pass to the Buyer once payment is received by Seller.

Buyer may terminate this contract in whole upon thirty (30) days advance written notice to Seller. In such event, Buyer shall be liable for termination charges. If goods ordered are a standard, manufacturer catalog item, Buyer will pay a cancellation charge for each unit cancelled equal the greater of: 20% of the purchase order item price or forfeiture of down payment/trade in. If goods are non-standard items built to the Buyer's custom order, Buyer will pay for all cost, direct and indirect incurred and committed for this contract, together with a reasonable allowance for prorated expenses and anticipated profits.

Buyer agrees to comply fully and with all laws and regulation concerning the purchase and sale of goods. In particular, Buyer agrees to comply with all applicable export administration regulations of the United States, including, but not limited to, the Export Administration Act, insofar as they apply to the sale of products.

Buyer shall indemnify and hold harmless Seller, its employees, officers and directors and the respective successors and assigns, from and against any and all liability, damages, claims, causes of actions, losses, costs and expenses (including attorneys' fees) of any kind arising out of injuries to any person (including death) or damage to any property caused by or related to the goods or any negligent act or omission of Buyer, its employees and agents

The validity, performance and construction of this Sales Order, shall be governed by the laws of the State of Illinois, of the United States of America

Seller shall not be liable, and shall be free from any potential liability for delay in delivery or non-delivery or any failure in shipment caused in whole, or in part, by the occurrence of any contingency beyond control of either Seller or Seller's suppliers including, but not limited to act of war (whether an actual declaration thereof is made or not), act of any government or any agency or subdivision thereof, judicial action, sabotage, insurrection, terrorism, riot or other act of civil disobedience, act of a public enemy, failure or delay in transportation, strikes, lockouts, shortage of labor or labor troubles of any kind, accidents, explosion, perils of the sea, fire, earthquake, flood, storm or any other act of God, restrictions or requisitions, shortage of labor, fuel, raw material or machinery or technical failure where Seller has exercised ordinary care in the prevention thereof, failure of manufacturers to deliver, bankruptcy or insolvency of manufacturers or suppliers, suspension of shipping facilities, act or default of any carrier or any other contingency of whatsoever nature beyond Seller's control affecting production, transportation to boarding point, loading, forwarding or unloading in such a situation at destination of the during the period contracted for, Buyer shall accept delivery under this contract when shipment is made. In such a situation, if shipments or delivery is not made in accept delivery if shipment is not made within a reasonable time after the cessation of the aforementioned impediments or causes. Seller may allocate delivery among Seller's customers.

This order shall not be binding upon Seller until accepted by Seller in writing hereon and when so accepted, the original order with original signatures as given Seller and in Seller's possession shall be conclusive and binding upon the parties hereto

The Buyer hereby acknowledges receipt of a copy of this Sales Order and Terms and Conditions

Customer Signature

Runnion Equipment Co

Date Accepted

4-11-16
Date

| SALES ORDER |



# RUNNION EQUIPMENT COMPANY

*Truck Mounted Cranes & Equipment*
*Sales, Service & Rentals*

7950 WEST 47th STREET • LYONS, ILLINOIS 60534
PHONE (708) 447-3169 • 1-800-824-6704 • FAX (708) 447-3730
www.runnionequipment.com

Sold To: Landale Signs and Neon Ltd.
Address: 8525 Argyll Rd. NW
Edmonton, AB T6C 4B2, Canada
780-437-3730
Attn: Darrell Brown

Date: 4/11/16

Quote No. 4952

Unit #3974U

Page 1 of 2

| QUANTITY | DESCRIPTION | PRICE |
|---|---|---|
| One (1) | Used 2005 Elliott G85F equipped as follows:<br><br>- 90' working height<br>- 5,900# maximum boom capacity<br>- Out and down main outriggers<br>- A-frame style rear stabilizers<br>- Single front outrigger<br>- 600# platform capacity<br>- Hydraulic circuit in basket<br>- Strobe lights mounted on crane pedestal<br><br>MOUNTED ON | |
| One (1) | 2005 Sterling LT8500 equipped as follows:<br><br>- 56,000# GVW<br>- CAT C7 Engine<br>- Automatic transmission<br>- Front axle 16,000#<br>- Front wheels – 22.5x12.2 steel<br>- Front tires – 385/65R22.5<br>- Rear axle - 40,000#<br>- Rear wheels – 22.5x8.25<br>- Rear tires – 11R22.5 | |
| | – Continued on Page 2 – | |

The terms and conditions appearing on the reverse side of this Sales Order
are made a part hereof the same as if rewritten at length herein.

"A" (4)

REC SALES SIGNATURE    DATE    4-11-16    PURCHASER SIGNATURE    April 12/16 DATE

SALES ORDER



# RUNNION EQUIPMENT COMPANY

*Truck Mounted Cranes & Equipment*
*Sales, Service & Rentals*

7950 WEST 47th STREET • LYONS, ILLINOIS 60534
PHONE (708) 447-3169 • 1-800-824-6704 • FAX (708) 447-3730
www.runnionequipment.com

Sold To: Landale Signs and Neon Ltd.
8525 Argyll Rd. NW
Address: Edmonton, AB T6C 4B2, Canada
780-437-3730
Attn: Darrell Brown

Date: 4/11/16

Quote No. 4952

Unit #3974U

Page 2 of 2

| QUANTITY | DESCRIPTION | PRICE |
|---|---|---|
| | - Differential lock on both axles<br>- Trailer package with pintle hook<br>- AM/FM/CD stereo<br>- Air conditioning<br>- Spotlight mounted on top of cab | |
| | Price: | $86,000.00 |
| | *Freight to Portal North Dakota not to exceed $2,000.00 | $ 2,000.00 |
| | All prices F.O.B. Lyons, IL and subject to all applicable tax<br>Quote firm for 30 days TERMS: 10% deposit at time of order<br>Balance due upon notification that unit is ready for delivery | 88,000.00<br>f.o.b. - Portal<br>ND. |

*Seller will supply a clean original copies title for the unit and a recall clearance letter from the manufacturer.*

"A"

The terms and conditions appearing on the reverse side of this Sales Order
are made a part hereof the same as if rewritten at length herein.

REC SALES SIGNATURE     DATE 4-11-16     X PURCHASER SIGNATURE     DATE April 11 /16

Received from May 6/16
Runnion
Willie
"B" 7-Pages



① "B"

## WISCONSIN CERTIFICATE OF TITLE

3799

| Vehicle Identification Number | Year | Make | | | | |
|---|---|---|---|---|---|---|
| 2FZHCHDCX5AU20053 | 2005 | STERLING INDUSTRIAL CORP | | | | |

| Title Number | Issue Date | Chassis Type | Odometer Reading | Odometer Status | Odometer Date |
|---|---|---|---|---|---|
| 16102Q1015-2 | 04/11/2016 | TRUK | | EXEMPT | |

| Product Number | Body Style | Color | Fleet No |
|---|---|---|---|
| 14081161027 | UNKNOWN | WHITE | |

**Titled Owner(s)**

PME EQUIPMENT INC
500 RANDOLPH DR
APPLETON, WI 54913-9293

The person, firm or corporation named on this Title is the lawful owner of the vehicle described, subject to any Security Interest (liens) shown. The order in which the Lien Holders appear on this Title does not necessarily represent their priority. The Wisconsin Department of Transportation will not be responsible for false or fraudulent odometer statements made in the assignment of the Certificate of Title or for errors in reporting mileage, brand disclosures or the history of the vehicle. The department has no actual knowledge about the history of the vehicle and makes no warranty that the title brands or mileage disclosures on prior titles have been carried forward onto this document.

2FZHCHDCX5AU20053

**Lien Holder(s)**
NONE.

**Additional Vehicle Detail**
PREVIOUSLY TITLED IN: IA

**SELLER:** When the vehicle is sold, complete the ASSIGNMENT OF CERTIFICATE OF TITLE on the top back of this title and deliver the title to the purchaser with the vehicle. You may wish to retain a copy of this title with the purchaser's information and signature as proof of sale for your records.

**PURCHASER:** Apply for a new title with the Wisconsin Division of Motor Vehicles immediately. To legally operate this vehicle, you are required to register it with the Division of Motor Vehicles.

**MAIL ADDRESS:**
Wisconsin Department of Transportation
PO Box 7949, Madison, WI 53707-7949

15-1-0390295

**QUESTIONS:**
Contact the Division of Motor Vehicles at:
414-266-1000, 608-266-1466
wisdmvinfo@dot.gov

**KEEP IN SAFE PLACE** — **DO NOT LAMINATE OR ALTER**



The seller is required to state the mileage and provide written vehicle disclosures in connection with the transfer of ownership. Failure to complete or provide a mileage statement or providing a false mileage statement, disclose required information, or providing a false statement may result in fines and/or imprisonment and may make you liable for damages to the purchaser. See Federal 49 USC and Ch. 342 Wisconsin laws.

I the seller, certify that to the best of my knowledge the information contained on this document is true and correct and that I have entered the vehicle odometer reading prior to disclosure, and selling price in compliance with federal and state law as referenced above. For value received, I sell, assign or transfer the vehicle described on this document and warrant title to purchaser.

ODOMETER NOW READS (No Tenths) **8 0 6 5 3**

☐ The odometer reading reflects the amount of mileage in excess of its mechanical limit.
☐ The odometer reading is NOT actual mileage. WARNING ODOMETER DISCREPANCY

and to the best of my knowledge it reflects the actual mileage of this vehicle unless one of the following statements is checked.
BRAND DISCLOSURE will be entered on future titles Check all that apply.

☐ Salvage vehicle ☐ Flood damaged ☐ Hail damaged ☐ Previous police vehicle ☐ Previous taxicab

Selling Price

Print Purchaser's Name:
RUNNION EQUIPMENT COMPANY

Print Seller Name:
PME EQUIPMENT INC

Print Purchaser's Address, City, State, ZIP Code:
7950 47th ST. LYONS, IL 60534

Print Seller Address, City, State, ZIP Code:
500 RANDOLF DR. APPLETON, WI 54913

Signature of Purchaser's Authorized Agent Signing Below:
Will Messuck / Agent     4/11/16

Signature of Seller(s) - Sign Below:
X _____ Mark     4/11/16

Sections 0-9 for Dealer Use Only
Print, Photocopy front and back for your records – Federal 49 CFR 580.5

Seller(s) - If joint ownership, with "or", only one seller's signature is required, with "and", both signatures are required.
Available or Salvage Real Dealer Number

Sale Date

---

ODOMETER NOW READS (No Tenths) **8 0 6 5 3**

☐ The odometer reading reflects the amount of mileage in excess of its mechanical limit.
☐ The odometer reading is NOT actual mileage. WARNING ODOMETER DISCREPANCY

and to the best of my knowledge it reflects the actual mileage of this vehicle unless one of the following statements is checked.
BRAND DISCLOSURE will be entered on future titles Check all that apply.

☐ Salvage vehicle ☐ Flood damaged ☐ Hail damaged ☐ Previous police vehicle ☐ Previous taxicab ☐ Manufacturer buyback

Print Purchaser's Name:
Landale Signs And Neon LTD

Print Seller Dealer Name:
Runnion Equipment Company

Print Purchaser's Address, City, State, ZIP Code:
8525 Argyll RD. NW Edmonton, AB T6C 4B2

Print Seller Address, City, State, ZIP Code:

Print Name of Purchaser's Authorized Agent Signing Below:
William Messuck/ Agent

Print Name of Selling Dealer's Authorized Agent Signing Below:
Wikkiam Messuck / Agent

Signature of Purchaser's Authorized Agent     Date
X Will Messuck/Agent

Signature of Selling Dealer's Authorized Agent     Date
X Will Messuck / Agent

Print Name or Signature of Sales Dealer Name or Consigning Selling Real if applicable
Available or Salvage Real Dealer Number

Sale Date

---

ODOMETER NOW READS (No Tenths)

☐ The odometer reading reflects the amount of mileage in excess of its mechanical limit.
☐ The odometer reading is NOT actual mileage. WARNING ODOMETER DISCREPANCY

and to the best of my knowledge it reflects the actual mileage of this vehicle unless one of the following statements is checked.
BRAND DISCLOSURE will be entered on future titles Check all that apply.

☐ Salvage vehicle ☐ Flood damaged ☐ Hail damaged ☐ Previous police vehicle ☐ Previous taxicab ☐ Manufacturer buyback

Print Purchaser's Name:

Print Seller Dealer Name:

Print Purchaser's Address, City, State, ZIP Code:

Print Seller Address, City, State, ZIP Code:

Print Name of Purchaser's Authorized Agent Signing Below:

Print Name of Selling Dealer's Authorized Agent Signing Below:

Signature of Purchaser's Authorized Agent     Date

Signature of Selling Dealer's Authorized Agent     Date
X

NO additional dealer reassignments permitted



"B"   (37)

VEHICLE EXPORTS TO CANADA SHIPPER'S LETTER OF INSTRUCTION

**1. U.S. EXPORTER/USPPI ADDRESS (NO PO BOX):**

Runnion Equipment Company

7950 47th Stret

Lyons, IL. 60534

| Field | Value |
|---|---|
| 6. U.S. EXPORTER'S EIN/TAX ID # | 36-2855271 |
| 7. U.S. EXPORTER CONTACT PERSON'S FIRST & LAST NAME | William Messuck |
| 8. U.S. EXPORTER PHONE # | 708-447-3169 |
| 9. CONSIGNEE CONTACT PERSONS FIRST & LAST NAME | |
| 10. CONSIGNEE PHONE # | |

**2. ULTIMATE CONSIGNEE NAME AND ADDRESS (NO PO BOX)**

Landale Signs And Neon LTD

8525 Argyll Rd. N.W.

Edmonton AB T6C 4B2

**3. ULTIMATE CONSIGNEE IS A :**

☑ DIRECT CONSUMER

☐ GOVERNMENT

☐ RESELLER

☐ OTHER

**SHIPMENT DETAILS**

| Field | Value |
|---|---|
| 11. STATE OF ORIGIN | Illinois |
| 12. U.S. PORT OF EXPORT | Portal, ND |
| 13. COUNTRY OF ULTIMATE DESTINATION | Canada |
| 14. EXPORT DATE | A.S.A.P. |
| 15. MODE OF TRANSPORT | Drive Away Service |
| 16. CARRIER'S NAME & SCAC | Mamo Transportation |
| 17. ROUTED EXPORT | ☑ YES ☐ NO |
| 18. PARTIES TO THIS TRANSACTION | ☐ RELATED ☑ NON RELATED |
| 19. HAZARDOUS | ☐ YES ☑ NO |

**4. FREIGHT ORIGIN COMPLETE ADDRESS (NO PO BOX) (IF DIFFERENT THAN EXPORTER)**

**5. INTERMEDIATE CONSIGNEE ADDRESS (NO PO BOX)**

**VEHICLE INFORMATION**

| Field | Value |
|---|---|
| 20. DESCRIPTION | Elliott G85F mounted on a 2005 Sterling LT8500 |
| 21. U.S. 10 DIGIT HTS # or 10 DIGIT SCHEDULE B | |
| 22. YEAR / MAKE / MODEL | 2005 Sterling LT8500 |
| 23. QUANTITY | 1 |
| 24. VEHICLE VALUE + U.S. DOMESTIC FREIGHT | $88,000.00 |
| 25. GROSS WEIGHT (KGS) | 16409.09 |
| 26. NLR OR LICENSE OF MANUFACTURE | ☑ U.S. ☐ OTHER (FOREIGN) |
| 27. NLR OR LICENSE # | |
| 28. ECCN# or EAR99 | |
| 29. ☐ SERIAL # OR ☑ VIN # | 2FZHCHDCX5AU20053 |
| 30. TITLE # (IF VIN # PROVIDED) | 16102Q1015-2 |
| 31. TITLE STATE (IF VIN # PROVIDED) | WISCONSIN |

*THIS DOCUMENT SHOULD NOT BE GIVEN TO CUSTOMS!*

| Field | Value |
|---|---|
| 32. CLIENT'S REFERENCE # | 136316 |
| 33. PRINTED NAME | WILLIAM MESSUCK |
| 34. TITLE | RENTAL COORDINATOR |
| 35. DATE | MAY 9TH 2016 |
| 36. SIGNATURE | *WILLIAM MESSUCK* |

☑ CHECK HERE TO VALIDATE ELECTRONIC SIGNATURE. ELECTRONIC SIGNATURES MUST BE TYPED IN ALL CAPITAL LETTERS IN FIELD 35 IN ORDER TO BE VALID.

☑ PLEASE NOTE THAT IF ANY INFORMATION PERTAINING TO THIS AES TRANSMISSION CHANGES, AN AMENDMENT WILL BE REQUIRED. INCORRECT INFORMATION NOT CORRECTED PRIOR TO EXPORT MAY RESULT IN PENALTIES ASSESSED TO THE PPI, EXINGSTON & CARRIER STARTING AT $10,000 USD.

☐ CHECK HERE IF THERE ARE ANY REMAINING NON LICENSABLE SCHEDULE B / HTS NUMBERS THAT DO NOT OTHERWISE REQUIRE AES FILING.

"B" ④

### Written Authorization to Prepare or Transmit Electronic Export Information

From a (check one):

__X__ U.S. Principal Party in Interest            _____ Foreign Principal Party in Interest

I, __Runnion Equipment Company__

Principal Party in Interest
(print full legal name of corporation, partnership, or individual)

having an office and place of business at:

__7950 47th Street        Lyons, IL. 60534__
(print full street address, city, state, postal, country)

(the "Principal Party in Interest"), hereby authorizes Livingston International, Inc. ("Livingston") to act as its authorized agent ("Authorized Agent") for freight forwarding, export control, U.S. Customs and Border Protection, and for Census Bureau purposes, to transmit such export information electronically that may be required or advisable by law or regulation in connection with the exportation or transportation of any goods by or on behalf of said Principal Party in Interest. The Principal Party in Interest certifies that necessary, proper and accurate information and documentation enabling the Authorized Agent to accurately and properly transmit relevant information electronically is and will be provided to the said Authorized Agent. The Principal Party in Interest further understands that civil and criminal penalties may be imposed for making false or fraudulent statements or for the violation of any U.S. laws or regulations regarding the transportation or exportation of goods and the Principal Party in Interest agrees to be bound by all statements of the Authorized Agent based upon information or documentation provided by the Principal Party in Interest to said Authorized Agent.

All business undertaken by the Authorized Agent for the Principal Party in Interest is subject to Livingston's Terms and Conditions for US international freight forwarding, which are posted on Livingston's website at www.livingstonintl.com, as same may be amended from time to time. This written authorization is to remain in full force and effect until revocation in writing is duly given by the Principal Party in Interest to the Authorized Agent.

Signature:  _____
                        (Duly Authorized Officer or Employee)

Printed Name:   William Messuck

Capacity: Rental Coordinator

Date:  5/9/2016

Tax ID:  36-2825271

Telephone:  708-447-3169

Livingston International, Inc.
Rev March 2014

"B" (5)

LIVINGSTON

## CREDIT CARD PAYMENT AGREEMENT AND AUTHORIZATION

The client stated below agrees to pay Livingston International, Inc. ("Livingston") all customs/logistics fees and duties resulting from services rendered via credit card. Please visit www.livingstonintl.com for Service Terms.

I authorize Livingston to keep my signature on file and to charge my credit card account:

[✓] For a one-time use.    [ ] On an ongoing bi-weekly basis, for amounts I owe.

I understand that this authorization is valid unless I cancel the authorization through written notice. I also agree to contact Livingston's accounting department if there is any change to my credit card account information.

I understand that Livingston processes credit card payments from 8 a.m. – 5 p.m. EST M-F (excluding holidays).

*I, the cardholder, agree to the above terms and have provided the information below to allow Livingston to automatically charge my credit card.*

### ONE-TIME USE ONLY

| Client number | Invoice amount | Invoice number | Rep. code |
|---|---|---|---|
| | | | |

### CREDIT CARD INFORMATION

**Runnion Equipment Company**
Client name

708-447-3169 | 708-447-3730 | wmessuck@runnionequipment.com

Phone | Fax | E-mail

Mike Prochot
Name (as it appears on credit card)

7950 47th Street
Billing address – Street name and number

| Lyons | IL | 60534 | U.S.A. |
|---|---|---|---|
| City | Province/State | Postal/Zip code | Country |

Credit card type:    VISA [✓]    MasterCard [ ]    American Express [ ]

| | 02/19 | |
|---|---|---|
| Credit card number | Expiry date | CVN (credit card verification number) |

| *[signature]* | 5/9/2016 | |
|---|---|---|
| Cardholder signature | Date | |

### INTERNAL USE ONLY

| | USD [ ]  CAD [ ] | |
|---|---|---|
| Applicable taxes | Currency | |

Notes

Updated 04-27-2015



"B"  6

LIVE HISTORY

VEHICLE EXPORTS TO CANADA SHIPPER'S LETTER OF INSTRUCTION

| | | |
|---|---|---|
| 1. U.S. EXPORTER/USPPI ADDRESS (NO PO BOX) | 6. U.S. EXPORTER'S EIN/TAX ID # | 36-2825271 |
| Runnion Equipment Company | 7. U.S. EXPORTER CONTACT PERSON'S FIRST & LAST NAME | William Messuck |
| 7950 47th Stret | 8. U.S. EXPORTER PHONE # | 708-447-3169 |
| Lyons, IL. 60534 | 9. CONSIGNEE CONTACT PERSON'S FIRST & LAST NAME | |
| | 10. CONSIGNEE PHONE # | |

| | | SHIPMENT DETAILS |
|---|---|---|
| 2. ULTIMATE CONSIGNEE NAME AND ADDRESS (NO PO BOX) | | |
| Landale Signs And Neon LTD | 11. STATE OF ORIGIN | Illinois |
| 8525 Argyll Rd. N.W. | 12. U.S. PORT OF EXPORT | Portal, ND |
| Edmonton AB T6C 4B2 | 13. COUNTRY OF ULTIMATE DESTINATION | Canada |
| | 14. EXPORT DATE | A.S.A.P. |
| 3. ULTIMATE CONSIGNEE IS A : | 15. MODE OF TRANSPORT | Drive Away Service |
| ☑ DIRECT CONSUMER | 16. CARRIER'S NAME & SCAC | Mamo Transportation |
| ☐ GOVERNMENT | 17. ROUTED EXPORT | ☑ YES  ☐ NO |
| ☐ RESELLER | 18. PARTIES TO THIS TRANSACTION | ☐ RELATED  ☑ NON RELATED |
| ☐ OTHER | 19. HAZARDOUS | ☐ YES  ☑ NO |

| | | VEHICLE INFORMATION |
|---|---|---|
| 4. FREIGHT ORIGIN COMPLETE ADRESS (NO PO BOX) (IF DIFFERENT THAN EXPORTER) | 20. DESCRIPTION | Elliott G85F mounted on a 2005 Sterling LT8500 |
| | 21. U.S. 10 DIGIT HTS # OR 10 DIGIT SCHEDULE # | |
| | 22. YEAR / MAKE / MODEL | 2005 Sterling LT8500 |
| | 23. QUANTITY | 1 |
| | 24. VEHICLE VALUE + U.S. DOMESTIC FREIGHT | $88,000.00 |
| | 25. GROSS WEIGHT (KGS) | 16409.09 |
| 5. INTERMEDIATE CONSIGNEE ADDRESS (NO PO BOX) | 26. COUNTRY OF MANUFACTURE | ☑ U.S.  ☐ OTHER (FOREIGN) |
| | 27. NLR OR LICENSE # | |
| | 28. ECCN# or EAR99 | |
| | 29. ☐ SERIAL #  OR  ☑ VIN # | 2FZHCHDCX5AU20053 |
| | 30. TITLE # (IF VIN # PROVIDED) | 16102Q1015-2 |
| | 31. TITLE STATE (IF VIN # PROVIDED) | WISCONSIN |
| THIS DOCUMENT SHOULD NOT BE GIVEN TO CUSTOMS! | 32. CLIENT'S REFERENCE # | 136316 |
| | 33. PRINTED NAME | WILLIAM MESSUCK |
| | 34. TITLE | RENTAL COORDINATOR |
| | 35. DATE | MAY 9TH 2016 |
| | 36. SIGNATURE | WILLIAM MESSUCK |

☐ CHECK HERE TO VALIDATE ELECTRONIC SIGNATURE. ELECTRONIC SIGNATURES MUST BE TYPED IN ALL CAPITAL LETTERS IN FIELD 36 IN ORDER TO BE VALID.

☐ PLEASE NOTE THAT IF ANY INFORMATION PERTAINING TO THIS AES TRANSMISSION CHANGES, AN AMENDMENT WILL BE REQUIRED. INCORRECT INFORMATION NOT CORRECTED PRIOR TO EXPORT MAY RESULT IN PENALTIES ASSESSED TO THE PPI, FILING/SDA OR CARRIER STARTING AT $10,000 USD.

☐ CHECK HERE IF THERE ARE ANY SEPARATE NON LICENSABLE SCHEDULE B / HTS NUMBERS THAT DO NOT OTHERWISE REQUIRE AES FILING.

*1ST instructions with routing*
*Landale poles*
*may 18/16*

**Darrell Brown**

| | |
|---|---|
| From: | Jennifer Molina [jmolina@runnionequpment.com] |
| Sent: | April 18, 2016 1:02 PM |
| To: | darrell@landalesigns.com |
| Cc: | prunnion@runnionequpment.com |
| Subject: | Invoice 136316 and wire info from Runnion Equipment Company |
| Attachments: | Inv_136316_from_Runnion_Equipment_Company_8360.pdf; Wiring Instructions BB&T.pdf |

Darrell,

Find the attached Invoice 136316 and wire instructions. Let me know when we should expect your wire so we can look out for it.

Thank you for your business - we appreciate it very much.

Sincerely,

Jennifer Molina

**Runnion Equipment Company**

800 824 6704

www.runnionequipment.com

1975 – 41 YEARS OF SERVICE – 2016

Crane & Equipment Solutions

For Contractors, Government, Rail, Utilities, or Agriculture/

Sales, Service, Parts, Rental/ Custom Mounting, Rebuilding

*"C" 6 pages*

*① "C"*

1



7950 WEST 47TH STREET • LYONS, ILLINOIS 60534

EQUIPMENT COMPANY

www.runnionequipment.com

PHONE 708-447-3169
800-824-6704
FAX 708-447-3730

# Invoice

| | |
|---|---|
| INVOICE DATE: | 4/18/2016 |
| INVOICE NO. | 13631b |

SOLD TO:

LANDALE SIGNS AND NEON LTD
8525 ARGYLL RD, NW
EDMONTON, AB T6C 4B2
CANADA

SHIPPED TO:

LANDALE SIGNS AND NEON LTD
8525 ARGYLL RD, NW
EDMONTON AB T6C 4B2
CANADA

| F.O.B. POINT | CUSTOMER ORDER NO. | SHIP VIA | Terms | SALESPERSON | S.O. No. |
|---|---|---|---|---|---|
| LYONS, IL | DARRELL BROWN | DRIVEAWAY | Due on receipt | PR | |

| ITEM CODE | U/M | QTY | DESCRIPTION | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| | | | PURCHASE OF A NEW ELLIOTT G85R, S/N - FR3245 MOUNTED ON A 2005 STERLING LT8500 S/N - 2FZHCHDCX5AU20053 | | |
| NEW CRAN... | ea | 1 | UNIT # 3974U | 86,000.00 | 86,000.00 |
| DOC FEE | | 1 | DOCUMENT FEE | 125.00 | 125.00 |
| PICKUP/DE... | | 1 | FREIGHT | 2,000.00 | 2,000.00 |

Thank you for your business.

| | |
|---|---|
| SALES TAX | $0.00 |
| **Total** | $88,125.00 |

② "C"



7950 WEST 47TH STREET * LYONS, ILLINOIS 60534

EQUIPMENT COMPANY

www.runnionequipment.com

WIRE TRANSFER INFORMATION

Account Name:

**Michael Mitch LLC**

Bank: **BB&T Bank**

Bank Address: **3531 Kildaire Farms Rd.,**

City: **Cary, NC 27518**

Rou ng #: ████████████

Account #: ████████████

Bene ciary: **MICHAEL MITCH LLC**

Bene ciary Add: **7950 West 47th Street**

**Lyons, ILLINOIS 60534**

**\*Please note there are Wire Fees apply --**

" C " ③

X-Envelope-From: jmolina@runnionequpment.com

Return-Path: <jmolina@runnionequpment.com>

Received: from us2.outbound.mailhostbox.com (us2.outbound.mailhostbox.com [208.91.198.232])

    by mail4c0.megamailservers.com (8.14.9/8.13.1) with ESMTP id u3IJ2AWN002105

    for <darrell@landalesigns.com>; Mon, 18 Apr 2016 15:02:15 -0400

Received: from 172.16.214.50 (unknown [199.79.63.238])

    (using TLSv1 with cipher AES256-SHA (256/256 bits))

    (No client certificate requested)

    (Authenticated sender: jmolina@runnionequpment.com)

    by us2.outbound.mailhostbox.com (Postfix) with ESMTPSA id 81659C6053;

    Mon, 18 Apr 2016 19:02:08 +0000 (GMT)

DKIM-Signature: v=1; a=rsa-sha256; c=relaxed/relaxed; d=runnionequpment.com;

    s=20160307; t=1461006128;

    bh=iFIvsHaherCJPGlVz4VTg3wyqUU3wi6mUlVcA9D3r/k=;

    h=Date:From:Reply-To:To:Cc:Subject;

    b=IP/YshHeRB2fco0XhFsw36DJkZPF3UPDVD4pcx5YutzQI6uYPrFmZNxI9TIS+ebex

    9Pg9gBAKOSydbdDc9tGdt+82g5DYUWTwnto1Tjatzuid9jE6v7slbRJKFEtHN86Ndi

    RHeTT2iP5IAyMIxwEimNZFUYrsnyJz4KmmNjrfqg=

Date: Tue, 19 Apr 2016 00:32:08 +0530 (IST)

From: Jennifer Molina <jmolina@runnionequpment.com>

Reply-To: Jennifer Molina <jmolina@runnionequpment.com>

To: darrell@landalesigns.com

Cc: prunnion@runnionequpment.com

Message-ID: <1615900147.1243.005c18df-6200-46fe-8dd6-3e9fbe171980.open-xchange@webmail.runnionequpment.com>

Subject: Invoice 136316 and wire info from Runnion Equipment Company

"C" (4)

MIME-Version: 1.0

Content-Type: multipart/mixed;

    boundary="----=_Part_1241_1398656669.1461006128411"

X-Priority: 3

Importance: Medium

X-Mailer: Open-Xchange Mailer v7.8.0-Rev26

X-Originating-Client: open-xchange-appsuite

X-CMAE-Score: 0

X-CMAE-Analysis: v=2.1 cv=epx/ttdX c=1 sm=1 tr=0

    a=ScuLOHym5We3HM0WBi98iA==:117 a=ScuLOHym5We3HM0WBi98iA==:17

    a=L9H7d07YOLsA:10 a=9cW_t1CCXrUA:10 a=s5jvgZ67dGcA:10

    a=8gTevd1NYjp3pC6l6bcA:9 a=QEXdDO2ut3YA:10 a=dqr7ymFexU8A:10

    a=9eyVB_a2fgo14vuAm18A:9 a=LaYEbCCULsVLQMYB:21 a=_W_S_7VecoQA:10

    a=imYkTtC6sKJV-ryTmPIA:9 a=n3BslyFRqc0A:10 a=huY-5r2Q7SIXD49stXsA:9

X-CTCH-RefID:
str=0001.0A020205.57152F38.014B,ss=1,re=0.000,recu=0.000,reip=0.000,vtr=str,vl=0,cl=1,cld=1,fgs=0

X-CTCH-VOD: Unknown

X-CTCH-Spam: Unknown

X-CTCH-Score: 0.000

X-CTCH-Rules:

X-CTCH-Flags: 0

X-CTCH-ScoreCust: 0.000

X-CSC: 0

X-CHA: v=2.1 cv=bod1Wiqi c=1 sm=1 tr=0 a=1vdt5iUSqNWgz+EK350Tfg==:117

    a=1vdt5iUSqNWgz+EK350Tfg==:17 a=L9H7d07YOLsA:10 a=9cW_t1CCXrUA:10

    a=s5jvgZ67dGcA:10 a=fsTKRxSFRzUA:10 a=kziv93cY1bsA:10 a=D0ZM_rHAAAAA:8

a=8gTevd1NYjp3pC6l6bcA:9 a=QEXdDO2ut3YA:10 a=dqr7ymFexU8A:10

a=9eyVB_a2fgo14vuAm18A:9 a=LaYEbCCULsVLQMYB:21 a=_W_S_7VecoQA:10

a=ImYkTtC6sKJV-ryTmPIA:9 a=n3BslyFRqc0A:10 a=huY-5r2Q7SIXD49stXsA:9

Received-SPF: pass (mail4c0: domain of runnionequpment.com designates 208.91.198.232 as permitted sender) client-ip=208.91.198.232; envelope-from=jmolina@runnionequpment.com;

X-WHL: LR



*Changed Bank Info.*
*Landslee notes*          *2ND Instructions / See routing*

**Darrell Brown**

| | |
|---|---|
| From: | Willie Messuck [wmessuck@runnionequpment.com] |
| Sent: | May 12, 2016 2:00 PM |
| To: | Darrell Brown |
| Cc: | prunnion@runnionequpment.com |
| Subject: | FINAL REVISED INVOICE ATTACHED AND UPDATED WIRE INFO |
| Attachments: | Inv_136316_from_Runnion_Equipment_Company_3720.pdf; Updated Wiring Instructions SunTrust.pdf |

Darrell,

Find the attached revised invoice and updated wiring instructions. Let me know when wire is sent so we can proceed.

Thank you

Willie Messuck

*DB:*
*Copied May 13/16*
*from email fill*

*"D"  6 pages*

*(1) "D"*

1



EQUIPMENT COMPANY

www.runnionequipment.com

7950 WEST 47TH STREET • LYONS, ILLINOIS 60534

PHONE 708-447-3169
800-824-6704
FAX 708-447-3730

# Invoice

| | |
|---|---|
| INVOICE DATE: | 4/18/2016 |
| INVOICE NO. | 136316 |

**SOLD TO:**

LANDALE SIGNS AND NEON LTD
8525 ARGYLL RD. NW
EDMONTON, AB T6C 4B2
CANADA

**SHIPPED TO:**

LANDALE SIGNS AND NEON LTD
8525 ARGYLL RD. NW
EDMONTON AB T6C 4B2
CANADA

| F.O.B. POINT | CUSTOMER ORDER NO. | SHIP VIA | Terms | SALESPERSON | S.O. No. |
|---|---|---|---|---|---|
| LYONS, IL | DARRELL BROWN | DRIVEAWAY | Due on receipt | PR | |

| ITEM CODE | U/M | QTY | DESCRIPTION | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| | | | PURCHASE OF A USED ELLIOTT G85R, S/N - FR3245 MOUNTED ON A 2005 STERLING LT8500 S/N - 2FZHCHDCX5AU20053 | | |
| USED CRA... | | 1 | UNIT # 3974U | 86,000.00 | 86,000.00 |
| SALES DISC... | ea | 1 | SALES DISCOUNT | -500.00 | -500.00 |
| DOC FEE | ea | 1 | DOCUMENT FEE | 125.00 | 125.00 |
| PICKUP/DE... | | 1 | FREIGHT | 2,000.00 | 2,000.00 |
| | | | *THE ABOVE EQUIPMENT IS SOLD AS IS WITHOUT ANY WARRANTY EXPRESS OR IMPLIED. THE PURCHASER WILL BEAR THE ENTIRE EXPENSE OF REPAIRING ANY LATENT OR PATENT DEFECTS THAT MAY PRESENTLY EXIST OR THAT MAY OCCUR IN THE VEHICLE NOTWITHSTANDING ANY PROMISE EXPRESS OR IMPLIED.* | | |

Thank you for your business.

| | |
|---|---|
| SALES TAX | $0.00 |
| **Total** | **$87,625.00** |

 7950 WEST 47TH STREET * LYONS, ILLINOIS 60534

EQUIPMENT COMPANY
PRIME C. CONTRACTORS
www.runnionequipment.com

WIRE TRANSFER INFORMATION

Account Name/Beneficiary:
PRIME C. CONTRACTORS

Bank: Sun Trust Bank
Address: 3610h King Str.
City: Alexandria, VA 22302

Routing #: ███████

Beneficiary: PRIME C. CONTRACTORS
Beneficiary Add: 7950 West 47th Street
Lyons, ILLINOIS 60534

Account #: ███████





*Please note there are Wire Fees apply —

X-Envelope-From: wmessuck@runnionequpment.com

Return-Path: <wmessuck@runnionequpment.com>

Received: from us2.outbound.mailhostbox.com (us2.outbound.mailhostbox.com [208.91.198.156])

       by mail98c0.megamailservers.com (8.14.9/8.13.1) with ESMTP id u4CK0MQh029636

       for <Darrell@landalesigns.com>; Thu, 12 May 2016 16:00:26 -0400

Received: from 172.16.214.18 (unknown [199.79.62.98])

       (using TLSv1 with cipher AES256-SHA (256/256 bits))

       (No client certificate requested)

       (Authenticated sender: wmessuck@runnionequpment.com)

       by us2.outbound.mailhostbox.com (Postfix) with ESMTPSA id 5581C1C1615;

       Thu, 12 May 2016 20:00:15 +0000 (GMT)

DKIM-Signature: v=1; a=rsa-sha256; c=relaxed/relaxed; d=runnionequpment.com;

       s=20160307; t=1463083221;

       bh=UbtpmHbg/eMxVsBg0ZLUoHxl4vfjReMxVzhTAk1KX0c=;

       h=Date:From:Reply-To:To:Cc:In-Reply-To:References:Subject;

       b=dFuK8x6yjSrEQOkhTspW+qSAdAyoEDR5GpB4li8orefoaKwU4YDsDZuN5vQSpMq+K

       NrFDufkYSYxmlKvFWUdH4/I7O2wkjXjMSUW+dJa9G/hG3mjVRnRoFMOZshkacOxm1S

       CpuS1yv/xsw9V7NsaclTL+njoiwzJCK9bFkwPAVo=

Date: Fri, 13 May 2016 01:30:15 +0530 (IST)

From: Willie Messuck <wmessuck@runnionequpment.com>

Reply-To: Willie Messuck <wmessuck@runnionequpment.com>

To: Darrell Brown <Darrell@landalesigns.com>

Cc: prunnion@runnionequpment.com

Message-ID: <1245503881.72296.dbef042e-dfcd-4877-a8cc-dfc2af2b5f31.open-xchange@webmail.runnionequpment.com>

In-Reply-To: <003301d1ac6f$30ba7b50$922f71f0$@com>



References: <1771888230.71323.4734f3f7-1b58-4999-ad6a-4e9633ec31aa.open-
xchange@webmail.runnionequpment.com>

<805811636.389647.1462979198551.JavaMail.yahoo@mail.yahoo.com>

<956438338.2506.dbef042e-dfcd-4877-a8cc-dfc2af2b5f31.open-
xchange@webmail.runnionequpment.com>

<003301d1ac6f$30ba7b50$922f71f0$@com>

Subject: FINAL REVISED INVOICE ATTACHED AND UPDATED WIRE INFO

MIME-Version: 1.0

Content-Type: multipart/mixed;

    boundary="----=_Part_72294_1538495499.1463083215037"

X-Priority: 3

Importance: Medium

X-Mailer: Open-Xchange Mailer v7.8.0-Rev26

X-Originating-Client: open-xchange-appsuite

X-CMAE-Score: 0

X-CMAE-Analysis: v=2.1 cv=erp/ttdX c=1 sm=1 tr=0

    a=OsE1w6L8WDwSEtwY4UF1mw==:117 a=OsE1w6L8WDwSEtwY4UF1mw==:17

    a=L9H7d07YOLsA:10 a=9cW_t1CCXrUA:10 a=s5jvgZ67dGcA:10

    a=8A7brI4kjU8C6ETGAX3PRdgeao0=:19 a=pn1XOJBzc_I0d1_mH5oA:9

    a=QEXdDO2ut3YA:10 a=OD5H4b7JbEYA:10 a=YAbHvesNYsf2bjJBl5QA:9

    a=_W_S_7VecoQA:10 a=ImYkTtC6sKJV-ryTmPIA:9 a=n3BslyFRqc0A:10

    a=KNEwJ7GyeRGIIKCqNsIA:9

X-CTCH-RefID:
str=0001.0A020206.5734E0DC.00BA,ss=1,re=0.000,recu=0.000,reip=0.000,vtr=str,vl=0,cl=1,cld=1,fgs=0

X-CTCH-VOD: Unknown

X-CTCH-Spam: Unknown

X-CTCH-Score: 0.000

X-CTCH-Rules:

X-CTCH-Flags: 0

X-CTCH-ScoreCust: 0.000

X-CSC: 0

X-CHA: v=2.1 cv=CPITA3bD c=1 sm=1 tr=0 a=8VrJf2YX1sHdtliGXwDnAA==:117

  a=8VrJf2YX1sHdtliGXwDnAA==:17 a=L9H7d07YOLsA:10 a=9cW_t1CCXrUA:10

  a=s5jvgZ67dGcA:10 a=-MngObXBZqsA:10 a=8A7brI4kjU8C6ETGAX3PRdgeao0=:19

  a=yrkiwgmsf1kA:10 a=tp16J-ZFAAAA:8 a=pn1XOJBzc_I0d1_mH5oA:9

  a=QEXdDO2ut3YA:10 a=cnMzBsKf2hMA:10 a=YAbHvesNYsf2bjJBI5QA:9

  a=_W_S_7VecoQA:10 a=ImYkTtC6sKJV-ryTmPIA:9 a=n3BslyFRqc0A:10

  a=KNEwJ7GyeRGIIKCqNsIA:9 a=SrCnRuYhpnTencJiu7jF:22

Received-SPF: pass (mail98c0: domain of runnionequpment.com designates 208.91.198.156 as permitted sender) client-ip=208.91.198.156; envelope-from=wmessuck@runnionequpment.com;

X-WHL: LR

"D" 6

**Darrell Brown**

| | |
|---|---|
| From: | Willie Messuck [wmessuck@runnionequpment.com] |
| Sent: | May 12, 2016 3:16 PM |
| To: | Darrell Brown |
| Subject: | RE: AES REQUIRED - Self Propelled Vehicles U.S. to Canada |

Darrell- Revised invoice and updated wiring instructions has been sent to you few minutes ago. Please confirm.

I will get back to you base on INT issue.

> On May 13, 2016 at 2:39 AM Darrell Brown <Darrell@landalesigns.com> wrote:
>
> Willie
>
> I have given you some wrong information. Apparently   according to my broker I am supposed to sent the docs. Off to the border people in Portal, not you
>
> This means I need the INT number  that you will be getting.  I then send the documents required to the border at Portal (along with the ITN number)  72 hours prior to the truck arriving at the border.
>
> Working this back I think you should state that the truck will arrive at Portal May 20th.
>
> This is based on the following assumptions —:
>
> you get the request for the  INT number submitted  tomorrow (Friday May 13th)
>
> You get the number back on Monday
>
> You send me the number Monday the 16th, I submit the required documents for the 72 hour clearance to Portal the same day
>
> If all is good , we should know no later than the 19th
>
> Your driver leaves Lyons on the 19th or the 20th he will  arrive on the  20th. I meet him.
>
> If you get me the revised invoice tomorrow you will have the money Monday .
>
> Sounds easy, what are the odds of this coming off just like that?

*Probably*
*NOT from Runnion, Enron reads attached.? See meeting*
*attached.*
**Darrell Brown** *→ Landale notes May 18/16*

*"E" 4 Pages*

| | |
|---|---|
| From: | Willie Messuck [wmessuck@runnionequpment.com] |
| Sent: | May 16, 2016 12:03 PM |
| To: | Darrell Brown |
| Subject: | Re: FW: Message from KM_C284e |

Darrell,

We received your wire. Sorry for the mix up from our accounting. I will let you know when i hear from Mike.

Thanks.

Sent from my iPhone

> On May 16, 2016 at 11:23 PM Darrell Brown <Darrell@landalesigns.com> wrote:
>
> Willie – attached is our money brokers document that track the entire transaction .
>
> Your bank has had the money since Friday at 12:36 PM .
>
> Call if you don't have clearance, this should be handled the same as cash, no delay.
>
> Darrell

*"E" (1)*

1

X-Envelope-From: wmessuck@runnionequpment.com

Return-Path: <wmessuck@runnionequpment.com>

Received: from us2.outbound.mailhostbox.com (us2.outbound.mailhostbox.com [162.210.70.59])

    by mail100c0.megamailservers.com (8.14.9/8.13.1) with ESMTP id u4GI383G020359

    for <Darrell@landalesigns.com>; Mon, 16 May 2016 14:03:12 -0400

Received: from 172.16.214.18 (unknown [199.79.62.98])

    (using TLSv1 with cipher AES256-SHA (256/256 bits))

    (No client certificate requested)

    (Authenticated sender: wmessuck@runnionequpment.com)

    by us2.outbound.mailhostbox.com (Postfix) with ESMTPSA id EF0BDC6492

    for <Darrell@landalesigns.com>; Mon, 16 May 2016 18:03:05 +0000 (GMT)

DKIM-Signature: v=1; a=rsa-sha256; c=relaxed/relaxed; d=runnionequpment.com;

    s=20160307; t=1463421786;

    bh=62CCWAu5BJ5qv6BwBB5f5RmBcMSdwIzAmOeiVNMvius=;

    h=Date:From:Reply-To:To:In-Reply-To:References:Subject;

    b=mINcg4HG8OuU9NGUBE55I5oKWKvOR4TMitJWpD4KQiK3xYrEzJmHQnpxtMihVGlvu

    6MpySNg4XPtdeYc+AeJGrIVsqhkfTZ1s3SVLzM44ZyZaw1WbsPBw+XxCSfCMfZoXkp

    eQOtt7FPL6cZKFWinOU2ZicxNz24GzzhktQvna6k=

Date: Mon, 16 May 2016 23:33:00 +0530 (IST)

From: Willie Messuck <wmessuck@runnionequpment.com>

Reply-To: Willie Messuck <wmessuck@runnionequpment.com>

To: Darrell Brown <Darrell@landalesigns.com>

"E" ②

Message-ID: <685362119.63549.e67d6115-1ff3-47e9-aff7-7a3f194edecf.open-xchange@webmail.runnionequpment.com>

In-Reply-To: <002f01d1af9b$e5c5eb40$b151c1c0$@com>

References: <002f01d1af9b$e5c5eb40$b151c1c0$@com>

Subject: Re: FW: Message from KM_C284e

MIME-Version: 1.0

Content-Type: multipart/alternative;

      boundary="----=_Part_63547_2039864229.1463421780913"

X-Priority: 3

Importance: Medium

X-Mailer: Open-Xchange Mailer v7.8.0-Rev26

X-Originating-Client: open-xchange-appsuite

X-CMAE-Score: 0

X-CMAE-Analysis: v=2.1 cv=epx/ttdX c=1 sm=1 tr=0

      a=OsE1w6L8WDwSEtwY4UF1mw==:117 a=OsE1w6L8WDwSEtwY4UF1mw==:17

      a=L9H7d07YOLsA:10 a=9cW_t1CCXrUA:10 a=s5jvgZ67dGcA:10

      a=8A7brI4kjU8C6ETGAX3PRdgeao0=:19 a=B5XrC3v8aoPBrbVjuloA:9

      a=QEXdDO2ut3YA:10 a=tfEiRtGvuFA7h005YMQA:9 a=iqIKCZG_rNGgJ2OY:21

      a=_W_S_7VecoQA:10

X-CTCH-RefID:
str=0001.0A020205.573A0B60.0171,ss=1,re=0.000,recu=0.000,reip=0.000,cl=1,cld=1,fgs=0

X-CTCH-VOD: Unknown

X-CTCH-Spam: Unknown

X-CTCH-Score: 0.000

X-CTCH-Rules:

X-CTCH-Flags: 0

X-CTCH-ScoreCust: 0.000

X-CSC: 0

X-CHA: v=2.1 cv=VplaXYGn c=1 sm=1 tr=0 a=lZBSkjJry2YraEZcjcT0pA==:117

      a=lZBSkjJry2YraEZcjcT0pA==:17 a=L9H7d07YOLsA:10 a=9cW_t1CCXrUA:10

a=s5jvgZ67dGcA:10 a=oSZ4ismWB0IA:10 a=8A7brI4kjU8C6ETGAX3PRdgeao0=:19

a=yrkiwgmsf1kA:10 a=ki1jnTn2AAAA:8 a=B5XrC3v8aoPBrbVjuloA:9

a=QEXdDO2ut3YA:10 a=tfEiRtGvuFA7hO05YMQA:9 a=iqIKCZG_rNGgJ2OY:21

a=_W_S_7VecoQA:10 a=_H4fwnLvk01xHASUj1Ki:22

Received-SPF: pass (mail100c0: domain of runnionequpment.com designates 162.210.70.59 as permitted sender) client-ip=162.210.70.59; envelope-from=wmessuck@runnionequpment.com;

X-WHL: LR

"E" ④

*REF To MIKE 27 LIVINGSTONINTL NOT @ yahoo.in*
*Lansdale notes May 18/16    See routing*

**Darrell Brown**

From:        Willie Messuck [wmessuck@runnionequipment.com]
Sent:        May 16, 2016 8:26 AM
To:          Darrell Brown; mmaciolek.livingstonintl@yahoo.com
Subject:     Re: Price Correction

*1"F" 4 pages*

Mike,

Any update on the export paperwork,

Thanks.

>     On May 13, 2016 at 8:34 PM Willie Messuck <wmessuck@runnionequpment.com> wrote:
>
>     Mike,
>
>     Please see attached.
>
>     Can you supply the ITN number today?
>
>     Thanks,
>
>     Willie Messuck

*May 18/16 rec'd*
*D.Brown — e.mail from*
*Willie of Runnion*
*cc. Livingston*
*— Note: yahoo address*
*(probably hacked)*

*1"F"*

X-Envelope-From: wmessuck@runnionequpment.com

Return-Path: <wmessuck@runnionequpment.com>

Received: from us2.outbound.mailhostbox.com (us2.outbound.mailhostbox.com [208.91.199.209])

by mail63c0.megamailservers.com (8.14.9/8.13.1) with ESMTP id u4GEPsEN026197

for <Darrell@landalesigns.com>; Mon, 16 May 2016 10:25:58 -0400

Received: from 172.16.214.18 (unknown [199.79.62.98])

(using TLSv1 with cipher AES256-SHA (256/256 bits))

(No client certificate requested)

(Authenticated sender: wmessuck@runnionequpment.com)

by us2.outbound.mailhostbox.com (Postfix) with ESMTPSA id A45FA781371;

Mon, 16 May 2016 14:25:51 +0000 (GMT)

DKIM-Signature: v=1; a=rsa-sha256; c=relaxed/relaxed; d=runnionequpment.com;

s=20160307; t=1463408751;

bh=J3I7eeT3tQS0w9c7Lg6HzcOXFfl4M+HoXv1o2dUZwmY=;

h=Date:From:Reply-To:To:In-Reply-To:References:Subject;

b=LIG4oJ0iy0nx2g+vb4y7V82zQ0fx23nJZXj/EfVw+qAJxxQsd/TYlJWlqyWCNk2Bi

wOykFRoskCyDniY5R4bXA+u0sqyVs6U3xGUzwPS7daCib1+qlVlBrhTnwJaRVzghY8

sSLgUvsTGCTBIe7u0cKt2rUUY4NAa4DDJv8PSEyU=

Date: Mon, 16 May 2016 19:55:51 +0530 (IST)

From: Willie Messuck <wmessuck@runnionequpment.com>

Reply-To: Willie Messuck <wmessuck@runnionequpment.com>

To: Darrell Brown <Darrell@landalesigns.com>,

mmaciolek.livingstonintl@yahoo.com

Message-ID: <359992581.54982.e67d6115-1ff3-47e9-aff7-7a3f194edecf.open-
xchange@webmail.runnionequpment.com>

In-Reply-To: <1420852570.135345.c9231dd1-a48a-4571-89a1-3a8e32d83913.open-xchange@webmail.runnionequpment.com>

References: <1771888230.71323.4734f3f7-1b58-4999-ad6a-4e9633ec31aa.open-xchange@webmail.runnionequpment.com>

<805811636.389647.1462979198551.JavaMail.yahoo@mail.yahoo.com>

<1420852570.135345.c9231dd1-a48a-4571-89a1-3a8e32d83913.open-xchange@webmail.runnionequpment.com>

Subject: Re: Price Correction

MIME-Version: 1.0

Content-Type: multipart/alternative;

boundary="----=_Part_54981_1109735155.1463408751614"

X-Priority: 3

Importance: Medium

X-Mailer: Open-Xchange Mailer v7.8.0-Rev26

X-Originating-Client: open-xchange-appsuite

X-CMAE-Score: 0

X-CMAE-Analysis: v=2.1 cv=R8SjYYlX c=1 sm=1 tr=0

a=OsE1w6L8WDwSEtwY4UF1mw==:117 a=OsE1w6L8WDwSEtwY4UF1mw==:17

a=L9H7d07YOLsA:10 a=9cW_t1CCXrUA:10 a=s5jvgZ67dGcA:10

a=7sRqry-GtzC19WljuE8A:9 a=QEXdDO2ut3YA:10 a=U0F6KL9exYUA:10

a=3hUQufiwkysA:10 a=e61lzPZHXSJUkjkwb5cA:9 a=_W_S_7VecoQA:10

a=gmAQISY0t_YA:10

X-CTCH-RefID:
str=0001.0A020202.5739D876.00D6,ss=1,re=0.000,recu=0.000,reip=0.000,cl=1,cld=1,fgs=0

X-CTCH-VOD: Unknown

X-CTCH-Spam: Unknown

X-CTCH-Score: 0.000

3 "F"

X-CTCH-Rules:

X-CTCH-Flags: 0

X-CTCH-ScoreCust: 0.000

X-CSC: 0

X-CHA: v=2.1 cv=T7e1EZ6Q c=1 sm=1 tr=0 a=LJYUhKJXOAHt3mM9wTo8Lw==:117

a=LJYUhKJXOAHt3mM9wTo8Lw==:17 a=L9H7d07YOLsA:10 a=9cW_t1CCXrUA:10

a=s5jvgZ67dGcA:10 a=w56gx56cbnYA:10 a=yrkiwgmsf1kA:10 a=tp16J-ZFAAAA:8

a=7sRqry-GtzC19WIjuE8A:9 a=QEXdDO2ut3YA:10 a=b7baBTRg94IA:10

a=3hUQufiwkysA:10 a=e61IzPZHXSJUkjkwbScA:9 a=_W_S_7VecoQA:10

a=SI80FZleqtoA:10 a=SrCnRuYhpnTencJiu7jF:22

Received-SPF: pass (mail63c0: domain of runnionequpment.com designates 208.91.199.209 as permitted sender) client-ip=208.91.199.209; envelope-from=wmessuck@runnionequpment.com;

X-WHL: LR



**Darrell Brown**

*3rd Instructions — see ROUTING*

| | |
|---|---|
| From: | Janice Ryce [jaryce@runnionequipment.com] |
| Sent: | May 18, 2016 10:00 AM |
| To: | darrell@landalesigns.com |
| Subject: | wire instruction |
| Attachments: | Wire instructions MAY 2016.pdf |

*Landale notes*
*of May 18/16*

See attached

Janice A. Ryce – Accounting
RUNNION EQUIPMENT COMPANY
jaryce@runnionequipment.com
800-824-6704  /  708-447-3169  /  708-447-3730 - Fax

*"G"  5 Pages*

http://www.runnionequipment.com
Crane & Equipment Solutions
For Contractors, Government, Rail, Utilities, or Agribusiness/
Sales, Service, Parts, Rental/ Custom Mounting, Rebuilding

🗙 Virus-free. www.avast.com

*3rd Banking info*
*different from first 2.*

*① "G"*



**EQUIPMENT COMPANY**
*7950 West 47th Street, Lyons, IL  60534*
*(800) 824-6704 Ph (708) 447-3730 Fax*
*www.runnionequipment.com*

*Truck Mounted Cranes & Equipment*
*Sales, Service & Rentals*

## ELECTRONIC PAYMENT INSTRUCTIONS

*UPDATED 12/19/2014*

### Wire Transfer, DOMESTIC:

Beneficiary Bank:  STATE BANK OF COUNTRYSIDE
6734 Joliet Road
Countryside, IL 60525
ABA# ████████

Beneficiary:  RUNNION EQUIPMENT COMPANY
7950 West 47th Street
Lyons, IL 60534
ACCT# ████████

### Wire Transfer, INTERNATIONAL:

Field 56A – Intermediary Institution:
SWIFT No.: ████████
BMO Harris Bank N.A.
111 W. Monroe Street
Chicago, IL 60603, USA

Field 57D – Account with Institution:
ABA ████████
State Bank of Countryside
6734 Joliet Rd.
Countryside, IL 60525

Field 59A – Beneficiary Customer:
RUNNION EQUIPMENT COMPANY
7950 West 47th Street
Lyons, IL 60534
ACCT# ████████

Field 70 – Remittance Information:
(Invoice, purchase order, Quote #, etc.)

*Field Tags are for a SWIFT MT103 / NOTE: BMO Harris Bank N.A. ABA is #071000288*

### ~ DIRECT INQUIRIES TO ~

*State Bank of Countryside – Sue Doering – 708.485.9756 – susan.doering@banksbc.com*
*Runnion Equipment Company – Janice Ryce – 708.447.3169 – jaryce@runnionequipment.com*

X-Envelope-From: SRS0=6opJaO=RL=runnionequipment.com=jaryce@eigbox.net

Return-Path: <SRS0=6opJaO=RL=runnionequipment.com=jaryce@eigbox.net>

Received: from bosmailout08.eigbox.net (bosmailout08.eigbox.net [66.96.190.8])

    by mail2c0.megamailservers.com (8.14.9/8.13.1) with ESMTP id u4IFxx0Y030460

    for <darrell@landalesigns.com>; Wed, 18 May 2016 12:00:01 -0400

Received: from bosmailscan01.eigbox.net ([10.20.15.1])

    by bosmailout08.eigbox.net with esmtp (Exim)

    id 1b33t9-0005Ic-7d

    for darrell@landalesigns.com; Wed, 18 May 2016 11:59:59 -0400

Received: from [10.115.3.31] (helo=bosimpout11)

    by bosmailscan01.eigbox.net with esmtp (Exim)

    id 1b33t4-0007eq-I6

    for darrell@landalesigns.com; Wed, 18 May 2016 11:59:59 -0400

Received: from bosauthsmtp16.yourhostingaccount.com ([10.20.18.16])

    by bosimpout11 with

    id vrzp1s00U0LoEWa01rzsRV; Wed, 18 May 2016 11:59:54 -0400

X-Authority-Analysis: v=2.1 cv=ZrtjKrLG c=1 sm=1 tr=0

a=2OW49aEHms2tn/AeNJ+rfA==:117 a=/wLUyWctDhgZ6L0N8bKtUQ==:17

a=L9H7d07YOLsA:10 a=9cW_t1CCXrUA:10 a=s5jvgZ67dGcA:10 a=fJkCZtVnKtkA:10

a=yrkiwgmsf1kA:10 a=DAwyPP_o2Byb1YXLmDAA:9 a=D0ZM_rHAAAAA:8 a=_6GpL_ENAAAA:8

a=I-Vl8pvmubT6bFV5-m4A:9 a=CjuIK1q_8ugA:10 a=dqr7ymFexU8A:10

a=LY2QW5W3NN8A:10 a=a3ixSpP2hmoA:10 a=xupg4knwUDYA:10 a=yMhMjlubAAAA:8

a=SSmOFEACAAAA:8 a=oiLOKi1Y_w7qQfK7UakA:9 a=_fjh9Q0xhSNOMQ81:21

a=gKO2Hq4RSVkA:10 a=UiCQ7L4-1S4A:10 a=hTZeC7Yk6K0A:10 a=frz4AuCg-hUA:10

a=THivb2UNNrY1KynY2VwA:9 a=n3BslyFRqc0A:10 a=xAkJRNjQopAsCTtKEr1O:22

a=HPItUfg3-W5T9FFxMdBG:22 a=BKKCjISod1eDJeS0ORpz:22 a=zjWhRoSqWz9hl55Hdlzg:22

Received: from 173-165-7-170-illinois.hfc.comcastbusiness.net ([173.165.7.170]:21985 helo=AliseTHINK)

        by bosauthsmtp16.eigbox.net with esmtpa (Exim)

        id 1b33sz-0005P8-5K

        for darrell@landalesigns.com; Wed, 18 May 2016 11:59:49 -0400

From: "Janice Ryce" <jaryce@runnionequipment.com>

To: <darrell@landalesigns.com>

Subject: wire instruction

Date: Wed, 18 May 2016 10:59:44 -0500

Message-ID: <000f01d1b11e$4c5f3c20$e51db460$@runnionequipment.com>

MIME-Version: 1.0

Content-Type: multipart/mixed;

        boundary="----=_NextPart_000_0010_01D1B0F4.638A1E80"

X-Mailer: Microsoft Outlook 14.0

Thread-Index: AdGxHktTF+THYNMkQnihVjrm2hG0Sg==

Content-Language: en-us

X-Antivirus: avast! (VPS 160518-0, 05/18/2016), Outbound message

X-Antivirus-Status: Clean

X-EN-UserInfo: 15dfe29874ee9a7464d8c954de55b6f6:931c98230c6409dcc37fa7e93b490c27

X-EN-AuthUser: jaryce@runnionequipment.com

Sender: "Janice Ryce" <jaryce@runnionequipment.com>

X-EN-OrigIP: 173.165.7.170                                          "G" (4)

X-EN-OrigHost: 173-165-7-170-illinois.hfc.comcastbusiness.net

X-CTCH-RefID:
str=0001.0A020202.573C9182.018F,ss=1,re=0.000,recu=0.000,reip=0.000,vtr=str,vl=0,cl=1,cld=1,fgs=0

X-CTCH-VOD: Unknown

X-CTCH-Spam: Unknown

X-CTCH-Score: 0.000

X-CTCH-Rules:

X-CTCH-Flags: 0

X-CTCH-ScoreCust: 0.000

X-CSC: 0

X-CHA: v=2.1 cv=XvXDZz19 c=1 sm=1 tr=0 a=uxT3n/+vRIdJZbamtU8tNw==:117

a=/wLUyWctDhgZ6L0N8bKtUQ==:17 a=L9H7d07YOLsA:10 a=9cW_t1CCXrUA:10

a=s5jvgZ67dGcA:10 a=HWQ9z8JDBPsA:10 a=fJkCZtVnKtkA:10 a=yrkiwgmsf1kA:10

a=DAwyPP_o2Byb1YXLmDAA:9 a=D0ZM_rHAAAAA:8 a=_6GpL_ENAAAAA:8

a=I-Vl8pvmubT6bFV5-m4A:9 a=CjuIK1q_8ugA:10 a=dqr7ymFexU8A:10

a=LY2QW5W3NN8A:10 a=a3ixSpP2hmoA:10 a=xupg4knwUDYA:10 a=yMhMjlubAAAA:8

a=SSmOFEACAAAA:8 a=oiLOKi1Y_w7qQfK7UakA:9 a=_fjh9Q0xhSNOMQ81:21

a=gKO2Hq4RSVkA:10 a=UiCQ7L4-1S4A:10 a=hTZeC7Yk6K0A:10 a=frz4AuCg-hUA:10

a=THivb2UNNrY1KynY2VwA:9 a=n3BslyFRqc0A:10 a=xAkJRNjQopAsCTtKEr1O:22

a=HPItUfg3-W5T9FFxMdBG:22 a=BKKCjlSod1eDJeS0ORpz:22

a=zjWhRoSqWz9hl55Hdlzg:22

Received-SPF: pass (mail2c0: domain of eigbox.net designates 66.96.190.8 as permitted sender) client-ip=66.96.190.8; envelope-from=SRS0=60pJaO=RL=runnionequipment.com=jaryce@eigbox.net;

X-WHL: LR

18/2016 11:50 FAX 7084473730          RUNNION EQUIPMENT CO.                    ☑001

*May 18 by Fax.*

**Willie Messuck** — *Other Email with spoofed Address*
*Faxed Direct. from Runnion*

From:           Pat Runnion <prunnion@runnionequipment.com>
Sent:           Wednesday, April 20, 2016 4:18 PM
To:             Willie Messuck
Subject:        FW: Message from KM_C284e
Attachments:    SKM_C284e16042013490.pdf

*Landale notes from May 18/16*

*This was sent by Fax from Runnion — Willie kept insisting my email exscluded a g mail address?*

*If then sent him this to show me as my copies do not have the "gmail"*  *FAXED*

Thank you,

*Patrick Runnion*

Runnion Equipment Company
800 824 6704
708 341 3169 cell
www.runnionequipment.com

1975 — 41 YEARS OF SERVICE — 2016

Crane & Equipment Solutions
For Contractors, Government, Rail, Utilities, or Agriculture/
Sales, Service, Parts, Rental/ Custom Mounting, Rebuilding

From: Darrell Brown [mailto:darrell.landalesigns@gmail.com]
Sent: Wednesday, April 20, 2016 5:35 PM
To: Pat Runnion
Subject: Message from KM_C284e

Pat –

attached is the title document info as you needed

new owner is – 640842 Alberta Ltd.

Address – 133 – 22555  Township Road 530, Sherwood Park, Alberta, Canada

Postal code – T8A4T7

I have been advised there is another document you need to fill in –it's required by the U.S. govt. I'm getting info
on it and will forward to you as soon as I  a copy

Darrell

*"H"*

*3 Pages*

*"H"*   *(1)*

1

03  8/2016 11:50 FAX 7084473730          RUNNION EQUIPMENT CO.                    ☑ 002

## Willie Messuck

| | |
|---|---|
| From: | Willie Messuck <wmessuck@runnionequipment.com> |
| Sent: | Wednesday, May 18, 2016 11:54 AM |
| To: | 'darrell@landalesigns.com' |
| Subject: | FW: FW: AES REQUIRED - Self Propelled Vehicles U.S. to Canada |

Darrell,
See below.
This is the only email address that I have for you.

Willie Messuck - Rental Coordinator
RUNNION EQUIPMENT COMPANY
wmessuck@runnionequipment.com
800-824-6704  /  708-447-3169

http://www.runnionequipment.com
Crane & Equipment Solutions
For Contractors, Government, Rail, Utilities, or Agribusiness/
Sales, Service, Parts, Rental/ Custom Mounting, Rebuilding

--------------------------------------------------------

From: Willie Messuck [mailto:wmessuck@runnionequipment.com]
Sent: Monday, May 16, 2016 2:15 PM
To: 'Darrell Brown'
Subject: RE: FW: AES REQUIRED - Self Propelled Vehicles U.S. to Canada

Darrell,
Our bank has no pending transactions??
Also the Broker has NOT gotten any export paperwork of or responded to my email or voicemail.

Willie Messuck - Rental Coordinator
RUNNION EQUIPMENT COMPANY
wmessuck@runnionequipment.com
800-824-6704  /  708-447-3169

http://www.runnionequipment.com
Crane & Equipment Solutions
For Contractors, Government, Rail, Utilities, or Agribusiness/
Sales, Service, Parts, Rental/ Custom Mounting, Rebuilding

From: Darrell Brown [mailto:darrell.landalesigns@gmail.com]
Sent: Thursday, May 12, 2016 5:04 PM
To: Willie Messuck
Subject: Re: FW: AES REQUIRED - Self Propelled Vehicles U.S. to Canada

Willie- Can you get the AES papers off today to get the INT number possibly tomorrow?

1                                                        "H"   ②

U. 18/2016 11:50 FAX 7084473730          RUNNION EQUIPMENT CO.                                    ☑003

If i could get the documents to Portal tomorrow. This would give us a day of grace at the end (20th)

Darrell

On Thu, May 12, 2016 at 4:28 PM, Darrell Brown <darrell.landalesigns@gmail.com> wrote:

Willie

I have given you some wrong information. Apparently   according to my broker I am supposed to sent the docs. Off to the border people in Portal, not you.

This means I need the INT number  that you will be getting.  I then send the documents required to the border at Portal  (along with the ITN number) 72 hours prior to the truck arriving at the border.

Working this back I think you should state that the truck will arrive at Portal May 20th.

This is based on the following assumptions --:

you get the request for the  INT number submitted  tomorrow (Friday May 13th)

You get the number back on Monday

You send me the number Monday the 16th, I submit the required documents for the 72 hour clearance  to Portal the same day

If all is good , we should know no later than the 19th

Your driver leaves Lyons on the 19th or the 20th he will  arrive on the  20th. I meet him.

Sounds easy, what are the odds of this coming off just like that?

Let's try!

On Thu, May 12, 2016 at 12:17 PM, Darrell Brown <darrell.landalesigns@gmail.com> wrote:

Willie

Hooray !! – progress and  success, way to go .

I'll need a revised sales order from you ..

Pat reduced  the cost of the truck by $500.00 when you could not get NAFTA clearance on the truck. My cost on the truck has gone up right around $7,000.00.

2

"H"  

Darrell Brown

From:           Pat Runnion [prunnion@runnionequipment.com]
Sent:           May 19, 2016 8:19 AM
To:             darrell@landalesigns.com
Subject:        FW: Message from KM_C284e
Attachments:    SKM_C284e16041311061.pdf

Darrell, attached is the email where you sent me back the signed order , from a Gmail account

Thank you,                                    "I" 6 pages

*Patrick Runnion*

**Runnion Equipment Company**
800 824 6704
708 341 3169 cell
www.runnionequipment.com

1975 – **41 YEARS OF SERVICE** – 2016

Crane & Equipment Solutions
For Contractors, Government, Rail, Utilities, or Agriculture/
Sales, Service, Parts, Rental/ Custom Mounting, Rebuilding

**From:** Darrell Brown [mailto:darrell.landalesigns@gmail.com]          First time "gmail" @ Runnion
**Sent:** Wednesday, April 13, 2016 1:27 PM                               Showed up
**To:** prunnion@runnionequipment.com                                     Landale notes
**Subject:** FW: Message from KM_C284e                                    from May 19/16

Pat – attached signed sales order for the 2005 Elliott and Sterling truck.

Darrell

[x]    Virus-free. www.avast.com

# ⌀ LANDALE SIGNS.

8525 ARGYLL ROAD
EDMONTON, AB T6C 4B2
PH (780)437-3730 FAX (780)435-9285
WWW.LANDALESIGNS.COM

## FACSIMILE TRANSMITTAL SHEET

| TO: PAT RUNNIN | FROM: |
|---|---|
| *Prunnion@runnionequipment* | Darrell Brown |

| COMPANY: | DATE: |
|---|---|
| Runnion Equipment Company | 4/13/16 |

| FAX NUMBER: | TOTAL NO. OF PAGES INCLUDING COVER: |
|---|---|
| 1 708 447-3730 | |

| PHONE NUMBER: | SENDER'S REFERENCE NUMBER: |
|---|---|
| 1-800 824-6704 | |

| RE: | YOUR REFERENCE NUMBER: |
|---|---|
| Used 2005 Elliott and truck | |

☐ URGENT  ☐ FOR REVIEW  ☐ PLEASE COMMENT  ☐ PLEASE REPLY  ☐ PLEASE RECYCLE

NOTES/COMMENTS:

Pat
I have signed and attached the 3 pages of the sales order as well as a copy of my memo to you of
yesterday.
Please send me the invoice for the equipment as discussed and I'll get it signed and back to you
immediately.

Thanks again
Regards
Darrell

② "I"

**Darrell Brown**

| | |
|---|---|
| From: | Darrell Brown <darrell@landalesigns.com> |
| Sent: | April-11-16 4:25 PM |
| To: | 'Pat Runnion' |
| Subject: | RE: quote |

Pat,
Thanks, -- I'll get the signed copies back to you in the morning.

We discussed the dyno and as far as I was concerned this is included the final price of $86,000.00 plus delivery . You looked up what the total expenses were against the truck, this included truck repairs, bucket repairs and you added in $700.00 for the dyno to come up with a total. (I believe -$7,700..00 ). This was all in as part of your offer of $88,000.00 plus $2,000.00 for delivery. My counter was $86,000.00 plus a maximum of $2,000.00 for delivery which we settled upon.

I also said that I wanted as part of the sale agreement that the truck and crane would be your responsibility up to the border when I take possession. This basically means your warranty covers the unit until I take possession at Portal.

One other question – you show the Elliott as having a hydraulic circuit in the basket. Is this the upper control levers that are used by the operator in the basket ?

Thanks
DADrrell

From: Pat Runnion [mailto:prunnion@runnionequipment.com]
Sent: April-11-16 12:06 PM
To: darrell@landalesigns.com
Subject: quote

Darrell, attached is the quote with freight for the Elliott you are buying. Please sign all three pages and return back to me, I will then get you an invoice put together. One thing we talked about was that you had offered to pay for the $500 dyno of the truck, I did not include that in this pricing.

Thank you.

*Patrick Runnion*

**Runnion Equipment Company**
800 824 6704
708 341 3169 cell
www.runnionequipment.com

1975 – **41 YEARS OF SERVICE** – 2016

**Crane & Equipment Solutions**
For Contractors, Government, Rail, Utilities, or Agriculture/
Sales, Service, Parts, Rental/ Custom Mounting, Rebuilding

1

SALES ORDER



## RUNNION EQUIPMENT COMPANY

Truck Mounted Cranes & Equipment
Sales, Service & Rentals

7950 WEST 47th STREET • LYONS, ILLINOIS 60534
PHONE (708) 447-3169 • 1-800-824-6704 • FAX (708) 447-3730
www.runnionequipment.com

Sold To: Landale Signs and Neon Ltd.
Address: 8525 Argyll Rd. NW
Edmonton, AB T6C 4B2, Canada
780-437-3730
Attn: Darrell Brown

Date: 4/11/16

Quote No. 4952

Unit #3974U

Page 1 of 2

| QUANTITY | DESCRIPTION | PRICE |
|---|---|---|
| One (1) | **Used 2005 Elliott G85F** equipped as follows: | |
| | - 90' working height | |
| | - 5,900# maximum boom capacity | |
| | - Out and down main outriggers | |
| | - A-frame style rear stabilizers | |
| | - Single front outrigger | |
| | - 600# platform capacity | |
| | - Hydraulic circuit in basket | |
| | - Strobe lights mounted on crane pedestal | |
| | MOUNTED ON | |
| One (1) | **2005 Sterling LT8500** equipped as follows: | |
| | - 56,000# GVW | |
| | - CAT C7 Engine | |
| | - Automatic transmission | |
| | - Front axle 16,000# | |
| | - Front wheels – 22.5x12.2 steel | |
| | - Front tires – 385/65R22.5 | |
| | - Rear axle - 40,000# | |
| | - Rear wheels – 22.5x8.25 | |
| | - Rear tires – 11R22.5 | |
| | - Continued on Page 2 – | |

(4) "I"

The terms and conditions appearing on the reverse side of this Sales Order
are made a part hereof the same as if rewritten at length herein.

REC SALES SIGNATURE        4-11-16        PURCHASER SIGNATURE        April 12/16

DATE                                                          DATE

<u>SALES ORDER</u>



# RUNNION EQUIPMENT COMPANY

**Truck Mounted Cranes & Equipment**
**Sales, Service & Rentals**

7950 WEST 47th STREET • LYONS, ILLINOIS 60534
PHONE (708) 447-3169 • 1-800-824-6704 • FAX (708) 447-3730
www.runnionequipment.com

Sold To: Landale Signs and Neon Ltd.
Address: 8525 Argyll Rd. NW
Edmonton, AB T6C 4B2. Canada
780-437-3730
Attn: Darrell Brown

Date: 4/11/16

Quote No. 4952

Unit #3974U

Page 2 of 2

| QUANTITY | DESCRIPTION | PRICE |
|---|---|---|
| | - Differential lock on both axles<br>- Trailer package with pintle hook<br>- AM/FM/CD stereo<br>- Air conditioning<br>- Spotlight mounted on top of cab | |
| | Price: | $86,000.00 |
| | *Freight to Portal North Dakota not to exceed $2,000.00 | $ 2,000.00 |
| | All prices F.O.B. Lyons, IL and subject to all applicable tax<br>Quote firm for 30 days TERMS: 10% deposit at time of order<br>Balance due upon notification that unit is ready for delivery | 88,000.00<br>F.O.b . Portal<br>ND. |

*Seller will supply a clean ~~original copy~~ bill of sale for the unit and a recall clearance letter from the manufacturer.* [signature]

⑤ "I"

The terms and conditions appearing on the reverse side of this Sales Order
are made a part hereof the same as if rewritten at length herein.

REC SALES SIGNATURE [signature]   DATE 4-11-16   PURCHASER SIGNATURE X [signature]   DATE April 11/16

SALES ORDER – SIGNATURE PAGE



RUNNION EQUIPMENT COMPANY
6400 WEST 73th STREET • LYONS, ILLINOIS 60534 PHONE • (708) 447-3169
1-800-823-6764 • FAX (708) 447-5791 • www.runnionequipment.com

Sold To: *LAndale Signs & Neon*          Date: *4-11-16*

Address:                                 Quote No. *4952*

## SALES ORDER - TERMS AND CONDITIONS OF SALE

This document contains the terms of sale. The entire contract between Seller and Buyer is contained in this Sales Order, no alleged oral promises or conditions not set forth herein shall be binding upon Seller or Buyer, and any prior negotiations between the parties are merged into the terms of this document.

Prices quoted are subject to change without notice in conformity with the Manufacturer's Price List effective at the time of delivery. Prices do not include taxes. Any tax, impost, levy, duty or other charge hereinafter imposed by any government or other authority on this sale will be added to the purchase price as herein noted or any later revision of the purchase price, and will be paid by Buyer unless Buyer provides Seller with a proper tax exemption certificate.

Upon acceptance of this order by Seller, if Buyer fails to perform the terms and conditions hereof, or refuses to accept delivery of the equipment, accessories or other items ordered within ten (10) days after notification that same are ready for delivery, the Seller, at its option may retain as liquidated damages all money, trade-ins or other property delivered to Seller by Buyer as down payment hereunder. Buyer will pay any cost of collection for any amount owed to Sellers, including, without limitation, reasonable attorney's fees, court costs and interest in the amount of 1% per month (12% per annum) from the date the amount is due.

Payment is due Seller from the date when Seller is prepared to make delivery. All equipment and material is delivered FOB Seller's plant and title and liability for loss or damage passes to Buyer upon Seller's delivery of the goods to a carrier for shipment to Buyer and any loss or damage thereafter shall not relieve Buyer from any obligation hereunder. Risk of loss for goods shall pass to the Buyer once payment is received by Seller.

Buyer may terminate this contract in whole upon thirty (30) days advance written notice to Seller. In such event, Buyer shall be liable for termination charges. If goods ordered are a standard, manufacturer catalog item, Buyer will pay a cancellation charge for each unit cancelled equal the greater of 30% of the purchase order item price or forfeiture of down payment/trade-in. If goods are non-standard items built to the Buyer's custom order, Buyer will pay for all cost, direct and indirect incurred and committed for this contract, together with a reasonable allowance for prorated expenses and anticipated profits.

Buyer agrees to comply fully and with all laws and regulation concerning the purchase and sale of goods. In particular, Buyer agrees to comply with all applicable export administration regulations of the United States, including, but not limited to, the Export Administration Act, insofar as they apply to the sale of products.

Buyer shall indemnify and hold harmless Seller, its employees, officers and directors and the respective successors and assigns, from and against any and all liability, damages, claims, causes of actions, losses, costs and expenses (including attorneys' fees) of any kind arising out of injuries to any person (including death) or damage to any property caused by or related to the goods or any negligent act or omission of Buyer, its employees and agents.

The validity, performance and construction of this Sales Order, shall be governed by the laws of the State of Illinois of the United States of America.

Seller shall not be liable, and shall be free from any potential liability for delay in delivery or non-delivery or any failure in shipment caused in whole, or in part, by the occurrence of any contingency beyond control of either Seller or Seller's suppliers including but not limited to act of war (whether an actual declaration thereof is made or not), act of any government or any agency or subdivision thereof, judicial action, sabotage, insurrection, terrorism, riot or other act of civil disobedience, act of a public enemy, failure or delay in transportation, strikes, lockouts, shortage of labor or labor troubles of any kind, accidents, explosion, perils of the sea, fire, earthquake, flood, storm or any other act of God, restrictions or requisitions, shortage of labor, fuel, raw material or machinery or technical failure where Seller has exercised ordinary care in the prevention thereof, failure of manufacturers to deliver, bankruptcy or insolvency of manufacturers or suppliers, suspension of shipping facilities, act or default of any carrier or any other contingency of whatsoever nature beyond Seller's control affecting production, transportation to boarding point, loading, forwarding or unloading in such a situation at destination of the goods covered by this contract including disturbances existing of the time this contract was made. In such a situation, if shipments or delivery is not made during the period contracted for, Buyer shall accept delivery under this contract when shipment is made, provided, however, Buyer shall not be obligated to accept delivery if shipment is not made within a reasonable time after the cessation of the aforementioned impediments or causes. Seller may allocate delivery among Seller's customers.

This order shall not be binding upon Seller until accepted by Seller in writing hereon and when so accepted, the original order with original signatures as given Seller and in Seller's possession shall be conclusive and binding upon the parties hereto.

The Buyer hereby acknowledges receipt of a copy of this Sales Order and Terms and Conditions.

_____          _____     "*I*"
Customer Signature                         Date Accepted
                                               *4-11-16*
_____               Date
Runnion Equipment Co.

## UNITED STATES DISTRICT COURT, NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

LANDALE SIGNS AND NEON, LTD., )
                                    )
          Plaintiff,      )
                                      )
          v.              )     Case No.: 16-cv-07619
                                      )
RUNNION EQUIPMENT CO.      )
and JOHN DOE,             )
                                      )
          Defendants.   )

### Landale's Responses to Runnion's First Set of Interrogatories

Pursuant to Fed. R. Civ. P. 33, Plaintiff, Landale Signs and Neon, Ltd. ("Landale"), through counsel, The Patterson Law Firm, LLC, submits the following Answers to Runnion Equipment Co.'s ("Runnion") First Set of Interrogatories to Plaintiff.

**General Objections**

All responses herein are made subject to and without waiving the following objections:

    1. Plaintiff objects to the interrogatories to the extent they call for information subject to the attorney client privilege, the attorney work product doctrine, or any other applicable privileges.

    2. Plaintiff objects to the interrogatories to the extent they seek to impose requirements beyond those set forth in the Federal Rules of Civil Procedure.

    3. Documents listed in answer to one interrogatory may also be responsive to another interrogatory.



EXHIBIT

Brown 2

July 20, 2018

4. Investigation continues and we reserve the right to supplement after

depositions have been taken and discovery has been responded to.

**Responses**

1. Identify the individuals who answered these Interrogatories or
contributed information used in answering these Interrogatories. If more than
one person provided the answers or information, identify the specific
Interrogatories answered by each person.

**ANSWER:** Darrell Brown.

2. Identify all employees, former and current, who participated in the
relationship with Runnion.

**ANSWER:** Darrell Brown.

3. Identify all the names and job titles of any employee, agent, or
representative of Landale who participated in a telephone call with any agent,
employee, or representative of the Runnion.

**ANSWER:** Darrell Brown, President.

4. Identify all the names and job titles of all of Landale's employees, agents,
or representatives who spoke by telephone with Patrick Runnion.

**ANSWER:** Darrell Brown, President.

5. Identify all dates of any telephone conversations between any of
Landale's employees, agents, or representatives, and any agent, employee, or
representative of Runnion.

**ANSWER:** Plaintiff objects to this interrogatory because it is overboard and

unduly burdensome in that it fails to specify a range of dates for which

Defendant is requesting information. Notwithstanding the foregoing objections,

there were a series of phone calls between Landale and Runnion between April

and May of 2016 relating the sale of the truck. Investigation continues with

respect to the dates which the telephone conversations took place.

6. Identify the substance of each telephone conversation listed in Interrogatory No. 5.

**ANSWER:** Plaintiff objects to this interrogatory because it is overboard and unduly burdensome in that it fails to specify a range of dates for which Defendant is requesting information. Notwithstanding the foregoing objections, Plaintiff does not recall the specifics of each particular conversation. However, Mr. Brown recalls that soon after the transaction was supposed to occur, he participated on a telephone call with Mr. Pat Runnion where the failed transaction was discussed and Mr. Runnion disclosed that a similar phishing scheme occurred to him in the past on a real estate deal. Additionally, Mr. Runnion expressed to Mr. Brown that he found it peculiar that Mr. Brown's e-mails were being sent in the early morning hours, which would indicate that there was likely some delay in the transmission of those communications.

7. Identify the dates of any and all telephone conversations between Landale's agents, representatives, employees, and Patrick Runnion.

**ANSWER:** Plaintiff objects to this interrogatory because it is overboard and unduly burdensome in that it fails to specify a range of dates for which Defendant is requesting information. Plaintiff lacks specific knowledge of the dates; however, one such call occurred soon after the transaction was supposed to occur between Mr. Brown and Pat Runnion. Investigation continues and Plaintiff reserves the right to supplement this response in the future.

8. Identify the substance of each telephone conversation described in the Interrogatory above.

**ANSWER:** Plaintiff objects to this interrogatory because it is overboard and unduly burdensome in that it fails to specify a range of dates for which Defendant is requesting information. Notwithstanding the foregoing objections, Plaintiff does not recall the specifics of each particular conversation. However, Mr. Brown recalls that after the transaction was supposed to occur, he participated on a telephone call with Pat Runnion where the failed transaction was discussed and he disclosed that a similar phishing scheme occurred to him in the past on a real estate deal.

9. Identify the name of any of Landale's agents, representatives, or employees who spoke to Patrick Runnion when he made any statement which indicated that Runnion's e-mail account had been interfered with by outside sources on a prior occasion.

**ANSWER:** Darrell Brown.

10. Identify any person, agent, employee, or representative of Landale who spoke to Patrick Runnion by telephone when he made any statement which supported the allegations that Runnion would assure that no information provided by Landale would be compromised in a similar fashion.

**ANSWER:** Mr. Runnion made no specific statements that he would protect Landale's information.

11. Describe in detail all efforts by Landale to mitigate damages.

**ANSWER:** Landale takes proactive steps to prevent breaches of its computer systems and servers by retaining an outside contractor who has installed security software and consistently checks on the status of the computer systems and servers. Additionally, Landale hired outside contractors for installation work of signs and then placed a comparable vehicle back into

service instead of using the new vehicle that it intended on purchasing from Runnion which reduced Runnion's potential consequential damages.

12. State the manner of organization of Landale; for example, corporation partnership, limited partnership, sole proprietorship, or individual.

a. If Landale is a corporation, identify each officer and director; and

b. If Landale is a partnership, identify each partner and state whether he is a general or limited partner.

**ANSWER:** Landale is a corporation. It has the following directors – Darrell Brown (also President), Laura Brown, and Carroll Brown.

13. Identify each allegation in the Answer to Plaintiff's Third Amended Complaint which Landale asserts is false or inaccurate, and describe in detail the facts, proof, or evidence you claim proves such allegation is false or inaccurate.

**ANSWER:** Plaintiff objects to this interrogatory because it is vague and confusing. Without waiving the foregoing objection, Plaintiff asserts that Runnion's denials in its Answer to the Third Amended Complaint are inaccurate or false relating to the phone conversation between Mr. Brown and Mr. Runnion soon after the transaction was to occurred where Mr. Runnion stated that a similar phishing scheme had been attempted against him before.

14. Identify your accountant, bookkeeper, office manager and any independent auditors, by name and title, during the last three years.

**ANSWER:** Landale objects to this Interrogatory because it calls for non-relevant information.

15. Please identify any agent, representative, or employee of Landale who had access to Landale's e-mail accounts during the past three (3) years.

**ANSWER:** Landale objects to this Interrogatory because it is vague and ambiguous when it requests it to identify who had access to its e-mail accounts. Further, it is overbroad and unduly burdensome in that it is requesting Landale to list every single person who had access to each of its e-mail accounts. Notwithstanding the foregoing objections, Darrell Brown and Mr. Neil Swindlehurst are the only individuals who have access to Mr. Brown's e-mail account.

16. Identify any in-person conversation or correspondence you have had with any employee or agent of Runnion, specifying the nature and subject matter of the conversation or correspondence, Runnion's representative involved, and, where applicable, any other persons that were present.

**ANSWER:** Landale never had any in-person conversations with employees or agents of Runnion. Landale has produced correspondence exchanged between it and Runnion. See Landale 1-53 and their accompany metadata.

17. Identify each act or omission Landale contends constitutes a breach of the Contract.

**ANSWER:** 1. Failing to prevent unauthorized third-parties from gaining access to the information related to this transaction; and 2. Failing to implement a suitable security system for Runnion's computer systems and servers relating to communications in this transaction which were intercepted by a third-party.

18. Please describe all facts, materials, or other evidence which support Landale's allegation that "upon information and belief," Runnion, acting through Patrick Runnion or any other individual, indicated that its e-mail system had been interfered with on a prior occasion.

**ANSWER:** Soon after the transaction was supposed to occur Darrell Brown participated on a telephone call with Pat Runnion where the failed transaction was discussed and Pat Runnion disclosed that a similar phishing scheme occurred to him in the past on a real estate deal.

19. Please state any and all facts, describe all evidence, and list all facts which support your allegation that personnel for Landale recognized that there was a delay in responses to Landale's e-mails to Runnion.

**ANSWER:** The e-mail timestamps indicate that many of Landale's e-mails were received by Runnion in the early morning hours. However, they were originally sent during regular work hours.

20. Please describe, list, or note, any evidence, facts, or documents which support the allegations contained in paragraph 17 of the Plaintiff's Third Amended Complaint.

**ANSWER:** Landale objects to this interrogatory to the extent that it is vague, overbroad, and unduly burdensome. Without waiving the foregoing objections, Landale utilizes software to protect its computer systems and servers. The headers (description of the IP address the communications are being sent and received) in the e-mails between the parties indicate that Runnion's e-mails were being forwarded to another party before being sent to Landale.

21. Please describe, list, or note, any evidence, facts, or documents which support the allegations contained in paragraph 18 of the Plaintiff's Third Amended Complaint.

**ANSWER:** Landale objects to this interrogatory to the extent that it is vague, overbroad, and unduly burdensome. Without waiving the foregoing

objections, Landale utilizes software to protect its computer systems and servers. The headers (description of the IP address the communications are being sent and received) in the e-mails between the parties indicate that Runnion's e-mails were being forwarded to another party before being sent to Landale. Furthermore, Mr. Runnion in a subsequent call with Mr. Brown after the transaction was supposed to be concluded stated that a similar phishing scheme had been attempted on him in the past.

22. Please describe, list, or note, any evidence, facts, or documents which support the allegations contained in paragraph 19 of the Plaintiff's Third Amended Complaint.

**ANSWER:** Landale objects to this interrogatory to the extent that it is vague, overbroad, and unduly burdensome. Without waiving the foregoing objections, Landale utilizes software to protect its computer systems and servers. The headers (description of the IP address the communications are being sent and received) in the e-mails between the parties indicate that Runnion's e-mails were being forwarded to another party before being sent to Landale. Furthermore, Mr. Runnion in a subsequent call with Mr. Brown after the transaction was supposed to be concluded stated that a similar phishing scheme had been attempted on him in the past. By using the intercepted information, Doe posed as Runnion and instructed Landale to wire the money to him.

23. Please describe, list, or note, any evidence, facts, or documents which support the allegations contained in paragraph 20 of the Plaintiff's Third Amended Complaint.

**ANSWER:** Landale objects to this interrogatory to the extent that it is vague, overbroad, and unduly burdensome. Without waiving the foregoing objections, Mr. Runnion disclosed to Mr. Brown that there was a previous phishing scheme that was attempted on him during a real estate transaction. Since Mr. Runnion was aware that his e-mails had been intercepted in the past, he should have been aware that they were continuing to be intercepted. Furthermore, Mr. Runnion expressed to Mr. Brown that he found it peculiar that Mr. Brown's e-mails were being sent in the early morning hours, which would indicate that there was likely some delay in the transmission of those communications. Lastly, during discussions with Runnion, it noted that Mr. Brown's email address in some communications changed from Darrell@landalesigns.com to Darrell.landalesigns@gmail.com.

24. Please list the date, and persons involved when "Mr. Brown inquired as to the cause of this delay" as alleged in paragraph 23 of the Plaintiff's Third Amended Complaint.

**ANSWER:** Landale objects to this interrogatory to the extent that it is vague, overbroad, and unduly burdensome. Without waiving the foregoing objections, Mr. Brown inquired about the delay after the transaction was supposed to be completed and he was discussing the failed transaction with Mr. Runnion.

25. Please describe, list, or note, any evidence, facts, or documents which support the allegations contained in paragraph 24 of the Plaintiff's Third Amended Complaint.

**ANSWER:** Landale objects to this interrogatory to the extent that it is vague, overbroad, and unduly burdensome. Without waiving the foregoing objections, Mr. Runnion disclosed to Mr. Brown that there was a previous phishing scheme that was attempted on him during a real estate transaction. Since Mr. Runnion was aware that his e-mails had been intercepted in the past, he should have been aware that they were continuing to be intercepted. Furthermore, Mr. Runnion expressed to Mr. Brown that he found it peculiar that Mr. Brown's e-mails were being sent in the early morning hours, which would indicate that there was likely some delay in the transmission of those communications.

26. Please describe, list, or note, any evidence, facts, or documents which support the allegations contained in paragraph 25 of the Plaintiff's Third Amended Complaint.

**ANSWER:** Landale objects to this interrogatory to the extent that it is vague, overbroad, and unduly burdensome. Without waiving the foregoing objections, Mr. Runnion disclosed to Mr. Brown that there was a previous phishing scheme that was attempted on him during a real estate transaction. Since Mr. Runnion was aware that his e-mails had been intercepted in the past, he should have been aware that they were continuing to be intercepted. Furthermore, Mr. Runnion expressed to Mr. Brown that he found it peculiar that Mr. Brown's e-mails were being sent in the early morning hours, which would indicate that there was likely some delay in the transmission of those communications.

27. Please describe, list, or note, any evidence, facts, or documents which support the allegations contained in paragraph 56 of the Plaintiff's Third Amended Complaint.

**ANSWER:** Landale objects to this interrogatory to the extent that it is vague, overbroad, and unduly burdensome. Without waiving the foregoing objections, it is standard custom and practice in business not to disclose information relating to a transaction to unnecessary and uninvolved third parties to prevent the possibility that such information could be used to perpetrate a scam on the parties entering into a transaction.

28. Please list all of the warnings and alerts that you refer to in paragraph 59(b) of the Plaintiff's Third Amended Complaint.

**ANSWER:** Landale objects to this interrogatory to the extent that it is vague, overbroad, and unduly burdensome. Without waiving the foregoing objections, Mr. Runnion disclosed to Mr. Brown that there was a previous phishing scheme that was attempted on him during a real estate transaction. Since Mr. Runnion was aware that his e-mails had been intercepted in the past, he should have been aware that they were continuing to be intercepted. Furthermore, Mr. Runnion expressed to Mr. Brown that he found it peculiar that Mr. Brown's e-mails were being sent in the early morning hours, which would indicate that there was likely some delay in the transmission of those communications.

29. Please list all warnings that you refer to in paragraph 59(e) of the Plaintiff's Third Amended Complaint.

**ANSWER:** Landale objects to this interrogatory to the extent that it is vague, overbroad, and unduly burdensome. Without waiving the foregoing objections, Mr. Runnion disclosed to Mr. Brown that there was a previous phishing scheme that was attempted on him during a real estate transaction. Since Mr. Runnion was aware that his e-mails had been intercepted in the past, he should have been aware that they were continuing to be intercepted. Furthermore, Mr. Runnion expressed to Mr. Brown that he found it peculiar that Mr. Brown's e-mails were being sent in the early morning hours, which would indicate that there was likely some delay in the transmission of those communications. Lastly, during discussions with Runnion, it noted that Mr. Brown's email address in some communications changed from Darrell@landalesigns.com to Darrell.landalesigns@gmail.com.

30. Please list all warnings that you refer to in paragraph 66 of the Plaintiff's Third Amended Complaint.

**ANSWER:** No warnings were referred to in paragraph 66 of the Landale's Third Amended Complaint.

Date: October 12, 2017

Respectfully Submitted,

_____
Thomas E. Patterson (No. 3128587)
Peter J. Evans (No. 6312759)
Alexander I. Passo (No. 6317519)
Patterson Law Firm, LLC
One N. La Salle St., Suite 2100
Chicago, IL 60602
(312) 223-1699
Fax: (312) 223-8549
tpatterson@pattersonlawfirm.com
pevans@pattersonlawfirm.com
apasso@pattersonlawfirm.com

Attorneys for Plaintiff

## Verification

I, Mr. Darrell Brown, hereby verify that I have read the attached Responses and Objections to Defendant's First Sets of Interrogatories and Requests for Production, and that the facts contained therein are true and correct to the best of my knowledge, information, and belief.

Dated: _____

_____
Darrell Brown, on behalf of Landale

Case: 1:16-cv-07619 Document #: 33 Filed: 01/18/17 Page 1 of 14 PageID #:197

**UNITED STATES DISTRICT COURT, NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION**

| | | |
|---|---|---|
| Landale Signs and Neon, Ltd., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:16-cv-07619 |
| | ) | |
| Runnion Equipment Co. and | ) | |
| John Doe, | ) | **Jury Trial Demanded** |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

### Third Amended Complaint

Plaintiff, Landale Signs and Neon, Ltd., by and through its attorneys,

Patterson Law Firm, LLC, for its Third Amended Complaint against

Defendants, Runnion Equipment Company and John Doe, states as

follows:

**Nature of the Action**

1.   This action stems from a data breach that resulted in the theft of

Plaintiff's funds. Plaintiff, Landale Signs and Neon, Ltd. ("Landale"),

entered into a contract to purchase a vehicle from Runnion Equipment

Company ("Runnion"). While negotiating the purchase of this vehicle,

Runnion negligently allowed John Doe to intercept sensitive information

related to the transaction.

1



EXHIBIT
Brown 3
July 20, 2018
PENGAD 800-631-6989

2.    John Doe utilized this information to pose as Runnion and to instruct Landale to wire the purchase amount for the vehicle to John Doe.

3.    Landale relied upon John Doe's misrepresentations and wired $87,625.00 to John Doe without receiving any benefit in exchange for the transaction.

**Parties**

4.    Plaintiff, Landale, is a Canadian corporation with its principal place of business in Edmonton, Canada.

5.    Defendant, Runnion, is an Illinois corporation with its principal place of business located in Lyons, Illinois.

6.    Defendant, John Doe, is an individual of unknown residence and citizenship. Landale does not know John Doe's identity or location at this time. Landale will amend its Complaint to name John Doe when his or her identity has been discovered.

**Jurisdiction & Venue**

7.    The matter in controversy exceeds, exclusive of interest and costs, the sum of seventy-five thousand dollars ($75,000.00).

8.    Jurisdiction in this action is based on diversity of citizenship of the Plaintiff and Defendants pursuant to 28 U.S.C. § 1332, with venue proper in this District pursuant to 28 U.S.C. § 1391.

**Background**

9.  Landale is a business that manufactures and installs custom outdoor and interior displays.

10. In April of 2016, Landale entered into a contract with Runnion for the purchase of a truck installed with a lift for $87,625.00.

11. Landale and Runnion partly communicated via e-mail to negotiate the terms of this agreement.

12. On May 12, 2016, Landale received an e-mail with instructions on how to wire the payment to Runnion pursuant to the terms of the agreement.

13. Landale followed these instructions and remitted payment per the agreed terms in the amount of $87,625.00.

14. Thereafter, Runnion informed Landale that it never received the payment.

15. Landale subsequently showed Runnion the string of e-mails whereby the-purported-Runnion instructed Landale on how to remit payment for the truck purchase.

16. Runnion represented that it never sent these communications and stated that Landale's communications must have been hacked.

17. Upon information and belief, Landale's computer network, database, and servers were never accessed by a third party.

3

18. Instead, upon information and belief, Runnion's computer network, database, and servers were accessed by John Doe.

19. John Doe utilized the information he or she intercepted from Runnion in order to pose as Runnion and to instruct Landale to wire him or her $87,625.00.

20. Runnion was aware or should have been aware that its computer network, database, and servers were improperly being accessed by a third party with ill intent.

21. During the negotiations, Landale's President, Mr. Darrell Brown, noticed that there was a delay in receiving e-mails from Runnion's President, Mr. Patrick Runnion.

22. Mr. Brown did not experience any delays when sending or receiving e-mails from other parties other than Mr. Runnion.

23. Mr. Brown inquired as to the cause of this delay when communicating with Runnion.

24. Mr. Runnion replied that he was aware of potential interference to his e-mail account.

25. Mr. Runnion further represented that he was advised that someone had been intercepting his e-mails during a prior transaction; however, a warning sign had been noticed and a potential theft during the transaction had been averted.

4

Case: 1:16-cv-07619 Document #: 33 Filed: 01/18/17 Page 5 of 14 PageID #:201

26. Upon information and belief, through this unauthorized access by John Doe, he or she discovered the terms and conditions of the contract between Landale and Runnion.

27. By utilizing this information, John Doe was able to pose as Runnion and instruct Landale to remit payment to the wrong bank account.

**Count I – Negligence (against Runnion)[1]**

28. Landale re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 27 as though fully set forth herein.

29. Runnion had a duty to exercise reasonable care in safeguarding, securing, and protecting the sensitive information sent by Landale.

30. Runnion also had a duty to exercise reasonable care in safeguarding, securing, and protecting the information it received from Landale from being compromised, lost, stolen, misused by, or disclosed to any unauthorized party.

31. Runnion had full knowledge of the sensitivity of the information sent by Landale and the type of harm that Landale could suffer if the information was disclosed or intercepted by a third party.

---

[1] Landale acknowledges the Court dismissed its negligence count with prejudice in the Order entered on December 22, 2016. (Dkt. # 29.) Landale, however, has filed a motion to reconsider the Court's ruling. Therefore, Landale has included the negligence count in its Third Amended Complaint to preserve it for the record.

Case: 1:16-cv-07619 Document #: 33 Filed: 01/18/17 Page 6 of 14 PageID #:202

32.  Upon information and belief, Runnion breached these duties through its negligent acts and omissions, which include, but are not limited to:

    a.  Failing to take appropriate action in remedying the interception of its e-mails, of which it was aware;

    b.  Failing to heed warnings and alerts that a phishing e-mail scam was being perpetrated;

    c.  Failing to implement a suitable security system to prevent the interception of its e-mails;

    d.  Disclosing Landale's private information to a third party who used this information to pose as Runnion in order to perpetuate a scam;

    e.  Failing to heed a warning that its computers, network, e-mails, and server had been compromised by a third party; and

    f.  Otherwise acting in a careless and negligent manner.

33. Landale was a foreseeable victim of any inadequate safety and security practices and procedures Runnion employed regarding its e-mail accounts and server.

34. As a direct and proximate result of Runnion's negligence, Landale suffered damages in the form of $87,625.00 sent to a third party without any benefit in return.

6

Wherefore, Plaintiff, Landale, prays that this Court enter judgment in its favor and against Defendant, Runnion, in an amount of $87,625.00, award pre-judgment and post-judgment interest, and grant any further relief this Court deems just and appropriate.

**Count II – Conversion (against John Doe)**

35. Landale re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 27 as though fully set forth herein.

36. Landale made a wire transfer to an account in exchange for a truck from Runnion.

37. Upon information and belief, through a scam perpetrated by John Doe, this payment, through a wrongful conversion, was intercepted by John Doe.

38. As a result of the scam perpetrated by John Doe, Landale has not received the bargained-for truck.

39. John Doe is not entitled to the funds intercepted from Landale and intended for Runnion.

40. Landale is entitled to the immediate, absolute, and unconditional possession of funds that were intercepted by John Doe.

41. John Doe intentionally interfered with Landale's attempted payment to Runnion and, through this interference, took dominion over the payment, over which John Doe has no legal claim.

7

42. John Doe's interference has deprived Landale of the possession or use of the funds that were intended for the purchase of the truck.

43. As a direct and proximate result of this interference, Landale has suffered damaged in the form of the $87,625.00 payment that was wrongfully converted for the personal benefit of John Doe.

Wherefore, Plaintiff, Landale, prays that this Court enter judgment in its favor and against Defendant, John Doe, in an amount of $87,625.00, award punitive damages in Landale's favor, award pre-judgment and post-judgment interest, and grant any further relief this Court deems just and appropriate..

## Count III – Fraud (against John Doe)

44. Landale re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 27 as though fully set forth herein.

45. John Doe falsely posed as Runnion and improperly instructed Landale to wire payment for the bargained-for truck to John Doe's bank account.

46. These statements and instructions were false statements of material facts.

47. John Doe knew that these statements and instructions were false.

48. John Doe made these statements and instructions with the intent to induce Landale to remit payment to John Doe.

8

49. Landale reasonably believed these statements and instructions and acted in justifiable reliance on the truth of these statements and instructions.

50. As a direct and proximate result of John Doe's false statements and instructions, Landale suffered actual damages.

51. Further, John Doe has been unjustly enriched by receiving funds from Landale that were intended for Runnion.

Wherefore, Plaintiff, Landale, prays that this Court enter judgment in its favor and against Defendant, John Doe, in an amount of $87,625.00, award punitive damages in Landale's favor, award pre-judgment and post-judgment interest, and grant any further relief this Court deems just and appropriate.

**Count IV – Breach of Contract (against Runnion)**

52. Landale re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 27 as though fully set forth herein.

53. Runnion and Landale entered into a contract for the sale of a truck. (Ex. A, Purchase Agreement.)

54. Every contract includes an implied duty of good faith and fair dealing.

55. The contract between Runnion and Landale also included an implied agreement by the parties to maintain confidentiality over sensitive information disclosed during the transaction.

9

56. This implied agreement was a material term to a transaction that was negotiated in part via email and completed electronically.

57. The agreement to keep sensitive information confidential in a transaction such as this one is consistent with the course of dealings of the parties and a standard custom within the industry.

58. At all times material, Landale had performed its obligations under the contract to protect confidential and sensitive information provided by Runnion.

59. Runnion breached the contract in the following ways which include, but are not limited to:

 a. Failing to take appropriate action in remedying the interception of its e-mails, of which it was aware;

 b. Failing to heed warnings and alerts that a phishing e-mail scam was being perpetrated;

 c. Failing to implement a suitable security system to prevent the interception of its e-mails;

 d. Disclosing Landale's private information to a third party who used this information to pose as Runnion in order to perpetuate a scam; and

 e. Failing to heed a warning that its computers, network, e-mails, and server had been compromised by a third party; and

10

f. Failing to adhere to its duty of good faith and fair dealing during the course of the negotiations and the transaction.

60. As a direct and proximate result of Runnion's breach of contract, Landale suffered damages in the form of $87,625.00 sent to a third party without any benefit in return.

Wherefore, Plaintiff, Landale, prays that this Court enter judgment in its favor and against Defendant, Runnion, in an amount of $87,625.00, award pre-judgment and post-judgment interest, and grant any further relief this Court deems just and appropriate.

**Count V – Breach of Implied Contract (against Runnion) (In the alternative to the breach of contract count)**

61. Landale re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 27 as though fully set forth herein.

62. Runnion and Landale entered into a contract for the sale of a truck.

63. In order to obtain the benefit of this transaction, Plaintiff disclosed sensitive information relating to its financial institution and details related to when and how it would pay for the truck.

64. Landale agreed to complete the transaction with the understanding that Runnion would take reasonable measures to safeguard any sensitive information from disclosure to third parties.

11

Case: 1:16-cv-07619 Document #: 33 Filed: 01/18/17 Page 12 of 14 PageID #:208

65. The understanding to safeguard sensitive financial information relating to a transaction is a standard practice in this course of business and a custom within the industry.

66. Upon information and belief, Runnion agreed to complete the transaction with the intent to safeguard any sensitive information from disclosure to third parties.

67. The parties' mutual intent constitutes a meeting of the minds regarding safeguarding sensitive information from disclosure to third parties.

68. By providing this sensitive information and upon Runnion's acceptance of such information, Landale and Runnion entered into implied contracts whereby Runnion was obligated to take reasonable steps to secure and safeguard that information which it was provided.

69. Such implied contracts are separate from the written agreement executed by the parties.

70. Without such implied contracts, Landale would not have provided this sensitive information to Runnion.

71. Runnion breached the contract in the following ways which include, but are not limited to:

    a. Failing to take appropriate action in remedying the interception of its e-mails, of which it was aware;

    b. Failing to heed warnings and alerts that a phishing e-mail scam was being perpetrated;

    c. Failing to implement a suitable security system to prevent the interception of its e-mails;

    d. Disclosing Landale's private information to a third party who used this information to pose as Runnion in order to perpetuate a scam; and

    e. Failing to heed a warning that its computers, network, e-mails, and server had been compromised by a third party.

72. As a direct and proximate result of Runnion's breach of contract, Landale suffered damages in the form of $87,625.00 sent to a third party without any benefit in return.

Wherefore, Plaintiff, Landale, prays that this Court enter judgment in its favor and against Defendant, Runnion, in an amount of $87,625.00, award pre-judgment and post-judgment interest, and grant any further relief this Court deems just and appropriate.

13

Case: 1:16-cv-07619 Document #: 33 Filed: 01/18/17 Page 14 of 14 PageID #:210

Date: January 18, 2017

Respectfully Submitted,
/s/Alexander I. Passo
Thomas E. Patterson (No. 3128587)
Alexander I. Passo (No. 6317519)
Peter J. Evans (No. 6312759)
Patterson Law Firm, LLC
One N. La Salle St., Suite 2100
Chicago, IL 60602
(312) 223-1699
Fax: (312) 223-8549
tpatterson@pattersonlawfirm.com
apasso@pattersonlawfirm.com

Attorneys for Plaintiff

14

SALES ORDER – SIGNATURE PAGE



## RUNNION EQUIPMENT COMPANY

7950 WEST 47th STREET • LYONS, ILLINOIS 60534 PHONE • (708) 447-3166
1-800-824-6704    FAX (708) 447-3730    www.runnionequipment.com

Sold To: LAndale Signs & Neon          Date: 4-11-16

Address:                                Quote No. 4952

### SALES ORDER - TERMS AND CONDITIONS OF SALE

This document contains the terms of sale. The entire contract between Seller and Buyer is contained in this Sales Order; no alleged oral promises or conditions not set forth herein shall be binding upon Seller or Buyer, and any prior negotiations between the parties are merged into the terms of this document.

Prices quoted are subject to change without notice in conformity with the Manufacturer's Price List effective at the time of delivery. Prices do not include taxes. Any tax, impost, levy, duty or other charge hereinafter imposed by any government or other authority on this sale will be added to the purchase price as herein noted or any later revision of the purchase price, and will be paid by Buyer unless Buyer provides Seller with a proper tax exemption certificate.

Upon acceptance of this order by Seller, if Buyer fails to perform the terms and conditions hereof, or refuses to accept delivery of the equipment, accessories or other items ordered within ten (10) days after notification that same are ready for delivery, the Seller, at its option may retain as liquidated damages all money, trade-ins or other property delivered to Seller by Buyer as down payment hereunder. Buyer will pay any cost of collection for any amount owed to Sellers, including, without limitation, reasonable attorney's fees, court costs and interest in the amount of 1% per month (12% per annum), from the date the amount is due.

Payment is due Seller from the date when Seller is prepared to make delivery. All equipment and material is delivered FOB Seller's plant and title and liability for loss or damage passes to Buyer upon Seller's delivery of the goods to a carrier for shipment to Buyer and any loss or damage thereafter shall not relieve Buyer from any obligation hereunder. Risk of loss for goods shall pass to the Buyer once payment is received by Seller.

Buyer may terminate this contract in whole upon thirty (30) days advance written notice to Seller. In such event, Buyer shall be liable for termination charges. If goods ordered are a standard, manufacturer catalog item, Buyer will pay a cancellation charge for each unit cancelled equal the greater of: 20% of the purchase order item price or forfeiture of down payment/trade in. If goods are non-standard items built to the Buyer's custom order, Buyer will pay for all cost, direct and indirect incurred and committed for this contract, together with a reasonable allowance for prorated expenses and anticipated profits.

Buyer agrees to comply fully and with all laws and regulation concerning the purchase and sale of goods. In particular, Buyer agrees to comply with all applicable export administration regulations of the United States, including, but not limited to, the Export Administration Act, insofar as they apply to the sale of products.

Buyer shall indemnify and hold harmless Seller, its employees, officers and directors and the respective successors and assigns, from and against any and all liability, damages, claims, causes of actions, losses, costs and expenses (including attorneys' fees) of any kind arising out of injuries to any person (including death) or damage to any property caused by or related to the goods or any negligent act or omission of Buyer, its employees and agents.

The validity, performance and construction of this Sales Order, shall be governed by the laws of the State of Illinois, of the United States of America.

Seller shall not be liable, and shall be free from any potential liability for delay in delivery or non-delivery or any failure in shipment caused in whole, or in part, by the occurrence of any contingency beyond control of either Seller or Seller's suppliers including, but not limited to act of war (whether an actual declaration thereof is made or not), act of any government or any agency or subdivision thereof, judicial action, sabotage, insurrection, terrorism, riot or other act of civil disobedience, act of a public enemy, failure or delay in transportation, strikes, lockouts, shortage of labor or labor troubles of any kind, accidents, explosion, perils of the sea, fire, earthquake, flood, storm or any other act of God, restrictions or requisitions, shortage of labor, fuel, raw material or machinery or technical failure where Seller has exercised ordinary care in the prevention thereof, failure of manufacturers to deliver, bankruptcy or insolvency of manufacturers or suppliers, suspension of shipping facilities, act or default of any carrier or any other contingency of whatsoever nature beyond Seller's control affecting production, transportation to boarding point, loading, forwarding or unloading in such a situation at destination of the goods covered by this contract including disturbances existing at the time this contract was made. In such a situation, if shipments or delivery is not made during the period contracted for, Buyer shall accept delivery under this contract when shipment is made; provided, however, Buyer shall not be obligated to accept delivery if shipment is not made within a reasonable time after the cessation of the aforementioned impediments or causes. Seller may allocate delivery among Seller's customers.

This order shall not be binding upon Seller until accepted by Seller in writing hereon and when so accepted, the original order with original signatures as given Seller and in Seller's possession shall be conclusive and binding upon the parties hereto.

The Buyer hereby acknowledges receipt of a copy of this Sales Order and Terms and Conditions.

Customer Signature          Date Accepted          EX A

## Carol

| | |
|---|---|
| **From:** | noreply@firmafx.com |
| **Sent:** | Friday, May 13, 2016 11:31 AM |
| **To:** | c-dbrown@shaw.ca |
| **Subject:** | Transfer Confirmation Trade # ███████ Settlement/Draw # ███████ |
| **Attachments:** | Wire Confirmation.pdf |

THE FOLLOWING MESSAGE IS BEING SENT VIA AN AUTOMATED PROCESS. PLEASE DO NOT REPLY TO THIS EMAIL.

Please find the following document(s) attached:
Transfer Confirmation Trade # ███████ Settlement/Draw # ███████


FIRMA Foreign Exchange Corporation

This e-mail and any attachments may contain confidential information. If you are not the intended recipient, please notify the sender immediately by return e-mail, delete this e-mail and destroy any copies. Any dissemination or use of this information by a person other than the intended recipient is unauthorized and may be illegal.


EXHIBIT
Brown 4
July 20, 2018

# Wire Confirmation



| | |
|---|---|
| **Trade ID#** | 1105178 |
| **Settlement Date** | 13 May 2016 |
| **Client Name** | Landale Signs And Neon Ltd |
| **Trade Name/Operating As** | |
| **Client Fax Number** | (780)4359285 |
| **Amount Transferred** | 87,625.00 |
| **Currency** | USD |
| **Beneficiary Name** | PRIME C. CONTRACTORS |
| **Beneficiary Account** | ▆▆▆▆▆▆ |
| **Bank Name** | Sun Trust Bank |
| **Bank Information** | 3610h King Street<br>Alexandria, VA<br>22302 |
| **Bank Routing / Swift / ABA#** | ▆▆▆▆▆▆ |
| **Receiving Bank Country Code** | US |
| **Intermediary Bank Name** | |
| **Intermediary Bank Information** | |
| **Intermediary Bank Swift Number** | |
| **By Order of** | Landale Signs And Neon Ltd, 8525 Argyll Road NW , Edmonton,<br>Alberta (AB), T6C 4B2, Canada |
| **Reference** | Landale Signs |

# Standard Terms and Conditions Apply – READ CAREFULLY BELOW

FIRMA Foreign Exchange Corporation's Standard Terms and Conditions apply – The client acknowledges receipt of the Standard Terms and Conditions and by signing below, the client agrees to be bound by the said Standard Terms and Conditions.

The Terms and Conditions include important information about your rights and responsibilities, including steps you must take to protect your interests, our obligations under our agreement, and limitations on our liability. You should review them carefully. To review FIRMA Foreign Exchange Corporation's Standard Terms and Conditions, go to www.firmafx.com/terms. Wire payments may be subject to fees imposed by the bank, intermediary banks, clearing houses and are not the responsibility of FIRMA Foreign Exchange Corp.

This order shall not be deemed to be proof of payment.

Authorized Signature _____     Date _____

# PLEASE SIGN AND FAX BACK TO FIRMA AT THE FAX NUMBER LISTED BELOW

Suite 400, 10205 101 Street NW
Edmonton, AB T5J 4H5

Tel. (780) 426-5971 Toll Free 1-866-426-2605
Fax. (780) 426-5920 Toll Free Fax 1-866-426-5920

FIRMA Foreign Exchange Corporation

# Transaction Confirmation



## Customer Information

Customer Account  #90032269

Carolyn Brown

Landale Signs And Neon Ltd

8525 Argyll Road NW

Edmonton,  Alberta (AB)

T6C 4B2

Canada

### Trade 1105178

| | Edmonton |
|---|---|
| Trade Date | 13-May-2016 |
| Settle Date | 13-May-2016 |

| Customer Buys | Exchange Rate | | |
|---|---|---|---|
| 87,625.00   USD | 1.0000 | 87,625.00 | USD |

| | | |
|---|---|---|
| Settlement Method: | Cheque | |
| Settlement: | 87,625.00 | USD |
| Service Charge (S/C) Total: | 40.00 | USD |
| Total Due: | 87,665.00 | USD |

### Payments

| Payment Type | Payee | Amount | S/C |
|---|---|---|---|
| Wire Transfer | PRIME C. CONTRACTORS | 87,625.00 | 40.00 |

Visit our new website at www.firmafx.com

Suite 400, 10205 101 Street NW
Edmonton, AB T5J 4H5

Tel. (780) 426-5971  Toll Free 1-866-426-2605
Fax. (780) 426-5920  Toll Free Fax 1-866-426-5920

FIRMA Foreign Exchange Corporation's Standard Terms and Conditions apply.
The Terms and Conditions include important information about your rights and responsibilities, including steps you must take to protect your interests, our obligations under our agreement, and limitations on our liability. You should review them carefully.
To review FIRMA Foreign Exchange Corporation's Standard Terms and Conditions, go to www.firmafx.com/terms.
FIRMA Foreign Exchange Corporation complies with money laundering and terrorist financing legislation. We report all suspicious transactions.

100-01                         5/13/2016      10:23:06 AM                                      Page 1 of 1

**Carol**

| | |
|---|---|
| **From:** | noreply@firmafx.com |
| **Sent:** | Friday, May 13, 2016 10:23 AM |
| **To:** | c-dbrown@shaw.ca |
| **Subject:** | Trade #1105178 Settlement/Draw #1030858 |
| **Attachments:** | Wire Confirmation.pdf; Transaction Confirmation.pdf |

THE FOLLOWING MESSAGE IS BEING SENT VIA AN AUTOMATED PROCESS. PLEASE DO NOT REPLY TO THIS EMAIL.

Please find the following document(s) attached:
Trade #1105178 Settlement/Draw #1030858

FIRMA Foreign Exchange Corporation

This e-mail and any attachments may contain confidential information. If you are not the intended recipient, please notify the sender immediately by return e-mail, delete this e-mail and destroy any copies. Any dissemination or use of this information by a person other than the intended recipient is unauthorized and may be illegal.

# EDMONTON POLICE SERVICE

## WITNESS STATEMENT FORM

**The accused may have a legal right to a copy of this report**

Occurrence No.
16 - 74102

| Type of Occurrence | Location | Date |
|---|---|---|
| FRAUD | EDMONTON | 2016 YYYY · 05 MM · 20 DD |

| | | Surname | Given Names | Date of Birth | Sex |
|---|---|---|---|---|---|
| ☐ Witness ☒ Complainant | | BROWN | DARRELL | 1945 YYYY · 02 MM · 03 DD | M |

*SEE ATTACHED TYPED*

*STATEMENT*

The personal information on this form will be collected, used, and disclosed for the purposes outlined in Sections 33 to 43 of the *Freedom of Information and Protection of Privacy (FOIPP) Act* and other legal requirements where they are consistent with the *FOIPP Act*. If you have any questions regarding the collection of information, contact the Edmonton Police Service, Freedom of Information and Protection of Privacy Unit, 9620 – 103 A Avenue, Edmonton, Alberta, T5H 0H7.

If your address changes during any part of this case, please contact
780-421-2217
EDMONTON POLICE SERVICE
VICTIM SERVICES UNIT

**Complainant / Witness**

I consent to the release of this statement to the insurance company of the victim of this incident.   ☒ Yes   ☐ No

| Signature | Date | Time | Page of |
|---|---|---|---|
| | 2016 YYYY · 5 MM · 20 DD | 10:55 | |

| Taken by: | Date | Time |
|---|---|---|
| Reg.: 3210 Name: Cst. Vallin Signature | 16 YYYY · max MM · 20 DD | 0953 |

### IT IS UNLAWFUL TO MAKE A FALSE REPORT TO THE POLICE
(The Edmonton Police Service will prosecute those cases)

Witness Copy



EXHIBIT
Brown 5
July 20, 2018



SunTrust Bank
Subpoena Department – FL ORL 7136
P.O Box 620577
Orlando, FL 32862-0577

Date: 10/28/2016

Invoice Reference #: SS-77753
*Please note the invoice reference # on your payment*

ALEXANDER I.PASSO
THE PATTERSON LAW FIRM, LLC
ONE NORTH LASALLE, SUITE 2100
CHICAGO, IL 60602

RE: Subpoena for PRIME CONTROLS CONTRACTORS, LLC

☒ Enclosed please find the bank documents responsive to the subpoena.
☐ Signature Card/Corporate Resolution cannot be located.
☐ Invalid account number/closed account
☐ The requested information is beyond the records retention period
☐ Based upon the information provided, we are unable to locate records for the designated
person or entity. Please provide additional information and we will renew our search (i.e.,
full SSN, TIN, account #, address and DOB).
☐ Other:

| Description | Qty | | Rate | | Total |
|---|---|---|---|---|---|
| Bank Statements | 4 | Statement(s) | $1.00 | per Statement | $ 4.00 |
| Photocopies | 4 | Copies | $ 0.50 | per copy | $ 2.00 |
| CD ** | | CD | $10.00 | per CD | $ 0.00 |
| Research/production | | | $35.00 | per hour | $ 35.00 |
| | | | | **Sub Total** | $ 41.00 |
| | | | | | |
| **SunTrust Tax ID: 58-0466330** | | | | **Total** | $ 41.00 |

*Your payment is appreciated within 30 days of the receipt of this invoice.*
*A late fee of $25.00 MAY be assessed after 30 days.*

Payment should be sent to:
SunTrust Bank
Attn: Subpoena Department
FL- ORL-7136
P.O Box 620577
Orlando, FL 32862-0577

*Please include a copy of this Invoice with your payment*

If you have any questions, please contact:

Keisha Clay
Operations Analyst
(407) 762-5577







**SUNTRUST**

Subpoena Services
FL-ORL-7136
P.O. Box 620577
Orlando, FL 32862-0577

RE: <u>16-CV-7619/PRIME CONTROLS CONTRACTORS, LLC</u>

## **CERTIFICATION**

I, _____Keisha Clay_____ do hereby certify under penalties and perjury that I am the custodian of records for SunTrust Bank and that the attached documents are true and accurate copies of our business records, maintained, and/or prepared by our company.

It is further certified that the records were made at or near the time of the occurrence of the matters set forth by a person with knowledge of those matters. The records were made and kept in the course of regularly conducted business activity and it is a regular practice of our company to make and keep such records.

_____
Signature

_____
10/28/16
Date

(55)

10/24/2016                                                    User

**Search:**

[                                    ▼]                                          

| DEP..266852 | PRIME CONTROLS CONTRACTORS, LLC |

---

Summary

| | | |
|---|---|---|
| **Client Type:** | **Organization** | **Address Eff Date: 2/16/2016** |
| **Name:** | **PRIME CONTROLS CONTRACTORS, LLC** | **In Care Of:** |
| **TIN:** | **462029835** | **Active Address:**   **2951 SATELLITE BLVD** |
| **DOB:** | | **DULUTH, GA 30096-2328** |
| **Home:** | | **United States of America** |
| **Business:** | | **Do Not Mail** |
| **ID Docs:** | **Yes** | **Do Not Call** |
| **Dominant CIN: 00626687420** | | **Do Not Fax** |
| **Dominant IP:  00626687420** | | **Do Not Email** |

Name

Address

Contact Methods

Text Information

Document Information

Relationships

Basic Data

Related Contracts

Officer Information

Submit Changes

10/24/2016
User

**Search:**

[                    ] ▼

---

| DEP..266852 |

---

Reminder: User must make one Contract Related Change at a time when adding and/or updating Address, Text, and Basic Data. Multiple updates are

| Address |
| Text Information |
| Contract-Party Relationships |
| Contract-Contract Relationships |
| Basic Data |

---

**Contract Number:**          1000187266852                                          **Status:**
**Product Type:**             DEP                                                    **Detail Stat**
**Product Category:**         [BR-BUSINESS CHECKING          ▼]                      **Status Cha**
                                                                                     **Open Date:**
**Product Acct Code:**        044-PRIMARY BUSINESS CHECKING                          **Close Date**
                                                                                     **PWM Relat**

**TIN Type:**                 Organization TIN
TIN:                          462029835

**Title 1:**                  PRIME CONTROLS CONTRACTORS, LLC
**Title 2:**
**Title 3:**

**Currency:**                 US dollars
**Language:**                 English

---

**Last Update User:**      uzici100                    **Last Update Date:**      2016-07-24 04:.

| Indicators |
| Preferences |

---

https://boui.suntrust.com/prweb/PRWebLDAP1/cn9KtNVWYyqpd4elDbm8mbLcZ-g1nu2b*/!STANDARD?pzPostData=-1714955049                                1/2

 **SUNTRUST**

**Deposit Account Resolution and Authorization for Business Entities**

**I. Business Entity Account Information**

| Name | Business Type |
|---|---|
| Prime Controls Contractors, Llc | Limited Liability Company |

| Governed By | Taxpayer ID Number | Date Resolution and Authorization Adopted |
|---|---|---|
| | 462029835 | 02/16/2016 |

| Account Number(s) |
|---|
| |

The undersigned in Section IX or X hereby certify to SunTrust Bank ("Bank") that the above named Business Entity is organized and existing under the laws of the State of _____ Virginia _____ and has been registered in the manner prescribed by law and is currently in full compliance with all requirements relating to its organization and continued existence under applicable law.

These resolutions and authorizations apply to the above referenced deposit account(s) (hereinafter "Account") currently open with the Bank and any additional Accounts opened in the future in the name of the Business Entity. For purposes of this resolution and authorization, Accounts will include any certificates of deposit in the name of the Business Entity. These resolutions and authorizations shall remain in full force and effect until written notice in a form acceptable to the Bank of their rescission or modification certified by the appropriate authorized individual(s) applicable to the Business Entity has been received by Bank and the Bank has had a reasonable time to act on said change. Receipt of such notice shall not affect any action taken by Bank prior thereto and Bank shall be held harmless from any claims, demands, expenses, loss, or damage resulting from, or growing out of, honoring the acts or instructions of any individual so certified or authorized in these resolutions to sign by delegation of authority in accordance herewith or refusing to honor any signature not so certified or authorized.

**II. Authority to sign, act, give instructions, access information, use Bank's services, perform transactions, enter into agreements and delegate authority on behalf of Business Entity.** Resolved, that Bank be and is hereby designated a depository for the Business Entity; that any one of the individuals or entities named in Section III below is an "Authorized Signer" and is authorized to act, give instructions, access information, use Bank's services, and perform transactions on behalf of Business Entity with respect to any Accounts of Business Entity with Bank or services provided to Business Entity by the Bank, to enter into on behalf of the Business Entity any of Bank's agreements including checking, savings, certificates of deposit, wire or electronic funds transfer, night deposit, cash management or other treasury management services agreements, or foreign exchange and other over-the-counter foreign currency transactions, agreements and transfers, and to delegate to any other individual or entity his or her authority to act, give instructions, access information, use Bank's services, perform transactions, and enter into agreements on behalf of the Business Entity, including agreements that delegate his or her authority to other individuals or entities with respect to the Business Entity's Accounts or Bank's services; that the Business Entity shall be bound by the terms and conditions of all such agreements and Bank's Rules and Regulations for Deposit Accounts related thereto, all as now existing or as amended from time to time; and that any Authorized Signer named in Section III, is authorized on behalf of this Business Entity to sign and to endorse for deposit, negotiation or collection, any and all checks, drafts, certificates of deposit, savings certificates, items or other instruments or written orders for the payment of money payable by or to the order of this Business Entity. Signatures and endorsements, if any, may be in writing, by stamp, or otherwise affixed, with or without designation or signature of the person so endorsing, it being understood that all prior endorsements on such items are guaranteed by this Business Entity, regardless of the lack of an express guarantee in the endorsement of this Business Entity.

Further Resolved, Bank is hereby directed to honor, pay and charge to the Accounts of this Business Entity, without inquiry as to the circumstances of the issuance or application of the proceeds of, any checks, drafts, items or other written orders on any of this Business Entity's Accounts with Bank, whether payable to, endorsed or negotiated by or for the credit of any person signing the same or any other of the Authorized Signers named in Section III when signed by any of the Authorized Signers named in Section III.

**III. Officers/Owner/General Partners/Members/Managers/Governors authorized to act, give instructions, access information, use Bank's services, perform transactions, enter into agreements, and delegate authority on behalf of the Business Entity**

The full name, title, and signature of each person authorized to act, give instructions, access information, use Bank's services, perform transactions, enter into agreements, and delegate his or her authority on behalf of the Business Entity as described in the resolutions set forth in this document is immediately below. [Instruction: If the General Partner, Member or Manager is also an entity (e.g., a corporation, LLC, or partnership), the name of the entity is entered in the column headed "Name", applicable title of General Partner, Member or Manager is entered in the column headed "Title", and the name of the individual signing on behalf of that entity and individual's title or position are entered in the column headed "Signature" and the individual signs directly underneath his/her name and title. The individual must provide a resolution on that entity reflecting the individual's authority.]

User ID UVKS142     Account Number 1000187266852

* Locations with DCOR scanning software submit with cover sheet via local scanner
* Locations without DCOR scanning software send to Output Review, FL-Orlando-7021

| Name | Title | Signature |
|------|-------|-----------|
| Jeffrey Gensemer | Member | |
| | | |
| | | |
| | | |
| | | |

**IV. Facsimile Signatures** (Complete this section only if machine or facsimile stamped signatures are to be used on items.) Further Resolved, that Bank is hereby requested, authorized and directed to honor any check, draft, item or other written order on any of this Business Entity's Accounts with Bank when bearing or purporting to bear the following authorized machine or facsimile signature of any of the above named individuals whose signatures are reproduced below, regardless of by whom or by what means the actual or purported machine or facsimile signatures may have been affixed. The Business Entity shall indemnify and hold the Bank harmless from any and all claims, expenses, losses, damages and costs, including attorneys' fees, resulting from, or growing out of the Bank's honoring the facsimile signature of any of the following individuals, its refusal to honor any facsimile signature of an individual not named below, or resulting from the unauthorized use of the instrument used to provide the facsimile signatures by persons other than authorized individuals.

**Name of Authorized Signer Listed in Section III**          **Machine/Facsimile Stamped Signature of Authorized Signer**

**V. Additional Signatories on Business Entity's Accounts.** Further resolved, the following individual(s) are authorized as additional signatories only to sign and to endorse for deposit or collection any checks, drafts, or other instruments or written orders for the payment of money payable to the order of the Business Entity and to sign checks, drafts, items or other written orders, and initiate wire or funds transfers and execute Bank's Funds Transfer Authorization wire request and disclosure form on any of the Business Entity's Accounts with Bank. [Instruction: If an additional signatory is not authorized to sign on all Accounts, specify the Account Number applicable to the signatory as indicated below.] Refer to the Signature Card(s) on the Account(s) for signatures of the **Additional Signatories.**

| Additional Signatory's Name | Position with Entity | Specific Deposit Account Number(s) Applicable to Signatory (Complete only if signatory is not authorized on all accounts) |
|------|------|------|
| | | |
| | | |
| | | |

**VI. Qualification Certification for Public Fund, Organization, Political Organization, Homeowners and Condominium Owners Association or Corporation Not Operated for Profit to earn interest on a checking account (NOW Account)**

Mark this section with an "X" only if Business Entity is eligible to earn interest on a checking account.
☐ I/We further certify that the above named Business Entity is eligible to earn interest on a checking account (referred to as a Negotiable Order of Withdrawal or NOW Account) in compliance with Regulation D of the Federal Reserve Act (12CFR 204) as a Public Fund or a Non-Profit Organization that is operated primarily for Religious, Philanthropic, Charitable, Educational, Political or other similar purposes under one of the following sections: Organization – Section 501 (C) (3) through (13), and (19) of the Internal Revenue Code (26 USC (IRC 1954) 501 (C) (3) – (13) and (19). Political Organization – Section 527 of the Internal Revenue Code (26 USC (IRC 1954) 527). Homeowners and Condominium Owners Associations – Section 528 of the Internal Revenue Code (26 USC (IRC 1954) 528).

**VII. Power to Act.** The undersigned certifies that there are no limits to the undersigned's powers to adopt this Authorization and to attest that the resolutions stated herein are accurate and that this Deposit Account Resolution and Authorization is in conformity with the provisions of the organizational instruments, which include the Business Entity's charter, bylaws, operating agreement, partnership agreement, shareholders' agreement or similar agreements by which the Business Entity or the undersigned party may be bound and does not violate the provisions thereof.

**VIII. Prior Acts.** All previous acts of or on behalf of the Business Entity as provided for above are hereby approved and ratified.

**IX. Certification—Corporation or Professional Corporation.** I, the undersigned, hereby certify to Bank that the above is a true copy of resolutions and authorizations of said Business Entity and that such resolutions and authorizations are in full force and effect and have not been amended or rescinded.

User ID  UVKS142          Account Number  1000187266852

* Locations with DCOR scanning software submit with cover sheet via local scanner
* Locations without DCOR scanning software send to Output Review, FL-Orlando-7021

In witness whereof, I have hereunto subscribed my name and affixed the seal of the Corporation this __16th__ of __February__ , __2016__ .

(Affix Seal here, if available)

_Authorized Signature_

JEFFREY GENSEMER, MEMBER

**Name and Title of President, Secretary, Assistant Secretary or
Other Officer as designated in the Corporation's Bylaws**

**X. Certification—Limited Liability Company, Partnership, Public Fund, Sole Proprietorship, Unincorporated Organization or Association, or Other Entity.** I/We, the undersigned, hereby certify to Bank that the above is a true copy of resolutions and authorizations of said Business Entity and that such resolutions are in full force and effect and have not been amended or rescinded. [Instruction: If the General Partner, Member or Manager is also an entity (e.g., a corporation, LLC, or partnership), the name of the entity and the word "By" are entered in the column headed "Signature"; the individual signing on behalf of that entity signs directly below the name of the entity; and the name of the individual and individual's title or position are entered in the column headed "Title". The individual must provide a resolution on that entity reflecting the individual's authority.]

| Name and Title | Signature | Date |
|---|---|---|
| Jeffrey Gensemer Member | | 02/16/2016 |
| | | |
| | | |
| | | |
| | | |

**Signature Requirement Instructions**

**The following signatures are required to complete and certify the Deposit Account Resolution and Authorization to be correct:**

- Corporations: Corporate Officers authorized to act on behalf of the corporation named in Section III should include the **President** and **Secretary** and any other applicable corporate officers, such as Vice President or Treasurer. **The President, Secretary, Assistant Secretary, or other corporate officer as designated in the bylaws of the corporation** is required to certify the Deposit Account Resolution and Authorization under Section IX.

- Limited Liability Companies: Section III and X require the signatures of all **members/managers/board members**, unless the Operating Agreement authorizes one or more members/managers/board members to conduct banking business, in which case the signatures of all such authorized members/managers/board members are sufficient.

- Public Fund Entities: Section III requires the signatures of individuals authorized to sign on behalf of the Public Fund Entity as **designated by the governing unit**, e.g., Board of County Commissioners, Mayor, Secretary of State, etc. The individual(s) authorized to represent the governing unit is required to certify the Deposit Account Resolution and Authorization under Section X.

- Partnerships: Section III and X require the signatures of **all General Partners**, unless the Partnership Agreement designates one or more partners to conduct banking business and perform banking transactions. In such cases, the designated general partner(s) are named in Section III as the **General Partners** authorized to act on behalf of the entity and these same General Partners will certify the Deposit Account Resolution and Authorization under Section X.

- Sole Proprietorships: Section III and X require the signature of the proprietor (owner) or in the case of a spousal proprietorship, the signatures of the husband and wife who own the Business Entity.

- Unincorporated Organizations or Associations: Section III requires the signatures of the **Officers** or **Positions** designated in the Organization or Association's bylaws or charter as authorized to act on behalf of the organization or association. The **President or Secretary** of the organization or association (or other individual designated to do so) is required to certify the Deposit Account Resolution and Authorization under Section X.

**Bank Use Only**

| Bank Number | Cost Center Number | Cost Center Name | |
|---|---|---|---|
| 0175 | 4430309 | DUKE STREET | |
| Prepared By | | Phone Number | Date |
| Karan K Saini | | (571)458-4965 | 02/16/2016 |
| Account Number(s) | 1000187266852 | | |
| Verification Method | | | |

User ID  UVKS142      Account Number  1000187266852

\* Locations with DCOR scanning software submit with cover sheet via local scanner
\* Locations without DCOR scanning software send to Output Review, FL-Orlando-7021

60.

**SUNTRUST**

**Business Account Signature Card**

| Region Number | Account Number | |
|---|---|---|
| 072 | | |

**Account Title**

PRIME CONTROLS CONTRACTORS, LLC

| Organization Type | Tax ID Number |
|---|---|
| Limited Liability Company | 462029835 |

| | Name/Title | | Signature |
|---|---|---|---|
| 1. | Jeffrey Gensemer | Member | |
| 2. | | | |
| 3. | | | |
| 4. | | | |
| 5. | | | |
| 6. | | | |

| Date Opened | Date Revised | Reason |
|---|---|---|
| 02/16/2016 | | |

| Cost Center Number | Officer Number | ID |
|---|---|---|
| 4430309 | 00018897 | |

| Work Phone Number | Prepared By | Maintenance Type |
|---|---|---|
| (571)384-8261 | Karan K Saini | ☐ New  ☐ Replacement  ☐ Change |

**SunTrust Bank ("Bank")**

It is agreed that all transactions between the Bank and the entity listed in the above Account Title ("Depositor") shall be governed by the rules and regulations for this account and the above signed as the authorized agent(s) of the Depositor hereby acknowledge(s) receipt of such rules and regulations and the funds availability policy. The Depositor also acknowledges the funds availability policy has been explained.

**Check appropriate box for federal tax classification; check only one of the following seven boxes:**

☐ Individual/sole proprietor or single-member LLC  ☐ C Corporation  ☐ S Corporation  ☐ Partnership  ☐ Trust/Estate

☒ Limited liability company
Enter the tax classification (C=C corporation, S=S corporation, P=partnership) _____ Note. For a single-member LLC that is disregarded, do not check LLC; check the appropriate box in the line above for the tax classification of the single-member owner.

☐ Other (see instructions) _____
**Exemptions: See Instructions** ☐ Exempt payee code (if any) _____    Exemption from FATCA reporting code (if any) ☒ N/A
(Applies to accounts maintained outside the U.S.)

**Certification—Under penalties of perjury, I, as authorized agent of the Depositor certify that:**

1. 462029835 is the correct taxpayer identification number for the Depositor (or the Depositor is waiting for a number to be issued); and
2. The Depositor is not subject to backup withholding because: (a) the Depositor is exempt from backup withholding, or (b) the Depositor has not been notified by the Internal Revenue Service (IRS) that it is subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified the Depositor that it is no longer subject to backup withholding; and
3. The Depositor is a U.S. citizen or other U.S. person (defined in the instructions); and
4. The FATCA code(s) entered on this form (if any) indicating that the Depositor is exempt from FATCA reporting is correct.

**Certification Instructions.** You must cross out item 2 above if the depositor has been notified by the IRS that the depositor is currently subject to backup withholding because the depositor has failed to report all interest and dividends on the depositor's tax return.

Signature of U.S. Person _____    Date 02-16-16

- Locations with DCOR scanning software submit with cover sheet via local scanner
- Locations without DCOR scanning software send to Output Review, FL-Orlando-7021
    - *FATCA= Foreign Account Tax Compliance Act

 **SUNTRUST**

**Business Account Signature Card**

| Region Number | Account Number | |
|---|---|---|
| 072 | ▮▮▮▮▮ | |

**Account Title**

PRIME CONTROLS CONTRACTORS, LLC

| Organization Type | Tax ID Number |
|---|---|
| Limited Liability Company | 462029835 |

| | Name/Title | | Signature(s) |
|---|---|---|---|
| 1. | Jeffrey Gensemer | Member | *(signature)* |
| 2. | | | |
| 3. | | | |
| 4. | | | |
| 5. | | | |
| 6. | | | |

| Date Opened | Date Revised | Reason |
|---|---|---|
| 02/16/2016 | | |

| Cost Center Number | Officer Number | ID |
|---|---|---|
| 4430309 | 00018897 | |

| Work Phone Number | Prepared By | Maintenance Type |
|---|---|---|
| (571)384-8261 | Karan K Saini | ☐ New ☐ Replacement ☐ Change |

**SunTrust Bank ("Bank")**

It is agreed that all transactions between the Bank and the entity listed in the above Account Title ("Depositor") shall be governed by the rules and regulations for this account and the above signed as the authorized agent(s) of the Depositor hereby acknowledge(s) receipt of such rules and regulations and the funds availability policy. The Depositor also acknowledges the funds availability policy has been explained.

**Check appropriate box for federal tax classification; check only one of the following seven boxes:**

☐ Individual/sole proprietor or single-member LLC ☐ C Corporation ☐ S Corporation ☐ Partnership ☐ Trust/Estate

☒ Limited liability company
Enter the tax classification (C=C corporation, S=S corporation, P=partnership) _____ **Note.** For a single-member LLC that is disregarded, do not check LLC; check the appropriate box in the line above for the tax classification of the single-member owner.

☐ Other (see instructions) _____

**Exemptions: See Instructions** ☐ Exempt payee code (if any) _____

Exemption from FATCA reporting code (if any) ☒ N/A
*(Applies to accounts maintained outside the U.S.)*

**Certification—Under penalties of perjury, I, as authorized agent of the Depositor certify that:**

1. 462029835 is the correct taxpayer identification number for the Depositor (or the Depositor is waiting for a number to be issued); and
2. The Depositor is not subject to backup withholding because: (a) the Depositor is exempt from backup withholding, or (b) the Depositor has not been notified by the Internal Revenue Service (IRS) that it is subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified the Depositor that it is no longer subject to backup withholding; and
3. The Depositor is a U.S. citizen or other U.S. person (defined in the instructions); and
4. The FATCA code(s) entered on this form (if any) indicating that the Depositor is exempt from FATCA reporting is correct.

**Certification Instructions.** You must cross out item 2 above if the depositor has been notified by the IRS that the depositor is currently subject to backup withholding because the depositor has failed to report all interest and dividends on the depositor's tax return.

Signature of U.S. Person _____ Date 02-16-16

- Locations with DCOR scanning software submit with cover sheet via local scanner
- Locations without DCOR scanning software send to Output Review, FL-Orlando-7021
  - *FATCA= Foreign Account Tax Compliance Act

630308 (11/15) CLP (11/15)
SunTrust Corporate Forms

Page 1 of 1



REFERENCE: 20161024000305 SB 20160401 20161031
KEISHA CLAY

STSC
SUBPOENA SERVICES
FL-ORLANDO-7136

DEAR VALUED CUSTOMER,

WE APPRECIATE YOUR BUSINESS AND THE OPPORTUNITY TO SERVE YOU.

WE HAVE ENCLOSED THE ACCOUNT INFORMATION RETRIEVED BY YOUR RECENT REQUEST
NUMBER 20161024000305  .  IF YOU HAVE QUESTIONS OR NEED ASSISTANCE WITH YOUR BANKING
NEEDS, PLEASE CONTACT US AT 1-800-SUNTRUST(800.786.8787) OR AT WWW.SUNTRUST.COM.
SUNTRUST REPRESENTATIVES ARE AVAILABLE TO ASSIST YOU 24 HOURS A DAY , 7 DAYS A
WEEK EITHER ON THE TELEPHONE OR VIA THE INTERNET.

THANK YOU FOR BANKING AT SUNTRUST.

SUNTRUST BANK
PO BOX 305183
NASHVILLE TN 37230-5183

# SUNTRUST

PAGE 1 OF 2
36/E00/0175/0/ 72

04/30/2016

ACCOUNT
STATEMENT

PRIME CONTROLS CONTRACTORS, LLC
8300 GREENSBORO DR
SUITE L1-622
MC LEAN VA 22102

QUESTIONS? PLEASE CALL
1-800-786-8787

DID YOU KNOW THAT 40% OF AMERICANS WOULD HAVE TROUBLE COMING UP WITH $2000
IN AN EMERGENCY? LET A SUNTRUST BANKER HELP YOU MAKE A SMART DECISION
WITH YOUR TAX REFUND OR BONUS, AND TAKE A STEP TOWARDS FINANCIAL CONFIDENCE.

---

## ACCOUNT SUMMARY

| ACCOUNT TYPE | ACCOUNT NUMBER | STATEMENT PERIOD |
|---|---|---|
| PRIMARY BUSINESS CHECKING | | 04/01/2016 - 04/30/2016 |

| DESCRIPTION | AMOUNT | DESCRIPTION | AMOUNT |
|---|---|---|---|
| BEGINNING BALANCE | $325.00 | AVERAGE BALANCE | $729.64 |
| DEPOSITS/CREDITS | $1,303.62 | AVERAGE COLLECTED BALANCE | $729.64 |
| CHECKS | $800.00 | NUMBER OF DAYS IN STATEMENT PERIOD | 30 |
| WITHDRAWALS/DEBITS | $212.54 | | |
| ENDING BALANCE | $616.08 | | |

---

## DEPOSITS/CREDITS

| DATE | AMOUNT | SERIAL # | DESCRIPTION |
|---|---|---|---|
| 04/05 | .04 | | ELECTRONIC/ACH CREDIT |
| | | | SPARK PAY MERCH  MicroDepst    10267235 |
| 04/07 | 1,302.58 | | ELECTRONIC/ACH CREDIT |
| | | | NCDOR IND INCOME TAX REFUND    00916711041 |
| 04/28 | 1.00 | | ELECTRONIC/ACH CREDIT |
| | | | TRANSFIRST        BKCD STLMT    543684555738331 |

DEPOSITS/CREDITS: 3                TOTAL ITEMS DEPOSITED: 0

---

## CHECKS

| CHECK NUMBER | AMOUNT | DATE PAID | CHECK NUMBER | AMOUNT | DATE PAID |
|---|---|---|---|---|---|
| 80 | 150.00 | 04/14 | *83 | 650.00 | 04/11 |

CHECKS: 2                *BREAK IN CHECK SEQUENCE

---

## WITHDRAWALS/DEBITS

| DATE | AMOUNT | SERIAL # | DESCRIPTION |
|---|---|---|---|
| 04/04 | 119.59 | | ELECTRONIC/ACH DEBIT |
| | | | COMCAST            CABLE        8227344 |
| 04/05 | .04 | | ELECTRONIC/ACH DEBIT |
| | | | SPARK PAY MERCH  MicroDepst 10267241 |
| 04/20 | 10.00 | | ACCOUNT ANALYSIS FEE |
| 04/28 | 70.91 | | ELECTRONIC/ACH DEBIT |
| | | | DELUXE BUS SYS.  CHK ORDERS 76677848 |
| 04/29 | 12.00 | | MAINTENANCE FEE |

WITHDRAWALS/DEBITS: 5

---

## BALANCE ACTIVITY HISTORY

| DATE | BALANCE | COLLECTED BALANCE | DATE | BALANCE | COLLECTED BALANCE |
|---|---|---|---|---|---|
| 04/01 | 325.00 | 325.00 | 04/04 | 205.41 | 205.41 |

MEMBER FDIC

CONTINUED ON NEXT PAGE

64

SUNTRUST BANK
PO BOX 305183
NASHVILLE TN 37230-5183

**SunTrust**

PAGE 2 OF 2
36/E00/0175/0/ 72

04/30/2016

ACCOUNT
STATEMENT

---

## BALANCE ACTIVITY HISTORY

| DATE | BALANCE | COLLECTED BALANCE | DATE | BALANCE | COLLECTED BALANCE |
|------|---------|-------------------|------|---------|-------------------|
| 04/05 | 205.41 | 205.41 | 04/20 | 697.99 | 697.99 |
| 04/07 | 1,507.99 | 1,507.99 | 04/28 | 628.08 | 628.08 |
| 04/11 | 857.99 | 857.99 | 04/29 | 616.08 | 616.08 |
| 04/14 | 707.99 | 707.99 | | | |

MEMBER FDIC

65

SUNTRUST BANK
PO BOX 305183
NASHVILLE TN 37230-5183

# SUNTRUST

PAGE 1 OF 5
36/E00/0175/0/ 72

05/31/2016

ACCOUNT
STATEMENT

PRIME CONTROLS CONTRACTORS, LLC
83 GREENSBORO DR
SUITE L1
MC LEAN VA 22102

QUESTIONS? PLEASE CALL
1-800-786-8787

EFFECTIVE 06/06/2016: SUNTRUST WILL ASSESS A $7 FEE FOR ANY
NON-SUNTRUST CLIENT CASHING A SUNTRUST CHECK AT ANY SUNTRUST BRANCH.
SUNTRUST WILL NOT ASSESS THIS FEE IF THE FACE VALUE OF THE CHECK IS $50 OR LESS.

---

## ACCOUNT SUMMARY

| ACCOUNT TYPE | ACCOUNT NUMBER | STATEMENT PERIOD |
|---|---|---|
| PRIMARY BUSINESS CHECKING | ▮▮▮▮▮▮▮ | 05/01/2016 - 05/31/2016 |

| DESCRIPTION | AMOUNT | DESCRIPTION | AMOUNT |
|---|---|---|---|
| BEGINNING BALANCE | $616.08 | AVERAGE BALANCE | $4,487.59 |
| DEPOSITS/CREDITS | $164,827.52 | AVERAGE COLLECTED BALANCE | $4,487.59 |
| CHECKS | $84,300.00 | NUMBER OF DAYS IN STATEMENT PERIOD | 31 |
| WITHDRAWALS/DEBITS | $81,786.56 | | |
| ENDING BALANCE | $612.96- | | |

---

## DEPOSITS/CREDITS

| DATE | AMOUNT | SERIAL # | DEPOSIT | DATE | AMOUNT SERIAL # |
|---|---|---|---|---|---|
| 05/31 | 10.00 | | DEPOSIT | | |
| 05/04 | 50.00 | | ELECTRONIC/ACH CREDIT | | |
| | | | TRANSFIRST        BKCD STLMT | | 543684555738331 |
| 05/09 | 3,075.00 | | ELECTRONIC/ACH CREDIT | | |
| | | | TRANSFIRST        BKCD STLMT | | 543684555738331 |
| 05/10 | 8,227.65 | | ELECTRONIC/ACH CREDIT | | |
| | | | TRANSFIRST        BKCD STLMT | | 543684555738331 |
| 05/11 | 2,714.26 | | ELECTRONIC/ACH CREDIT | | |
| | | | TRANSFIRST        BKCD STLMT | | 543684555738331 |
| 05/13 | 1,430.31 | | ELECTRONIC/ACH CREDIT | | |
| | | | TRANSFIRST        BKCD STLMT | | 543684555738331 |
| 05/13 | 7,969.30 | | ELECTRONIC/ACH CREDIT | | |
| | | | TRANSFIRST        BKCD STLMT | | 543684555738331 |
| 05/13 | 87,625.00 | | ELECTRONIC/ACH CREDIT | | |
| | | | TRANSFIRST        BKCD STLMT | | 543684555738331 |
| 05/16 | 34,000.00 | | INCOMING FEDWIRE CR TRN #014483 | | |
| 05/17 | 1,241.75 | | TRANSFER FROM CHK 7124 CONFIRM NBR 616102117 | | |
| | | | ELECTRONIC/ACH CREDIT | | |
| | | | TRANSFIRST        BKCD STLMT | | 543684555738331 |
| 05/17 | 5,843.00 | | ELECTRONIC/ACH CREDIT | | |
| | | | TRANSFIRST        BKCD STLMT | | 543684555738331 |
| 05/18 | 9,000.00 | | ATM TRANSFER FROM CHECKING         TR DATE 05/17 | | |
| | | | SEVEN CORNERS          FALLS CHURCH VA L248VA272 | | |
| 05/18 | 1,341.25 | | ELECTRONIC/ACH CREDIT | | |
| | | | TRANSFIRST        BKCD STLMT | | 543684555738331 |
| 05/25 | 2,300.00 | | ONLINE BANKING TRANSFER FROM 0175 1000187267124 | | |

DEPOSITS/CREDITS: 14          TOTAL ITEMS DEPOSITED: 0

---

## CHECKS

| CHECK NUMBER | AMOUNT | DATE PAID | CHECK NUMBER | AMOUNT | DATE PAID |
|---|---|---|---|---|---|
| 80 | 32,000.00 | 05/16 | *1010 | 9,000.00 | 05/17 |
| 81 | 4,000.00 | 05/10 | *1015 | 34,300.00 | 05/16 |
| *1007 | 5,000.00 | 05/17 | | | |

MEMBER FDIC                    CONTINUED ON NEXT PAGE



SUNTRUST BANK
PO BOX 305183
NASHVILLE TN 37230-5183

# SUNTRUST

ACCOUNT
STATEMENT

CHECKS: 5                           *BREAK IN CHECK SEQUENCE

WITHDRAWALS/DEBITS

| DATE | AMOUNT | SERIAL # | DESCRIPTION | | |
|------|--------|----------|-------------|--|--|
| 05/02 | 4.99 | | ELECTRONIC/ACH DEBIT | | |
| | | | GO DADDY | WEB ORDER | 1676168367 |
| 05/02 | 4.99 | | ELECTRONIC/ACH DEBIT | | |
| | | | GO DADDY | WEB ORDER | 1676335197 |
| 05/03 | 1.65 | | ELECTRONIC/ACH DEBIT | | |
| | | | BILLMATRIX | BILLPAYFEE | 17516742422 |
| 05/03 | 413.56 | | ELECTRONIC/ACH DEBIT | | |
| | | | DOMINION VA & NC BILL PAY | | 17516742421 |
| 05/03 | 12.17 | | ELECTRONIC/ACH DEBIT | | |
| | | | GO DADDY | WEB ORDER | 1676560937 |
| 05/04 | 24.00 | | CHECK CARD PURCHASE | | TR DATE 05/03 |
| | | | CAPT WHITES SEAFOOD CI | WASHINGTON | DC |
| 05/04 | 50.00 | | CHECK CARD PURCHASE | | TR DATE 05/03 |
| | | | PRIME CONTROLS CONTRAC | MC LEAN | VA |
| 05/05 | 4.15 | | CHECK CARD PURCHASE | | TR DATE 05/03 |
| | | | EAST POTOMAC GOLF COUR | WASHINGTON | DC |
| 05/05 | 7.59 | | CHECK CARD PURCHASE | | TR DATE 05/04 |
| | | | STARBUCKS #07596 ARLIN | ARLINGTON | VA |
| 05/05 | 32.76 | | CHECK CARD PURCHASE | | TR DATE 05/03 |
| | | | EAST POTOMAC GOLF COUR | WASHINGTON | DC |
| 05/05 | 20.00 | | POINT OF SALE DEBIT | | TR DATE 05/04 |
| | | | SHELL Service | ARLINGTON | VA 81000701 |
| 05/06 | 2.18 | | CHECK CARD PURCHASE | | TR DATE 05/05 |
| | | | DUNKIN #346020 Q35 | ARLINGTON | VA |
| 05/06 | 4.93 | | CHECK CARD PURCHASE | | TR DATE 05/05 |
| | | | STARBUCKS #07596 ARLIN | ARLINGTON | VA |
| 05/06 | 6.77 | | CHECK CARD PURCHASE | | TR DATE 05/04 |
| | | | SUBWAY 00302265 | BAILEYS CROSS | VA |
| 05/06 | 10.46 | | CHECK CARD PURCHASE | | TR DATE 05/04 |
| | | | BABYLON FUTBOL CAFE | FALLS CHURCH | VA |
| 05/09 | 700.00 | | ATM CASH WITHDRAWAL | | TR DATE 05/09 |
| | | | BRADLEE #2 | ALEXANDRIA | VA L079VA209 |
| 05/09 | 1,700.00 | | WITHDRAWAL | | |
| 05/09 | 7.69 | | CHECK CARD PURCHASE | | TR DATE 05/07 |
| | | | SMOOTHIE KING #0435Q55 | ARLINGTON | VA |
| 05/09 | 4.12 | | POINT OF SALE DEBIT | | TR DATE 05/06 |
| | | | SHELL Service | ARLINGTON | VA 81000701 |
| 05/09 | 5.40 | | POINT OF SALE DEBIT | | TR DATE 05/07 |
| | | | FRESK MKT-174- | ALEXANDRIA | VA 4P8WHB2H |
| 05/09 | 25.33 | | POINT OF SALE DEBIT | | TR DATE 05/08 |
| | | | FRESK MKT-174- | ALEXANDRIA | VA 4P8WHBQX |
| 05/10 | 1.09 | | ELECTRONIC/ACH DEBIT | | |
| | | | TRANSFIRST DISCOUNT | | 543684555738331 |
| 05/10 | 700.00 | | ATM CASH WITHDRAWAL | | TR DATE 05/10 |
| | | | BRADLEE #2 | ALEXANDRIA | VA L079VA209 |
| 05/10 | 1,500.00 | | WITHDRAWAL | | |
| 05/10 | 25.72 | | CHECK CARD PURCHASE | | TR DATE 05/09 |
| | | | WINGSTOP 1080 | FALLS CHURCH | VA |
| 05/10 | 31.44 | | CHECK CARD PURCHASE | | TR DATE 05/09 |
| | | | HESS 02867 | ALEXANDRIA | VA |
| 05/10 | 37.17 | | CHECK CARD PURCHASE | | TR DATE 05/09 |
| | | | DICK'S SPORTING #290 | BAILEYS CROSS | VA |
| 05/10 | 107.99 | | CHECK CARD PURCHASE | | TR DATE 05/10 |
| | | | COMCAST OF ALEXANDRIA | 800-COMCAST | VA |
| 05/11 | 2,400.00 | | WITHDRAWAL | | |
| 05/11 | 22.77 | | CHECK CARD PURCHASE | | TR DATE 05/09 |
| | | | THE RITZ CARLTON F&B | ARLINGTON | VA |
| 05/12 | 700.00 | | ATM CASH WITHDRAWAL | | TR DATE 05/11 |
| | | | BRADLEE #2 | ALEXANDRIA | VA L079VA209 |

MEMBER FDIC                         CONTINUED ON NEXT PAGE

SUNTRUST BANK
PO BOX 305183
NASHVILLE TN 37230-5183

# SUNTRUST

PAGE 3 OF 5
36/E00/0175/0/ 72

05/31/2016

ACCOUNT
STATEMENT

---

| DATE | AMOUNT SERIAL # | DESCRIPTION |
|------|-----------------|-------------|
| | | WITHDRAWALS/DEBITS |
| 05/12 | 1,800.00 | WITHDRAWAL |
| 05/12 | 7.59 | CHECK CARD PURCHASE                    TR DATE 05/11 |
| | | STARBUCKS #07305 ALEXA    ALEXANDRIA    VA |
| 05/12 | 26.52 | CHECK CARD PURCHASE                    TR DATE 05/11 |
| | | HESS 02867                ALEXANDRIA    VA |
| 05/12 | 45.47 | CHECK CARD PURCHASE                    TR DATE 05/11 |
| | | BUFFALO WILD WINGS 055    ALEXANDRIA    VA |
| 05/13 | 15.00 | INCOMING FEDWIRE TRANSFER FEE TRN #014483 |
| 05/13 | 40,000.00 | ONLINE BANKING TRANSFER TO 0175 1000187267124 |
| 05/13 | 804.90 | ELECTRONIC/ACH DEBIT |
| | | TRANSFIRST      CHARGEBACK 543684555738331 |
| 05/13 | 1,115.00 | ELECTRONIC/ACH DEBIT |
| | | TRANSFIRST      CHARGEBACK 543684555738331 |
| 05/13 | 700.00 | ATM CASH WITHDRAWAL                    TR DATE 05/13 |
| | | CROSSROADS SAFEWAY #1    FALLS CHURCH VA L653VA456 |
| 05/13 | 2,300.00 | WITHDRAWAL |
| 05/13 | 5,000.00 | OVER-THE-COUNTER WITHDRAWAL |
| 05/16 | 1.00 | ATM MINI STATEMENT FEE |
| 05/16 | 300.00 | ATM CASH WITHDRAWAL                    TR DATE 05/15 |
| | | BRADLEE #2                ALEXANDRIA    VA L079VA209 |
| 05/16 | 700.00 | ATM CASH WITHDRAWAL                    TR DATE 05/15 |
| | | BRADLEE #2                ALEXANDRIA    VA L079VA209 |
| 05/16 | 2,500.00 | WITHDRAWAL |
| 05/16 | 14.84 | CHECK CARD PURCHASE                    TR DATE 05/14 |
| | | POTOMAC SHORES GOLF CL    DUMFRIES      VA |
| 05/16 | 24.00 | CHECK CARD PURCHASE                    TR DATE 05/14 |
| | | DAVIDS II CAR WASH        ARLINGTON     VA |
| 05/16 | 26.21 | CHECK CARD PURCHASE                    TR DATE 05/14 |
| | | POTOMAC SHORES GOLF CL    DUMFRIES      VA |
| 05/16 | 30.00 | CHECK CARD PURCHASE                    TR DATE 05/13 |
| | | PRIME CONTROLS CONTRAC    ARLINGTON     VA |
| 05/16 | 38.60 | CHECK CARD PURCHASE                    TR DATE 05/12 |
| | | 1757 GOLF CLUB            DULLES        VA |
| 05/16 | 66.00 | CHECK CARD PURCHASE                    TR DATE 05/13 |
| | | UPWORK**BAL-13MAY         MOUNTAIN VIEWCA |
| 05/16 | 115.00 | CHECK CARD PURCHASE                    TR DATE 05/14 |
| | | POTOMAC SHORES GOLF CL    DUMFRIES      VA |
| 05/16 | 5.29 | POINT OF SALE DEBIT                    TR DATE 05/16 |
| | | BEDBATH&BEYOND            ARLINGTON     VA 03060003 |
| 05/16 | 45.90 | POINT OF SALE DEBIT                    TR DATE 05/16 |
| | | USPS 510315014            ARLINGTON     VA 33202497 |
| 05/16 | 87.95 | POINT OF SALE DEBIT                    TR DATE 05/14 |
| | | VA ABC STORE 2            BAILEYS XRDS VA 99294955 |
| 05/16 | 105.79 | POINT OF SALE DEBIT                    TR DATE 05/13 |
| | | FRESH MKT-174-            ALEXANDRIA    VA 4P8WHBWN |
| 05/16 | 128.20 | POINT OF SALE DEBIT                    TR DATE 05/14 |
| | | BEST BUY #283             FALLS CHURCH VA 06586992 |
| 05/17 | 304.00 | OVERDRAFT ITEM FEE |
| 05/17 | 300.00 | ATM CASH WITHDRAWAL                    TR DATE 05/16 |
| | | BRADLEE #2                ALEXANDRIA    VA L079VA209 |
| 05/17 | 700.00 | ATM CASH WITHDRAWAL                    TR DATE 05/16 |
| | | BRADLEE #2                ALEXANDRIA    VA L079VA209 |
| 05/17 | 8,200.00 | ATM TRANSFER TO CHECKING              TR DATE 05/16 |
| | | BRADLEE #2                ALEXANDRIA    VA L079VA209 |
| 05/17 | 4.35 | CHECK CARD PURCHASE                    TR DATE 05/16 |
| | | STARBUCKS #07305 ALEXA    ALEXANDRIA    VA |
| 05/17 | 13.40 | CHECK CARD PURCHASE                    TR DATE 05/16 |
| | | SQ *Z-KABOB (FALLSC       FALLS CHURCH VA |
| 05/17 | 37.99 | POINT OF SALE DEBIT                    TR DATE 05/17 |
| | | BARBER'S AUTO - LIBER     ALEXANDRIA    VA 86638301 |

MEMBER FDIC                                   CONTINUED ON NEXT PAGE

68.

SUNTRUST BANK
PO BOX 305183
NASHVILLE TN 37230-5183

# SUNTRUST

PAGE 4 OF 5
36/E00/0175/0/ 72

05/31/2016

ACCOUNT
STATEMENT

---

## WITHDRAWALS/DEBITS

| DATE | AMOUNT | SERIAL # | DESCRIPTION | | |
|------|--------|----------|-------------|---|---|
| 05/17 | 918.50 | | POINT OF SALE DEBIT | TR DATE 05/16 | |
| | | | GIANT 0780 | FALLS CHURCH VA 001 | |
| 05/18 | 700.00 | | ATM CASH WITHDRAWAL | TR DATE 05/17 | |
| | | | BRADLEE #2 | ALEXANDRIA VA L079VA209 | |
| 05/18 | 4.09 | | CHECK CARD PURCHASE | TR DATE 05/17 | |
| | | | FEDEXOFFICE 00018358 | BAILEYS CROSSVA | |
| 05/18 | 16.00 | | CHECK CARD PURCHASE | TR DATE 05/16 | |
| | | | 1757 GOLF CLUB | DULLES VA | |
| 05/18 | 34.39 | | CHECK CARD PURCHASE | TR DATE 05/17 | |
| | | | FEDEXOFFICE 00018358 | BAILEYS CROSSVA | |
| 05/18 | 192.90 | | CHECK CARD PURCHASE | TR DATE 05/17 | |
| | | | GOLF GALAXY # 89 | FAIRFAX VA | |
| 05/18 | 91.79 | | POINT OF SALE DEBIT | TR DATE 05/17 | |
| | | | PAYPAL *GOLFBA | San Jose CA 31181710 | |
| 05/18 | 243.79 | | POINT OF SALE DEBIT | TR DATE 05/17 | |
| | | | BEST BUY #283 | FALLS CHURCH VA 06586992 | |
| 05/19 | 1,254.75 | | ELECTRONIC/ACH DEBIT | | |
| | | | TRANSFIRST BKCD STLMT 543684555738331 | | |
| 05/19 | 703.00 | | ATM CASH WITHDRAWAL | TR DATE 05/18 | |
| | | | CAPITAL ONE | BAILEYS CRSSRVA 0000CEF2 | |
| 05/19 | 2.35 | | CHECK CARD PURCHASE | TR DATE 05/17 | |
| | | | OPC MSC*SERVICE FEE 02 | 800-487-4567 NE | |
| 05/19 | 8.60 | | CHECK CARD PURCHASE | TR DATE 05/18 | |
| | | | RED TOP CAB | ARLINGTON VA | |
| 05/19 | 14.70 | | CHECK CARD PURCHASE | TR DATE 05/17 | |
| | | | PHO GOLDEN COW | FALLS CHURCH VA | |
| 05/19 | 66.98 | | CHECK CARD PURCHASE | TR DATE 05/18 | |
| | | | JET.COM | 855-538-4323 NJ | |
| 05/19 | 100.00 | | CHECK CARD PURCHASE | TR DATE 05/18 | |
| | | | OPC*VIRGINIA SCC | 804-371-2123 CA | |
| 05/19 | 21.19 | | POINT OF SALE DEBIT | TR DATE 05/19 | |
| | | | BEST BUY #283 | FALLS CHURCH VA 06586992 | |
| 05/19 | 3.00 | | ATM CASH WITHDRAWAL FEE | | |
| 05/20 | 114.00 | | OVERDRAFT ITEM FEE | | |
| 05/20 | 760.00 | | RETURNED ITEM FEE | | |
| 05/20 | 2,000.00 | | ELECTRONIC/ACH DEBIT | | |
| | | | TRANSFIRST SETTLE 543684555738331 | | |
| 05/20 | 15.82 | | CHECK CARD PURCHASE | TR DATE 05/18 | |
| | | | PHO GOLDEN COW | FALLS CHURCH VA | |
| 05/20 | 87.00 | | CHECK CARD PURCHASE | TR DATE 05/18 | |
| | | | BABYLON FUTBOL CAFE | FALLS CHURCH VA | |
| 05/23 | 114.00 | | OVERDRAFT ITEM FEE | | |
| 05/23 | 4.35 | | CHECK CARD PURCHASE | TR DATE 05/19 | |
| | | | CLASSIC BAKERY | GAITHERSBURG MD | |
| 05/23 | 4.50 | | CHECK CARD PURCHASE | TR DATE 05/19 | |
| | | | UMCP CONCESSIONS II | COLLEGE PARK MD | |
| 05/23 | 111.00 | | CHECK CARD PURCHASE | TR DATE 05/18 | |
| | | | UPWORK**BAL-18MAY | MOUNTAIN VIEWCA | |
| 05/25 | 38.00 | | RETURNED ITEM FEE | | |

WITHDRAWALS/DEBITS: 92

---

## BALANCE ACTIVITY HISTORY

| DATE | BALANCE | COLLECTED BALANCE | DATE | BALANCE | COLLECTED BALANCE |
|------|---------|-------------------|------|---------|-------------------|
| 05/01 | 616.08 | 616.08 | 05/05 | 90.22 | 90.22 |
| 05/02 | 606.10 | 606.10 | 05/06 | 65.88 | 65.88 |
| 05/03 | 178.72 | 178.72 | 05/09 | 698.34 | 698.34 |
| 05/04 | 154.72 | 154.72 | 05/10 | 2,522.64 | 2,522.64 |

MEMBER FDIC

CONTINUED ON NEXT PAGE

69

SUNTRUST BANK
PO BOX 305183
NASHVILLE TN 37230-5183

# SUNTRUST

PAGE 5 OF 5
36/E00/0175/0/ 72



05/31/2016

ACCOUNT
STATEMENT

---

## BALANCE ACTIVITY HISTORY

| DATE | BALANCE | COLLECTED BALANCE | DATE | BALANCE | COLLECTED BALANCE |
|------|---------|-------------------|------|---------|-------------------|
| 05/11 | 2,814.13 | 2,814.13 | 05/19 | 325.71 | 325.71 |
| 05/12 | 234.55 | 234.55 | 05/20 | -2,651.11 | -2,651.11 |
| 05/13 | 47,324.26 | 47,324.26 | 05/23 | -2,884.96 | -2,884.96 |
| 05/16 | 10,835.48 | 10,835.48 | 05/25 | -622.96 | -622.96 |
| 05/17 | -6,558.01 | -6,558.01 | 05/31 | -612.96 | -612.96 |
| 05/18 | 2,500.28 | 2,500.28 | | | |

MEMBER FDIC

SUNTRUST BANK
PO BOX 305183
NASHVILLE TN 37230-5183

# SUNTRUST

PAGE 1 OF 1
66/E00/0175/0/ 72

06/30/2016

ACCOUNT
STATEMENT

PRIME CONTROLS CONTRACTORS, LLC
83 GREENSBORO DR
SUITE L1
MC LEAN VA 22102

QUESTIONS? PLEASE CALL
1-800-786-8787

IS IT TIME TO MAKE A PERSONAL COMMITMENT TO IMPROVE YOUR FINANCIAL HEALTH?
THEN IT'S TIME TO TAKE ACTION.
JOIN US AT ONUP.COM TO LEARN HOW TO MOVE FROM FINANCIAL STRESS TO CONFIDENCE.

----------------------------------------------------------------------------

| ACCOUNT SUMMARY | | | STATEMENT PERIOD |
|---|---|---|---|
| ACCOUNT TYPE | ACCOUNT NUMBER | | |
| PRIMARY BUSINESS CHECKING | | | 06/01/2016 - 06/30/2016 |

| DESCRIPTION | AMOUNT | DESCRIPTION | AMOUNT |
|---|---|---|---|
| BEGINNING BALANCE | $612.96- | AVERAGE BALANCE | $607.10- |
| DEPOSITS/CREDITS | $20.00 | AVERAGE COLLECTED BALANCE | $607.10- |
| CHECKS | $.00 | NUMBER OF DAYS IN STATEMENT PERIOD | 30 |
| WITHDRAWALS/DEBITS | $20.40 | | |
| ENDING BALANCE | $613.36- | | |

----------------------------------------------------------------------------

### DEPOSITS/CREDITS

| DATE | AMOUNT | SERIAL # | DESCRIPTION |
|---|---|---|---|
| 06/17 | 20.00 | | Fraud Inspector Fee Refund |

DEPOSITS/CREDITS: 1          TOTAL ITEMS DEPOSITED: 0

----------------------------------------------------------------------------

### WITHDRAWALS/DEBITS

| DATE | AMOUNT | SERIAL # | DESCRIPTION |
|---|---|---|---|
| 06/20 | 8.40 | | ACCOUNT ANALYSIS FEE |
| 06/30 | 12.00 | | MAINTENANCE FEE |

WITHDRAWALS/DEBITS: 2

----------------------------------------------------------------------------

### BALANCE ACTIVITY HISTORY

| DATE | BALANCE | COLLECTED BALANCE | DATE | BALANCE | COLLECTED BALANCE |
|---|---|---|---|---|---|
| 06/01 | -612.96 | -612.96 | 06/20 | -601.36 | -601.36 |
| 06/17 | -592.96 | -592.96 | 06/30 | -613.36 | -613.36 |

MEMBER FDIC

(71)

SUNTRUST BANK
PO BOX 305183
NASHVILLE TN 37230-5183

# SUNTRUST

PAGE 1 OF 1
66/E00/0175/0/ 72

07/31/2016

ACCOUNT
STATEMENT

PRIME CONTROLS CONTRACTORS, LLC
83 GREENSBORO DR
SUITE L1
MC LEAN VA 22102

QUESTIONS? PLEASE CALL
1-800-786-8787

IS IT TIME TO MAKE A PERSONAL COMMITMENT TO IMPROVE YOUR FINANCIAL HEALTH?
THEN IT'S TIME TO TAKE ACTION.
JOIN US AT ONUP.COM TO LEARN HOW TO MOVE FROM FINANCIAL STRESS TO CONFIDENCE.

---

## ACCOUNT SUMMARY

| ACCOUNT TYPE | ACCOUNT NUMBER | STATEMENT PERIOD |
|---|---|---|
| PRIMARY BUSINESS CHECKING ***CLOSED*** | ▉▉▉▉▉▉ | 07/01/2016 - 07/31/2016 |

| DESCRIPTION | AMOUNT | DESCRIPTION | AMOUNT |
|---|---|---|---|
| BEGINNING BALANCE | $613.36- | AVERAGE BALANCE | $415.50- |
| DEPOSITS/CREDITS | $613.36 | AVERAGE COLLECTED BALANCE | $415.50- |
| CHECKS | $.00 | NUMBER OF DAYS IN STATEMENT PERIOD | 31 |
| WITHDRAWALS/DEBITS | $.00 | | |
| ENDING BALANCE | $.00 | | |

---

### DEPOSITS/CREDITS

| DATE | AMOUNT | SERIAL # | DESCRIPTION |
|---|---|---|---|
| 07/22 | 613.36 | | OVERDRAFT BANK CLOSING CREDIT |

DEPOSITS/CREDITS: 1        TOTAL ITEMS DEPOSITED: 0

---

### BALANCE ACTIVITY HISTORY

| DATE | BALANCE | COLLECTED BALANCE | DATE | BALANCE | COLLECTED BALANCE |
|---|---|---|---|---|---|
| 07/01 | -613.36 | -613.36 | 07/29 | .00 | .00 |
| 07/22 | .00 | .00 | | | |

MEMBER FDIC



SALES ORDER

# RUNNION EQUIPMENT COMPANY

Truck Mounted Cranes & Equipment
Sales, Service & Rentals

7950 WEST 47th STREET • LYONS, ILLINOIS 60534
PHONE (708) 447-3169 • 1-800-824-6704 • FAX (708) 447-3730
www.runnionequipment.com

Sold To: Landale Signs and Neon Ltd.
Address: 8525 Argyll Rd. NW
Edmonton, AB T6C 4B2, Canada
780-437-3730
Attn: Darrell Brown

Date: 4/11/16

Quote No. 4952

Page 1 of 2

Unit #3974U

| QUANTITY | DESCRIPTION | PRICE |
|---|---|---|
| One (1) | **Used 2005 Elliott G85F** equipped as follows: | |
| | - 90' working height | |
| | - 5,900# maximum boom capacity | |
| | - Out and down main outriggers | |
| | - A-frame style rear stabilizers | |
| | - Single front outrigger | |
| | - 600# platform capacity | |
| | - Hydraulic circuit in basket | |
| | - Strobe lights mounted on crane pedestal | |
| | MOUNTED ON | |
| One (1) | **2005 Sterling LT8500** equipped as follows: | |
| | - 56,000# GVW | |
| | - CAT C7 Engine | |
| | - Automatic transmission | |
| | - Front axle 16,000# | |
| | - Front wheels – 22.5x12.2 steel | |
| | - Front tires – 385/65R22.5 | |
| | - Rear axle - 40,000# | |
| | - Rear wheels – 22.5x8.25 | |
| | - Rear tires – 11R22.5 | |
| | - Continued on Page 2 – | |

EXHIBIT
Brown 7
July 20, 2018

PENGAD 800-631-6989

The terms and conditions appearing on the reverse side of this Sales Order
are made a part hereof the same as if rewritten at length herein.

REC SALES SIGNATURE          DATE          PURCHASER SIGNATURE          DATE

4-11-16          April 12/16

SALES ORDER



# RUNNION EQUIPMENT COMPANY

7950 WEST 47th STREET • LYONS, ILLINOIS 60534
PHONE (708) 447-3169 • 1-800-824-6704 • FAX (708) 447-3730
www.runnionequipment.com

*Truck Mounted Cranes & Equipment*
*Sales, Service & Rentals*

| Sold To: | Landale Signs and Neon Ltd. | Date: | 4/11/16 |
| Address: | 8525 Argyll Rd. NW | | |
| | Edmonton, AB T6C 4B2, Canada | Quote No. | 4952 |
| | 780-437-3730 | | |
| | Attn: Darrell Brown | Unit #3974U | |

Page 2 of 2

| QUANTITY | DESCRIPTION | PRICE |
|---|---|---|
| | - Differential lock on both axles | |
| | - Trailer package with pintle hook | |
| | - AM/FM/CD stereo | |
| | - Air conditioning | |
| | - Spotlight mounted on top of cab | |
| | Price: | $86.000.00 |
| | | $ 2,000.00 |
| | *Freight to Portal North Dakota not to exceed $2.000.00 | |
| | | $88.000.00 |
| | All prices F.O.B. Lyons, IL. and subject to all applicable tax | F.O.B. Portal |
| | Quote firm for 30 days TERMS: 10% deposit at time of order | N.D. |
| | Balance due upon notification that unit is ready for delivery | |

Seller will supply a clean original copies title for
the unit and a recall clearance letter
from the manufacturer.

The terms and conditions appearing on the reverse side of this Sales Order
are made a part hereof the same as if rewritten at length herein.

| | 4-11-16 | X | April 11/16 |
| REC SALES SIGNATURE | DATE | PURCHASER SIGNATURE | DATE |

SALES ORDER – SIGNATURE PAGE

 RUNNION EQUIPMENT COMPANY

Sold To: LAndale Signs & Neon

Address:

Date: 4-11-16

Quote No. 4952

## SALES ORDER - TERMS AND CONDITIONS OF SALE

This document contains the terms of sale. The entire contract between Seller and Buyer is contained in this Sales Order; no alleged oral promises or conditions not set forth herein shall be binding upon Seller or Buyer, and any prior negotiations between the parties are merged into the terms of this document.

Prices quoted are subject to change without notice in conformity with the Manufacturer's Price List effective at the time of delivery. Prices do not include taxes. Any tax, impost, levy, duty or other charge hereinafter imposed by any government or other authority on this sale will be added to the purchase price as herein noted or any later revision of the purchase price, and will be paid by Buyer unless Buyer provides Seller with a proper tax exemption certificate.

Upon acceptance of this order by Seller, if Buyer fails to perform the terms and conditions hereof, or refuses to accept delivery of the equipment, accessories or other items ordered within ten (10) days after notification that same are ready for delivery, the Seller, at its option may retain as liquidated damages all money, trade-ins or other property delivered to Seller by Buyer as down payment hereunder. Buyer will pay any cost of collection for any amount owed to Sellers, including, without limitation, reasonable attorney's fees, court costs and interest in the amount of 1% per month (12% per annum) from the date the amount is due.

Payment is due Seller from the date when Seller is prepared to make delivery. All equipment and material is delivered FOB Seller's plant and title and liability for loss or damage passes to Buyer upon Seller's delivery of the goods to a carrier for shipment to Buyer and any loss or damage thereafter shall not relieve Buyer from any obligation hereunder. Risk of loss for goods shall pass to the Buyer once payment is received by Seller.

Buyer may terminate this contract in whole upon thirty (30) days advance written notice to Seller. In such event, Buyer shall be liable for termination charges. If goods ordered are a standard, manufacturer catalog item Buyer will pay a cancellation charge for each unit cancelled equal the greater of 20% of the purchase order item price or forfeiture of down payment made in. If goods are non-standard items built to the Buyer's custom order, Buyer will pay for all cost, direct and indirect incurred and committed to this contract, together with a reasonable allowance for prorated expenses and anticipated profits.

Buyer agrees to comply fully and with all laws and regulation concerning the purchase and sale of goods. In particular, Buyer agrees to comply with all applicable export administration regulations of the United States, including, but not limited to, the Export Administration Act, insofar as they apply to the sale of products.

Buyer shall indemnify and hold harmless Seller, its employees, officers and directors and the respective successors and assigns, from and against any and all liability, damages, claims, causes of actions, losses, costs and expenses (including attorneys fees) of any kind arising out of injuries to any person (including death) or damage to any property caused by or related to the goods or any negligent act or omission of Buyer, its employees and agents.

The validity, performance and construction of this Sales Order shall be governed by the laws of the State of Illinois of the United States of America.

Seller shall not be liable, and shall be free from any potential liability, for delay in delivery or non-delivery or any failure in shipment caused in whole, or in part, by the occurrence of any contingency beyond its control or other cause or loss of supplies, including, but not limited to act of war (whether an actual declaration thereof is made or not), act of any government or other authority or of persons defined, justice action, sabotage, insurrection, terrorism, riot or other act of civil disobedience, act of a public enemy, failure or delay in transportation, strikes, lockouts, shortage of labor or labor troubles of any kind, accidents, explosion, perils of the sea, fire, earthquake, flood, storm or any other act of God, restrictions or requisitions, shortage of labor, fuel, raw material or machinery or technical failure where Seller has exercised ordinary care in the prevention thereof, failure of manufacturers to deliver, bankruptcy or insolvency of manufacturers or suppliers, suspension of shipping facilities, act or default of any carrier or any other contingency of whatsoever nature beyond Sellers control affecting production, transportation to shipment point, loading, forwarding or unloading or in such a situation at destination of the goods covered by this contract including disturbances or restricting of this line. If the contract was made, in such a situation, if shipments or delivery is not made during the period contracted for, Buyer shall accept delivery under this contract when shipment is made; provided, however, Buyer shall not be obligated to accept delivery if shipment is not made within a reasonable time after the cessation of the aforementioned impediments or causes. Seller may allocate delivery among Seller's customers.

This order shall not be binding upon Seller until accepted by Seller in writing herein and until such accepted, the original order with original signatures as given Seller and in Seller's possession shall be conclusive and binding upon the parties hereto.

The Buyer hereby acknowledges receipt of a copy of this Sales Order and Terms and Conditions.

Customer Signature

Runnion Equipment Co.

April 15/16
Date Accepted

4-11-16
Date



**EQUIPMENT COMPANY**

www.runnionequipment.com

7950 WEST 47TH STREET * LYONS, ILLINOIS 60534

PHONE 708-447-3169
800-824-6704
FAX 708-447-3730

# Invoice

| | |
|---|---|
| INVOICE DATE: | 4/18/2016 |
| INVOICE NO. | 136316 |

SOLD TO:

LANDALE SIGNS AND NEON LTD
8525 ARGYLL RD. NW
EDMONTON, AB T6C 4B2
CANADA

SHIPPED TO:

LANDALE SIGNS AND NEON LTD
8525 ARGYLL RD. NW
EDMONTON AB T6C 4B2
CANADA

| F.O.B. POINT | CUSTOMER ORDER NO. | SHIP VIA | Terms | SALESPERSON | S.O. No. |
|---|---|---|---|---|---|
| LYONS, IL | DARRELL BROWN | DRIVEAWAY | Due on receipt | PR | |

| ITEM CODE | U/M | QTY | DESCRIPTION | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| | | | PURCHASE OF A USED ELLIOTT G85R, S/N - FR3245 MOUNTED ON A 2005 STERLING LT8500 S/N - 2FZHCHDCX5AU20053 | | |
| USED CRA... | | 1 | UNIT # 3974U | 86,000.00 | 86,000.00 |
| DOC FEE | ea | 1 | DOCUMENT FEE | 125.00 | 125.00 |
| PICKUP/DE... | | 1 | FREIGHT | 2,000.00 | 2,000.00 |
| | | | *THE ABOVE EQUIPMENT IS SOLD AS IS WITHOUT ANY WARRANTY EXPRESS OR IMPLIED. THE PURCHASER WILL BEAR THE ENTIRE EXPENSE OF REPAIRING ANY LATENT OR PATENT DEFECTS THAT MAY PRESENTLY EXIST OR THAT MAY OCCUR IN THE VEHICLE NOTWITHSTANDING ANY PROMISE EXPRESS OR IMPLIED.* | | |

Thank you for your business.

| | |
|---|---|
| SALES TAX | $0.00 |
| **Total** | **$88,125.00** |



**EQUIPMENT COMPANY**

www.runnionequipment.com

7950 WEST 47TH STREET * LYONS, ILLINOIS 60534

PHONE 708-447-3169
800-824-6704
FAX 708-447-3730

# Invoice

| | |
|---|---|
| INVOICE DATE: | 4/18/2016 |
| INVOICE NO. | 136316 |

**SOLD TO:**

LANDALE SIGNS AND NEON LTD
8525 ARGYLL RD. NW
EDMONTON, AB T6C 4B2
CANADA

**SHIPPED TO:**

LANDALE SIGNS AND NEON LTD
8525 ARGYLL RD. NW
EDMONTON AB T6C 4B2
CANADA

| F.O.B. POINT | CUSTOMER ORDER NO. | SHIP VIA | Terms | SALESPERSON | S.O. No. |
|---|---|---|---|---|---|
| LYONS, IL | DARRELL BROWN | DRIVEAWAY | Due on receipt | PR | |

| ITEM CODE | U/M | QTY | DESCRIPTION | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| | | | PURCHASE OF A USED ELLIOTT G85R, S/N - FR3245 MOUNTED ON A 2005 STERLING LT8500 S/N - 2FZHCHDCX5AU20053 | | |
| USED CRA... | | 1 | UNIT # 3974U | 86,000.00 | 86,000.00 |
| SALES DISC... | ea | 1 | SALES DISCOUNT | -500.00 | -500.00 |
| DOC FEE | ea | 1 | DOCUMENT FEE | 125.00 | 125.00 |
| PICKUP/DE... | | 1 | FREIGHT | 2,000.00 | 2,000.00 |
| | | | *THE ABOVE EQUIPMENT IS SOLD AS IS WITHOUT ANY WARRANTY EXPRESS OR IMPLIED. THE PURCHASER WILL BEAR THE ENTIRE EXPENSE OF REPAIRING ANY LATENT OR PATENT DEFECTS THAT MAY PRESENTLY EXIST OR THAT MAY OCCUR IN THE VEHICLE NOTWITHSTANDING ANY PROMISE EXPRESS OR IMPLIED.* | | |

Thank you for your business.

| | |
|---|---|
| SALES TAX | $0.00 |
| **Total** | $87,625.00 |

REVISED

Services Agency   frontaliers du Canada

PROTECTED B (When Completed)

## NORTH AMERICAN FREE TRADE AGREEMENT

### CERTIFICATE OF ORIGIN

(Instructions Attached)

Please print or type

| 1 Exporter's Name and Address: | 2 Blanket Period: |
|---|---|

Runnion Equipment Company
7950 47th Street
Lyons, IL. 60534

From 04/25/16    To 12/31/2016    (DD - MM - YY)

Tax Identification Number: ▶ 36-2825271

| 3 Producer's Name and Address: | 4 Importer's Name and Address: |
|---|---|

Runnion Equipment Company
7950 47th Street
Lyons, IL. 60534

Landale Signs & Neon Ltd.
8525 Argyll Rd. NW
Edmonton, AB T6C4B2

Tax Identification Number: ▶ 36-2825271

Tax Identification Number: ▶

| 5 Description of Good(s) | 6 HS tariff Classification Number | 7 Preference Criterion | 8 Producer | 9 Net Cost | 10 Country of Origin |
|---|---|---|---|---|---|
| 2005 Sterling LT8500 Vin 2FZHCHDCX5AU20053 | | | | | |

**11** I certify that:

– the information on this document is true and accurate and I assume the responsibility for proving such representations. I understand that I am liable for any false statements or material omissions made on or in connection with this document;

– I agree to maintain, and present upon request, documentation necessary to support this Certificate, and to inform, in writing, all persons to whom the Certificate was given of any changes that would affect the accuracy or validity of this Certificate;

– the goods originated in the territory of one or more of the Parties, and comply with the origin requirements specified for those goods in the North American Free Trade Agreement, and unless specifically exempted in Article 411 or Annex 401, there has been no further production or any other operation outside the territories of the Parties; and

– this Certificate consists of _____ pages, including all attachments.

| Authorized Signature: | Company: |
|---|---|
| Name: | Title: |
| Date (dd-mm-yy): Telephone: | Fax: |

B232 E (08)                    (Ce formulaire existe aussi en français)            BSF314 E

Canada

# U.S. Customs and Border Protection
## Vehicle/Equipment Export Worksheet

### Description of Vehicle or Equipment

| | |
|---|---|
| VIN / Serial Number: | 2FZHCHDX5AU27053 |
| Year: | 2005 |
| Make: | STERLING |
| Model: | LT 8500 |

ITN = NUMBER _____

### Title Information

| | |
|---|---|
| Title Issuing State: | WISCONSIN |

### Transporting Information

| | |
|---|---|
| Name: (Person / Company / Individual transporting the vehicle) | MIAMIS TRANSPORTATION INC |
| Telephone: | 833-668-6835 Ext. 4112 or 4111 |
| Name of U.S. Border Crossing: | PORTAL - N. DAKOTA |
| Estimated Date of Export: (Can be NO MORE than 50 days from the filing of this worksheet) | MAY 27 2016 |

### U.S. Address of Seller / Owner

| | |
|---|---|
| Name: | RUNNION EQUIPMENT COMPANY |
| Address : | 7980 - 47 th Street |
| City: | LYONS |
| State: | ILL. |
| Zip Code: | 60534 |
| Telephone: | 800-824-6124 |
| Cellular: | 708-341-3169 |

### Canadian Address of Purchaser / Owner / Ultimate Consignee

| | |
|---|---|
| Name: | WANDALE SIGNS & NEON LTD |
| Address : | 8525 ARGYLL Rd. NW |
| City: | EDMONTON, ALBERTA |
| Province: | ALBERTA |
| Postal Code: | T6C 4B2 |
| Telephone: | 780-437-3730 |
| Cellular: | 780 717-2699 |

### NORTH AMERICAN FREE TRADE AGREEMENT
### CERTIFICATE OF ORIGIN INSTRUCTIONS

**For purposes of obtaining preferential tariff treatment, this document must be completed legibly and in full by the exporter and be in the possession of the importer at the time the declaration is made. This document may also be completed voluntarily by the producer for use by the exporter. Please print or type.**

Field 1: State the full legal name, address (including country) and legal tax identification number of the exporter. Legal tax identification number is: in Canada, employer number assigned by the Canada Revenue Agency or the importer/exporter number assigned by the Canada Border Services Agency; in Mexico, federal taxpayer's registry number (RFC); and the United States, employer's identification number or Social Security Number.

Field 2: Complete field if the Certificate covers multiple shipments of identical goods as described in Field 5 that are imported into a NAFTA country for a specified period of up to one year (blanket period). "FROM" is the date upon which the Certificate becomes applicable to the good covered by the blanket Certificate (it may be prior to the date of signing this Certificate). "TO" is the date upon which the blanket period expires. The importation of a good for which preferential tariff treatment is claimed based on this Certificate must occur between these dates.

Field 3: State the full legal name, address (including country) and legal tax identification number, as defined in Field 1, of the producer. If more than one producer's good is included on the Certificate, attach a list of the additional producers, including the legal name, address (including country) and legal tax identification number, cross referenced to the good described in Field 5. If you wish this information to be confidential, it is acceptable to state "Available to Customs upon request". If the producer and the exporter are the same, complete field with "SAME". If the producer is unknown, it is acceptable to state "UNKNOWN".

Field 4: State the full legal name, address (including country) and legal tax identification number, as defined in Field 1, of the importer. If importer is not known, state "UNKNOWN"; if multiple importers, state "VARIOUS".

Field 5: Provide a full description of each good. The description should be sufficient to relate it to the invoice description and to the Harmonized System (HS) description of the good. If the Certificate covers a single shipment of a good, include the invoice number as shown on the commercial invoice. If not known, indicate another unique reference number, such as the shipping order number.

Field 6: For each good described in Field 5, identify the HS tariff classification to six digits. If the good is subject to a specific rule of origin in Annex 401 that requires eight digits, identify to eight digits, using the HS tariff classification of the country into whose territory the good is imported.

Field 7: For each good described in Field 5, state which criterion (A through F) is applicable. The rules of origin are contained in Chapter Four and Annex 401. Additional rules are described in Annex 703.2 (certain agricultural goods), Annex 300-B, Appendix 6A (certain textile goods) and Annex 308.1 (certain automatic data processing goods and their parts). **Note: In order to be entitled to preferential tariff treatment, each good must meet at least one of the criteria below.**

**Preference Criteria**

A    The good is "wholly obtained or produced entirely" in the territory of one or more of the NAFTA countries, as referred to in Article 415. Note: The purchase of a good in the territory does not necessarily render it "wholly obtained or produced". If the good is an agricultural good, see also criterion F and Annex 703.2. (Reference: Article 401(a) and 415)

B    The good is produced entirely in the territory of one or more of the NAFTA countries and satisfies the specific rule of origin, set out in Annex 401, that applies to its tariff classification. The rule may include a tariff classification change, regional value-content requirement or a combination thereof. The good must also satisfy all other applicable requirements of Chapter Four. If the good is an agricultural good, see also criterion F and Annex 703.2. (Reference: Article 401(b))

C    The good is produced entirely in the territory of one or more of the NAFTA countries exclusively from originating materials. Under this criterion, one or more of the materials may not fall within the definition of "wholly produced or obtained", as set out in Article 415. All materials used in the production of the good must qualify as "originating" by meeting the rules of Article 401(a) through (d). If the good is an agricultural good, see also criterion F and Annex 703.2. (Reference: Article 401(c))

D    Goods are produced in the territory of one or more of the NAFTA countries but do not meet the applicable rule of origin, set out in Annex 401, because certain non-originating materials do not undergo the required change in tariff classification. The goods do nonetheless meet the regional value-content requirement specified in Article 401(d). This criterion is limited to the following two circumstances:

    1.    the good was imported into the territory of a NAFTA country in an unassembled or disassembled form but was classified as an assembled good, pursuant to HS General Rule of Interpretation 2(a); or

    2.    the good incorporated one or more non-originating materials, provided for as parts under the HS, which could not undergo a change in tariff classification because the heading provided for both the good and its parts and was not further subdivided into subheadings, or the subheading provided for both the good and its parts and was not further subdivided.

    Note: This criterion does not apply to Chapters 61 through 63 of the HS (Reference: Article 401(d))

E    Certain automatic data processing goods and their parts, specified in Annex 308.1, that do not originate in the territory are considered originating upon importation into the territory of a NAFTA country from the territory of another NAFTA country when the Most-Favoured-Nation Tariff rate of the good conforms to the rate established in Annex 308.1 and is common to all NAFTA countries. (Reference: Annex 308.1)

F    The good is an originating agricultural good under preference criterion A, B or C above and is not subject to a quantitative restriction in the importing NAFTA country because it is a "qualifying good" as defined in Annex 703.2, Section A or B (please specify). A good listed in Appendix 703.2.B.7 is also exempt from quantitative restrictions and is eligible for NAFTA preferential tariff treatment if it meets the definition of "qualifying good" in Section A of Annex 703.2. Note 1: This criterion does not apply to goods that wholly originate in Canada or the United States and are imported into either country. Note 2: A tariff rate quota is not a quantitative restriction.

Field 8: For each good described in field 5, state "YES" if you are the producer of the good. If you are not the producer of the good, state "NO" followed by (1), (2), or (3), depending on whether this certificate was based upon: (1) your knowledge of whether the good qualifies as an originating good; (2) your reliance on the producer's written representation (other than a Certificate of Origin) that the good qualifies as an originating good; or (3) a completed and signed Certificate for the good, voluntarily provided to the exporter by the producer.

Field 9: For each good described in Field 5, where the good is subject to a regional value content (RVC) requirement, indicate "NC" if the RVC is calculated according to the net cost method; otherwise, indicate "NO". If the RVC is calculated according to the net cost method over a period of time, further identify the beginning and ending dates (DD/MM/YY) of that period. (Reference: Articles 402.1, 402.5)

Field 10: Identify the name of the country ("MX" or "US" for agricultural and textile goods exported to Canada; "US" or "CA" for all goods exported to Mexico; or "CA" or "MX" for all goods exported to the United States) to which the preferential rate of customs duty applies, as set out in Annex 302.2, in accordance with the Marking Rules or in each Party's schedule of tariff elimination.

    For all other originating goods exported to Canada, indicate appropriately "MX" or "US" if the goods originate in that NAFTA country, within the meaning of the NAFTA Rules of Origin Regulations, and any subsequent processing in the other NAFTA country does not increase the transaction value of the goods by more than 7%; otherwise indicate as "JNT" for joint production. (Reference: Annex 302.2)

Field 11: This field must be completed, signed and dated by the exporter. When the Certificate is completed by the producer for use by the exporter, it must be completed, signed and dated by the producer. The date must be the date the Certificate was completed and signed.

# WISCONSIN CERTIFICATE OF TITLE

| Vehicle Identification Number | Year | Make |
|---|---|---|
| 2FZHCHDCX5AU20053 | 2005 | STERLING INDUSTRIAL CORP |

| Title Number | Issue Date | Chassis Type | Odometer Reading | Odometer Status | Odometer Date |
|---|---|---|---|---|---|
| 16102Q1015-2 | 04/11/2016 | TRUK | | EXEMPT | |

| Product Number | Body Style | Color | | Fleet No. |
|---|---|---|---|---|
| 14081161027 | UNKNOWN | WHITE | | |

**Titled Owner(s)**
PME EQUIPMENT INC
500 RANDOLPH DR
APPLETON, WI 54913-9293

The person, firm or corporation named on this Title is the lawful owner of the vehicle described, subject to any Security Interest (liens) shown. The order in which the Lien Holders appear on this Title does not necessarily represent their priority. The Wisconsin Department of Transportation will not be responsible for false or fraudulent odometer statements made in the assignment of the Certificate of Title or for errors in reporting mileage, brand disclosures or the history of the vehicle. The department has no actual knowledge about the history of the vehicle and makes no warranty that the title brands or mileage disclosures on prior titles have been carried forward onto this document.

2FZHCHDCX5AU20053

**Lien Holder(s)**
NONE,

**Additional Vehicle Detail**
PREVIOUSLY TITLED IN: IA

**SELLER:** When the vehicle is sold, complete the ASSIGNMENT OF CERTIFICATE OF TITLE on the top back of this title and deliver the title to the purchaser with the vehicle. You may wish to retain a copy of this title with the purchaser's information and signature as proof of sale for your records.

**PURCHASER:** Apply for a new title with the Wisconsin Division of Motor Vehicles immediately. To legally operate this vehicle, you are required to register it with the Division of Motor Vehicles.

MAIL ADDRESS:
Wisconsin Department of Transportation
PO Box 7949, Madison, WI 53707-7949

15-1-0890435

QUESTIONS:
Contact the Division of Motor Vehicles at:
414-266-1000, 608-266-1466
wisconsindmv.gov

KEEP IN SAFE PLACE          DO NOT KEEP IN VEHICLE

## ASSIGNMENT OF CERTIFICATE OF TITLE

The seller is required to state the odometer mileage when vehicle ownership is transferred. Failure to complete or providing a false statement may result in fines and or imprisonment and will make you liable for damages to the purchaser. See Federal and St. 642 regulation.

30653

RUNNION EQUIPMENT COMPANY

PME EQUIPMENT INC

7950 47th ST   LYONS IL 60537

500 RANDOLF DR. APPLETON, WI 54913

Will Meusch/Agent   4/11/16

Steve Muka   4/11/16

Sections 2-3 For Dealer Use Only

NO additional dealer reassignments permitted

