Page 1

1          IN THE UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF ILLINOIS

3                   EASTERN DIVISION

4    LANDALE SIGNS and NEON,      )

5    LTD.,                        )

6              Plaintiff,         )  No. 1:16-cv-07619

7       vs.                       )

8    RUNNION EQUIPMENT CO.,       )

9    and JOHN DOE,                )

10             Defendants.        )

11        The deposition of PATRICK RUNNION, called

12   for examination pursuant to the Rules of Civil

13   Procedure for the United States District Courts

14   pertaining to the taking of depositions, taken

15   before Jacqueline Shenberger, Certified

16   Shorthand Reporter within and for the County of

17   Cook and State of Illinois, at One North

18   Franklin, Illinois, on August 28, 2018, at the

19   hour of 3:00 PM.

20

21

22

23   Jacqueline Shenberger

24   License No:  084-001524

**EXHIBIT B**

Page 2

1              I N D E X
2 WITNESS                    EXAMINATION
3 PATRICK RUNNION
4 BY MR. HAEBERLE                    5
5 BY MR. POLICK                     62
6
7
8
9
10
11          E X H I B I T S
12 NUMBER                MARKED FOR ID
13  Deposition
14  Exhibit No. 10  E-mail           16
15  Exhibit No. 11  E-mail           19
16  Exhibit No. 12  E-mail           26
17  Exhibit No. 13  E-mail           39
18  Exhibit No. 14  Fax Transmission    39
19  Exhibit No. 15  E-mail chain       39
20  Exhibit No. 16  Fax            41
21  Exhibit No. 17  Group of Documents    50
22  Exhibit No. 18  Fax            52
23  Exhibit No. 19  Subpoena         58
24  Exhibit No. 4   Notice of Rule       60

Page 3

1          30(b)(6)
2  Exhibit No. 20  Documents          69
3  Exhibit No. 21  E-mail           70
4
5 EXHIBIT NO's 1-3, 5-9 Attached
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 4

1 APPEARANCES:
2      PATTERSON LAW GROUP PC
3      BY: MR. MICHAEL HAEBERLE
4      200 West Monroe Street
5      Suite 2025
6      Chicago, Illinois  60606
7      Mhaeberle@patterson.com
8        Representing the Plaintiff;
9
10      STEVEN P. POLICK & ASSOCIATES P.C.
11      BY:  MR. STEVEN P. POLICK
12      155 North Michigan Avenue
13      Suite 700
14      Chicago, Illinois  60601
15      (312) 729-5414
16      spolick@sbcglobal.net
17        Representing the Defendants;
18          * * * *
19
20
21
22
23
24

Page 5

1      (Deposition commenced at 3:00)
2      (Whereupon, the witness was duly
3      sworn.)
4        PATRICK RUNNION,
5 called as a witness herein, was examined and
6 testified as follows:
7        EXAMINATION
8      BY MR. HAEBERLE:
9      Q.  Please state and spell your name for
10 the record?
11      A.  Patrick Runnion, R-u-n-n-i-o-n.
12      MR. HAEBERLE:  This is the deposition of
13 Patrick Runnion, taken pursuant to the Federal
14 Rules of Civil Procedure and notice and
15 agreement of the parties.
16 BY MR. HAEBERLE:
17      Q.  Is it okay if I call you Pat?
18      A.  That's fine.
19      Q.  Have you been deposed before?
20      A.  I have.
21      Q.  How many times?
22      A.  Approximately four.
23      Q.  When was the last time?
24      A.  Can I reference my attorney on this?

2 (Pages 2 - 5)

Page 6

1   Q.   You've got to do it to your
2   recollection?
3   A.   2010.
4   Q.   What was the context?
5   A.   A crane accident, we were suing.
6   Q.   Same one that Willie testified about?
7   A.   Correct.
8   Q.   The other times you've been deposed
9   have all of those been in connection with
10  Runnion Equipment Company?
11  A.   Yes.
12  Q.   And aside from the one we talked about,
13  were all of those cases in which Runnion was
14  either a plaintiff or a defendant?
15  A.   Yes.
16  Q.   How many times was Runnion a plaintiff
17  that you were deposed in?
18  A.   One that I know of, two, I'm sorry, two
19  that I know of.
20  Q.   Two.  So Runnion was a plaintiff two
21  times plus the crane accident in 2010?
22  A.   And one other crane accident, so that
23  would be the fourth.
24  Q.   And that crane accident was Runnion a

Page 7

1   plaintiff or --
2   A.   A --
3   MR. POLICK:  I think he said they were only
4   plaintiffs twice.
5   A.   Plaintiff twice and defendant twice.
6   BY MR. HAEBERLE:
7   Q.   Okay.  You've never been deposed in
8   your personal capacity, correct?
9   A.   That is correct.
10  Q.   You've been here all day, so I'm not
11  going to go through the rules, aside from the
12  fact that if you don't understand my question,
13  let me know.  If you don't say anything, I'm
14  going to assume you understood it, is that fair?
15  A.   That's fair.
16  Q.   What's your current address?
17  A.   150 South Arlington, Elmhurst, Illinois
18  60126.
19  Q.   How long have you lived there?
20  A.   Four years.
21  Q.   I assume you own it?
22  A.   I do.
23  Q.   Who was the attorney who represented
24  you in purchasing that property?

Page 8

1   A.   I don't recall his name.
2   Q.   Do you recall who the broker was when
3   you bought it?
4   A.   It was -- I don't know her name, but
5   you guys do because you deposed her.
6   Q.   She's from Graysick? (Phonetic)
7   A.   Graysick, Maria Graysick.
8   Q.   Have you ever been convicted of a crime
9   other than traffic violations?
10  A.   No.
11  Q.   Any medications, substances or other
12  reasons you can't testify truthfully today?
13  A.   No.
14  Q.   What did you do to prepare for your
15  deposition today?
16  A.   Read the transcripts of Mr. Brown.
17  MR. POLICK:  Transcripts or transcript?
18  A.   Transcript.
19  BY MR. HAEBERLE:
20  Q.   Did you review any other documents in
21  preparation for this deposition?
22  A.   No.
23  Q.   Did you meet with anyone in preparation
24  for this deposition?

Page 9

1   A.   Steve Polick, our attorney.
2   Q.   When?
3   A.   Last week.
4   Q.   Who else was there?
5   A.   Janice, Willie, Mike Spaniel and
6   myself.
7   Q.   What's the highest level of education
8   that you've obtained?
9   A.   Four years of college.
10  Q.   Where?
11  A.   Indiana State for a year and a half and
12  Northern Illinois for two and a half.
13  Q.   You graduated from NIU?
14  A.   I did not graduate.
15  Q.   Did you have any sort of focus while
16  you were there?
17  A.   Marketing.
18  Q.   When was the last year you were there?
19  A.   1980.
20  Q.   What did you do after leaving NIU?
21  A.   Went to work at Runnion Equipment.
22  Q.   And have you -- since 1980 have you had
23  any other employment aside from Runnion
24  Equipment?

3 (Pages 6 - 9)

Page 10

1   A.  No.
2   Q.  Could you tell me your job titles
3  starting at Runnion Equipment to the present?
4   A.  Outside sales.  President.  CEO.
5   Q.  CEO is your current title, correct?
6   A.  Correct.
7   Q.  And do you -- you were succeeded by
8  Mike in your role as president, correct?
9   A.  Correct.
10   Q.  And it was your parents who started
11  Runnion Equipment, correct?
12   A.  Correct.
13   Q.  When you were growing up did you work
14  at the company at all?
15   A.  Yes.
16   Q.  Part-time?
17   A.  Yes.
18   Q.  I want to focus in on 2016.  What were
19  your -- were you CEO at that time?
20   A.  I don't know, I'm not sure when the
21  switch over happened, it was on or about that
22  time.
23   Q.  So I'll ask for your roles and
24  responsibilities both as CEO and as president,

Page 11

1  including how they differ.  So what are your
2  roles and responsibilities as CEO?
3   A.  The roles and responsibilities have not
4  shifted.  Mike Prochot's roles have gotten
5  larger.  So now he has authority over the sales
6  department which before he did not.
7   Q.  So before -- do you also currently have
8  authority over sales or did you turn that over
9  too?
10   A.  No, I have authority over that as well.
11   Q.  What do you mean by authority?
12   A.  Mike is more of a dotted line.  I'm in
13  charge of the day to day operations of it.  But
14  Mike has directional control over things that
15  might pertain to policies and procedures and
16  that type of thing.
17   Q.  And what else does your role of CEO
18  entail?
19   A.  I oversee Mike's role, I oversee the
20  sales role.  Final decision maker on any
21  banking, any insurance, any type of sales
22  questions, any type of sales questions that come
23  up I'm the final sounding board on that.
24   Q.  What's your involvement in sales

Page 12

1  transaction, meaning, are you consulted for
2  every equipment sale?
3   A.  No.
4   Q.  In 2016 were you consulted for every
5  equipment sale?
6   A.  No.  I should ask by consulting, I
7  should -- I know about every equipment sale, but
8  if the sale travels smoothly through the pipe
9  line, I'm not questioning them, if there's not
10  anything, like okay, what are we going to get
11  for a trade number on something, or the customer
12  is asking for something as a salesman that I
13  don't have authority to say yes or no to.  What
14  is the corporate side of things want to say, so
15  that's what I'm being consulted on.
16   Q.  So you are brought in when there's the
17  need to deviate from the salesman who is granted
18  authority?
19   A.  Correct.
20   Q.  Why were you brought into the Landale
21  transaction?
22   A.  We didn't have an inside salesman at
23  the time, so I was handling inside sales calls
24  when that call came in. Let me back that up.  We

Page 13

1  have an inside sales person, I'm not sure if we
2  had an inside sales person at the time of the
3  Landale deal.  But even if we did and that
4  inside sales person was busy with another call,
5  was out sick, was whatever, I would be the
6  overflow sales person that would grab the phone.
7   Q.  So you have in 2016, fair to say you
8  had pretty good working knowledge about what
9  your cost was for the all the equipment you were
10  selling as well as what you would sell it at?
11   A.  Correct.
12   Q.  And you would be the one who would make
13  those ultimate decisions, as to pricing
14  sessions, and any other business terms, correct?
15   A.  Correct.
16   Q.  Do you have any training or experience
17  with computers other than what you've gained
18  through your work at Runnion?
19   A.  No.
20   Q.  Same question, but as to the internet
21  rather than computers?
22   A.  No formal training on that.
23   Q.  When did Runnion adopt a computing
24  system?

4 (Pages 10 - 13)

Page 14

1    COURT REPORTER: Did you say competing
2  system?
3    MR. HAEBERLE: Computing.
4    MR. POLICK: Yeah, it sounded like competing.
5    A. So computers you're asking, correct?
6  BY MR. HAEBERLE:
7    Q. Yes?
8    A. 1999 would be my guess.
9    Q. I would imagine that a decent part of
10  your day is spent on e-mails, is that correct?
11    A. It is.
12    Q. If you would ballpark, what percent of
13  your day do you spend sending and receiving
14  e-mails, what would that be?
15    A. So I would say the computer is always
16  on at my desk. I do a lot by computer. But
17  then I would also do a lot by phone, if
18  something comes up, an e-mail that requires a
19  phone call, if it makes more sense I will do a
20  phone call. From a standpoint of how many
21  e-mails I would do a day, I would probably as a
22  guess say I receive legitimate e-mails as
23  opposed to, you know, if you want to buy some
24  used tires from me or something like that. So

Page 15

1  business type e-mails are probably 15 e-mails
2  coming in and probably 15 going out, so I would
3  say total 30 correspondence business nature a
4  day.
5    Q. Would you describe yourself as good
6  with computers?
7    A. I know how to turn one and off, send
8  e-mails, delete some things. So I would not say
9  good, I would say fair.
10    Q. Proficient for what you need to do, but
11  no particular interest, is that right?
12    A. Correct.
13    Q. Do you have any knowledge or
14  understanding about Runnion's e-mail server or
15  its computer security?
16    A. I do not.
17    Q. Do you rely on Mr. Spaniel for that?
18    A. I rely on Mr. Spaniel and Mike Prochot.
19    Q. What's Mike Prochot's role in the
20  computer cyber security?
21    A. He would be the one that Mike Spaniel
22  would report to. So any type of new upgrades of
23  computer product or anything to do with the
24  computer it goes through Mike.

Page 16

1    Q. And why does it go through Mike?
2    A. He's more proficient with computers
3  than I am.
4    Q. And do you know if he has formal
5  training with computers?
6    A. I don't know that.
7    Q. Do you recognize this e-mail?
8        (Whereupon, Deposition Exhibit
9         No. 10 was marked for
10        identification.)
11  BY MR. HAEBERLE:
12    Q. I'm showing you Exhibit 10, do you
13  recognize Exhibit 10?
14    A. I don't.
15    Q. Brad, is that your son?
16    A. That's correct.
17    Q. He was working at Runnion in the spring
18  of 2016?
19    A. Correct.
20    Q. Do you recall his involvement at all in
21  the Landale transaction?
22    A. I do not.
23    Q. What I want to direct your attention to
24  here is the little note at the bottom of this

Page 17

1  e-mail. The first page of Exhibit 10, which is
2  a note to protect against computer viruses, so
3  on and so forth.
4        Is that something that's on Runnion's
5  e-mails that are sent out or are you --
6    A. I don't know that.
7    Q. Do you recall having seen that on other
8  Runnion e-mails?
9    A. I can't say no without looking at the
10  e-mails, so no.
11    Q. You heard Mike Spaniel talk about a
12  sales password that he gives to you. Do you
13  recall his testimony earlier today?
14    A. I do.
15    Q. Does he in fact give you a password for
16  the sales wireless?
17    A. I get a password from Mike on a
18  quarterly basis.
19    Q. And that is for the sales wireless
20  access, correct?
21    A. I believe so.
22    Q. Who do you distribute that to?
23    A. Each salesman has their own. So I have
24  my own for my computer.

5 (Pages 14 - 17)

Page 18

1    Q.  And so salesman John Doe comes in, do
2  you give salesman John Doe his own password?
3    A.  I do not.
4    Q.  Do you distribute any Wi-Fi passwords
5  to anyone?
6    A.  I do not.
7    Q.  Okay.  Do you have access to Wi-Fi in
8  the Runnion facility?
9    A.  I don't think so. My computer is
10  hardware in, so I don't think I need to be on
11  the Wi-Fi.
12    Q.  Do you have an e-mail set up on your
13  phone?
14    A.  I do.
15    Q.  Do you have your work e-mail set up on
16  any laptop?
17    A.  I do not.
18    Q.  Do you have it set up on a home PC?
19    A.  I do not.
20    Q.  Or a home computer of any sort?
21    A.  No.
22    Q.  Do you know how much Runnion pays Mi
23  Tech Guy every month for their services?
24    A.  I do not.

Page 19

1    Q.  Do you -- are you familiar with any
2  policies regarding employees using their
3  personal e-mails at Runnion?
4    A.  I'm not aware of any policies.
5        (Whereupon, Deposition Exhibit
6        No. 11 was marked for
7        identification.)
8  BY MR. HAEBERLE:
9    Q.  Showing you what we've marked as
10  Exhibit 11, which is an e-mail from you to Mike,
11  May 25th.  Take a minute to look at it.
12    A.  Okay.
13    Q.  Do you recognize this e-mail?
14    A.  This e-mail chain, yes.  I don't
15  remember this particular top piece, so I don't
16  know.  You're asking me specifically if I
17  remember this portion on the front, I do not
18  remember the top half.
19    Q.  Okay.  The remaining part of the chain
20  you recognize and recall?
21    A.  Yes.
22    Q.  And this e-mail was sent in the
23  ordinary course of Runnion's business, correct?
24    A.  Correct.

Page 20

1    Q.  And you have maintained this e-mail
2  that you produced in the ordinary course of
3  Runnion's business employment, correct?
4    A.  My e-mail?
5    Q.  Yes.
6    A.  Yes.  My e-mail has not changed.
7    Q.  I want to ask you about Jim Hopkinson,
8  do you know who he is?
9    A.  I do.
10    Q.  Who is he?
11    A.  Currently he is our PSSR salesman for
12  Runnion Equipment Company.
13    Q.  Do you know what his e-mail address is?
14    A.  I don't.
15    Q.  Does he have a Runnion Equipment e-mail
16  address?
17    A.  He does.
18    Q.  Directing your attention to page 4 of
19  this document.  Is it fair to say
20  jthopkinson@gmail.com is not his Runnion
21  Equipment?
22    A.  That is correct.
23    Q.  I'm looking at the next page, page 5.
24  There is an e-mail from a Nick Guzlas to

Page 21

1  service@runnionequipment.com?
2    A.  Correct.
3    Q.  Are you familiar with a
4  service@runnionequipment.com e-mail address?
5    A.  I don't know that we have one or not,
6  so I'm not --
7    MR. HAEBERLE:  Could you read back the
8  question.
9        (Whereupon, the record was read
10        as requested.)
11  BY MR. HAEBERLE:
12    Q.  Were you aware that in 2016 there was
13  an e-mail address service at
14  runnionequipment.com?
15    A.  There may be, I don't know that for a
16  fact.  I think we have sales at Runnion
17  Equipment.  I think we have service -- I think
18  there are those generic headings that would then
19  get dumped into or forwarded onto the service
20  manager at the time.  So I don't know if the
21  mail from Freeway Ford was being sent to
22  service@runnionequipment.com, which then would
23  have been Jim Hopkinson at the time would have
24  been our service manager.  He may have received

Page 22

1 that, so that's my guess on what's happened
2 here. But I don't know for a fact.
3    Q.  Okay. So Jim Hopkinson in April of
4 2016 was the service manager?
5    A.  Correct. There was a transfer about
6 that time, so I think if -- I mean, if he's
7 showing it down here it's probably service
8 manager, that's what he was at the time. He has
9 since moved onto a different position in the
10 company.
11    Q.  Sure. If you look on page 1, it's an
12 e-mail from you to Mike that you said you don't
13 really recall that much. Do -- and I'll
14 represent to you there are a bunch of e-mails
15 that you forwarded to Mike around this time, in
16 late May, 2016. Do you recall why you were
17 forwarding e-mails to Mike in late May 2016?
18    MR. POLICK: It doesn't say he doesn't recall
19 much, it's regarding a recall of paperwork,
20 which I assume is a product recall.
21    A.  Correct.
22 BY MR. HAEBERLE:
23    Q.  But you didn't recall seeing that?
24    A.  Correct.

Page 23

1    Q.  No, that's fine.
2    A.  So after Darrell Brown and Landale
3 suggested that there was a problem, where we
4 didn't get the property, right after this was
5 brought up that there was issues with us
6 receiving the wire, I told Mike, I said let him
7 know what was going on with Landale, we had a
8 conversation and I said, well, let me send you
9 off some of the e-mails that I sent back and
10 forth with Landale. So I may have forwarded a
11 bunch of them onto Mike, and I don't know if
12 this is one of them or not.
13    MR. POLICK: And by Mike, you mean Mike
14 Prochot?
15    A.  Mike Prochot, correct.
16 BY MR. HAEBERLE:
17    Q.  How did you determine which e-mails to
18 forward to Mike?
19    A.  I just went through my outbox, I was
20 looking to see what I sent, I picked the ones
21 that I saw, I may have missed some.
22    Q.  And what was the purpose of sending
23 those e-mails to Mike?
24    A.  Just so that he was on board with what

Page 24

1 was going on.
2    Q.  Do you know how Runnion first came into
3 contact with Darrell Brown and Landale?
4    A.  There are two ways, I don't know which
5 way it is. So we have -- we work with a lot of
6 brokers across the United States. So I have
7 brokers that sell cranes. I have brokers that
8 sell trailers. I have other brokers they just
9 kind of freelance and they resell things. I'm
10 not sure if Darrell Brown came through a broker
11 that refers people to us. Then I would owe them
12 a commission on the referral or if they contact
13 me directly off the internet, because we do
14 quite a bit internet advertising.
15    Q.  Are you familiar with Machinno
16 (phonetic)
17    A.  That's sounds familiar, but I couldn't
18 say yes for sure.
19    Q.  So you have no understanding of whether
20 it is or is not an equipment search engine?
21    A.  Not sitting here, no.
22    Q.  Okay. And I would assume, but just to
23 confirm that you do not know what your fee
24 structure is with Machinno (Phonetic), if you

Page 25

1 have one?
2    A.  If we have one, I would not know what
3 that fee structure is.
4    Q.  Do you know why you were -- we've
5 touched upon this a little bit, but why you
6 eventually got brought into the -- strike that.
7       We saw an earlier e-mail. Actually,
8 we'll go back to Exhibit 10. So based on
9 Exhibit 10, does this refresh your recollection
10 that Brad was involved in some way in the
11 Landale transaction?
12    A.  I don't know that he was. I might have
13 asked Brad if I was out of the office to forward
14 me something. I do that often if I'm not in the
15 office, I'll call, can you shoot me off
16 something and whoever it was, whoever I was
17 talking to at the time would help me out with
18 it.
19    Q.  So is it fair to say you don't recall
20 whether you became involved in the Landale
21 transaction because it escalated to you or
22 because of some other reason, such as an
23 overflow call or someone being out --
24    A.  I was the one that started that, which

7 (Pages 22 - 25)

Page 26

1 is why I continued doing it. So I was the one
2 that first had contact with Landale.
3    Q.  And then you just maintained continuity
4 through the process?
5    A.  Correct.
6    Q.  Do you know why you became -- why you
7 started --
8    A.  I don't know if it was an overflow call
9 or the inside salesman was off sick or whatever
10 the case was.
11            (Whereupon, Deposition Exhibit
12            No. 12 was marked for
13            identification.)
14 BY MR. HAEBERLE:
15    Q.  I won't ask you questions based on
16 this yet.  But do you how you knew what address
17 to contact Darrell at?
18    A.  I don't understand your question.
19    Q.  Sure.  How did you know to what address
20 you were supposed to e-mail Darrell?
21    A.  I would have been -- I don't know if he
22 called in or if he e-mailed in.  I thought I
23 remember seeing something from some of this
24 paperwork here that's being passed around,

Page 27

1 saying do you still have this G85, I might be
2 interested in it.  So that would have been an
3 inbound e-mail that I would have responded back
4 to or I may have called him at that point in
5 time, if that was something that would have come
6 in or if he called in.  So I don't know where I
7 would have got the e-mail from to answer your
8 question.
9    Q.  Okay.
10            (Whereupon, Deposition Exhibit
11            No. 13 was marked for
12            identification.)
13 BY MR. HAEBERLE:
14    Q.  So comparing Exhibit 12 and 13, would
15 you agree with me that you initially at least on
16 April 20th, 2016 sent an e-mail to
17 darrell@landalesigns@gmail.com?
18    A.  That's what the header shows, yes.
19    Q.  Do you disagree with that?
20    A.  Do I disagree that's what the headers
21 are?
22    Q.  Yes.
23    A.  No, that's what the headers say.  So
24 that's where they would have gone.

Page 28

1    Q.  Do you agree with me on Exhibit 13 you
2 were not responding to any e-mail Darrell sent,
3 you're sending him a new e-mail, correct?
4    A.  This is my signature on the bottom so
5 -- and this is from Runnion Equipment at the
6 top, so I then would have to assume that it is
7 coming from me, yes.
8    Q.  Maybe my question wasn't clear.  You're
9 not replying to an e-mail from Darrell, you're
10 e-mailing him not as part of a direct reply to a
11 chain, correct?
12    A.  Correct.
13    Q.  Any idea how you started e-mailing him
14 at some point at darrell.landalesigns@gmail.com?
15    A.  He e-mailed me once and then I replied
16 to an e-mail and at that point in time it was
17 gmail at that point.
18    Q.  What do you mean it was gmail at that
19 point?
20    A.  So there was -- our correspondence
21 going back and forth, he would send me
22 something, I would respond or vice versa, I
23 would send something to him, and he would
24 respond.  He sent me something once, I responded

Page 29

1 and from that point forward it was always Gmail.
2 So I was never given a gmail account, it just
3 got sent to me as a gmail account.
4    Q.  And so this is -- you'd agree that
5 Exhibit 13 is one where you're typing Darrell's
6 name in, correct?
7    A.  Oh, because I didn't respond?
8    Q.  Correct.
9    A.  Yes, I would assume that would be the
10 case.
11    Q.  Any idea how Darrell's name, Darrell's
12 gmail account auto populates?
13    A.  I have no clue how that works.
14    Q.  Do you recall when you were typing
15 Darrell's name in did you have the option to
16 select Darrell at gmail or Darrell at Landale
17 Signs?
18    A.  I do not recall that.
19    Q.  In this time did you notice that
20 Darrell's e-mail was a gmail account?
21    A.  I did not.
22    Q.  Did you notice any chains from the
23 Landale Signs to a gmail account?
24    A.  I did not notice that.

8 (Pages 26 - 29)

Page 30

1    Q.   At some point, however, you learned
2  that Darrell was e-mailing you from a gmail
3  account which was not the correct account,
4  correct?
5    A.   At some point in time after we found
6  out that Darrell's e-mail at gmail was a bogus
7  e-mail, I went back into all of my e-mails
8  looking to see when it switched over from
9  Landale to gmail, and going forward from that
10  point, relatively certain going forward from
11  that point it was always going to gmail.
12    Q.   Why -- when you were going back to look
13  you were looking specifically for when it
14  switched from Landale to G mail, correct?
15    A.   That's correct.
16    Q.   Why were you looking for that?
17    A.   Because that's when Darrell made a
18  comment to whether it was Willie or Janice,
19  whomever it was, that I don't have a gmail
20  account.  They came to me and said Landale is
21  claiming they don't have a gmail account.  So I
22  don't know if it was a phone conversation at the
23  time with Darrell or whatever the case was, but
24  I was told again either by Darrell or my people

Page 31

1  internally that is not a good e-mail account for
2  Darrell, being the gmail account, so I went back
3  in trying to find the date when they that would
4  have switched or when I would have first found a
5  gmail account, coming into Runnion Equipment
6  Company.
7    Q.   Okay.  I'm going to backup when you
8  first found out that there was a problem with
9  the Landale transaction and the wire transfer?
10    A.   All right.
11    Q.   Do you recall from whom you found that
12  out?
13    A.   That would either have been from Willie
14  or Janice.
15    Q.   Do you recall what either of them told
16  you?
17    A.   It would have been ongoing for sometime
18  with the effect that saying that Landale keeps
19  on saying they sent their money and we don't
20  have it, so it was a conversation that went on
21  for a few days, I suppose, as to well, Landale
22  said they sent it, maybe it's going to be a day
23  late.  So Willie would have been asking so that
24  we could get this delivered in the fashion that

Page 32

1  Landale Sign was looking for.  So the three of
2  us were on it and Mike Prochot was I'm sure
3  appraised of the situation along the way as
4  well.  Until which point in time Willie or
5  Janice sent off some more wiring instructions
6  and that's when Landale came back and said those
7  aren't my instructions that I had.  So and I
8  don't know when that happened, if that was
9  within three days or within the first week of
10  all that happening.
11    Q.   So during that period were you
12  interfacing with Darrell or were you just
13  interfacing with Willie, Janice and --
14    A.   I'm sure I would have been talking to
15  Darrell as well.
16    Q.   Do you recall any of those
17  conversations during the what I'll call the
18  sorting out period, where you were trying to
19  figure out before he said those aren't the wire
20  instructions I received?
21    A.   I remember one where were talking and I
22  was trying to find out where the one that
23  switched over to his gmail account.  So I was on
24  the phone call with him looking through my

Page 33

1  e-mails at the time, I believe he was doing the
2  same thing on his side of things to find out
3  when and where it would have happened time wise.
4    Q.   Was anyone else on that call?
5    A.   No, not to my knowledge, nothing on
6  Runnion's side.
7    Q.   Were any conclusions drawn from that
8  call?
9    A.   Other than what time we thought that we
10  saw the gmail pop up the first time.
11    Q.   At any point -- at what point did you
12  become aware that e-mails were being sent to
13  Darrell from Runnion --
14    A.   I can't answer that, I don't remember
15  that.
16    Q.   During the call with Darrell pre
17  discovery of the wrong wire instructions where
18  you guys were talking about gmail, do you recall
19  a discussion of Runnion acuffment (sic)?
20    A.   I don't recall that conversation.
21    Q.   Now, let's turn to after you learned or
22  after it's discovered, I guess, that the wire
23  instructions that Darrell sent, wired to, did
24  not match the wire instructions, the wire

Page 34

1  instructions that accurately described Runnion's
2  bank account.
3      A.  Okay.
4      Q.  When did you discover that the money
5  had been wired to the wrong account?
6      A.  I would have to go back and research
7  the date.  I can't give you those dates right
8  now, off my memory.
9      Q.  Who did you hear that from?
10     A.  Who did I hear --
11     Q.  That there was a wire that went to a
12  different account than Runnion's account?
13     A.  I don't know if that was somebody at
14  Runnion or if that was Darrell himself.
15     Q.  Okay.  Do you have a specific
16  recollection of any conversation with anybody at
17  Runnion concerning that subject?
18     A.  I'm sure I would have talked with
19  Willie, Janice and Mike, all three of them.
20     Q.  Did you ever have a conversation with
21  Darrell about the money being wired to the wrong
22  account?
23     A.  I'm sure I did.
24     Q.  Do you have any specific recollection

Page 35

1  of it?
2      A.  I do not.
3      Q.  Following -- do you have a specific
4  recollection of any call with Darrell following
5  the gmail call that we talked about?
6      A.  Specifically in relation to -- I don't
7  have any specifics that I can recall saying, you
8  know, I can gave you generalities, what I
9  remember on certain calls, if that's what you're
10  asking?
11     Q.  Sure, I'd just like to march through
12  the calls?
13     A.  Okay.  So I know at one point in time
14  he said, you know, don't sell that crane,
15  because I still want it.  Can you hold onto it
16  for me.  So I said I will do that for awhile
17  while we sorted this out.  I know at one time
18  after this happened I --
19     MR. POLICK:  By this you mean the fraudulent
20  wire transfer?
21     A.  Yes.  And then after the fraudulent
22  wire transfer I know I had made a comment to him
23  at one time that while I was out of the country,
24  my financial adviser where I keep all my money,

Page 36

1  in the stock markets and what have you, received
2  a phone call asking on Pat Runnion's behalf to
3  wire some money off for a condo that we were
4  looking to buy, which was never done and it was
5  a bogus e-mail.  I don't know if it was an
6  e-mail or a phone call.  No, I'm sure it was an
7  e-mail because he would have recognized my
8  voice.  So he received a bogus e-mail saying hi,
9  this is Pat Runnion, you know, send me 50 grand,
10  a certain amount of money, I don't remember what
11  the amount was from my account because we're
12  going to buy a condo down here in Mexico, which
13  he did not do.
14     Q.  Who's your financial advisor?
15     A.  Capstone Financial?
16     Q.  And who particularly at Capstone?
17     A.  At that time was a fellow by the name
18  of Keith Plyzinsky (phonetic) and I have no clue
19  how to spell it.  He's no longer with the
20  company, he went to a different financial
21  company.
22     Q.  When he was at the company was there a
23  specific office that he --
24     A.  They only have one office and that is

Page 37

1  in Lombard, I think.
2      Q.  Did you ever receive a copy of that
3  e-mail?
4      A.  I did not.
5      Q.  And why did you bring that up to
6  Darrell?
7      A.  Just to say hey, I feel bad, I've heard
8  of these things happening, something like that
9  similar happened to me.
10     Q.  Okay.  And your understanding of it is
11  someone sent an e-mail to Keith claiming to be
12  you, but it wasn't you?
13     A.  That is correct.
14     Q.  Do you have any knowledge from what
15  e-mail account it was sent?
16     A.  I have no clue.
17     Q.  Did you ever communicate with Keith by
18  e-mail?
19     A.  I'm sure I have.
20     Q.  Would you have done that from your
21  Runnion account or personal account?
22     A.  I don't recall.
23     Q.  And aside from the Capstone issue that
24  we've discussed have you ever had any -- do you

10 (Pages 34 - 37)

Page 38

1 have any knowledge of anyone attempting to
2 impersonate you or claim that they were acting
3 on your behalf?
4    A. Not that I'm aware of.
5    Q. Was the Keith -- was the Keith, I'll
6 call it the Keith spoofing, if that's fair,
7 you'll understand what I mean.
8    A. Yes.
9    Q. Was the Keith spoofing reported to any
10 authorities?
11    A. We made a report to the police in
12 Elmhurst.
13    Q. And the Elmhurst police because that's
14 where you were residing at the time?
15    A. That is correct.
16    Q. So let's go back to conversations with
17 Darrell, any other specifics from any
18 conversations with Darrell that you can recall?
19    A. No. In reference in here -- are you
20 specifically asking in reference to the wire
21 transfer?
22    Q. To the wire transfer. Not to the prior
23 negotiations or something to that effect?
24    A. No is my answer then.

Page 39

1    Q. Nothing else. Okay.
2        (Whereupon, Deposition Exhibit
3        No. 14 was marked for
4        identification.)
5 BY MR. HAEBERLE:
6    Q. Showing you what's been marked as
7 Exhibit 14. Do you recognize this document?
8    A. I do.
9    Q. Is that your handwriting on the first
10 page?
11    A. It is.
12    Q. Do you recall why you were sending
13 this?
14    A. 5-19, this would have been, I believe,
15 in reference to Darrell asking questions about
16 wiring instructions and/or invoice. So I would
17 have sent this off to him showing that this is
18 what we sent to him without any information for
19 wiring instructions, according to what I
20 handwrote in this.
21        (Whereupon, Deposition Exhibit
22        No. 15 was marked for
23        identification.)
24 BY MR. HAEBERLE:

Page 40

1    Q. Showing you what was marked as Exhibit
2 15. Do you recognize this e-mail chain?
3    A. I remember seeing this from Mike
4 Prochot. I don't recall sending this off to
5 Darrell, unless he asked for it.
6    Q. Let's talk about your recollection as
7 to receiving it from Mike Prochot. Did you have
8 a conversation with Mike about it?
9    A. This would have been talking about wire
10 fraud, that's what were talking about.
11    Q. And any reason you were talking about
12 wire fraud other than --
13    A. Landale Sign?
14    Q. Yes, other than Landale Signs?
15    A. No.
16    Q. Specifically was the purpose -- what
17 was the purpose of him sending you this, to the
18 best of your knowledge?
19    A. Background information on wire fraud.
20    Q. Does the excerpted paragraph that he
21 included in his e-mail to you mean anything to
22 you?
23    A. No, it looks like something he would
24 have copied and pasted from something that he

Page 41

1 read and passed along to me the information that
2 he had here.
3    Q. And you read this, did you see this as
4 general background or anything specific?
5    A. General background, just understanding
6 a little bit clearer how wire fraud happens.
7    Q. Do you recall having a conversation
8 with either Mike or Darrell about this article?
9    A. I don't recall a conversation about it,
10 no.
11    Q. I want to switch gears briefly here.
12 Actually, let's mark this first.
13        (Whereupon, Deposition Exhibit
14        No. 16 was marked for
15        identification.)
16 BY MR. HAEBERLE:
17    Q. Let me know when you've reviewed it?
18    A. Okay. I've looked at it.
19    Q. Do you recall receiving this fax from
20 Darrell?
21    A. I do not recall it specifically, no.
22    Q. The number on top on the first page is
23 (708) 447-3730 is Runnion's fax number?
24    A. Yes.

11 (Pages 38 - 41)

1   Q.   And looking at the second page.
2   MR. POLICK:   If we're pointing out the one
3 with the cupnit (phonetic) right, you've got
4 that as well.  I don't know if we cleared that
5 up for the record, but a cupnit is actually
6 running equipment commonly spelled without an I
7 in it and it was used by the cup (phonetic).
8   A.   Correct.  So this was not sent by my
9 employee.
10 BY MR. HAEBERLE:
11  Q.   Correct.  Did you ever conduct any
12 investigation into who was sending e-mails on
13 behalf of incupment (Phonetic)?
14  A.   I do not know of any investigation
15 being done on Runnion Equipment.
16  Q.   The -- on page 2 is that in fact
17 Runnion's logo subject to the corner appearing
18 to be folded over?
19  A.   That looks like a Runnion logo,
20 correct.
21  MR. POLICK:   A Runnion what?
22  A.   A Runnion logo.
23 BY MR. HAEBERLE:
24  Q.   Do you recall having a conversation

1 with Darrell.  I apologize if I asked you this
2 already, about this fax?
3   A.   I don't recall a conversation with
4 Darrel about this fax.
5   Q.   Okay.  You can put that one away then.
6       How long have you been --
7   A.   Sorry.
8   Q.   No problem.  How long have you been in
9 the equipment sales industry?
10  A.   The business was started in 1975.  I've
11 been working at Runnion since.
12  Q.   So for your entire adult and some of
13 your not adult career?
14  A.   Correct.
15  Q.   Would you agree that when you're
16 entering into a sale of equipment you have a
17 duty to work in good faith with a counterparty?
18  A.   Good faith in reference to --
19  Q.   The transaction itself?
20  A.   All of my -- the good faith, I'm not
21 quite sure what you're asking for there.  So, I
22 mean yes, I'm not out running around telling
23 people that I'm trying to sell a crane to X, Y,
24 Z company, that is confidential, between myself

1 and X, Y, Z.  There are many reasons for that
2 confidentiality.  I don't want anybody out there
3 trying to sell the same crane to my customers.
4 So I keep that quiet.
5   Q.   So you'd agree that in the equipment
6 sales industry there is a custom and practice of
7 maintaining the confidentiality of the
8 negotiations of the equipment sale, correct?
9   A.   For anybody who's not involved with it,
10 correct.
11  Q.   Correct.  For anyone who's not involved
12 with a specific transaction, correct?
13  A.   Correct.
14  Q.   Would you agree or disagree with the
15 statement that when -- let me backup, because I
16 think we're kind of talking crossways on
17 different questions.  Just so I'm understanding
18 this.  Strike that.
19      I want to jump to my good faith
20 question, because I'm not sure you understood
21 it.
22  MR. POLICK:   Yeah, what do you mean by good
23 faith and the context of it, the crane industry
24 especially?

1
2 BY MR. HAEBERLE:
3   Q.   I'll ask a question, if you don't
4 understand it, let me know.  Do you -- do you
5 have an understanding or is it your belief that
6 when you're selling equipment to someone you
7 should be doing so in good faith?
8   A.   Yes.  Good faith is, I guess is a broad
9 term.  It is a little challenging to understand
10 -- my reputation is very much in the industry,
11 so, I mean, I am truthful in my word, I do what
12 I say I'm going to do.  I assume that all
13 encompasses good faith, so then if that's what
14 you're saying, then yes, I'm doing those things
15 to protect my name, to protect my customers
16 name, so it is -- yes, if that's what you're
17 asking about is in good faith.
18  MR. POLICK:   That's a good definition.
19 BY MR. HAEBERLE:
20  Q.   And under that definition you in fact
21 believe that your counterparty in the
22 transaction, the counterparty to Runnion has an
23 opportunity to work in good faith with you as
24 well, correct?

12 (Pages 42 - 45)

Page 46

1    A.   I assume that he would be doing that.
2 There are customers that probably don't, but
3 that's their prerogative, not mine.
4    Q.   And when you're selling equipment,
5 people are buying equipment that there is at
6 least a custom that your customer is not going
7 to disclose confidential information concerning
8 the transaction, correct?
9    A.   I don't know that that's true.
10    Q.   So it's your expectation that the
11 seller is not going to disclose confidential
12 information, but not the buyer, is that correct?
13    MR. POLICK:   Well, define confidential
14 information?
15 BY MR. HAEBERLE:
16    Q.   Do you understand my question?
17    A.   I guess I want to know what you mean by
18 confidential information?  I know what I would
19 consider that.
20    Q.   What would you consider confidential
21 information?
22    A.   Pricing, pricing would probably be the
23 primary thing I would be most concerned with
24 when my customers are out there, that they're

Page 47

1 not out there sharing pricing while we're
2 negotiating.
3    Q.   And you also wouldn't want the -- you
4 believe there is an obligation, for example, to
5 keep the parties banking details confidential as
6 between the two parties engaging in the
7 transaction, correct?
8    A.   Certainly.
9    Q.   The details of the negotiations you
10 expect that the seller of equipment in the
11 equipment sales industry would not be divulging
12 the details of the negotiation to third parties
13 of the transaction, correct?
14    A.   That's correct.
15    Q.   Do you have an estimate has to how many
16 transactions internationally -- let me be more
17 specific.  How many equipment sales Runnion has
18 done internationally over the past five years?
19    A.   If I would guess that's probably from a
20 title piece of equipment, which is different
21 than parts, is that what you're asking?
22    Q.   Yes.
23    A.   Not including parts.  Okay.  I would
24 guess that we probably do one per year.

Page 48

1    Q.   Have you done any to Canada that you
2 can recall other than Landale?
3    A.   Yes, I know I've done one to Cropac,
4 C-r-o-p-a-c Equipment Company.  They're another
5 equipment dealer up in Canada.
6    Q.   When was that approximately?
7    A.   Five years ago.
8    Q.   So I'm going to use the term truck as
9 the piece of equipment that you were going to
10 sell to Landale.  Do you understand what I'm
11 talking --
12    MR. POLICK:   It's a truck mounted crane.
13    MR. HAEBERLE:   That's fine.
14 BY MR. HAEBERLE:
15    Q.   I'm going to call it a truck, do you
16 understand what I mean when I call it a truck?
17    A.   I'm good with that.
18    MR. POLICK:   It's like a snap ring.
19 BY MR. HAEBERLE:
20    Q.   Do you still -- does Runnion still own
21 the truck that was --
22    MR. POLICK:   Objection, it's a truck mounted
23 crane.
24    A.   The truck mounted crane we do no longer

Page 49

1 own that.
2 BY MR. HAEBERLE:
3    Q.   When did you sell it?
4    A.   I don't know the answer to that.
5 Within a year after the transaction that we had
6 fall apart with Landale.
7    Q.   Did you sell it for more or less than
8 you sold it to Landale?
9    A.   I don't know the answer to that.
10    Q.   Do you have records of that?
11    A.   Yes.
12    Q.   Do you have cyber liability insurance
13 for Runnion?
14    A.   I don't know that.
15    Q.   Who would?
16    A.   Mike Prochot.
17    Q.   Do you know whether any insurance claim
18 has been submitted to cover the transaction with
19 Landale?
20    A.   We haven't lost any money, so I would
21 say no.
22    Q.   Do you have an understanding that
23 sometimes insurance will also cover cost of
24 defense?

13 (Pages 46 - 49)

Page 50

1    A.  I'm not aware of that.
2    Q.  Have you taken any steps personally to
3  see whether the transaction was with Landale and
4  the attorney fees you presumably are incurring
5  are covered by insurance?
6    A.  I have not.
7          (Whereupon, Deposition Exhibit
8          No. 17 was marked for
9          identification.)
10 BY MR. HAEBERLE:
11   Q.  I'm showing you a group of documents
12 that your attorney produced on your behalf in
13 this case.  Produced the entire document as -- I
14 believe your attorney produced to us as one PDF,
15 so that's the way --
16   MR. POLICK:  It's not one document, it's
17 several documents.
18 BY MR. HAEBERLE:
19   Q.  I'm going to direct your attention to
20 the signature on page 1, is that your signature?
21   A.  It is.
22   Q.  The signature on page 2 is your
23 signature, correct?
24   A.  It is.

Page 51

1    Q.  And the signature on page 3 is your
2  signature as well, correct?
3    A.  It is.
4    Q.  And the sales order signature page, do
5  you consider that part of the equipment sale
6  contract?
7    A.  I do.
8    Q.  And then do you also consider the
9  invoice as part of the equipment sales contract?
10   A.  No.
11   Q.  So if you're telling me what is the
12 equipment sales contract, is it the sales order
13 signature page that's on page 3 of this exhibit
14 that has a lot of small words?
15   A.  Correct.
16   Q.  And is there anything else that you
17 consider part of the contract?
18   A.  The description would have been page 1
19 of page 2.  So the description of the equipment.
20 So if this were to be in a hard form that I
21 wasn't faxing, page 3 would have been the
22 paperwork on the back side of it, because we
23 don't have -- we don't scan from the back side
24 of it, we just copy this page and say these are

Page 52

1  the terms and conditions, please sign that as
2  well.
3    Q.  Understood.  So page 3 is actually on
4  the back of page 2?
5    A.  If you read at the very bottom here, it
6  says terms and conditions are on the back side.
7    Q.  Yes, I see that.  So would that also be
8  the back side of page 1 too --
9    A.  That is correct.
10   Q.  So it's really page 3 is on the back of
11 both page 1 and page 2, correct?
12   A.  That is correct.
13         (Whereupon, Deposition Exhibit
14         No. 18 was marked for
15         identification.)
16 BY MR. HAEBERLE:
17   Q.  Showing you what has been marked as
18 Exhibit 18.  I produced it in this way because I
19 got it as a PDF.  Feel free to look at it as
20 much as you want.  But I'm really only
21 interested in the last page here.  Is this your
22 handwriting?
23   A.  It is not.
24   Q.  Do you know whose handwriting it is?

Page 53

1    A.  I do not.
2    Q.  Do you know how this -- where this
3  document was stored?
4        Let me strike that, that's a confusing
5  question.  So I'll represent to you that your
6  attorney turned over this set of documents among
7  other documents.  Looking at this series of
8  documents, which were together in production, do
9  you know where -- whether this handwritten sheet
10 is in fact --
11   A.  The last page.
12   Q.  Yes.  Is that in the file relating to
13 the truck?
14   A.  I don't know the answer to that.
15   Q.  Okay.  This type of handwritten sheet
16 is this something that's often done in the
17 context of transactions at Runnion?
18   A.  There are handwritten notes that go
19 back and forth on sales sometimes, so I don't
20 know how often.  I don't know how to say often.
21   Q.  Sure.  When do handwritten notes go
22 back and forth?
23   A.  When somebody handwrites a note.
24   Q.  So a sales person might handwrite a

14 (Pages 50 - 53)

Page 54

1  note to you or who might handwrite a note to
2  who?
3     A.  Anybody that would be involved, this
4  may have -- only based on this if there's an
5  annual inspection report, so whoever did this
6  may have put it on the back there, it all
7  depends upon who's involved with what portion of
8  the transaction, I guess.  So if we're talking
9  about the painting contractor, who might have
10  painted this, he might have given me a
11  handwritten note.  If I was talking with the guy
12  who was the truck mechanic, he might have done
13  something like this.  And that would have just
14  gotten passed along so that whatever information
15  was with that would have gone with it.  So I
16  don't know -- I don't know who this would have
17  been and I don't know how often it happens, I
18  guess to answer your question.
19     Q.  Okay.  So this type of note is not
20  one that --
21     A.  It's not unusual, but I wouldn't say
22  every deal has a handwritten note that is in the
23  file.
24     Q.  And do you -- would you be able to

Page 55

1  recognize Brad's handwriting?
2     A.  I would.
3     Q.  And is this Brad's handwriting?
4     A.  I don't believe that is Brad's
5  handwriting, no.
6     Q.  Would you be able to recognize Joe
7  Cole's handwriting?
8     A.  I would not.
9     Q.  Okay.  You can put that one away.
10       Do you have any knowledge of Runnion
11  Equipment electronic payment practices?
12     A.  I know of the fact that we take them
13  and I know of the fact that we have instructions
14  that we send off to our customers.  So in that
15  regard, yes, I do.
16     Q.  And so other than that, is that the
17  extent of your knowledge of that subject?
18     A.  I believe so.
19     Q.  You heard Janice testify earlier about
20  a change in the wire instructions that took
21  place following Landale?
22     A.  Correct.
23     Q.  Regarding -- and just so we're clear
24  for the record, since this is a different

Page 56

1  deposition, the change was that now there's an
2  instruction to -- for the customer to call and
3  orally confirm the wire instructions, is that
4  correct?
5     A.  That is how we are doing it now,
6  correct.
7     MR. POLICK:  I'll just object to post
8  remedial measures, but you can answer subject to
9  the continuing objection.
10     A.  We are, as with any of our procedures
11  we're constantly trying to find what the best
12  procedures would be, if anybody has come along
13  that shows something that might be a good idea,
14  we will incorporate that into some of our terms
15  or some of our operational procedures.  So if we
16  see something that comes along that's more --
17  that has more benefit from a protection
18  standpoint on the wire instructions, then we
19  would change it at the time to make it better--
20     Q.  And what --
21     A.  Fail-safe.
22     Q.  Sorry, I didn't mean to interrupt you.
23  What, if anything, was the better idea that
24  caused you to incorporate this new provision?

Page 57

1     A.  We had one of our vendors give us
2  wiring instructions and there was something that
3  was written on there saying call this number to
4  confirm wiring instructions due to wire fraud
5  and what have you.  This seems to be going on in
6  the industry quite a bit as far as the
7  cautionary tales, so I suggested that to Mike
8  Prochot and I said that this might be something
9  that we should think about, changing in our
10  procedures and that's what we did.
11     Q.  Do you have any understanding as to --
12  or do you have any knowledge about the use of
13  the I Power server?
14     A.  I do not.
15     Q.  Were you involved in any decision to
16  use the I Power server?
17     A.  No.
18     Q.  Before sitting through Mike Spaniel's
19  deposition, did you know you were using that
20  power server?
21     A.  I heard the name I Power before, yes.
22     Q.  Aside from the name and what knowledge,
23  if any, do you have as to what I Power does and
24  what service it provides?

15 (Pages 54 - 57)

Page 58

1    A.  I have none.
2         (Whereupon, Deposition Exhibit
3         No. 19 was marked for
4         identification.)
5 BY MR. HAEBERLE:
6    Q.  Do you recognize this document?
7    A.  I believe I've seen this before.
8    Q.  Take as much time as you need to review
9 it, but I'm interested in the last page.
10 I want to go back to the condo in
11 Mexico spoofing that we talked about earlier.
12 Do you understand what I'm talking about when I
13 say condo Mexico spoofing?
14   A.  I do.
15   Q.  That your financial advisor saying,
16 hey, got a call, wanted me to transfer money
17 correct?
18   A.  Correct.
19   Q.  Do you know what year that was?
20   A.  I don't.
21   Q.  Do you have any -- do you have a copy
22 of the police report to the Elmhurst Police
23 Department?
24   A.  I doubt it.

Page 59

1    Q.  And I believe I already asked you, just
2 to close the loop, do you have any e-mails or
3 communications or documents involving that
4 spoofing attempt?
5    A.  I do not.
6    Q.  I want to direct your attention to
7 Exhibit Number 4.  On your personal -- I'm
8 asking as to your personal e-mail or personal
9 communications, rather than Runnion's Corporate
10 communications do you have any e-mails,
11 communications, text messages or any other type
12 of communications whatsoever from January 1st
13 2012 to the present relating to the topics
14 listed in A through G?
15   MR. POLICK:  I would just pose an objection,
16 it says any communication as to any
17 attorney-client privileged communications
18 obviously.  And also to what's previously been
19 disclosed in discovery.  Subject to that, you
20 can answer.
21 BY MR. HAEBERLE:
22   Q.  I do want to clarify.  I do not want to
23 know if there are any attorney-client
24 communications that are personal attorney-client

Page 60

1 communications as opposed to any of your Landale
2 e-mail account.  I don't want to know the
3 content of those.
4    A.  My personal account you're asking?
5    Q.  Correct?
6    A.  Okay.  So I can say no for sure to
7 Landale.  I can say no to B.  And I can say
8 cyber security, I would say no.  I don't know
9 what interface with Patrick Runnion's e-mails, I
10 don't know what that means --
11   MR. POLICK:  Interference.
12   A.  Interference, I'm sorry.  I don't know
13 of any -- I would say no to that.
14      I would sale no to that.  I would say
15 no to E.  I would say no to all of them.
16 BY MR. HAEBERLE:
17   Q.  Okay.  You can put that one away and
18 I'll be showing you what I have previously
19 marked as Exhibit 4.
20         (Whereupon, Deposition Exhibit
21         No. 4 was previously marked for
22         identification.)
23 BY MR. HAEBERLE:
24   Q.  I think we've seen this enough times.

Page 61

1 So I am now going to close Patrick Runnion's
2 personal dep and open the 30(b)(6) dep.
3    A.  Can I just ask a question?
4    Q.  Sure.
5    A.  I don't understand that, why is this a
6 different deposition than all the other one's,
7 just so I'm clear?
8    Q.  I'm happy to explain that.  This a --
9 you know, I've noticed up a deposition of
10 Runnion Equipment Company as a company, rather
11 than you as individuals in addition to your
12 personal deposition?
13   A.  Okay.
14   Q.  So formally what I'm doing now is this
15 is a deposition of the company, Runnion
16 Equipment Company, through its designated or
17 representative on the list of topics.
18   A.  So this is just saying in another form
19 or fashion is everything you just said before is
20 true, you're going to attach it to this and
21 we're good to go.
22   Q.  We'll see.  And Steve can explain more
23 on the procedure to you to the extent you have
24 an interest in that.

16 (Pages 58 - 61)

Page 62

1    Do you understand that you have been
2  designated as a representative of Runnion
3  Equipment Company with Runnion Equipment
4  Company's knowledge of the topic listed in topic
5  4, which is any fake, spoof or imposter e-mail
6  sent or received by any Runnion Equipment
7  Company address or any address purporting to be
8  Runnion Equipment Company?
9    A.  Yes.
10   Q.  Do you have any knowledge of any fake,
11 spoofed, or imposter e-mails sent or received by
12 any Runnion Equipment Company address or any
13 address purporting to by Runnion Equipment
14 Company, other than the e-mails sent in the
15 context of the Landale transaction?
16   A.  I do not.
17   MR. HAEBERLE:  Okay.  I have nothing further.
18   MR. POLICK:  I've got some questions, Pat.
19         EXAMINATION
20      BY MR. POLICK:
21   Q.  You mentioned some time ago, to
22 your knowledge, you know, you never did any kind
23 of investigation into the possible source of
24 this fraudulent person at Runnion incupnet

Page 63

1  (Phonetic) Company?
2    A.  Correct.
3    Q.  But you have had the opportunity of
4  reading Darrell Brown's deposition transcript?
5    A.  I have.
6    Q.  You're also familiar with Neal
7  Swindelhurst's (Phonetic) testimony?
8    A.  Yes.
9    Q.  And from your review of that you
10 understand that Swindelhurst did an
11 investigation into the source or attempted to
12 find the course of the incupnet?  (Phonetic)
13   A.  Correct.
14   Q.  And could not?
15   A.  Correct.
16   Q.  So you're aware of an investigation
17 being done --
18   A.  Right.
19   Q.  I know Counsel asked you some questions
20 about good faith and you gave a pretty good
21 definition there in terms of honesty, dealing in
22 the industry that you've been in, actually since
23 you were a kid.  But in terms of the other topic
24 was in reference to confidential information.

Page 64

1  And I think one of the things you mentioned that
2  you would prefer to keep a transaction
3  confidential because you have competitors in the
4  industry?
5    A.  Correct.
6    Q.  You don't want somebody to come in and
7  undersell you?
8    A.  That's correct.
9    Q.  One way or the other.  I assume you
10 also have confidential customer base?
11   A.  Correct.
12   Q.  Accounts?
13   A.  Yes.
14   Q.  You call on yourself to your service
15 cranes.  You not only sell them, you service --
16   A.  Rent them.
17   Q.  Rent them and you sell parts?
18   A.  That is correct.
19   Q.  So that's a kind of protected
20 information that you have in the confines of
21 your company?
22   A.  Correct.
23   MR. HAEBERLE:  Objection.
24   MR. POLICK:  As to what?

Page 65

1    MR. HAEBERLE:  As to form and to the extent
2  it contradicts prior testimony.
3    MR. POLICK:  Overruled.
4  BY MR. POLICK:
5    Q.  But anyway that's part of your
6  protected information that you keep in house
7  typically?
8    A.  That Runnion keeps, correct.
9    Q.  Okay.  Now, in terms of other
10 information as to Runnion Equipment Company
11 you're certainly listed in the phone book?
12   A.  To what there is anymore, yes.
13   Q.  Yeah, what's left of hard copy.
14      You're listed online?
15   A.  Correct.
16   Q.  You got a website?
17   A.  Yes.
18   Q.  You've got signs?
19   A.  Yes.
20   Q.  I assume you're also mentioned in trade
21 journals?
22   A.  Yes, we are.
23   Q.  I'm sure many brokers in the industry
24 are familiar with you?

17 (Pages 62 - 65)

Page 66

```
1    A.   Correct.
2    Q.   I am also certain that many people in
3 the crane industry are familiar with your
4 company?
5    A.   They are.
6    Q.   And many people in the truck mounted
7 crane industry are familiar with your company?
8    A.   They are.
9    Q.   So that's the kind of information
10 that's always out there?
11   A.   That is correct.
12   Q.   Always accessible to anybody who wants
13 to take a look in the phone book or drive by
14 your facility or go online?
15   A.   Correct.
16   Q.   And I assume the same is probably true
17 with reference to Landale in terms of their
18 website, their contact information?
19   A.   Yes.
20   Q.   And that would extend to even like your
21 e-mail address, your street address, things of
22 that nature?
23   A.   Correct.
24   Q.   So those are not the kinds things that
```

Page 67

```
1 you would term confidential?
2    A.   Correct.
3    Q.   The other thing that you said that you
4 would like to keep confidential is your pricing?
5    A.   Correct.
6    Q.   Again, just because that's part of your
7 property interest that you've developed over the
8 years?
9    A.   Correct.  And just to add to that, we
10 do have some published prices out on the
11 internet for some pieces of equipment.
12   Q.   Okay.
13   A.   But that too when we start getting into
14 negotiation with somebody that's what I would
15 consider confidential.
16   Q.   Sure.  Like purchasing any other kind
17 of equipment?
18   A.   Correct.
19   Q.   If someone shops around they might use
20 your price to their advantage against somebody
21 else?
22   A.   Correct.
23   Q.   Or vice versa?
24   A.   Correct.
```

Page 68

```
1    Q.   In your conversations and negotiations
2 with Darrell Brown did you ever make any kind of
3 commitment to keep information confidential?
4    A.   No.
5    Q.   You had only one written contract with
6 Darrell Brown and Landale?
7    A.   Correct.
8    Q.   And on that point, I know it's been
9 marked a few times as an Exhibit.  I guess
10 Exhibit 17 and page 3 is where the terms and
11 conditions are identified, which again, Counsel
12 already confirmed that is actually the back of
13 pages 1 and 2?
14   A.   Correct.
15   Q.   And this is actually the -- in essence
16 the offer and acceptance for the transaction?
17   A.   Correct.
18   Q.   And you signed it on behalf of Runnion
19 Equipment Company on what date?
20   A.   April 11th, 2016.
21   Q.   And the signature above your line
22 appears to be the April 12th?
23   A.   I'm looking at it, the 12th or 18th.
24   Q.   Okay.  Again, of 2016?
```

Page 69

```
1    A.   Correct.
2    Q.   And that comes through or from Darrell
3 Brown on behalf of Landale?
4    A.   Correct.  So the date up at the top was
5 4-11, that's when I signed it and sent it off,
6 it looks like the 18th would make sense because
7 we're invoicing them on 4-18.
8    Q.   Okay.  Now, in terms of documentation
9 that was received previously.  As a -- well,
10 let's put it all together.  I guess we'll mark
11 it as a separate exhibit, why don't we do that?
12        (Whereupon, Deposition Exhibit
13         No. 20 was marked for
14         identification.)
15 BY MR. POLICK:
16   Q.   Now, with reference to Exhibit 20.  The
17 cover page purports to come from Darrell Brown,
18 but again he's using this gmail address.  Do you
19 agree?
20   A.   Correct.
21   Q.   And this is dated April 13th, 2016 at
22 1:27 PM?
23   A.   Correct.
24   Q.   And the first thing after that, or the
```

18 (Pages 66 - 69)

Page 70

1 next page after that is actually a fax cover
2 sheet that's -- but it's directed to Pat Runnion
3 at Runnion Equipment?
4    A.  Correct.
5    Q.  As opposed to writing in a -- well, it
6 writes in a fax number further down.  And that
7 in turn is actually -- as we get down to, again,
8 the signed signature page with your signature
9 and Darrell Brown's signature?
10    A.  Correct.
11    Q.  This was transmitted back to Runnion
12 Equipment Company on or about April 13th of
13 2016?
14    A.  Okay.
15    Q.  Now, that's what the first sheet says
16 and the second sheet, which is a fax cover page
17 also has the same date?
18    A.  Okay.  I see that.
19    Q.  The confirmation gmail was used to send
20 back the signed contract, signed by Darrell?
21    A.  Correct.
22         (Whereupon, Deposition Exhibit
23          No. 21 was marked for
24          identification.)

Page 71

1
2 BY MR. POLICK:
3    Q.  Now, Exhibit 21, this again is an
4 e-mail.  And what's the date of this e-mail?
5    A.  April 22nd.
6    Q.  And it purports to be from Darrell
7 Brown of Landale?
8    A.  At gmail.
9    Q.  And he's again using a gmail address to
10 send that to you?
11    A.  Correct.
12    Q.  Some other details they need for the
13 NAFTA, that kind of stuff.
14       Now, that e-mail would appear to fit
15 between the two exhibits that Counsel showed
16 you, Exhibit 12 and Exhibit 13, would you agree?
17    A.  Fit between as far as timing goes?
18    Q.  Yes, date wise?
19    A.  Yes, that would be between the two.
20    Q.  Okay.  So Exhibit 12 was sent on April
21 20th from LandaleSigns.com?
22    A.  Correct.
23    Q.  And then the one you're holding,
24 Exhibit 21 comes from Darrell at gmail?

Page 72

1    A.  Correct.
2    Q.  And then Exhibit 13 is also gmail?
3    A.  Correct.
4    Q.  So Counsel was saying he wanted to know
5 when the change occurred, I believe you're
6 holding it in your hand as Exhibit 21?
7    A.  Okay.  I agree.
8    Q.  Is that correct?
9    A.  Yes.
10    Q.  I know Counsel was asking you
11 questions, now that I have the Exhibits out of
12 order, I'll put them back in order.  But what
13 happened to this truck mounted crane and you
14 referenced the fact that Darrell initially said
15 hold on to it, I still think I want to buy it?
16    A.  Correct.
17    Q.  And in fact did you hold that crane for
18 Mr. Brown and Landale for quite some time?
19    A.  It was probably within a year's period
20 of time before we released it.
21    Q.  And repeatedly, to your knowledge -- so
22 the record is clear, I repeatedly contacted the
23 Plaintiff's Counsel who had also requested that
24 I hold it, inquiring whether Landale was ever

Page 73

1 going to go forward with the transaction.  And
2 we held it for quite a period of time without
3 getting any kind of an affirmative response.
4 Are you aware of that?
5    A.  Yes.
6    Q.  So at some point we had to try to sell
7 the crane to mitigate our damages.  Because
8 we're not making money on the crane when it's
9 sitting on the lot?
10    A.  Correct.
11    Q.  I'm sorry, truck mounted crane.
12    A.  Truck mounted crane.
13    Q.  So eventually on my recommendation in
14 order to mitigate your damages and in light of
15 the fact that Counsel failed to respond to
16 numerous requests, you did your best to sell the
17 truck mounted crane?
18    A.  That's right.
19       MR. HAEBERLE:  Objection to the extent you're
20 inviting attorney-client privilege information.
21 I request that cause a waiver of privilege as to
22 communications surrounding that to the extent
23 you're waiving it there.  So I ask that you
24 withdraw the question or agree that privilege is

19 (Pages 70 - 73)

Page 74

1  waived as to that --
2      MR. POLICK:  Privilege isn't waived.
3  BY MR. POLICK:
4      Q.  In any event, if it satisfies Counsel.
5  At some point you ended up selling the truck
6  mounted crane?
7      A.  That is correct.
8      Q.  You're not exactly sure when?
9      A.  That's right.
10      Q.  But you held it for quite a period of
11  time at the request of Landale?
12      A.  Correct.
13      Q.  And in terms of your conversation that
14  you had with Darrell after you learned of the
15  wire transfer fraud and specifically with regard
16  to what happened with your financial
17  consultant,, that would have been several days
18  after you learned of the wire transfer fraud?
19      A.  Correct.
20      Q.  So you yourself have never been a
21  victim of the similar thing that happened to
22  Landale?
23      A.  I never lost any money because of wire
24  fraud, correct.

Page 75

1      Q.  And again, it was directed to whatever
2  your financial man's last name is, I forgot?
3      A.  Correct.
4      Q.  Soon after this happened did you
5  have occasion to report this to the Federal
6  Bureau of Investigation?
7      A.  We did.
8      Q.  The conversation -- well, I think the
9  record will bear out that the wire transfer to
10  Virginia, apparently to a Mr. Gensemer
11  (Phonetic) occurred on Friday the 13th of May,
12  2016?
13      A.  Correct.
14      Q.  And I think your conversations and
15  communications back and forth with Darrell Brown
16  were then the following Wednesday, which I
17  believe would be the 18th of May?
18      A.  Correct.
19      Q.  Does that time line sound about right
20  to you?
21      A.  Sounds about right.
22      Q.  Did you have any further communication
23  after May 18th?
24      A.  I don't recall any.

Page 76

1      Q.  At the time you received these e-mails
2  from Darrell Brown at his gmail address did you
3  have any reason to believe it was not Darrell
4  Brown?
5      A.  No.
6      Q.  In fact, those communications that he
7  sent you addressed details with reference to the
8  transaction in question?
9      A.  That is correct.
10      Q.  Because there was in fact a period of
11  negotiation going on where you talked about
12  pricing, you talked about service to the unit,
13  inspection of the unit, things of that nature?
14      A.  Correct.
15      Q.  So your first notice that the gmail
16  account was not in fact Darrell Brown's occurred
17  only after you learned of a fraudulent wire
18  transfer to Virginia?
19      A.  Correct.
20      MR. POLICK:  I don't have any further
21  questions.
22      MR. HAEBERLE:  All right.  I have nothing
23  further.
24      MR. POLICK:  We'll reserve signature.

Page 77

1      MR. HAEBERLE:  I'll order e-tran of Spaniel,
2  Messuck and Pat.
3      MR. POLICK:  You'll attach all of the
4  exhibits?
5      MR. HAEBERLE:  Can you just attach all of the
6  exhibits to all three?
7      COURT REPORTER:  Of course.
8      MR. POLICK:  And I'll take a copy.
9          (Deposition concluded at 4:34)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

20 (Pages 74 - 77)

Page 78

1
STATE OF ILLINOIS      )
2                       )  SS:
3 COUNTY OF COOK        )
4     I, Jacqueline Shenberger, a Certified
5 Shorthand Reporter within and for the County of
6 Cook and State of Illinois, do hereby certify
7 that heretofore, to-wit, on August 28, 2018,
8 personally appeared before me, at 1 North
9 Franklin, Chicago, Illinois, PATRICK RUNNION, in
10 a cause now pending and undetermined in the
11 Circuit Court of Cook County, Illinois, wherein
12 LANDALE SIGNS and NEON, LTD. is the Plaintiff,
13 and RUNNION EQUIPMENT CO., and JOHN DOE are the
14 Defendants.
15     I further certify that the said witness was
16 first duly sworn to testify the truth, the whole
17 truth and nothing but the truth in the cause
18 aforesaid; that the testimony then given by said
19 witness was reported stenographically by me in
20 the presence of the said witness, and afterwards
21 reduced to typewriting by Computer-Aided
22 Transcription, and the foregoing is a true and
23 correct transcript of the testimony so given by
24 said witness as aforesaid.

Page 79

1     I further certify that the signature to the
2 foregoing deposition was reserved by counsel for
3 the respective parties.
4     I further certify that the taking of this
5 deposition was pursuant to Notice, and that
6 there were present at the deposition the
7 attorneys hereinbefore mentioned.
8     I further certify that I am not counsel for
9 nor in any way related to the parties to this
10 suit, nor am I in any way interested in the
11 outcome thereof.
12     IN TESTIMONY WHEREOF:  I have hereunto set my
13 hand and affixed my notarial seal this 21st of
14 September, 2018.
15
16
17
18
19
20     Certified Shorthand Reporter
21
22
23
24

Page 80

1           Veritext Legal Solutions
                1100 Superior Ave
2               Suite 1820
                Cleveland, Ohio 44114
3               Phone: 216-523-1313
4  September 25, 2018
5
6  To: Steven P. Polick
7  Case Name: Landale Signs And Neon, Ltd. v. Runnion Equipment Co., et
   al.
8  Veritext Reference Number: 2992345
9  Witness: Patrick Runnion      Deposition Date:  8/28/2018
10
   Dear Sir/Madam:
11
12 Enclosed please find a deposition transcript.  Please have the witness
13 review the transcript and note any changes or corrections on the
14 included errata sheet, indicating the page, line number, change, and
15 the reason for the change.  Have the witness' signature notarized and
16 forward the completed page(s) back to us at the Production address
   shown
17
   above, or email to production-midwest@veritext.com.
18
19 If the errata is not returned within thirty days of your receipt of
20 this letter, the reading and signing will be deemed waived.
21
   Sincerely,
22
   Production Department
23
24 NO NOTARY REQUIRED IN CA

Page 81

1        DEPOSITION REVIEW
         CERTIFICATION OF WITNESS
2
   ASSIGNMENT REFERENCE NO: 2992345
3  CASE NAME: Landale Signs And Neon v. Runnion Equipment Co.
   DATE OF DEPOSITION: 8/28/2018
4  WITNESS' NAME: Patrick Runnion
5      In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7      I have made no changes to the testimony
   as transcribed by the court reporter.
8
9  Date          Patrick Runnion
10     Sworn to and subscribed before me,
   Notary Public in and for the State and County,
11 the referenced witness did personally appear
   and acknowledge that:
12
       They have read the transcript;
13     They signed the foregoing Sworn
       Statement; and
14     Their execution of this Statement is of
       their free act and deed.
15
       I have affixed my name and official seal
16
   this _____ day of_____, 20___.
17
18     Notary Public
19
       Commission Expiration Date
20
21
22
23
24
25

21 (Pages 78 - 81)

Page 82

1          DEPOSITION REVIEW
           CERTIFICATION OF WITNESS
2
    ASSIGNMENT REFERENCE NO: 2992345
3   CASE NAME: Landale Signs And Neon v. Runnion Equipment Co.
    DATE OF DEPOSITION: 8/28/2018
4   WITNESS' NAME: Patrick Runnion
5       In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7       I have listed my changes on the attached
    Errata Sheet, listing page and line numbers as
8   well as the reason(s) for the change(s).
9       I request that these changes be entered
    as part of the record of my testimony.
10
        I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
    that both be appended to the transcript of my
12  testimony and be incorporated therein.
13  _____
    Date              Patrick Runnion
14
        Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
    the referenced witness did personally appear
16  and acknowledge that:
17      They have read the transcript;
        They have listed all of their corrections
18  in the appended Errata Sheet;
        They signed the foregoing Sworn
19  Statement; and
        Their execution of this Statement is of
20  their free act and deed.
21      I have affixed my name and official seal
22  this _____ day of_____, 20____ .
23  _____
        Notary Public
24
    _____
25      Commission Expiration Date

Page 83

1          ERRATA SHEET
           VERITEXT LEGAL SOLUTIONS MIDWEST
2          ASSIGNMENT NO: 8/28/2018
3   PAGE/LINE(S) /       CHANGE      /REASON
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19
    _____
20  Date              Patrick Runnion
21  SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22  DAY OF _____, 20_____ .
23  _____
        Notary Public
24
    _____
25      Commission Expiration Date

22 (Pages 82 - 83)

[& - agreement]                                                      Page 1

| & | | | |
|---|---|---|---|

**&**  4:10

**0**

**07619**  1:6
**084-001524**  1:24

**1**

**1**  22:11 50:20
 51:18 52:8,11
 68:13 78:8
**1-3**  3:5
**10**  2:14 16:9,12,13
 17:1 25:8,9
**11**  2:15 19:6,10
**1100**  80:1
**11th**  68:20
**12**  2:16 26:12
 27:14 71:16,20
**12377**  79:19
**12th**  68:22,23
**13**  2:17 27:11,14
 28:1 29:5 71:16
 72:2
**13th**  69:21 70:12
 75:11
**14**  2:18 39:3,7
**15**  2:19 15:1,2
 39:22 40:2
**150**  7:17
**155**  4:12
**16**  2:14,20 41:14
**17**  2:21 50:8 68:10
**18**  2:22 52:14,18
**1820**  80:2
**18th**  68:23 69:6
 75:17,23
**19**  2:15,23 58:3
**1975**  43:10
**1980**  9:19,22
**1999**  14:8

**1:16**  1:6
**1:27**  69:22

**2**

**2**  42:16 50:22
 51:19 52:4,11
 68:13
**20**  3:2 69:13,16
 81:16 82:22 83:22
**200**  4:4
**2010**  6:3,21
**2012**  59:13
**2016**  10:18 12:4
 13:7 16:18 21:12
 22:4,16,17 27:16
 68:20,24 69:21
 70:13 75:12
**2018**  1:18 78:7
 79:14 80:4
**2025**  4:5
**20th**  27:16 71:21
**21**  3:3 70:23 71:3
 71:24 72:6
**216-523-1313**  80:3
**21st**  79:13
**22nd**  71:5
**25**  80:4
**25th**  19:11
**26**  2:16
**27**  2:17
**28**  1:18 78:7
**2992345**  80:8 81:2
 82:2

**3**

**3**  51:1,13,21 52:3
 52:10 68:10
**30**  3:1 15:3 61:2
**312**  4:15
**39**  2:18,19
**3:00**  1:19 5:1

**4**

**4**  2:24 20:18 59:7
 60:19,21 62:5
**4-11**  69:5
**4-18**  69:7
**41**  2:20
**44114**  80:2
**447-3730**  41:23
**4:34**  77:9

**5**

**5**  2:4 20:23
**5-19**  39:14
**5-9**  3:5
**50**  2:21 36:9
**52**  2:22
**58**  2:23

**6**

**6**  3:1 61:2
**60**  2:24
**60126**  7:18
**60601**  4:14
**60606**  4:6
**62**  2:5
**69**  3:2

**7**

**70**  3:3
**700**  4:13
**708**  41:23
**729-5414**  4:15

**8**

**8/28/2018**  80:9
 81:3 82:3 83:2

**a**

**able**  54:24 55:6
**acceptance**  68:16
**access**  17:20 18:7
**accessible**  66:12
**accident**  6:5,21,22
 6:24

**account**  29:2,3,12
 29:20,23 30:3,3,20
 30:21 31:1,2,5
 32:23 34:2,5,12,12
 34:22 36:11 37:15
 37:21,21 60:2,4
 76:16
**accounts**  64:12
**accurately**  34:1
**acknowledge**
 81:11 82:16
**act**  81:14 82:20
**acting**  38:2
**acuffment**  33:19
**add**  67:9
**addition**  61:11
**address**  7:16
 20:13,16 21:4,13
 26:16,19 62:7,7,12
 62:13 66:21,21
 69:18 71:9 76:2
 80:16
**addressed**  76:7
**adopt**  13:23
**adult**  43:12,13
**advantage**  67:20
**advertising**  24:14
**adviser**  35:24
**advisor**  36:14
 58:15
**affirmative**  73:3
**affixed**  79:13
 81:15 82:21
**aforesaid**  78:18,24
**ago**  48:7 62:21
**agree**  27:15 28:1
 29:4 43:15 44:5
 44:14 69:19 71:16
 72:7 73:24
**agreement**  5:15

[aided - capacity]                                                                 Page 2

**aided** 78:21
**al** 80:7
**amount** 36:10,11
**annual** 54:5
**answer** 27:7 33:14
  38:24 49:4,9
  53:14 54:18 56:8
  59:20
**anybody** 34:16
  44:2,9 54:3 56:12
  66:12
**anymore** 65:12
**anyway** 65:5
**apart** 49:6
**apologize** 43:1
**apparently** 75:10
**appear** 71:14
  81:11 82:15
**appearances** 4:1
**appeared** 78:8
**appearing** 42:17
**appears** 68:22
**appended** 82:11
  82:18
**appraised** 32:3
**approximately**
  5:22 48:6
**april** 22:3 27:16
  68:20,22 69:21
  70:12 71:5,20
**arlington** 7:17
**article** 41:8
**aside** 6:12 7:11
  9:23 37:23 57:22
**asked** 25:13 40:5
  43:1 59:1 63:19
**asking** 12:12 14:5
  19:16 31:23 35:10
  36:2 38:20 39:15
  43:21 45:17 47:21
  59:8 60:4 72:10

**assignment** 81:2
  82:2 83:2
**associates** 4:10
**assume** 7:14,21
  22:20 24:22 28:6
  29:9 45:12 46:1
  64:9 65:20 66:16
**attach** 61:20 77:3
  77:5
**attached** 3:5 82:7
**attempt** 59:4
**attempted** 63:11
**attempting** 38:1
**attention** 16:23
  20:18 50:19 59:6
**attorney** 5:24 7:23
  9:1 50:4,12,14
  53:6 59:17,23,24
  73:20
**attorneys** 79:7
**august** 1:18 78:7
**authorities** 38:10
**authority** 11:5,8
  11:10,11 12:13,18
**authorize** 82:11
**auto** 29:12
**ave** 80:1
**avenue** 4:12
**aware** 19:4 21:12
  33:12 38:4 50:1
  63:16 73:4
**awhile** 35:16

**b**

**b** 2:11 3:1 60:7
  61:2
**back** 12:24 21:7
  23:9 25:8 27:3
  28:21 30:7,12
  31:2 32:6 34:6
  38:16 51:22,23
  52:4,6,8,10 53:19

53:22 54:6 58:10
  68:12 70:11,20
  72:12 75:15 80:16
**background** 40:19
  41:4,5
**backup** 31:7 44:15
**bad** 37:7
**ballpark** 14:12
**bank** 34:2
**banking** 11:21
  47:5
**base** 64:10
**based** 25:8 26:15
  54:4
**basis** 17:18
**bear** 75:9
**behalf** 36:2 38:3
  42:13 50:12 68:18
  69:3
**belief** 45:5
**believe** 17:21 33:1
  39:14 45:21 47:4
  50:14 55:4,18
  58:7 59:1 72:5
  75:17 76:3
**benefit** 56:17
**best** 40:18 56:11
  73:16
**better** 56:19,23
**bit** 24:14 25:5 41:6
  57:6
**board** 11:23 23:24
**bogus** 30:6 36:5,8
**book** 65:11 66:13
**bottom** 16:24 28:4
  52:5
**bought** 8:3
**brad** 16:15 25:10
  25:13
**brad's** 55:1,3,4

**briefly** 41:11
**bring** 37:5
**broad** 45:8
**broker** 8:2 24:10
**brokers** 24:6,7,7,8
  65:23
**brought** 12:16,20
  23:5 25:6
**brown** 8:16 23:2
  24:3,10 68:2,6
  69:3,17 71:7
  72:18 75:15 76:2
  76:4
**brown's** 63:4 70:9
  76:16
**bunch** 22:14 23:11
**bureau** 75:6
**business** 13:14
  15:1,3 19:23 20:3
  43:10
**busy** 13:4
**buy** 14:23 36:4,12
  72:15
**buyer** 46:12
**buying** 46:5

**c**

**c** 48:4,4
**ca** 80:24
**call** 5:17 12:24
  13:4 14:19,20
  25:15,23 26:8
  32:17,24 33:4,8,16
  35:4,5 36:2,6 38:6
  48:15,16 56:2
  57:3 58:16 64:14
**called** 1:11 5:5
  26:22 27:4,6
**calls** 12:23 35:9,12
**canada** 48:1,5
**capacity** 7:8

[capstone - corporate]                                                                 Page 3

**capstone** 36:15,16
   37:23
**career** 43:13
**case** 26:10 29:10
   30:23 50:13 80:6
   81:3 82:3
**cases** 6:13
**cause** 73:21 78:10
   78:17
**caused** 56:24
**cautionary** 57:7
**ceo** 10:4,5,19,24
   11:2,17
**certain** 30:10 35:9
   36:10 66:2
**certainly** 47:8
   65:11
**certificate** 82:11
**certification** 81:1
   82:1
**certified** 1:15 78:4
   79:20
**certify** 78:6,15
   79:1,4,8
**chain** 2:19 19:14
   19:19 28:11 40:2
**chains** 29:22
**challenging** 45:9
**change** 55:20 56:1
   56:19 72:5 80:14
   80:15 82:8 83:3
**changed** 20:6
**changes** 80:13
   81:7 82:7,9
**changing** 57:9
**charge** 11:13
**chicago** 4:6,14
   78:9
**circuit** 78:11
**civil** 1:12 5:14
   81:5 82:5

**claim** 38:2 49:17
**claiming** 30:21
   37:11
**clarify** 59:22
**clear** 28:8 55:23
   61:7 72:22
**cleared** 42:4
**clearer** 41:6
**cleveland** 80:2
**client** 59:17,23,24
   73:20
**close** 59:2 61:1
**clue** 29:13 36:18
   37:16
**cole's** 55:7
**college** 9:9
**come** 11:22 27:5
   56:12 64:6 69:17
**comes** 14:18 18:1
   56:16 69:2 71:24
**coming** 15:2 28:7
   31:5
**commenced** 5:1
**comment** 30:18
   35:22
**commission** 24:12
   81:19 82:25 83:25
**commitment** 68:3
**commonly** 42:6
**communicate**
   37:17
**communication**
   59:16 75:22
**communications**
   59:3,9,10,11,12,17
   59:24 60:1 73:22
   75:15 76:6
**company** 6:10
   10:14 20:12 22:10
   31:6 36:20,21,22
   43:24 48:4 61:10

   61:10,15,16 62:3,7
   62:8,12,14 63:1
   64:21 65:10 66:4
   66:7 68:19 70:12
**company's** 62:4
**comparing** 27:14
**competing** 14:1,4
**competitors** 64:3
**completed** 80:16
**computer** 14:15
   14:16 15:15,20,23
   15:24 17:2,24
   18:9,20 78:21
**computers** 13:17
   13:21 14:5 15:6
   16:2,5
**computing** 13:23
   14:3
**concerned** 46:23
**concerning** 34:17
   46:7
**concluded** 77:9
**conclusions** 33:7
**conditions** 52:1,6
   68:11
**condo** 36:3,12
   58:10,13
**conduct** 42:11
**confidential** 43:24
   46:7,11,13,18,20
   47:5 63:24 64:3
   64:10 67:1,4,15
   68:3
**confidentiality**
   44:2,7
**confines** 64:20
**confirm** 24:23
   56:3 57:4
**confirmation**
   70:19

**confirmed** 68:12
**confusing** 53:4
**connection** 6:9
**consider** 46:19,20
   51:5,8,17 67:15
**constantly** 56:11
**consultant** 74:17
**consulted** 12:1,4
   12:15
**consulting** 12:6
**contact** 24:3,12
   26:2,17 66:18
**contacted** 72:22
**content** 60:3
**context** 6:4 44:23
   53:17 62:15
**continued** 26:1
**continuing** 56:9
**continuity** 26:3
**contract** 51:6,9,12
   51:17 68:5 70:20
**contractor** 54:9
**contradicts** 65:2
**control** 11:14
**conversation** 23:8
   30:22 31:20 33:20
   34:16,20 40:8
   41:7,9 42:24 43:3
   74:13 75:8
**conversations**
   32:17 38:16,18
   68:1 75:14
**convicted** 8:8
**cook** 1:17 78:3,6
   78:11
**copied** 40:24
**copy** 37:2 51:24
   58:21 65:13 77:8
**corner** 42:17
**corporate** 12:14
   59:9

**[correct - different]**

**correct** 6:7 7:8,9
10:5,6,8,9,11,12
12:19 13:11,14,15
14:5,10 15:12
16:16,19 17:20
19:23,24 20:3,22
21:2 22:5,21,24
23:15 26:5 28:3
28:11,12 29:6,8
30:3,4,14,15 37:13
38:15 42:8,11,20
43:14 44:8,10,11
44:12,13 45:24
46:8,12 47:7,13,14
50:23 51:2,15
52:9,11,12 55:22
56:4,6 58:17,18
60:5 63:2,13,15
64:5,8,11,18,22
65:8,15 66:1,11,15
66:23 67:2,5,9,18
67:22,24 68:7,14
68:17 69:1,4,20,23
70:4,10,21 71:11
71:22 72:1,3,8,16
73:10 74:7,12,19
74:24 75:3,13,18
76:9,14,19 78:23
**corrections** 80:13
82:17
**correspondence**
15:3 28:20
**cost** 13:9 49:23
**counsel** 63:19
68:11 71:15 72:4
72:10,23 73:15
74:4 79:2,8
**counterparty**
43:17 45:21,22
**country** 35:23

**county** 1:16 78:3,5
78:11 81:10 82:15
**course** 19:23 20:2
63:12 77:7
**court** 1:1 14:1
77:7 78:11 81:7
**courts** 1:13
**cover** 49:18,23
69:17 70:1,16
**covered** 50:5
**crane** 6:5,21,22,24
35:14 43:23 44:3
44:23 48:12,23,24
66:3,7 72:13,17
73:7,8,11,12,17
74:6
**cranes** 24:7 64:15
**crime** 8:8
**cropac** 48:3
**crossways** 44:16
**cup** 42:7
**cupnit** 42:3,5
**current** 7:16 10:5
**currently** 11:7
20:11
**custom** 44:6 46:6
**customer** 12:11
46:6 56:2 64:10
**customers** 44:3
45:15 46:2,24
55:14
**cv** 1:6
**cyber** 15:20 49:12
60:8

**d**

**d** 2:1
**damages** 73:7,14
**darrel** 43:4
**darrell** 23:2 24:3
24:10 26:17,20
27:17 28:2,9

29:16,16 30:2,17
30:23,24 31:2
32:12,15 33:13,16
33:23 34:14,21
35:4 37:6 38:17
38:18 39:15 40:5
41:8,20 43:1 63:4
68:2,6 69:2,17
70:9,20 71:6,24
72:14 74:14 75:15
76:2,3,16
**darrell's** 29:5,11
29:11,15,20 30:6
**darrell.landalesi...**
28:14
**date** 31:3 34:7
68:19 69:4 70:17
71:4,18 80:9 81:3
81:9,19 82:3,13,25
83:20,25
**dated** 69:21
**dates** 34:7
**day** 7:10 11:13,13
14:10,13,21 15:4
31:22 81:16 82:22
83:22
**days** 31:21 32:9
74:17 80:19
**deal** 13:3 54:22
**dealer** 48:5
**dealing** 63:21
**dear** 80:10
**decent** 14:9
**decision** 11:20
57:15
**decisions** 13:13
**deed** 81:14 82:20
**deemed** 80:20
**defendant** 6:14
7:5

**defendants** 1:10
4:17 78:14
**defense** 49:24
**define** 46:13
**definition** 45:18
45:20 63:21
**delete** 15:8
**delivered** 31:24
**dep** 61:2,2
**department** 11:6
58:23 80:22
**depends** 54:7
**deposed** 5:19 6:8
6:17 7:7 8:5
**deposition** 1:11
2:13 5:1,12 8:15
8:21,24 16:8 19:5
26:11 27:10 39:2
39:21 41:13 50:7
52:13 56:1 57:19
58:2 60:20 61:6,9
61:12,15 63:4
69:12 70:22 77:9
79:2,5,6 80:9,12
81:1,3 82:1,3
**depositions** 1:14
**describe** 15:5
**described** 34:1
**description** 51:18
51:19
**designated** 61:16
62:2
**desk** 14:16
**details** 47:5,9,12
71:12 76:7
**determine** 23:17
**developed** 67:7
**deviate** 12:17
**differ** 11:1
**different** 22:9
34:12 36:20 44:17

[different - fair]                                                                 Page 5

47:20 55:24 61:6
**direct** 16:23 28:10
  50:19 59:6
**directed** 70:2 75:1
**directing** 20:18
**directional** 11:14
**directly** 24:13
**disagree** 27:19,20
  44:14
**disclose** 46:7,11
**disclosed** 59:19
**discover** 34:4
**discovered** 33:22
**discovery** 33:17
  59:19
**discussed** 37:24
**discussion** 33:19
**distribute** 17:22
  18:4
**district** 1:1,2,13
**division** 1:3
**divulging** 47:11
**document** 20:19
  39:7 50:13,16
  53:3 58:6
**documentation**
  69:8
**documents** 2:21
  3:2 8:20 50:11,17
  53:6,7,8 59:3
**doe** 1:9 18:1,2
  78:13
**doing** 26:1 33:1
  45:7,14 46:1 56:5
  61:14
**dotted** 11:12
**doubt** 58:24
**drawn** 33:7
**drive** 66:13
**due** 57:4

**duly** 5:2 78:16
**dumped** 21:19
**duty** 43:17

**e**

**e** 2:1,11,14,15,16
  2:17,19 3:3 14:10
  14:14,18,21,22
  15:1,1,8,14 16:7
  17:1,5,8,10 18:12
  18:15 19:3,10,13
  19:14,22 20:1,4,6
  20:13,15,24 21:4
  21:13 22:12,14,17
  23:9,17,23 25:7
  26:20,22 27:3,7,16
  28:2,3,9,10,13,15
  28:16 29:20 30:2
  30:6,7,7 31:1 33:1
  33:12 36:5,6,7,8
  37:3,11,15,18 40:2
  40:21 42:12 59:2
  59:8,10 60:2,9,15
  62:5,11,14 66:21
  71:4,4,14 76:1
  77:1
**earlier** 17:13 25:7
  55:19 58:11
**eastern** 1:3
**education** 9:7
**effect** 31:18 38:23
**either** 6:14 30:24
  31:13,15 41:8
**electronic** 55:11
**elmhurst** 7:17
  38:12,13 58:22
**email** 80:17
**employee** 42:9
**employees** 19:2
**employment** 9:23
  20:3

**enclosed** 80:12
**encompasses**
  45:13
**ended** 74:5
**engaging** 47:6
**engine** 24:20
**entail** 11:18
**entered** 82:9
**entering** 43:16
**entire** 43:12 50:13
  81:5 82:5
**equipment** 1:8
  6:10 9:21,24 10:3
  10:11 12:2,5,7
  13:9 20:12,15,21
  21:17 24:20 28:5
  31:5 42:6,15 43:9
  43:16 44:5,8 45:6
  46:4,5 47:10,11,17
  47:20 48:4,5,9
  51:5,9,12,19 55:11
  61:10,16 62:3,3,6
  62:8,12,13 65:10
  67:11,17 68:19
  70:3,12 78:13
  80:6 81:3 82:3
**errata** 80:14,19
  82:7,10,18 83:1
**escalated** 25:21
**especially** 44:24
**essence** 68:15
**estimate** 47:15
**et** 80:6
**event** 74:4
**eventually** 25:6
  73:13
**exactly** 74:8
**examination** 1:12
  2:2 5:7 62:19
**examined** 5:5

**example** 47:4
**excerpted** 40:20
**executed** 82:10
**execution** 81:14
  82:19
**exhibit** 2:14,15,16
  2:17,18,19,20,21
  2:22,23,24 3:2,3,5
  16:8,12,13 17:1
  19:5,10 25:8,9
  26:11 27:10,14
  28:1 29:5 39:2,7
  39:21 40:1 41:13
  50:7 51:13 52:13
  52:18 58:2 59:7
  60:19,20 68:9,10
  69:11,12,16 70:22
  71:3,16,16,20,24
  72:2,6
**exhibits** 71:15
  72:11 77:4,6
**expect** 47:10
**expectation** 46:10
**experience** 13:16
**expiration** 81:19
  82:25 83:25
**explain** 61:8,22
**extend** 66:20
**extent** 55:17 61:23
  65:1 73:19,22

**f**

**facility** 18:8 66:14
**fact** 7:12 17:15
  21:16 22:2 42:16
  45:20 53:10 55:12
  55:13 72:14,17
  73:15 76:6,10,16
**fail** 56:21
**failed** 73:15
**fair** 7:14,15 13:7
  15:9 20:19 25:19

38:6
**faith** 43:17,18,20
  44:19,23 45:7,8,13
  45:17,23 63:20
**fake** 62:5,10
**fall** 49:6
**familiar** 19:1 21:3
  24:15,17 63:6
  65:24 66:3,7
**far** 57:6 71:17
**fashion** 31:24
  61:19
**fax** 2:18,20,22
  41:19,23 43:2,4
  70:1,6,16
**faxing** 51:21
**federal** 5:13 75:5
**fee** 24:23 25:3
**feel** 37:7 52:19
**fees** 50:4
**fellow** 36:17
**fi** 18:4,7,11
**figure** 32:19
**file** 53:12 54:23
**final** 11:20,23
**financial** 35:24
  36:14,15,20 58:15
  74:16 75:2
**find** 31:3 32:22
  33:2 56:11 63:12
  80:12
**fine** 5:18 23:1
  48:13
**first** 17:1 24:2
  26:2 31:4,8 32:9
  33:10 39:9 41:12
  41:22 69:24 70:15
  76:15 78:16
**fit** 71:14,17
**five** 47:18 48:7

**focus** 9:15 10:18
**folded** 42:18
**following** 35:3,4
  55:21 75:16
**follows** 5:6
**ford** 21:21
**foregoing** 78:22
  79:2 81:13 82:18
**forgot** 75:2
**form** 51:20 61:18
  65:1
**formal** 13:22 16:4
**formally** 61:14
**forth** 17:3 23:10
  28:21 53:19,22
  75:15
**forward** 23:18
  25:13 29:1 30:9
  30:10 73:1 80:16
**forwarded** 21:19
  22:15 23:10
**forwarding** 22:17
**found** 30:5 31:4,8
  31:11
**four** 5:22 7:20 9:9
**fourth** 6:23
**franklin** 1:18 78:9
**fraud** 40:10,12,19
  41:6 57:4 74:15
  74:18,24
**fraudulent** 35:19
  35:21 62:24 76:17
**free** 52:19 81:14
  82:20
**freelance** 24:9
**freeway** 21:21
**friday** 75:11
**front** 19:17
**further** 62:17 70:6
  75:22 76:20,23
  78:15 79:1,4,8

**g**

**g** 30:14 59:14
**g85** 27:1
**gained** 13:17
**gears** 41:11
**general** 41:4,5
**generalities** 35:8
**generic** 21:18
**gensemer** 75:10
**getting** 67:13 73:3
**give** 17:15 18:2
  34:7 57:1
**given** 29:2 54:10
  78:18,23
**gives** 17:12
**gmail** 28:17,18
  29:1,2,3,12,16,20
  29:23 30:2,6,9,11
  30:19,21 31:2,5
  32:23 33:10,18
  35:5 69:18 70:19
  71:8,9,24 72:2
  76:2,15
**gmail.com** 20:20
  27:17 28:14
**go** 7:11 16:1 25:8
  34:6 38:16 53:18
  53:21 58:10 61:21
  66:14 73:1
**goes** 15:24 71:17
**going** 7:11,14
  12:10 15:2 23:7
  24:1 28:21 30:9
  30:10,11,12 31:7
  31:22 36:12 45:12
  46:6,11 48:8,9,15
  50:19 57:5 61:1
  61:20 73:1 76:11
**good** 13:8 15:5,9
  31:1 43:17,18,20
  44:19,22 45:7,8,13

  45:17,18,23 48:17
  56:13 61:21 63:20
  63:20
**gotten** 11:4 54:14
**grab** 13:6
**graduate** 9:14
**graduated** 9:13
**grand** 36:9
**granted** 12:17
**graysick** 8:6,7,7
**group** 2:21 4:2
  50:11
**growing** 10:13
**guess** 14:8,22 22:1
  33:22 45:8 46:17
  47:19,24 54:8,18
  68:9 69:10
**guy** 18:23 54:11
**guys** 8:5 33:18
**guzlas** 20:24

**h**

**h** 2:11
**haeberle** 2:4 4:3
  5:8,12,16 7:6 8:19
  14:3,6 16:11 19:8
  21:7,11 22:22
  23:16 26:14 27:13
  39:5,24 41:16
  42:10,23 45:2,19
  46:15 48:13,14,19
  49:2 50:10,18
  52:16 58:5 59:21
  60:16,23 62:17
  64:23 65:1 73:19
  76:22 77:1,5
**half** 9:11,12 19:18
**hand** 72:6 79:13
**handling** 12:23
**handwrite** 53:24
  54:1

[handwrites - know]                                                                                          Page 7

**handwrites** 53:23
**handwriting** 39:9
 52:22,24 55:1,3,5
 55:7
**handwritten** 53:9
 53:15,18,21 54:11
 54:22
**handwrote** 39:20
**happened** 10:21
 22:1 32:8 33:3
 35:18 37:9 72:13
 74:16,21 75:4
**happening** 32:10
 37:8
**happens** 41:6
 54:17
**happy** 61:8
**hard** 51:20 65:13
**hardware** 18:10
**header** 27:18
**headers** 27:20,23
**headings** 21:18
**hear** 34:9,10
**heard** 17:11 37:7
 55:19 57:21
**held** 73:2 74:10
**help** 25:17
**hereinbefore** 79:7
**heretofore** 78:7
**hereunto** 79:12
**hey** 37:7 58:16
**hi** 36:8
**highest** 9:7
**hold** 35:15 72:15
 72:17,24
**holding** 71:23 72:6
**home** 18:18,20
**honesty** 63:21
**hopkinson** 20:7
 21:23 22:3

**hour** 1:19
**house** 65:6

**i**

**idea** 28:13 29:11
 56:13,23
**identification**
 16:10 19:7 26:13
 27:12 39:4,23
 41:15 50:9 52:15
 58:4 60:22 69:14
 70:24
**identified** 68:11
**illinois** 1:2,17,18
 4:6,14 7:17 9:12
 78:1,6,9,11
**imagine** 14:9
**impersonate** 38:2
**imposter** 62:5,11
**inbound** 27:3
**included** 40:21
 80:14
**including** 11:1
 47:23
**incorporate** 56:14
 56:24
**incorporated**
 82:12
**incupment** 42:13
**incupnet** 62:24
 63:12
**incurring** 50:4
**indiana** 9:11
**indicating** 80:14
**individuals** 61:11
**industry** 43:9 44:6
 44:23 45:10 47:11
 57:6 63:22 64:4
 65:23 66:3,7
**information** 39:18
 40:19 41:1 46:7
 46:12,14,18,21

54:14 63:24 64:20
 65:6,10 66:9,18
 68:3 73:20
**initially** 27:15
 72:14
**inquiring** 72:24
**inside** 12:22,23
 13:1,2,4 26:9
**inspection** 54:5
 76:13
**instruction** 56:2
**instructions** 32:5
 32:7,20 33:17,23
 33:24 34:1 39:16
 39:19 55:13,20
 56:3,18 57:2,4
**insurance** 11:21
 49:12,17,23 50:5
**interest** 15:11
 61:24 67:7
**interested** 27:2
 52:21 58:9 79:10
**interface** 60:9
**interfacing** 32:12
 32:13
**interference** 60:11
 60:12
**internally** 31:1
**internationally**
 47:16,18
**internet** 13:20
 24:13,14 67:11
**interrupt** 56:22
**investigation**
 42:12,14 62:23
 63:11,16 75:6
**inviting** 73:20
**invoice** 39:16 51:9
**invoicing** 69:7
**involved** 25:10,20
 44:9,11 54:3,7

57:15
**involvement** 11:24
 16:20
**involving** 59:3
**issue** 37:23
**issues** 23:5

**j**

**jacqueline** 1:15,23
 78:4
**janice** 9:5 30:18
 31:14 32:5,13
 34:19 55:19
**january** 59:12
**jim** 20:7 21:23
 22:3
**job** 10:2
**joe** 55:6
**john** 1:9 18:1,2
 78:13
**journals** 65:21
**jthopkinson** 20:20
**jump** 44:19

**k**

**keep** 35:24 44:4
 47:5 64:2 65:6
 67:4 68:3
**keeps** 31:18 65:8
**keith** 36:18 37:11
 37:17 38:5,5,6,9
**kid** 63:23
**kind** 24:9 44:16
 62:22 64:19 66:9
 67:16 68:2 71:13
 73:3
**kinds** 66:24
**knew** 26:16
**know** 6:18,19 7:13
 8:4 10:20 12:7
 14:23 15:7 16:4,6
 17:6 18:22 19:16

**[know – midwest]** Page 8

20:8,13 21:5,15,20
22:2 23:7,11 24:2
24:4,23 25:2,4,12
26:6,8,19,21 27:6
30:22 32:8 34:13
35:8,13,14,17,22
36:5,9 41:17 42:4
42:14 45:4 46:9
46:17,18 48:3
49:4,9,14,17 52:24
53:2,9,14,20,20
54:16,16,17 55:12
55:13 57:19 58:19
59:23 60:2,8,10,12
61:9 62:21,22
63:19 68:8 72:4
72:10
**knowledge** 13:8
15:13 33:5 37:14
38:1 40:18 55:10
55:17 57:12,22
62:4,10,22 72:21

**l**

**landale** 1:4 12:20
13:3 16:21 23:2,7
23:10 24:3 25:11
25:20 26:2 29:16
29:23 30:9,14,20
31:9,18,21 32:1,6
40:13,14 48:2,10
49:6,8,19 50:3
55:21 60:1,7
62:15 66:17 68:6
69:3 71:7 72:18
72:24 74:11,22
78:12 80:6 81:3
82:3
**landalesigns** 27:17
**landalesigns.com**
71:21

**laptop** 18:16
**larger** 11:5
**late** 22:16,17
31:23
**law** 4:2
**learned** 30:1 33:21
74:14,18 76:17
**leaving** 9:20
**left** 65:13
**legal** 80:1 83:1
**legitimate** 14:22
**letter** 80:20
**level** 9:7
**liability** 49:12
**license** 1:24
**light** 73:14
**line** 11:12 12:9
68:21 75:19 80:14
82:7 83:3
**list** 61:17
**listed** 59:14 62:4
65:11,14 82:7,17
**listing** 82:7
**little** 16:24 25:5
41:6 45:9
**lived** 7:19
**logo** 42:17,19,22
**lombard** 37:1
**long** 7:19 43:6,8
**longer** 36:19 48:24
**look** 19:11 22:11
30:12 52:19 66:13
**looked** 41:18
**looking** 17:9 20:23
23:20 30:8,13,16
32:1,24 36:4 42:1
53:7 68:23
**looks** 40:23 42:19
69:6
**loop** 59:2

**lost** 49:20 74:23
**lot** 14:16,17 24:5
51:14 73:9
**lst** 59:12

**m**

**machinno** 24:15
24:24
**madam** 80:10
**mail** 2:14,15,16,17
2:19 3:3 14:18
15:14 16:7 17:1
18:12,15 19:10,13
19:14,22 20:1,4,6
20:13,15,24 21:4
21:13,21 22:12
25:7 26:20 27:3,7
27:16 28:2,3,9,16
29:20 30:6,7,14
31:1 36:5,6,7,8
37:3,11,15,18 40:2
40:21 59:8 60:2
62:5 66:21 71:4,4
71:14
**mailed** 26:22
28:15
**mailing** 28:10,13
30:2
**mails** 14:10,14,21
14:22 15:1,1,8
17:5,8,10 19:3
22:14,17 23:9,17
23:23 30:7 33:1
33:12 42:12 59:2
59:10 60:9 62:11
62:14 76:1
**maintained** 20:1
26:3
**maintaining** 44:7
**maker** 11:20
**making** 73:8

**man's** 75:2
**manager** 21:20,24
22:4,8
**march** 35:11
**maria** 8:7
**mark** 41:12 69:10
**marked** 2:12 16:9
19:6,9 26:12
27:11 39:3,6,22
40:1 41:14 50:8
52:14,17 58:3
60:19,21 68:9
69:13 70:23
**marketing** 9:17
**markets** 36:1
**match** 33:24
**mean** 11:11 22:6
23:13 28:18 35:19
38:7 40:21 43:22
44:22 45:11 46:17
48:16 56:22
**meaning** 12:1
**means** 60:10
**measures** 56:8
**mechanic** 54:12
**medications** 8:11
**meet** 8:23
**memory** 34:8
**mentioned** 62:21
64:1 65:20 79:7
**messages** 59:11
**messuck** 77:2
**mexico** 36:12
58:11,13
**mhaeberle** 4:7
**mi** 18:22
**michael** 4:3
**michigan** 4:12
**midwest** 80:17
83:1

[mike - parties]                                                                    Page 9

**mike** 9:5 10:8 11:4
  11:12,14 15:18,19
  15:21,24 16:1
  17:11,17 19:10
  22:12,15,17 23:6
  23:11,13,13,15,18
  23:23 32:2 34:19
  40:3,7,8 41:8
  49:16 57:7,18
**mike's** 11:19
**mine** 46:3
**minute** 19:11
**missed** 23:21
**mitigate** 73:7,14
**money** 31:19 34:4
  34:21 35:24 36:3
  36:10 49:20 58:16
  73:8 74:23
**monroe** 4:4
**month** 18:23
**mounted** 48:12,22
  48:24 66:6 72:13
  73:11,12,17 74:6
**moved** 22:9

**n**

**n** 2:1 5:11,11,11
**nafta** 71:13
**name** 5:9 8:1,4
  29:6,11,15 36:17
  45:15,16 57:21,22
  75:2 80:6 81:3,4
  81:15 82:3,4,21
**nature** 15:3 66:22
  76:13
**neal** 63:6
**need** 12:17 15:10
  18:10 58:8 71:12
**negotiating** 47:2
**negotiation** 47:12
  67:14 76:11

**negotiations** 38:23
  44:8 47:9 68:1
**neon** 1:4 78:12
  80:6 81:3 82:3
**never** 7:7 29:2
  36:4 62:22 74:20
  74:23
**new** 15:22 28:3
  56:24
**nick** 20:24
**niu** 9:13,20
**no's** 3:5
**north** 1:17 4:12
  78:8
**northern** 1:2 9:12
**notarial** 79:13
**notarized** 80:15
**notary** 80:24
  81:10,18 82:15,23
  83:23
**note** 16:24 17:2
  53:23 54:1,1,11,19
  54:22 80:13
**notes** 53:18,21
**notice** 2:24 5:14
  29:19,22,24 76:15
  79:5
**noticed** 61:9
**number** 2:12
  12:11 41:22,23
  57:3 59:7 70:6
  80:8,14
**numbers** 82:7
**numerous** 73:16

**o**

**o** 5:11 48:4
**object** 56:7
**objection** 48:22
  56:9 59:15 64:23
  73:19

**obligation** 47:4
**obtained** 9:8
**obviously** 59:18
**occasion** 75:5
**occurred** 72:5
  75:11 76:16
**offer** 68:16
**office** 25:13,15
  36:23,24
**official** 81:15
  82:21
**oh** 29:7
**ohio** 80:2
**okay** 5:17 7:7
  12:10 18:7 19:12
  19:19 22:3 24:22
  27:9 31:7 34:3,15
  35:13 37:10 39:1
  41:18 43:5 47:23
  53:15 54:19 55:9
  60:6,17 61:13
  62:17 65:9 67:12
  68:24 69:8 70:14
  70:18 71:20 72:7
**once** 28:15,24
**one's** 61:6
**ones** 23:20
**ongoing** 31:17
**online** 65:14 66:14
**open** 61:2
**operational** 56:15
**operations** 11:13
**opportunity** 45:23
  63:3
**opposed** 14:23
  60:1 70:5
**option** 29:15
**orally** 56:3
**order** 51:4,12
  72:12,12 73:14
  77:1

**ordinary** 19:23
  20:2
**outbox** 23:19
**outcome** 79:11
**outside** 10:4
**overflow** 13:6
  25:23 26:8
**overruled** 65:3
**oversee** 11:19,19
**owe** 24:11

**p**

**p** 4:10,11 48:4
  80:5
**p.c.** 4:10
**page** 17:1 20:18,23
  20:23 22:11 39:10
  41:22 42:1,16
  50:20,22 51:1,4,13
  51:13,18,19,21,24
  52:3,4,8,10,11,11
  52:21 53:11 58:9
  68:10 69:17 70:1
  70:8,16 80:14,16
  82:7 83:3
**pages** 68:13
**painted** 54:10
**painting** 54:9
**paperwork** 22:19
  26:24 51:22
**paragraph** 40:20
**parents** 10:10
**part** 10:16 14:9
  19:19 28:10 51:5
  51:9,17 65:5 67:6
  82:9
**particular** 15:11
  19:15
**particularly** 36:16
**parties** 5:15 47:5,6
  47:12 79:3,9

parts  47:21,23 64:17
passed  26:24 41:1 54:14
password  17:12 17:15,17 18:2
passwords  18:4
pasted  40:24
pat  5:17 36:2,9 62:18 70:2 77:2
patrick  1:11 2:3 5:4,11,13 60:9 61:1 78:9 80:9 81:4,9 82:4,13 83:20
patterson  4:2
patterson.com  4:7
payment  55:11
pays  18:22
pc  4:2 18:18
pdf  50:14 52:19
pending  78:10
people  24:11 30:24 43:23 46:5 66:2,6
percent  14:12
period  32:11,18 72:19 73:2 74:10 76:10
person  13:1,2,4,6 53:24 62:24
personal  7:8 19:3 37:21 59:7,8,8,24 60:4 61:2,12
personally  50:2 78:8 81:11 82:15
pertain  11:15
pertaining  1:14
phone  13:6 14:17 14:19,20 18:13 30:22 32:24 36:2

36:6 65:11 66:13 80:3
phonetic  8:6 24:16 24:24 36:18 42:3 42:7,13 63:1,7,12 75:11
picked  23:20
piece  19:15 47:20 48:9
pieces  67:11
pipe  12:8
place  55:21
plaintiff  1:6 4:8 6:14,16,20 7:1,5 78:12
plaintiff's  72:23
plaintiffs  7:4
please  5:9 52:1 80:12,12
plus  6:21
plyzinsky  36:18
pm  1:19 69:22
point  27:4 28:14 28:16,17,19 29:1 30:1,5,10,11 32:4 33:11,11 35:13 68:8 73:6 74:5
pointing  42:2
police  38:11,13 58:22,22
policies  11:15 19:2 19:4
polick  2:5 4:10,11 7:3 8:17 9:1 14:4 22:18 23:13 35:19 42:2,21 44:22 45:18 46:13 48:12 48:18,22 50:16 56:7 59:15 60:11 62:18,20 64:24 65:3,4 69:15 71:2

74:2,3 76:20,24 77:3,8 80:5
pop  33:10
populates  29:12
portion  19:17 54:7
pose  59:15
position  22:9
possible  62:23
post  56:7
power  57:13,16,20 57:21,23
practice  44:6
practices  55:11
pre  33:16
prefer  64:2
preparation  8:21 8:23
prepare  8:14
prerogative  46:3
presence  78:20
present  10:3 59:13 79:6
president  10:4,8 10:24
presumably  50:4
pretty  13:8 63:20
previously  59:18 60:18,21 69:9
price  67:20
prices  67:10
pricing  13:13 46:22,22 47:1 67:4 76:12
primary  46:23
prior  38:22 65:2
privilege  73:20,21 73:24 74:2
privileged  59:17
probably  14:21 15:1,2 22:7 46:2 46:22 47:19,24

66:16 72:19
problem  23:3 31:8 43:8
procedure  1:13 5:14 61:23 81:5 82:5
procedures  11:15 56:10,12,15 57:10
process  26:4
prochot  15:18 23:14,15 32:2 40:4,7 49:16 57:8
prochot's  11:4 15:19
produced  20:2 50:12,13,14 52:18
product  15:23 22:20
production  53:8 80:16,17,22
proficient  15:10 16:2
property  7:24 23:4 67:7
protect  17:2 45:15 45:15
protected  64:19 65:6
protection  56:17
provides  57:24
provision  56:24
pssr  20:11
public  81:10,18 82:15,23 83:23
published  67:10
purchasing  7:24 67:16
purporting  62:7 62:13
purports  69:17 71:6

[purpose - runnion]                                                    Page 11

**purpose** 23:22 40:16,17
**pursuant** 1:12 5:13 79:5
**put** 43:5 54:6 55:9 60:17 69:10 72:12

**q**

**quarterly** 17:18
**question** 7:12 13:20 21:8 26:18 27:8 28:8 44:20 45:3 46:16 53:5 54:18 61:3 73:24 76:8
**questioning** 12:9
**questions** 11:22,22 26:15 39:15 44:17 62:18 63:19 72:11 76:21
**quiet** 44:4
**quite** 24:14 43:21 57:6 72:18 73:2 74:10

**r**

**r** 5:11 48:4
**read** 8:16 21:7,9 41:1,3 52:5 81:5,6 81:12 82:5,6,17
**reading** 63:4 80:20
**really** 22:13 52:10 52:20
**reason** 25:22 40:11 76:3 80:15 82:8 83:3
**reasons** 8:12 44:1
**recall** 8:1,2 16:20 17:7,13 19:20 22:13,16,18,19,20 22:23 25:19 29:14

29:18 31:11,15 32:16 33:18,20 35:7 37:22 38:18 39:12 40:4 41:7,9 41:19,21 42:24 43:3 48:2 75:24
**receipt** 80:19
**receive** 14:22 37:2
**received** 21:24 32:20 36:1,8 62:6 62:11 69:9 76:1
**receiving** 14:13 23:6 40:7 41:19
**recognize** 16:7,13 19:13,20 39:7 40:2 55:1,6 58:6
**recognized** 36:7
**recollection** 6:2 25:9 34:16,24 35:4 40:6
**recommendation** 73:13
**record** 5:10 21:9 42:5 55:24 72:22 75:9 82:9
**records** 49:10
**reduced** 78:21
**reference** 5:24 38:19,20 39:15 43:18 63:24 66:17 69:16 76:7 80:8 81:2 82:2
**referenced** 72:14 81:11 82:15
**referral** 24:12
**refers** 24:11
**refresh** 25:9
**regard** 55:15 74:15
**regarding** 19:2 22:19 55:23

**related** 79:9
**relating** 53:12 59:13
**relation** 35:6
**relatively** 30:10
**released** 72:20
**rely** 15:17,18
**remaining** 19:19
**remedial** 56:8
**remember** 19:15 19:17,18 26:23 32:21 33:14 35:9 36:10 40:3
**rent** 64:16,17
**repeatedly** 72:21 72:22
**replied** 28:15
**reply** 28:10
**replying** 28:9
**report** 15:22 38:11 54:5 58:22 75:5
**reported** 38:9 78:19
**reporter** 1:16 14:1 77:7 78:5 79:20 81:7
**represent** 22:14 53:5
**representative** 61:17 62:2
**represented** 7:23
**representing** 4:8 4:17
**reputation** 45:10
**request** 73:21 74:11 82:9,11
**requested** 21:10 72:23
**requests** 73:16
**required** 80:24

**requires** 14:18
**research** 34:6
**resell** 24:9
**reserve** 76:24
**reserved** 79:2
**residing** 38:14
**respective** 79:3
**respond** 28:22,24 29:7 73:15
**responded** 27:3 28:24
**responding** 28:2
**response** 73:3
**responsibilities** 10:24 11:2,3
**returned** 80:19
**review** 8:20 58:8 63:9 80:13 81:1 82:1
**reviewed** 41:17
**right** 15:11 23:4 31:10 34:7 42:3 63:18 73:18 74:9 75:19,21 76:22
**ring** 48:18
**role** 10:8 11:17,19 11:20 15:19
**roles** 10:23 11:2,3 11:4
**rule** 2:24
**rules** 1:12 5:14 7:11 81:5 82:5
**running** 42:6 43:22
**runnion** 1:8,11 2:3 5:4,11,13 6:10,13 6:16,20,24 9:21,23 10:3,11 13:18,23 16:17 17:8 18:8 18:22 19:3 20:12 20:15,20 21:16

**[runnion – south]**                                                          Page 12

24:2 28:5 31:5
33:13,19 34:14,17
36:9 37:21 42:15
42:19,21,22 43:11
45:22 47:17 48:20
49:13 53:17 55:10
61:10,15 62:2,3,6
62:8,12,13,24 65:8
65:10 68:18 70:2
70:3,11 78:9,13
80:6,9 81:3,4,9
82:3,4,13 83:20
**runnion's** 15:14
17:4 19:23 20:3
33:6 34:1,12 36:2
41:23 42:17 59:9
60:9 61:1
**runnionequipme...**
21:1,4,14,22

**s**

**s** 2:11 80:16 82:8,8
83:3
**safe** 56:21
**sale** 12:2,5,7,8
43:16 44:8 51:5
60:14
**sales** 10:4 11:5,8
11:20,21,22,24
12:23 13:1,2,4,6
17:12,16,19 21:16
43:9 44:6 47:11
47:17 51:4,9,12,12
53:19,24
**salesman** 12:12,17
12:22 17:23 18:1
18:2 20:11 26:9
**satisfies** 74:4
**saw** 23:21 25:7
33:10
**saying** 27:1 31:18
31:19 35:7 36:8

45:14 57:3 58:15
61:18 72:4
**says** 52:6 59:16
70:15
**sbcglobal.net** 4:16
**scan** 51:23
**seal** 79:13 81:15
82:21
**search** 24:20
**second** 42:1 70:16
**security** 15:15,20
60:8
**see** 23:20 30:8
41:3 50:3 52:7
56:16 61:22 70:18
**seeing** 22:23 26:23
40:3
**seen** 17:7 58:7
60:24
**select** 29:16
**sell** 13:10 24:7,8
35:14 43:23 44:3
48:10 49:3,7
64:15,17 73:6,16
**seller** 46:11 47:10
**selling** 13:10 45:6
46:4 74:5
**send** 15:7 23:8
28:21,23 36:9
55:14 70:19 71:10
**sending** 14:13
23:22 28:3 39:12
40:4,17 42:12
**sense** 14:19 69:6
**sent** 17:5 19:22
21:21 23:9,20
27:16 28:2,24
29:3 31:19,22
32:5 33:12,23
37:11,15 39:17,18
42:8 62:6,11,14

69:5 71:20 76:7
**separate** 69:11
**september** 79:14
80:4
**series** 53:7
**server** 15:14 57:13
57:16,20
**service** 21:1,4,13
21:17,19,22,24
22:4,7 57:24
64:14,15 76:12
**services** 18:23
**sessions** 13:14
**set** 18:12,15,18
53:6 79:12
**sharing** 47:1
**sheet** 53:9,15 70:2
70:15,16 80:14
82:7,10,18 83:1
**shenberger** 1:15
1:23 78:4
**shifted** 11:4
**shoot** 25:15
**shops** 67:19
**shorthand** 1:16
78:5 79:20
**showed** 71:15
**showing** 16:12
19:9 22:7 39:6,17
40:1 50:11 52:17
60:18
**shown** 80:16
**shows** 27:18 56:13
**sic** 33:19
**sick** 13:5 26:9
**side** 12:14 33:2,6
51:22,23 52:6,8
**sign** 32:1 40:13
52:1
**signature** 28:4
50:20,20,22,23

51:1,2,4,13 68:21
70:8,8,9 76:24
79:1,19 80:15
**signed** 68:18 69:5
70:8,20,20 81:13
82:18
**signing** 80:20
**signs** 1:4 29:17,23
40:14 65:18 78:12
80:6 81:3 82:3
**similar** 37:9 74:21
**sincerely** 80:21
**sir** 80:10
**sitting** 24:21 57:18
73:9
**situation** 32:3
**small** 51:14
**smoothly** 12:8
**snap** 48:18
**sold** 49:8
**solutions** 80:1
83:1
**somebody** 34:13
53:23 64:6 67:14
67:20
**son** 16:15
**soon** 75:4
**sorry** 6:18 43:7
56:22 60:12 73:11
**sort** 9:15 18:20
**sorted** 35:17
**sorting** 32:18
**sound** 75:19
**sounded** 14:4
**sounding** 11:23
**sounds** 24:17
75:21
**source** 62:23
63:11
**south** 7:17

[spaniel - told]                                                    Page 13

spaniel  9:5 15:17
   15:18,21 17:11
   77:1
spaniel's  57:18
specific  34:15,24
   35:3 36:23 41:4
   44:12 47:17
specifically  19:16
   30:13 35:6 38:20
   40:16 41:21 74:15
specifics  35:7
   38:17
spell  5:9 36:19
spelled  42:6
spend  14:13
spent  14:10
spolick  4:16
spoof  62:5
spoofed  62:11
spoofing  38:6,9
   58:11,13 59:4
spring  16:17
ss  78:2
standpoint  14:20
   56:18
start  67:13
started  10:10
   25:24 26:7 28:13
   43:10
starting  10:3
state  1:17 5:9 9:11
   78:1,6 81:10
   82:15
statement  44:15
   81:13,14 82:19,19
states  1:1,13 24:6
stenographically
   78:19
steps  50:2
steve  9:1 61:22

steven  4:10,11
   80:5
stock  36:1
stored  53:3
street  4:4 66:21
strike  25:6 44:18
   53:4
structure  24:24
   25:3
stuff  71:13
subject  34:17
   42:17 55:17 56:8
   59:19
submitted  49:18
subpoena  2:23
subscribed  81:10
   82:14 83:21
substances  8:11
succeeded  10:7
suggested  23:3
   57:7
suing  6:5
suit  79:10
suite  4:5,13 80:2
superior  80:1
suppose  31:21
supposed  26:20
sure  10:20 13:1
   22:11 24:10,18
   26:19 32:2,14
   34:18,23 35:11
   36:6 37:19 43:21
   44:20 53:21 60:6
   61:4 65:23 67:16
   74:8
surrounding
   73:22
swindelhurst
   63:10
swindelhurst's
   63:7

switch  10:21 41:11
switched  30:8,14
   31:4 32:23
sworn  5:3 78:16
   81:10,13 82:14,18
   83:21
system  13:24 14:2

**t**

t  2:11
take  19:11 55:12
   58:8 66:13 77:8
taken  1:14 5:13
   50:2
tales  57:7
talk  17:11 40:6
talked  6:12 34:18
   35:5 58:11 76:11
   76:12
talking  25:17
   32:14,21 33:18
   40:9,10,11 44:16
   48:11 54:8,11
   58:12
tech  18:23
tell  10:2
telling  43:22 51:11
term  45:9 48:8
   67:1
terms  13:14 52:1,6
   56:14 63:21,23
   65:9 66:17 68:10
   69:8 74:13
testified  5:6 6:6
testify  8:12 55:19
   78:16
testimony  17:13
   63:7 65:2 78:18
   78:23 79:12 81:6
   81:7 82:6,9,12
text  59:11

thereof  79:11
thing  11:16 33:2
   46:23 67:3 69:24
   74:21
things  11:14 12:14
   15:8 24:9 33:2
   37:8 45:14 64:1
   66:21,24 76:13
think  7:3 18:9,10
   21:16,17,17 22:6
   37:1 44:16 57:9
   60:24 64:1 72:15
   75:8,14
third  47:12
thirty  80:19
thought  26:22
   33:9
three  32:1,9 34:19
   77:6
time  5:23 10:16,19
   10:22 12:23 13:2
   21:20,23 22:6,8,15
   25:17 27:5 28:16
   29:19 30:5,23
   32:4 33:1,3,9,10
   35:13,17,23 36:17
   38:14 56:19 58:8
   62:21 72:18,20
   73:2 74:11 75:19
   76:1
times  5:21 6:8,16
   6:21 60:24 68:9
timing  71:17
tires  14:24
title  10:5 47:20
titles  10:2
today  8:12,15
   17:13
told  23:6 30:24
   31:15

[top - word]                                                                    Page 14

top  19:15,18 28:6
  41:22 69:4
topic  62:4,4 63:23
topics  59:13 61:17
total  15:3
touched  25:5
trade  12:11 65:20
traffic  8:9
trailers  24:8
training  13:16,22
  16:5
tran  77:1
transaction  12:1
  12:21 16:21 25:11
  25:21 31:9 43:19
  44:12 45:22 46:8
  47:7,13 49:5,18
  50:3 54:8 62:15
  64:2 68:16 73:1
  76:8
transactions  47:16
  53:17
transcribed  81:7
transcript  8:17,18
  63:4 78:23 80:12
  80:13 81:5,12
  82:5,11,17
transcription
  78:22
transcripts  8:16
  8:17
transfer  22:5 31:9
  35:20,22 38:21,22
  58:16 74:15,18
  75:9 76:18
transmission  2:18
transmitted  70:11
travels  12:8
truck  48:8,12,15
  48:16,21,22,24
  53:13 54:12 66:6

72:13 73:11,12,17
  74:5
true  46:9 61:20
  66:16 78:22
truth  78:16,17,17
truthful  45:11
truthfully  8:12
try  73:6
trying  31:3 32:18
  32:22 43:23 44:3
  56:11
turn  11:8 15:7
  33:21 70:7
turned  53:6
twice  7:4,5,5
two  6:18,18,20,20
  9:12 24:4 47:6
  71:15,19
type  11:16,21,22
  15:1,22 53:15
  54:19 59:11
typewriting  78:21
typically  65:7
typing  29:5,14

**u**

u  5:11
ultimate  13:13
undersell  64:7
understand  7:12
  26:18 38:7 45:4,9
  46:16 48:10,16
  58:12 61:5 62:1
  63:10
understanding
  15:14 24:19 37:10
  41:5 44:17 45:5
  49:22 57:11
understood  7:14
  44:20 52:3
undetermined
  78:10

unit  76:12,13
united  1:1,13 24:6
unusual  54:21
upgrades  15:22
use  48:8 57:12,16
  67:19

**v**

v  80:6 81:3 82:3
vendors  57:1
veritext  80:1,8
  83:1
veritext.com.
  80:17
versa  28:22 67:23
vice  28:22 67:23
victim  74:21
violations  8:9
virginia  75:10
  76:18
viruses  17:2
voice  36:8
vs  1:7

**w**

waived  74:1,2
  80:20
waiver  73:21
waiving  73:23
want  10:18 12:14
  14:23 16:23 20:7
  35:15 41:11 44:2
  44:19 46:17 47:3
  52:20 58:10 59:6
  59:22,22 60:2
  64:6 72:15
wanted  58:16 72:4
wants  66:12
way  24:5 25:10
  32:3 50:15 52:18
  64:9 79:9,10

ways  24:4
we've  19:9 25:4
  37:24 60:24
website  65:16
  66:18
wednesday  75:16
week  9:3 32:9
went  9:21 23:19
  30:7 31:2,20
  34:11 36:20
west  4:4
whatsoever  59:12
whereof  79:12
wi  18:4,7,11
willie  6:6 9:5
  30:18 31:13,23
  32:4,13 34:19
wire  23:6 31:9
  32:19 33:17,22,24
  33:24 34:11 35:20
  35:22 36:3 38:20
  38:22 40:9,12,19
  41:6 55:20 56:3
  56:18 57:4 74:15
  74:18,23 75:9
  76:17
wired  33:23 34:5
  34:21
wireless  17:16,19
wiring  32:5 39:16
  39:19 57:2,4
wise  33:3 71:18
wit  78:7
withdraw  73:24
witness  2:2 5:2,5
  78:15,19,20,24
  80:9,12 81:1,4,11
  82:1,4,15
witness'  80:15
word  45:11

[words - z]

| | |
|---|---|
| **words** | 51:14 |
| **work** | 9:21 10:13 |
| | 13:18 18:15 24:5 |
| | 43:17 45:23 |
| **working** | 13:8 |
| | 16:17 43:11 |
| **works** | 29:13 |
| **writes** | 70:6 |
| **writing** | 70:5 |
| **written** | 57:3 68:5 |
| **wrong** | 33:17 34:5 |
| | 34:21 |

| x |
|---|
| **x** 2:1,11 43:23 |
| 44:1 |

| y |
|---|
| **y** 43:23 44:1 |
| **yeah** 14:4 44:22 |
| 65:13 |
| **year** 9:11,18 47:24 |
| 49:5 58:19 |
| **year's** 72:19 |
| **years** 7:20 9:9 |
| 47:18 48:7 67:8 |

| z |
|---|
| **z** 43:24 44:1 |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

**Janice Ryce**

| | |
|---|---|
| **From:** | Janice Ryce <jaryce@runnionequipment.com> |
| **Sent:** | Thursday, May 12, 2016 3:16 PM |
| **To:** | darrell.landalesigns@gmail.com |
| **Subject:** | Runnion Equipment Wire Transfer Information attached |
| **Attachments:** | REC Wire instructions DEC 19 2014.pdf |

Janice A. Ryce – Accounting
RUNNION EQUIPMENT COMPANY
jaryce@runnionequipment.com
800-824-6704  /  708-447-3169 /  708-447-3730 - Fax

http://www.runnionequipment.com
Crane & Equipment Solutions
For Contractors, Government, Rail, Utilities, or Agribusiness/
Sales, Service, Parts, Rental/ Custom Mounting, Rebuilding



1



**EQUIPMENT COMPANY**

*Truck Mounted Cranes & Equipment*
*Sales, Service & Rentals*

*7950 West 47th Street, Lyons, IL  60534*
*(800) 824-6704 Ph (708) 447-3730 Fax*
*www.runnionequipment.com*

## ELECTRONIC PAYMENT INSTRUCTIONS

*UPDATED 12/19/2014*

### Wire Transfer, *DOMESTIC*:

Beneficiary Bank:   STATE BANK OF COUNTRYSIDE
6734 Joliet Road
Countryside, IL 60525
ABA# ▓▓▓▓▓

Beneficiary:   RUNNION EQUIPMENT COMPANY
7950 West 47th Street
Lyons, IL 60534
ACCT# ▓▓▓▓▓

### Wire Transfer, *INTERNATIONAL*:

Field 56A – Intermediary Institution:

SWIFT No.: ▓▓▓▓▓
BMO Harris Bank N.A.
111 W. Monroe Street
Chicago, IL 60603, USA

Field 57D – Account with Institution:

ABA ▓▓▓▓▓
State Bank of Countryside
6734 Joliet Rd.
Countryside, IL 60525

Field 59A – Beneficiary Customer:

RUNNION EQUIPMENT COMPANY
7950 West 47th Street
Lyons, IL 60534
ACCT# ▓▓▓▓▓

Field 70 – Remittance Information:

(Invoice, purchase order, Quote #, etc.)

*Field Tags are for a SWIFT MT103 / NOTE: BMO Harris Bank N.A. ABA is #071000288*

*~ DIRECT INQUIRIES TO ~*

*State Bank of Countryside – Sue Doering – 708.485.9756 – susan.doering@banksbc.com*
*Runnion Equipment Company – Janice Ryce – 708.447.3169 – jaryce@runnionequipment.com*

**Michael Haeberle**

| | |
|---|---|
| **From:** | Janice Ryce <jaryce@runnionequipment.com> |
| **Sent:** | Wednesday, May 18, 2016 10:53 AM |
| **To:** | darrell.landalesigns@gmail.com |
| **Subject:** | test. |
| **Attachments:** | Wire instructions MAY 2016.pdf |

Wire info attached

Janice A. Ryce – Accounting
RUNNION EQUIPMENT COMPANY
jaryce@runnionequipment.com
800-824-6704  /  708-447-3169  /  708-447-3730 - Fax

http://www.runnionequipment.com
Crane & Equipment Solutions
For Contractors, Government, Rail, Utilities, or Agribusiness/
Sales, Service, Parts, Rental/ Custom Mounting, Rebuilding



1



**EQUIPMENT COMPANY**
*7950 West 47th Street, Lyons, IL  60534*
*(800) 824-6704 Ph (708) 447-3730 Fax*
*www.runnionequipment.com*

*Truck Mounted Cranes & Equipment*
*Sales, Service & Rentals*

## ELECTRONIC PAYMENT INSTRUCTIONS

*UPDATED 12/19/2014*

### Wire Transfer, *DOMESTIC*:

| | |
|---|---|
| Beneficiary Bank: | STATE BANK OF COUNTRYSIDE |
| | 6734 Joliet Road |
| | Countryside, IL 60525 |
| | ABA# ▮▮▮▮▮▮ |
| Beneficiary: | RUNNION EQUIPMENT COMPANY |
| | 7950 West 47th Street |
| | Lyons, IL 60534 |
| | ACCT# ▮▮▮▮▮▮ |

### Wire Transfer, *INTERNATIONAL*:

Field 56A – Intermediary Institution:

SWIFT No.: ▮▮▮▮▮
BMO Harris Bank N.A.
111 W. Monroe Street
Chicago, IL 60603, USA

Field 57D – Account with Institution:

ABA ▮▮▮▮▮
State Bank of Countryside
6734 Joliet Rd.
Countryside, IL 60525

Field 59A – Beneficiary Customer:

RUNNION EQUIPMENT COMPANY
7950 West 47th Street
Lyons, IL 60534
ACCT# ▮▮▮▮▮

Field 70 – Remittance Information:

(Invoice, purchase order, Quote #, etc.)

*\* Field Tags are for a SWIFT MT103 / NOTE: BMO Harris Bank N.A. ABA is #071000288*

---

### ~ DIRECT INQUIRIES TO ~

*State Bank of Countryside – Sue Doering – 708.485.9756 – susan.doering@banksbc.com*
*Runnion Equipment Company - Janice Ryce – 708.447.3169 – jaryce@runnionequipment.com*

**Michael Haeberle**

| | |
|---|---|
| **From:** | Janice Ryce <jaryce@runnionequipment.com> |
| **Sent:** | Wednesday, May 18, 2016 11:00 AM |
| **To:** | 'darrell@landalesigns.com' |
| **Subject:** | wire instruction |
| **Attachments:** | Wire instructions MAY 2016.pdf |

See attached

Janice A. Ryce – Accounting
**RUNNION EQUIPMENT COMPANY**
jaryce@runnionequipment.com
**800-824-6704  /  708-447-3169  /  708-447-3730 - Fax**

http://www.runnionequipment.com
Crane & Equipment Solutions
For Contractors, Government, Rail, Utilities, or Agribusiness/
**Sales, Service, Parts, Rental/ Custom Mounting, Rebuilding**



1



**Truck Mounted Cranes & Equipment
Sales, Service & Rentals**

## EQUIPMENT COMPANY

*7950 West 47th Street, Lyons, IL 60534
(800) 824-6704 Ph (708) 447-3730 Fax
www.runnionequipment.com*

### *ELECTRONIC PAYMENT INSTRUCTIONS*

*UPDATED 12/19/2014*

#### Wire Transfer, *DOMESTIC*:

| | |
|---|---|
| Beneficiary Bank: | STATE BANK OF COUNTRYSIDE |
| | 6734 Joliet Road |
| | Countryside, IL 60525 |
| | ABA# ▮▮▮ |
| Beneficiary: | RUNNION EQUIPMENT COMPANY |
| | 7950 West 47th Street |
| | Lyons, IL 60534 |
| | ACCT# ▮▮▮ |

#### Wire Transfer, *INTERNATIONAL*:

Field 56A – Intermediary Institution:

SWIFT No.: ▮▮▮
BMO Harris Bank N.A.
111 W. Monroe Street
Chicago, IL 60603, USA

Field 57D – Account with Institution:

ABA ▮▮▮
State Bank of Countryside
6734 Joliet Rd.
Countryside, IL 60525

Field 59A – Beneficiary Customer:

RUNNION EQUIPMENT COMPANY
7950 West 47th Street
Lyons, IL 60534
ACCT# ▮▮▮

Field 70 – Remittance Information:

(Invoice, purchase order, Quote #, etc.)

*\* Field Tags are for a SWIFT MT103 / NOTE: BMO Harris Bank N.A. ABA is #071000288*

---

### ~ *DIRECT INQUIRIES TO* ~

*State Bank of Countryside – Sue Doering – 708.485.9756 – susan.doering@banksbc.com*
*Runnion Equipment Company – Janice Ryce – 708.447.3169 – jaryce@runnionequipment.com*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| Landale Signs and Neon, Ltd., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:16-cv-07619 |
| | ) | |
| Runnion Equipment Co., and | ) | |
| John Doe, | ) | |
| | ) | |
| Defendants. | ) | |

### Notice of Rule 30(b)(6) Deposition

TO: Steven Polick
    Steven Polick & Associates, P.C.
    155 N. Michigan Ave., Ste. 700
    Chicago, IL 60601
    spolick@sbcglobal.net

Please take notice that pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, Plaintiff, through its attorneys, Patterson Law Firm, LLC shall take the deposition on oral examination of **Runnion Equipment Co.**, through a designated representative, who shall be designated to testify on (1) Runnion Equipment Co.'s policies and procedures for sending wire transfer information; (2) Runnion Equipment Co.'s computer systems and computer security; (3) Runnion Equipment Co.'s email server settings and security; and (4) Any fake, spoofed, or imposter emails sent or received by any Runnion Equipment Co. address or any address purporting to be by Runnion Equipment Co.

The deposition shall take place on **August 15, 2018 at 3:00 PM** at the offices of Patterson Law Firm, LLC, One North LaSalle St., Suite 2100, Chicago, Illinois, 60602, before a duly qualified court reporter.

Respectfully submitted,

Michael Haeberle
Patterson Law Firm, LLC
One North LaSalle Street
Suite 2100
Chicago, IL 60602
Tel. 312-223-1699

△ π EXHIBIT #4
Deponent
Date 5-25 Rptr 5
WWW.DEPOBOOK.COM

Fax. 312-223-8549
mhaeberle@pattersonlawfirm.com
Attorneys for Plaintiff

### Proof of Service

The undersigned attorney, on oath, states that he served the attached **Notice of 30(b)(6) Deposition** via e-mail and U.S. Mail by depositing the same in the United States post box located at One North LaSalle Street, Chicago, Illinois, which was addressed to counsel of record and bore proper postage prepaid on July 27, 2018.

Michael Haeberle

# Michael Haeberle

| | |
|---|---|
| **From:** | Brad Runnion <barunnion@runnionequipment.com> |
| **Sent:** | Monday, April 11, 2016 12:09 PM |
| **To:** | Pat Runnion (PRUNNION@RUNNIONEQUIPMENT.COM) |
| **Cc:** | Jennifer Molina (jmolina@runnionequipment.com) |
| **Subject:** | Emailing: Landale Signs |
| **Attachments:** | Landale Signs.pdf |

Your message is ready to be sent with the following file or link attachments:

Landale Signs

Note: To protect against computer viruses, e-mail programs may prevent sending or receiving certain types of file attachments. Check your e-mail security settings to determine how attachments are handled.



1

[SALES ORDER]



# RUNNION EQUIPMENT COMPANY

**Truck Mounted Cranes & Equipment**
**Sales, Service & Rentals**

7950 WEST 47th STREET • LYONS, ILLINOIS 60534
PHONE (708) 447-3189 • 1-800-824-6704 • FAX (708) 447-3730
www.runnionequipment.com

| Sold To | Landale Signs and Neon Ltd. | Date: | 4/11/16 |
|---|---|---|---|
| Address | 8525 Argyll Rd. NW | | |
| | Edmonton, AB T6C 4B2, Canada | Quote No. | 4952 |
| | 780-437-3730 | | |
| | Attn: Darrell Brown | | Unit #3974U |

Page 1 of 2

| QUANTITY | DESCRIPTION | PRICE |
|---|---|---|
| One (1) | **Used 2005 Elliott G85F equipped as follows:** | |
| | - 90' working height | |
| | - 5,900# maximum boom capacity | |
| | - Out and down main outriggers | |
| | - A-frame style rear stabilizers | |
| | - Single front outrigger | |
| | - 600# platform capacity | |
| | - Hydraulic circuit in basket | |
| | - Strobe lights mounted on crane pedestal | |
| | **MOUNTED ON** | |
| One (1) | **2005 Sterling LT8500 equipped as follows:** | |
| | - 56,000# GVW | |
| | - CAT C7 Engine | |
| | - Automatic transmission | |
| | - Front axle 16,000# | |
| | - Front wheels – 22.5x12.2 steel | |
| | - Front tires – 385/65R22.5 | |
| | - Rear axle - 40,000# | |
| | - Rear wheels – 22.5x8.25 | |
| | - Rear tires – 11R22.5 | |
| | - Continued on Page 2 – | |

The terms and conditions appearing on the reverse side of this Sales Order
are made a part hereof the same as if rewritten at length herein.

| REC SALES SIGNATURE | DATE | PURCHASER SIGNATURE | DATE |
|---|---|---|---|

SALES ORDER



# RUNNION EQUIPMENT COMPANY

7950 WEST 47th STREET • LYONS, ILLINOIS 60534
PHONE (708) 447-3189 • 1-800-824-6704 • FAX (708) 447-3730
www.runnionequipment.com

*Truck Mounted Cranes & Equipment*
*Sales, Service & Rentals*

| | | | |
|---|---|---|---|
| Sold To: | Landale Signs and Neon Ltd. | Date. | 4/11/16 |
| Address | 8525 Argyll Rd. NW | | |
| | Edmonton, AB T6C 4B2, Canada | Quote No. | 4952 |
| | 780-437-3730 | | |
| | Attn: Darrell Brown | Unit #3974U | |

Page 2 of 2

| QUANTITY | DESCRIPTION | PRICE |
|---|---|---|
| | - Differential lock on both axles | |
| | - Trailer package with pintle hook | |
| | - AM/FM/CD stereo | |
| | - Air conditioning | |
| | - Spotlight mounted on top of cab | |
| | Price: | $86,000.00 |
| | | |
| | *Freight to Portal North Dakota not to exceed $2,000.00 | |
| | | |
| | All prices F.O.B. Lyons, Il. and subject to all applicable tax | |
| | Quote firm for 30 days TERMS: 10% deposit at time of order | |
| | Balance due upon notification that unit is ready for delivery | |

The terms and conditions appearing on the reverse side of this Sales Order
are made a part hereof the same as if rewritten at length herein

| REC SALES SIGNATURE | DATE | PURCHASER SIGNATURE | DATE |
|---|---|---|---|

## SALES ORDER – SIGNATURE PAGE



# RUNNION EQUIPMENT COMPANY

7950 WEST 47th STREET • LYONS, ILLINOIS 60534 PHONE • (708) 447-3169
1-800-824-6704      FAX (708) 447-3730      www.runnionequipment.com

Sold To:                                                          Date:

Address:                                                          Quote No.

### SALES ORDER - TERMS AND CONDITIONS OF SALE

This document contains the terms of sale. The entire contract between Seller and Buyer is contained in this Sales Order, no alleged oral promises or conditions not set forth herein shall be binding upon Seller or Buyer, and any prior negotiations between the parties are merged into the terms of this document.

Prices quoted are subject to change without notice in conformity with the Manufacturer's Price List effective at the time of delivery. Prices do not include taxes. Any tax, impost, levy, duty or other charge hereinafter imposed by any government or other authority on this sale will be added to the purchase price as herein noted or any later revision of the purchase price, and will be paid by Buyer unless Buyer provides Seller with a proper tax exemption certificate.

Upon acceptance of this order by Seller, if Buyer fails to perform the terms and conditions hereof, or refuses to accept delivery of the equipment, accessories or other items ordered within ten (10) days after notification that same are ready for delivery, the Seller, at its option may retain as liquidated damages all money, trade-ins or other property delivered to Seller by Buyer as down payment hereunder.  Buyer will pay any cost of collection for any amount owed to Sellers, including, without limitation, reasonable attorney's fees, court costs and interest in the amount of 1% per month (12% per annum) from the date the amount is due.

Payment is due Seller from the date when Seller is prepared to make delivery.  All equipment and material is delivered F.O.B. Seller's plant and title and liability for loss or damage passes to Buyer upon Seller's delivery of the goods to a carrier for shipment to Buyer and any loss or damage thereafter shall not relieve Buyer from any obligation hereunder.  Risk of loss for goods shall pass to the Buyer once payment is received by Seller.

Buyer may terminate this contract in whole upon thirty (30) days advance written notice to Seller.  In such event, Buyer shall be liable for termination charges.  If goods ordered are a standard, manufacturer catalog item, Buyer will pay a cancellation charge for each unit cancelled equal the greater of: 20% of the purchase order item price or forfeiture of down payment/trade in.  If goods are non-standard items built to the Buyer's custom order, Buyer will pay for all cost, direct and indirect incurred and committed for this contract, together with a reasonable allowance for prorated expenses and anticipated profits.

Buyer agrees to comply fully with all laws and regulation concerning the purchase and sale of goods.  In particular, Buyer agrees to comply with all applicable export administration regulations of the United States, including, but not limited to, the Export Administration Act, insofar as they apply to the sale of products.

Buyer shall indemnify and hold harmless Seller, its employees, officers and directors and the respective successors and assigns, from and against any and all liability, damages, claims, causes of actions, losses, costs and expenses (including attorneys' fees) of any kind arising out of injuries to any person (including death) or damage to any property caused by or related to the goods or any negligent act or omission of Buyer, its employees and agents.

The validity, performance and construction of this Sales Order shall be governed by the laws of the State of Illinois, of the United States of America.

Seller shall not be liable, and shall be free from any potential liability for delay in delivery or non-delivery or any failure in shipment caused in whole or in part, by the occurrence of any contingency beyond control of either Seller or Seller's suppliers including, but not limited to act of war (whether an actual declaration thereof is made or not), act of any government or any agency or subdivision thereof, judicial action, sabotage, insurrection, terrorism, riot or other act of civil disobedience, act of a public enemy, failure or delay in transportation, strikes, lockouts, shortage of labor or labor troubles of any kind, accidents, explosion, perils of the sea, fire, earthquake, flood, storm or any other act of God, restrictions or requisitions, shortage of labor, fuel, raw material or machinery or technical failure where Seller has exercised ordinary care in the prevention thereof, failure of manufacturers to deliver, bankruptcy or insolvency of manufacturers or suppliers, suspension of shipping facilities, act or default of any carrier or any other contingency of whatsoever nature beyond Seller's control affecting production, transportation to boarding point, loading, forwarding or unloading in such a situation at destination of the goods covered by this contract including disturbances existing at this time this contract was made. In such a situation, if shipments or delivery is not made during the period contracted for, Buyer shall accept delivery under this contract when shipment is made, provided, however, Buyer shall not be obligated to accept delivery if shipment is not made within a reasonable time after the cessation of the aforementioned impediments or causes.  Seller may allocate delivery among Seller's customers.

This order shall not be binding upon Seller until accepted by Seller in writing hereon and when so accepted, the original order with original signatures as given Seller and in Seller's possession shall be conclusive and binding upon the parties hereto.

The Buyer hereby acknowledges receipt of a copy of this Sales Order and Terms and Conditions.

_____                    _____
Customer Signature                                          Date Accepted

_____                    _____
Runnion Equipment Co                                       Date

**Michael Haeberle**

| | |
|---|---|
| **From:** | Pat Runnion <prunnion@runnionequipment.com> |
| **Sent:** | Wednesday, May 25, 2016 9 52 AM |
| **To:** | 'Michael F. Prochot' |
| **Subject:** | FW: FW: recall paperwork |
| **Attachments:** | SKM_C284e16042210000.pdf |

Thank you.


*Patrick Runnion*

**Runnion Equipment Company**
**800 824 6704**
**708 341 3169 cell**
**www.runnionequipment.com**

**1975 – 41 YEARS OF SERVICE – 2016**

**Crane & Equipment Solutions**
**For Contractors, Government, Rail, Utilities, or Agriculture/**
**Sales, Service, Parts, Rental/ Custom Mounting, Rebuilding**

**From:** Pat Runnion [mailto:prunnion@runnionequipment.com]
**Sent:** Friday, April 22, 2016 12:02 PM
**To:** Willie Messuck (wmessuck@runnionequipment.com)
**Subject:** FW: FW: recall paperwork

Willie, this is the sale of our G85, any word from Marno on the ITN?



Thank you.


*Patrick Runnion*

**Runnion Equipment Company**
**800 824 6704**
**708 341 3169 cell**
**www.runnionequipment.com**

**1975 – 41 YEARS OF SERVICE – 2016**



1

**Crane & Equipment Solutions**
**For Contractors, Government, Rail, Utilities, or Agriculture/**
**Sales, Service, Parts, Rental/ Custom Mounting, Rebuilding**

**From:** Darrell Brown [mailto:darrell.landalesigns@gmail.com]
**Sent:** Friday, April 22, 2016 11:18 AM
**To:** Pat Runnion
**Subject:** Re: FW: recall paperwork

Have a look at the attached U.S. Customs and Border Protection Vehicle/Equipment Export Worksheet attached.

This completed form must be turned in with the rest of the documents at the border—if you could get the pertinent info. filled in – especially the transportation information and send it to me I will include it with the rest of the documents.

Thanks

Darrell

On Fri, Apr 22, 2016 at 11:15 AM, Darrell Brown <darrell.landalesigns@gmail.com> wrote:

Good morning Pat

Yesterday I advised that we require an "ITN" number in order to clear the border -- You do this by going to : aesdirect./census.gov/registration/register_form_user.cig

This is the AES Direct application that will ultimately get you an ITN number. This number is vital to getting the unit across the border.

I'll need this number along with the rest of the documents --:

1) a copy of the title - I have a copy that will do for now but the ORIGINAL document must accompany the truck to the border.

2) manufacturers certificate of recalls –(I have these)

3) U.S. Customs and Border Protection vehicle/equipment export sheet (I'll email you a copy of this sheet as it requires transport information ) please fill in and return to me

4) Bill of sale ( you will send this to me when you release the vehicle)

5) Invoice (I have a copy)

6) ITN number -(I'll get this from you when you get it from the U.S. Govt.)

Also let me have your wiring instructions.

2

Sorry for all of the delays but getting through the red tape is mind boggling



Thanks

Darrell

On Thu, Apr 21, 2016 at 2:33 PM, Darrell Brown <darrell.landalesigns@gmail.com> wrote:

Pat

Just a head's up. I was told when you get the AES thing done you will get an ITN number that is apparently vital to get the truck cleared. I'm trying to find out what we need to do with the number once we have it ??

Thanks

Darrell

On Thu, Apr 21, 2016 at 1:21 PM, Darrell Brown <darrell.landalesigns@gmail.com> wrote:

Pat

I had a Freightliner dealer do a recall on the truck and this is what I received back, the gal I was in contact with advised that this is what she sends the government agency and as far as she knows it is sufficient as far as a recall "letter " is concerned.

I'm sending it to our broker and I'm hoping it's all they need.

I have been trying to deal with both the U S and Canadian customs as well as trying get the NAFTA clearances for the truck and the crane. It has been a struggle to say the least , if we don't get clearance there will be a hefty duty to pay, with the clearance documents there will be none - so it's worth the work to get all of the documents together and file all of them at once.

I hope to get the last of the information today. I will keep you informed.

Regards

Darrell

On Wed, Apr 20, 2016 at 9:18 AM, Darrell Brown <darrell.landalesigns@gmail.com> wrote:

Pat – I have never seen one so I'll send it to the broker and see if this is what we need , thanks

Darrell

3

On Tue, Apr 19, 2016 at 3:11 PM, Pat Runnion <prunnion@runnionequipment.com> wrote:

Darrell, is this what you need for the recall paperwork?

Thank you,

*Patrick Runnion*

**Runnion Equipment Company**

800 824 6704

708 341 3169 cell

www.runnionequipment.com

1975 – 41 YEARS OF SERVICE – 2016

Crane & Equipment Solutions

For Contractors, Government, Rail, Utilities, or Agriculture/

Sales, Service, Parts, Rental/ Custom Mounting, Rebuilding

**From:** Jim Hopkinson [mailto:jthopkinson@gmail.com]
**Sent:** Tuesday, April 19, 2016 2:53 PM
**To:** prunnion@runnionequipment.com
**Subject:** FW: recall paperwork

Pat.

Here is the VIN report for the Elliott unit

Thank you

James Hopkinson

Product Support

Runnion Equipment Company

800-824-6704

**From:** Nick Guzlas [mailto:nick.guzlas@freewaytruck.com]
**Sent:** Tuesday, April 19, 2016 2:23 PM
**To:** service@runnionequipment.com
**Subject:** recall paperwork

Jim,

Attached is a copy of the recall sheet. It had 1 recall which was completed  10/15/09 . There are no open recall campaigns on this vehicle as of this date

Nick Guzlas

Service Manager

Freeway Ford Sterling Truck Sales

(708) 442-9000

5

Virus-free  www.avast.com

Virus-free  www.avast.com

# U.S. Customs and Border Protection

## Vehicle/Equipment Export Worksheet

| Description of Vehicle or Equipment | |
|---|---|
| VIN / Serial Number: | |
| Year: | |
| Make: | |
| Model: | |

| Title Information | |
|---|---|
| Title Issuing State: | |

| Transporting Information | |
|---|---|
| Name:<br>(Person / Company / Individual transporting the vehicle) | |
| Telephone: | |
| Name of U.S. Border Crossing: | |
| Estimated Date of Export:<br>(Can be NO MORE than 90 days from the filing of this worksheet) | |

| U.S. Address of Seller / Owner | |
|---|---|
| Name: | |
| Address : | |
| City: | |
| State: | |
| Zip Code: | |
| Telephone: | |
| Cellular: | |

| Canadian Address of Purchaser / Owner / Ultimate Consignee | |
|---|---|
| Name: | 640842 ALBERTA LTD |
| Address : | 133 - 22555 TOWNSHIP ROAD 530 |
| City: | SHERWOOD PARK |
| Province: | ALBERTA, Canada . |
| Postal Code: | T8A4T7 |
| Telephone: | 780 - 464 029U |
| Cellular: | 750 - 717 - 2699 |

Courtesy of USAimexport Publications
www.USAimexport.com | www.USAimexport.blogspot.com | info@USAimexport.com

**Michael Haeberle**

| | |
|---|---|
| **From:** | Pat Runnion <prunnion@runnionequipment.com> |
| **Sent:** | Wednesday, April 20, 2016 10:50 AM |
| **To:** | darrell@landalesigns.com |
| **Subject:** | FW: G85 Title |
| **Attachments:** | G85 Title.pdf |

Darrel , can you fill out the title and send it back to me as you want it to read?

Thank you,

*Patrick Runnion*

**Runnion Equipment Company**
**800 824 6704**
**708 341 3169 cell**
**www.runnionequipment.com**

**1975 – 41 YEARS OF SERVICE – 2016**

Crane & Equipment Solutions
For Contractors, Government, Rail, Utilities, or Agriculture/
Sales, Service, Parts, Rental/ Custom Mounting, Rebuilding

**From:** Willie Messuck [mailto:wmessuck@runnionequipment.com]
**Sent:** Wednesday, April 20, 2016 9:52 AM
**To:** Pat Runnion
**Subject:** G85 Title

Pat,
Please see attached.
Thanks,

Willie Messuck - Rental Coordinator
RUNNION EQUIPMENT COMPANY
wmessuck@runnionequipment.com
800-824-6704 / 708-447-3169

http://www.runnionequipment.com
Crane & Equipment Solutions
For Contractors, Government, Rail, Utilities, or Agribusiness/
Sales, Service, Parts, Rental/ Custom Mounting, Rebuilding



1

 Virus-free. www.avast.com

# WISCONSIN CERTIFICATE OF TITLE

| Vehicle Identification Number | | Year | Make | | | | |
|---|---|---|---|---|---|---|---|
| 2FZHCHDCX5AU20053 | | 2005 | STERLING INDUSTRIAL CORP | | | | |
| Title Number | Issue Date | | Chassis Type | Odometer Reading | Odometer Status | | Odometer Date |
| 16102Q1015-2 | 04/11/2016 | | TRUK | | EXEMPT | | |
| Product Number | Body Style | | Color | | | Fleet No. | |
| 14081161027 | UNKNOWN | | WHITE | | | | |

**Titled Owner(s)**
PME EQUIPMENT INC
500 RANDOLPH DR
APPLETON, WI 54913-9293

The person, firm or corporation named on this Title is the lawful owner of the vehicle described, subject to any Security Interest (liens) shown. The order in which the Lien Holders appear on this Title does not necessarily represent their priority. The Wisconsin Department of Transportation will not be responsible for false or fraudulent odometer statements made in the assignment of the Certificate of Title or for errors in reporting mileage, brand disclosures or the history of the vehicle. The department has no actual knowledge about the history of the vehicle and makes no warranty that the title brands or mileage disclosures on prior titles have been carried forward onto this document.
2FZHCHDCX5AU20053

**Lien Holder(s)**
NONE,

**Additional Vehicle Detail**
PREVIOUSLY TITLED IN: IA

**SELLER:** When the vehicle is sold, complete the ASSIGNMENT OF CERTIFICATE OF TITLE on the top back of this title and deliver the title to the purchaser with the vehicle. You may wish to retain a copy of this title with the purchaser's information and signature as proof of sale for your records.

**PURCHASER:** Apply for a new title with the Wisconsin Division of Motor Vehicles immediately. To legally operate this vehicle, you are required to register it with the Division of Motor Vehicles.

**MAIL ADDRESS:**
Wisconsin Department of Transportation
PO Box 7949, Madison, WI 53707-7949

**QUESTIONS:**
Contact the Division of Motor Vehicles at
414-266-1000, 608-266-1466
wisdmv@dot.wi.gov

15 - 1 - 0890435

**KEEP IN SAFE PLACE**      **DO NOT KEEP IN VEHICLE**

## ASSIGNMENT OF CERTIFICATE OF TITLE

The seller is required to state the mileage and provide written vehicle disclosure in connection with the transfer of ownership. Failure to complete a mileage statement or providing a false mileage statement, disclose required information, or providing a false statement may result in fines and/or imprisonment and may make you liable for damages to the purchaser. See Federal 49 USC and Ch. 342 Wisconsin laws.

I, the seller, certify that to the best of my knowledge the information contained on this document is true and correct and that I have entered the vehicle odometer reading, brand disclosure, and selling price in compliance with federal and state law as referenced above. For value received, I sell, assign or transfer the vehicle described on this document and warrant title to purchaser.

**1.**

ODOMETER NOW READS (No Tenths)
and to the best of my knowledge is
actual mileage of this vehicle unless one of the following statements is checked:

☐ The odometer reading reflects the amount of mileage in **excess** of its mechanical limit

☐ The odometer reading is NOT actual mileage. WARNING ODOMETER DISCREPANCY

**8 1 0 6 5 3**

Selling Price

BRAND DISCLOSURE (will be printed on future title) Check all that apply:

☐ Salvage vehicle  ☐ Flood damaged  ☐ Hail damaged  ☐ Previous police vehicle  ☐ Previous taxicab

Print Purchaser Name

**RUNNION EQUIPMENT COMPANY**

Print Seller Name

**PME EQUIPMENT INC**

Print Purchaser Address, City, State, ZIP Code

**7950 47th ST  LYONS, IL 60534**

Print Seller Address, City, State, ZIP Code

**500 RANDOLF DR. APPLETON, WI 54913**

Signature of Purchaser         Date

X **Well Manual (Agent)** 4/11/16

Signature of Seller(s) — See note
Date
X **____ Mulso** 4/11/16

### Sections 2–3 For Dealer Use Only
Dealer: Produce now and back for your records - Federal 49 CFR 580.5

**2.**

Print Consigning Auction Dealer Name or Consigning Salvage Pool (if applicable)

Auction or Salvage Pool Dealer Number

Sale Date

ODOMETER NOW READS (No Tenths)
and to the best of my knowledge is
actual mileage of this vehicle unless one of the following statements is checked:

☐ The odometer reading reflects the amount of mileage in **excess** of its mechanical limit

☐ The odometer reading is NOT actual mileage. WARNING ODOMETER DISCREPANCY

BRAND DISCLOSURE (will be printed on future title) Check all that apply:

☐ Salvage vehicle  ☐ Flood damaged  ☐ Hail damaged  ☐ Previous police vehicle  ☐ Previous taxicab  ☐ Manufacturer buyback

Print Purchaser Name

Print Selling Dealer Name

Print Purchaser Address, City, State, ZIP Code

Print Seller Address, City, State, ZIP Code

Print Name of Purchaser's Authorized Agent Signing Below

Print Name of Selling Dealer's Authorized Agent Signing Below

Signature of Purchaser's Authorized Agent         Date
X

Signature of Selling Dealer's Authorized Agent         Date
X

**3.**

Print Consigning Auction Dealer Name or Consigning Salvage Pool (if applicable)

Auction or Salvage Pool Dealer Number

Sale Date

ODOMETER NOW READS (No Tenths)
and to the best of my knowledge is
actual mileage of this vehicle unless one of the following statements is checked:

☐ The odometer reading reflects the amount of mileage in **excess** of its mechanical limit

☐ The odometer reading is NOT actual mileage. WARNING ODOMETER DISCREPANCY

BRAND DISCLOSURE (will be printed on future title) Check all that apply:

☐ Salvage vehicle  ☐ Flood damaged  ☐ Hail damaged  ☐ Previous police vehicle  ☐ Previous taxicab  ☐ Manufacturer buyback

Print Purchaser Name

Print Selling Dealer Name

Print Purchaser Address, City, State, ZIP Code

Print Seller Address, City, State, ZIP Code

Print Name of Purchaser's Authorized Agent Signing Below

Print Name of Selling Dealer's Authorized Agent Signing Below

Signature of Purchaser's Authorized Agent         Date
X

Signature of Selling Dealer's Authorized Agent         Date
X

**NO additional dealer reassignments permitted**

**Michael Haeberle**

| | |
|---|---|
| **From:** | Pat Runnion <prunnion@runnionequipment.com> |
| **Sent:** | Monday, April 25, 2016 3:41 PM |
| **To:** | Darrell Brown (darrell.landalesigns@gmail.com) |
| **Subject:** | FW. Jake Skoczylas |
| **Attachments:** | Jake Skoczylas vcf |

Thank you.

*Patrick Runnion*

**Runnion Equipment Company**
**800 824 6704**
**708 341 3169 cell**
**www.runnionequipment.com**

**1975 – 41 YEARS OF SERVICE – 2016**

**Crane & Equipment Solutions**
**For Contractors, Government, Rail, Utilities, or Agriculture/**
**Sales, Service, Parts, Rental/ Custom Mounting, Rebuilding**



1

## Michael Haeberle

| | |
|---|---|
| **Full Name:** | Jake Skoczylas |
| **Last Name:** | Skoczylas |
| **First Name:** | Jake |
| **Company:** | Mamo Transportation |
| | |
| **Business:** | (888) 668-6885 ext· 4112 or 4111 |
| **Mobile:** | (919) 869-5964 |
| **Business Fax:** | (919) 563-1132 |
| | |
| **Web Page:** | http://www.mamotransportation.com |

Per Terry, $1 65 per mile is a good number for budget purposes

05/19/2016 15:54 FAX 7084473730          RUNNION EQUIPMENT CO.          @001

```
                        ***********************
                        ***   TX REPORT   ***
                        =====================
```

TRANSMISSION OK

TX/RX NO                2495
CONNECTION TEL                        17804359285
CONNECTION ID
ST. TIME                05/19 15:53
USAGE T                 01'14
PGS. SENT               3
RESULT                  OK

# RUNNION *Equipment Company*

**Truck Mounted Cranes & Equipment**
**Sales, Service & Rentals**
Visit our Website at www.RunnionEquipment.com

7950 West 47th St.
Lyons, IL 60534
Ph: (708) 447-3169  Fax: (708) 447-3730
Toll Free: (800) 824-6704

# Fax Transmission

FAX TO: _____    AT FAX NUMBER: _780- 435- 9285_

_____

_____                DATE: _____

                                        TIME: _____

ATTN: | DArrell |                       PAGES: _____

RE: | INVOICE from Runnion |

NOTE:

DArrell, this is what Jennifer
emailed you on 4-18
She did not give you any wire
instructions as pArt of her email.
only the invoice

△ π EXHIBIT 4
Deponent
Date 8-28-
www.DEPOBOOK.com

 *Equipment Company*

7950 West 47th St.
Lyons, IL 60534

*Truck Mounted Cranes & Equipment*
*Sales, Service & Rentals*
Visit our Website at www.RunnionEquipment.com

Ph: (708) 447-3169  Fax: (708) 447-3730
Toll Free: (800) 824-6704

## Fax Transmission

FAX TO: _____     AT FAX NUMBER: _780- 435- 9285_

_____

_____     DATE: _____

TIME: _____

ATTN: | Darrell |     PAGES: _____

RE: | INVoice from Runnion |

NOTE:

_Darrell, this is what Jennifer_
_emailed you on 4-18_
_She did not give you any wire_
_instructions as part of her email._
_only the invoice_

_Tal_

NATIONAL CRANE – PALFINGER – PRENTICE – LIFT ALL – ARM LIFT – TRAIL KING – TADANO – POTAIN
NEW – USED – PARTS – RENTAL – SERVICE
TRUCK MOUNTED CRANES – AERIAL BUCKET TRUCKS – LOWBOY TRAILERS

**Jennifer Molina**

| | |
|---|---|
| **From:** | Jennifer Molina <jmolina@runnionequipment.com> |
| **Sent:** | Monday, April 18, 2016 11:40 AM |
| **To:** | 'darrell.landalesigns@gmail.com' |
| **Subject:** | Invoice 136316 from Runnion Equipment Company |
| **Attachments:** | Inv_136316_from_Runnion_Equipment_Company_8360.pdf |

## Runnion Equipment Company

**Invoice** *Due 04/18/2016*
*136316*

Amount Due: **$88,125.00**

Dear Customer,

Your invoice-136316 for 88,125.00 is attached. Please remit payment at your earliest convenience.

Thank you for your business - we appreciate it very much.

Sincerely,
Runnion Equipment Company

7084473169
www.runnionequipment.com

1



**EQUIPMENT COMPANY**

www.runnionequipment.com

7950 WEST 47TH STREET • LYONS, ILLINOIS 60534

PHONE 708-447-3169
800-824-6704
FAX 708-447-3730

# Invoice

| INVOICE DATE | 4/18/2016 |
|---|---|
| INVOICE NO. | 136316 |

**SOLD TO**

LANDALE SIGNS AND NEON LTD
8525 ARGYLL RD NW
EDMONTON, AB T6C 4B2
CANADA

**SHIPPED TO**

LANDALE SIGNS AND NEON LTD
8525 ARGYLL RD NW
EDMONTON AB T6C 4B2
CANADA

| F.O.B. POINT | CUSTOMER ORDER NO | | SHIP VIA | Terms | SALESPERSON | S.O. No. |
|---|---|---|---|---|---|---|
| LYONS, IL | DARRELL BROWN | | DRIVEAWAY | Due on receipt | PR | |

| ITEM CODE | U/M | QTY | DESCRIPTION | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| | | | PURCHASE OF A NEW ELLIOTT G85R, S/N - FR3245 MOUNTED ON A 2005 STERLING L T8500 S/N - 2FZHCHDCX5AU20053 | | |
| NEW CRAN... | ea | 1 | UNIT # 3974U | 86,000.00 | 86,000.00 |
| DOC FEE | | 1 | DOCUMENT FEE | 125.00 | 125.00 |
| PICKUP/DE | | 1 | FREIGHT | 2,000.00 | 2,000.00 |

Thank you for your business.

| | |
|---|---|
| SALES TAX | $0.00 |
| **Total** | $88,125.00 |

05/19/2016 15:54 FAX 7084473730          RUNNION EQUIPMENT CO.                    @001

```
                    ************************
                    ***    TX REPORT    ***
                    ************************


        TRANSMISSION OK

        TX/RX NO              2495
        CONNECTION TEL.                   17804359285
        CONNECTION ID
        ST. TIME              05/19 15:53
        USAGE T               01'14
        PGS. SENT             3
        RESULT                OK
```

# RUNNION Equipment Company

**Truck Mounted Cranes & Equipment**
**Sales, Service & Rentals**
Visit our Website at www.RunnionEquipment.com

7950 West 47th St.
Lyons, IL 60534
Ph: (708) 447-3169  Fax: (708) 447-3730
Toll Free: (800) 824-6704

## Fax Transmission

FAX TO: _____    AT FAX NUMBER: _780- 435- 9285_

_____

_____                    DATE: _____

                                     TIME: _____

ATTN: | DArrell |                    PAGES: _____

RE: | INVOICE from Runnion |

NOTE:

DArrell, this is what Jennifer
emailed you on 4-18
She did not give you any wire
instructions as part of her email.
only the invoice

_Tal_

**Michael Haeberle**

| | |
|---|---|
| **From:** | Pat Runnion <prunnion@runnionequipment.com> |
| **Sent:** | Friday, May 20, 2016 10:19 AM |
| **To:** | darrell@landalesigns.com |
| **Subject:** | FW: Wire Fraud |
| **Attachments:** | Dissecting_Wire_Fraud_WP_Dec2013.pdf |

Thank you,

*Patrick Runnion*

**Runnion Equipment Company**
**800 824 6704**
**708 341 3169 cell**
**www.runnionequipment.com**

**1975 – 41 YEARS OF SERVICE – 2016**

**Crane & Equipment Solutions**
**For Contractors, Government, Rail, Utilities, or Agriculture/**
**Sales, Service, Parts, Rental/ Custom Mounting, Rebuilding**

**From:** Michael F. Prochot [mailto:mfprochot@runnionequipment.com]
**Sent:** Thursday, May 19, 2016 4:24 PM
**To:** Pat Runnion
**Subject:** Interesting reading - Wire Fraud

"Malware – It's everywhere and therefore nearly impossible to avoid, distributed in email, on spoofed websites, and arriving in text messages sent to smartphones. There are an estimated 70,000 variants released every day. According to the Anti-Phishing Working Group, 40% of computers already are infected with malware. Rapid malware innovations create new threats and extend the time to detection, leaving FI's further exposed. Malware detection providers themselves say that when something new appears, it can take weeks to research and formulate new protections. Criminal networks are sharing successes, technologies, and techniques, accelerating their investments to exploit this weakness."

Michael F. Prochot - President
RUNNION EQUIPMENT COMPANY
mfprochot@runnionequipment.com



800-824-6704  /  708-447-3169

http://www.runnionequipment.com
Crane & Equipment Solutions
For Contractors, Government, Rail, Utilities, and Agribusiness/
Sales, Service, Parts, Rental/ Custom Mounting, Rebuilding

 Virus-free. www.avast.com



# Dissecting Wire Fraud: How it Happens, and How to Prevent It



**WHITE PAPER**

©2011 Guardian Analytics, Inc. All rights reserved.



## Introduction

Preventing wire fraud starts with understanding how it is perpetrated and the many options fraudsters have for initiating fraudulent wire requests. And it is indeed the money movement method of choice with 76 percent of all fraud attempts featuring a wire transfer, according to an FS-ISAC survey.

In the last 20 years, the number of wire transfers taking place has nearly doubled, now exceeding 130 million each year, while the total dollar value of all transfers has tripled in the same time period reaching $600 trillion in 2012.

The increase in originators, volume, and dollar amount and other inherent characteristics of wire payments make them very attractive to fraudsters. Financial institutions must shore up their security to decrease fraud losses and the accompanying operational and reputational costs. Controls designed to ensure the originator and beneficiary are legitimate are routinely defeated. And rules-based solutions being implemented by many institutions to detect fraudulent wires are time-consuming to set up and maintain, generate a large number of false positives, and still miss fraud.

This paper provides examples of actual fraud cases that illustrate the breadth of schemes in play, available fraud prevention solutions, and the strengths, weaknesses, and limitations of each. It also recommends a behavior-based fraud prevention strategy that has been proven in the marketplace to detect wire fraud regardless of how the wire request was originated or what fraud scheme is in play.



# Fraud Schemes Use a Diverse Mix of How Accounts are Compromised, Points of Compromise, and Wire Initiation Method

## Limitless Options For Committing Wire Fraud

Criminals constantly are evolving their schemes and attack vectors, not only mixing the methods and points of compromise and channels in new combinations, but also showing a growing trend of using online accounts in particular to gather information needed to commit fraud in other channels. Guardian Analytics' own data has revealed thousands of fraudulent sessions where data was gathered online and used to perpetrate fraud in an offline channel.

Collectively, there are endless paths from the initial account compromise to the wire transfer, using both human and malware-based attacks to access accounts (see Figure 1).



*Figure 1: Each path represents a different potential scheme, further complicated by the multiple variations within each node, such as the many malware families and variants.*



## Method of Compromise

Credentials and the accompanying personal information needed to compromise accounts are readily available on criminal online marketplaces. In addition, account holders not only still are using simple passwords, but they also are reusing the same passwords on multiple services, which makes it even easier for criminals to compromise accounts. When a fraudster compromises an email account, for example, there's a good chance he also now has the password for online banking. A 2012 study of Yahoo and Sony breaches revealed that 60% of users that maintained accounts on both sites used the same password.

If the fraudster doesn't have the credentials for his target victim, there are many options for acquiring them.

- **Malware** – It's everywhere and therefore nearly impossible to avoid, distributed in email, on spoofed websites, and arriving in text messages sent to smartphones. There are an estimated 70,000 variants released every day. According to the Anti-Phishing Working Group, 40% of computers already are infected with malware. Rapid malware innovations create new threats and extend the time to detection, leaving FI's further exposed. Malware detection providers themselves say that when something new appears, it can take weeks to research and formulate new protections. Criminal networks are sharing successes, technologies, and techniques, accelerating their investments to exploit this weakness.

- **Social Engineering** – A recent Gartner report described "fraud scams that took social engineering tactics to new heights of deviousness." Criminals get credentials or other personal information from prospective victims and trick innocent 3rd parties, such as customer service agents, to actually help them complete a fraudulent wire.

- **Phishing** – Traditional phishing attacks start with an authentic looking email from a bank, a credit card company, the IRS, or another credible entity asking the victim to provide personal or financial information. The victim clicks on a link that goes to a fake site that collects personal or financial information, or the link installs malware on the victim's computer.

- **Vishing & SMishing** – In vishing attacks (voicemail phishing) the criminal calls claiming to be a bank, credit card company, or similar organization (often achieved by spoofing the caller ID so it looks like the call really is from the bank), and asks the victim to confirm personal information over the phone. It's either a live conversation or urgent sounding voicemail asking victim to call back and leave information to avoid some dire results. Fraudsters also use phishing attacks against mobile devices and tablets (SMS phishing, or SMishing), delivering a convincing and similarly urgent text message either with a link to a malicious payload or with a call-back number. When the victim calls, they're connected to an Automated Voice Response (AVR) system that asks them for personal or financial information.

- **Email Compromise** – This works two ways: gaining access to email can lead to online banking access, and visa versa. Either way, the fraudster ends up with access to both systems. What makes it much easier for the criminals is account holders' tendency to reuse passwords. When a criminal compromises a victim's email account through other means, he has a reasonably good chance that the online banking password is the same as or very similar to the email password. In addition, compromising an email account provides criminals with access to personal information that could be used to successfully authenticate him in a range of online accounts and services.



## Point of Compromise

As shown in Figure 1, each of these methods of compromise can be used against multiple targets, ranging from the account holder's online or mobile device to customers themselves to bank employees.

## Method of Wire Initiation

How an account is compromised does not necessarily dictate the channel through which the fraudster originates a wire. After obtaining credentials and compromising an account, fraudsters can submit wire requests through online and mobile banking channels as well as through offline channels such as the call center, fax, or through a branch.

# Sample Fraud Schemes Featuring Wire Payments

The wire channel clearly is the money movement channel of choice for fraudsters, especially when one considers that wires are often used to move large sums, are frequently used by businesses that have large account balances, move money quickly, and are hard to reverse. To illustrate the point made in Figure 1, here are just a few of the many ways for criminals to originate fraudulent wire transactions. These examples highlight how fraudsters are able to bypass controls and defeat security measures.

**Online Wire Request to Defeat Out-of-Band Confirmation** – The most common wire scheme starts with compromising an online account and then either disabling all security alerts or entering a new phone number or email address, defeating out-of-band (OOB) confirmation and preventing the victim from knowing that the account has been compromised. The fraudster then simply submits a wire request through the compromised online account and approves his own request.

One specific technique to defeat OOB is to compromise the victim's online banking account and change their email address to a very similar disposable email address (see Without a Trace Fraud Informer), which doesn't look particularly suspicious but results in the confirmation email being sent to the fraudster.

**Funeral Scheme Uses Compromised Email Account** – The basic version of this scenario starts with the fraudster compromising the victim's email account. He then uses the compromised email account to send a request to the FI's relationship manager explaining that he's out of country for a funeral and needs money for expenses. The FI emails the necessary Letter of Authority, which the fraudster receives, signs and faxes back, preying on the fact that FIs don't check signatures carefully. Upon receiving the signed form, the FI wires the requested funds to the fraudster's account.

A more sophisticated version starts when the fraudster compromises an online banking account to view check images to get the victim's signature. The rest of the scheme unfolds the same as above, although this time the form is returned with an accurately forged signature. This scheme could also use other life events, for example an accident where medical expenses are the excuse for needing the funds.

**Online Live Chat Targets Customer Service** – A fraudster compromises an online banking account and gathers (or changes) personal information. He then engages in a live chat session with a customer service agent saying that he's having trouble sending a wire and asks for help. The agent believes the fraudster



is legitimate because he has successfully logged into online banking. If the agent does request additional confirmation, the fraudster has gathered enough personal information to convince the agent that he is the real customer. (see Chatting for Dollars Fraud Informer for a complete write-up of this scheme.)

**Commercial Account Takeover to Defeat Dual Controls** – There are several versions of how fraudsters are able to take over commercial accounts and defeat dual controls.

1) A fraudster compromises an online banking admin account and then creates a new user with the authority to approve wire requests. He originates a wire request from the admin account, and then signs into the newly created account and approves his own wire request.

2) It also could work the other way, with the new account originating the wire and the admin account approving it, depending on what privileges the admin account has.

3) A third variation is that the fraudster modifies the privileges of the compromised account so that he can originate and approve a wire transfer from the same account.

**Targeting Employees to Gain Inside Access to the Wire System** – Using a spear-phishing scheme, malware designed to compromise the back-end payment system is installed on a bank employee's computer. The malware takes over the victim's computer, enabling the fraudster to submit a large-dollar transfer into the wire system (see 2012 FBI alert). This clearly is a more sophisticated attack, but the ability to steal a large amount of money makes it worth the effort to the fraudster.

**Using DDoS Attack as a Smokescreen** – The CCC has reported confirmed examples of DDoS attacks being used as smoke screens for fraud attacks (read the alert). One example is that the fraudsters contact customer service during a DDoS attack to ask for help completing a wire. The customer service agent is aware of the website being down and therefore is particularly eager to help, possibly bypassing some established security procedures and confirmations.

**Template Modifications Are Nearly Invisible** – This scheme starts with compromising the computer of an employee in the finance department or a corporate online banking account. In both scenarios, the objective is to locate existing wire templates and then modify the beneficiary information, possibly just the account number. These can be templates stored on a corporate server or employee's computer, or available through the company's online banking account. After changing the template, the fraudster simply waits for the victim to use the template, hoping that they don't notice the subtle changes that cause the funds to be wired to the fraudster's account instead of to the intended beneficiary. In a variation on this scheme, the fraudster modifies the Originator-to-Beneficiary instructions (OBI) and inserts a request to forward the funds to an account that the fraudster holds (for example, he adds "for the benefit of" or "for further credit" instructions).

**Fake Vendor Invoice** – The fraudster mocks up a fake invoice from a known vendor and submits it to a company for payment with fraudulent payment instructions. Especially when the vendor being spoofed has a long-term relationship and is known to submit regular invoices, the victimized company often doesn't review it quite as closely, but submits it to the bank for payment. Fraudsters will also use this scam to attack many companies simultaneously with the same invoice template, pretending to be a supplier used by a lot of different companies, such as the phone company or the electric utility.



## Total Cost of Wire Fraud

While wire transfers themselves often are for large dollar amounts, the losses associated with a fraudulent wire don't stop there. Additional costs incurred by the victimized financial institution include:

- **Investigation** – Time needed to research the loss, evaluate and possibly adjust internal procedures, and document the results. One financial institution estimates that it takes at least 100 person hours to complete an investigation into a fraud attack.

- **Remediation** – For corporate accounts, the financial institution is not legally required to reimburse the account holder for losses. But many do anyway in the interest of maintaining good customer relations and recognizing the lifetime value of the customer.

- **Litigation** – There are several legal precedents that side with the account holder that was victimized in a fraud loss. These results can increase the likelihood of victims pursuing legal measures to recover losses, resulting in legal costs for the financial institution.

- **Brand and Reputation Erosion** – Account holders have many choices for where to bank. So, the fact that a particular financial institution has been the victim of fraud impacts a prospective client's decision on where to bank.

- **Fines** – Banks can face severe fines or penalties resulting from non-compliance. Often these fines are part of the public record and further erode the financial institution's brand and reputation. Once a bank has been fined, the bank will be under closer scrutiny from bank examiners and may be required to submit more documentation or evidence of compliance for an extended period of time.

- **Customer Churn** – Despite best intentions and remediation, many customers still leave. A survey of small and medium-sized business conducted by Ponemon Institute found that 43% of customers took all or some of their banking business elsewhere after just one attack, even if there were no losses.

## Available Solutions for Detecting Wire Fraud

There is a variety of solutions available designed to detect fraudulent wire payments. This section briefly describes each along with strengths and weaknesses.

### Manual Review

The most basic fraud prevention strategy is to review all wire requests manually. While this can be tedious, especially reviewing details like account numbers that must be looked up and carefully checked, this strategy often is preferred by institutions that process a very small number of wires. The advantage is that there is no technology investment needed, but at the cost of staff time. And some fraudulent wires are very hard to distinguish manually from legitimate ones.

### Rules-based Solutions

A number of solutions use rules to flag potentially suspicious wires. However, there are significant challenges presented by rules-based solutions that result in missed fraud, lots of time needed for maintenance, and a large number of false positives.



- **Requires knowledge of fast-changing fraud schemes** – Fraud schemes are dynamic. To write a rule to detect fraud, one must know what the fraud looks like, where the request originates, when it is likely to occur, or some combination of factors. But fraudsters continually change their tactics and have become good at disguising their true identity, location, beneficiary information, or other aspects of the attack that a rule might be written to detect.

- **Legitimate activities look like fraud** – Rules are written to detect unusual amounts or activities that could be indicative of fraud. However, what is unusual for one originator might be common for another, making it very challenging to write a rule that is effective against a diverse client base that likely has infrequent or dynamic wire activity.

- **False positives divert resources** – Rules-based solutions generate a large number of false positives. These are legitimate requests that still fail to pass one rule or another, and therefore require manual review before being processed. A large number of false positives requires staff time and increases the risk that, in their haste to keep up with the volume, someone will approve a request that truly is fraudulent.

- **Rules maintenance takes time** – Rules must be maintained, updated to reflect new policies, emerging fraud threats, or client feedback. It's an endless process that is a steady drain on resources.

## Behavior-based Wire Fraud Prevention

These systems model the behavior associated with wire payments and then compare all activity to the established baseline of normal behavior to detect unusual or unexpected activities that could be indicative of fraud. Behavior-based solutions have demonstrated their effectiveness at detecting fraud to the extent that the FFIEC included this as a minimum expectation of a layered security strategy (see page 5 of the Guidance issued in June 2011). While fraudsters have proven their ability to mimic the computer or location or IP address of an originator, they cannot mimic all aspects of normal behavior. At some point during the process of originating a wire, the fraudster will do something that is unusual or suspicious when compared to the victim's normal behavior.

Behavior based solutions:

- **Automatically monitor the activity of every originator and beneficiary for every wire transaction**

- **Create and continually update models of individual behavior, comparing new wires to established norms for that particular originator**

- **Are easy to set up and don't require rules to be established or maintained because behavior drives the model**

- **Focus manual reviews on only high risk wires, creating a minimal number of false positives**



# Behavior-based Anomaly Detection – A Closer Look

Anomaly detection solutions detect unusual activity – anomalies – when compared to established norms. Behavior-based anomaly detection solutions do so while using individual originator, transaction, and beneficiary behavior as the focal point of what is being analyzed (see Figure 2).

**Behavioral Profile**

**Originator**
- Name
- Account
- ID Code
- Originator FI
- Sender FI
- Instructing FI
- OBI BBI
- Origin Country

**Transaction**
- Direction
- Amount
- Transfer Type
- Business Code
- Type/Subtype
- Frequency
- Currency
- Settlement Method

**Beneficiary**
- Name
- Account
- ID Code
- Receiver FI
- Beneficiary FI
- Intermediate FI
- Frequency
- Destination Country

**Behavioral Analytics**

Originator Model    Beneficiary Model

Individual

Population-level Models

Fraud Analytics/Threat Data

**Resulting Fraud Detection**

Are the originator's wire actions normal?
-Timing  - Type  - Accounts
-Velocity  - Direction

Are the transactions typical?
-Type  - Amount
-Originator / Beneficiary

Are the transactions being made to a risky beneficiary?
-Suspicious account?

*Figure 2. Behavioral analytics solutions use rich, historical activity information about the originator, transaction and beneficiary as well as external sources of threat data to analyze new wire requests in order to answer critically important questions and prevent fraudulent wires*

1. **Behavioral Profile models normal behavior** – Behavior-based solutions create and continually update models of normal behavior that consider numerous characteristics of the originator, transaction, and beneficiary.

2. **Behavioral Analytics compares new wires to established norms** – All new wire requests are analyzed against the established models of normal wire activity as well as external fraud analytics and threat data. Additionally, behavior-based solutions:

   - Analyze all wire requests from all channels, including those originated in a branch, via fax or email, through customer service, or directly from a customer

   - Alert only on items that are anomalous when compared to established normal behavior, and don't generate alerts simply because a transaction exceeds a pre-determined threshold



- Track and alert on even very small variances, such as changes to the beneficiary account number, while putting these small variances into the broader context of other factors and activities

- Allow FIs to employ limits and caps incrementally to behavior-based analysis to watch for specific high-risk activities or to accommodate specific client requirements

3. **Resulting analysis detects fraudulent wires** – Insights delivered help fraud and wire analysts answer critical questions to prevent fraudulent wires before they're submitted for payment. The questions to be answered could include: are the originator's actions normal, are the transactions typical, and are the beneficiaries risky?

# Fraud Examples Revisited

Revisiting the examples of wire fraud described earlier, the chart below shows some of the suspicious activity in each scheme that would be detected by a behavior-based anomaly detection solution.

| Fraud Example | Activities Detected by Behavioral Analytics Solution |
|---|---|
| **Online Wire Request** | ○ Unusual time of day for the request<br>○ Unusual amount of time since the last request (velocity) or frequency since prior requests<br>• Unusual amounts and beneficiaries |
| **Funeral Scheme** | • First time originator and beneficiary<br>• Inconsistent with prior wire requests<br>• Looks suspicious in context of information from other banking systems; for example, recent online banking activity may indicate that the victim is not out of the country |
| **Online Live Chat** | • First-time wire request<br>• Unusual timing of the request<br>• Unusual velocity<br>• A new beneficiary<br>• Variation in how the account holder typically initiates wires (e.g. typically it's done personally and this time it's through a bank employee) |
| **Commercial Account Takeover** | • Unusual beneficiaries and amounts<br>• Suspicious timing or velocity relative to previous wire activity |
| **Inside Access to the Wire System** | • Unusual beneficiaries and amounts<br>• Suspicious timing or velocity |
| **Template Modification** | • New beneficiary<br>• Unexpected relationship between originator and beneficiary |
| **Using DDoS Attack as a Smokescreen** | • First-time wire request<br>• Unusual timing of the request<br>• Unusual velocity<br>• A new beneficiary |
| **Fake Vendor Invoice** | • New payment details, such as the account number<br>• Unusual velocity of payments to that vendor/beneficiary |



## Advantages of Behavior-based Solutions

In addition to the most important benefit – preventing fraudulent wires – there are other advantages to implementing a behavior-based anomaly detection solution.

**Reduce Operating Costs** – Spend less time manually reviewing wires that pose no risk. Behavior-based solutions integrated with the wire system can automatically release low-risk wires, focusing efforts on the high-risk wires while providing the tools to quickly investigate and determine the most appropriate action.

**Reduce Customer Call Backs** – Rather than calling all customers submitting wires over a set dollar amount, FIs can reduce the number of outbound verification calls and limit them to the truly high-risk wires regardless of the dollar amount.

**Improve Client Service** – With the confidence that a behavior-based anomaly detection solution is monitoring all wires and will detect high-risk activity, FIs can improve client service by offering expedited or real-time wire processing.

**Improve Competitiveness** – FIs can attract new account holders by offering the fast, flexible wire payment services they're looking for.

**High-fidelity Fraud Detection** – Typically rules are about the originator. Anomaly detection solutions look at originator plus the beneficiary behavior and history and the relationship between the two, which provides a better indicator of normal versus fraudulent activity.

## Conclusion

It's more important than ever for financial institutions to implement cost effective wire security solutions, especially considering the characteristics of the wire channel that make it so appealing to criminals, the sophistication and extensive capabilities of fraudsters, and the many ways in which they can use wires as part of their schemes.

Using behavioral analytics to understand originator and beneficiary behavior has proven its effectiveness regardless of how a wire request is originated, how an account is compromised, or the overall fraud scheme in play. Somewhere during the process of accessing an account, and setting up and submitting a wire request, the fraudster's behavior will differ from the victim's, at which point the financial institution can intervene and disrupt the transaction before any money (or time or trust) is lost.



## About FraudMAP Wire

FraudMAP Wire is Guardian Analytics' industry proven behavior-based fraud detection solution that detects fraudulent wire transactions originated from any channel – online, fax, email, call center, or in a branch – and across all types of wires – inbound, outbound, book and transfer. FraudMAP Wire integrates with all major wire platforms to analyze each wire transaction, and automated risk scoring creates a streamlined workflow for managing wire risk.

FraudMAP Wire uses proven behavior-based anomaly detection capabilities to identify high-risk wire activity, resulting in maximum detection with a minimum of false positives, all without manual intervention or rules to write and maintain. Using Guardian Analytics' proprietary and patented behavioral analytics technology, Dynamic Account Modeling®, FraudMAP Wire creates and dynamically updates behavioral profiles for each wire originator and beneficiary. FraudMAP Wire analyzes each wire to determine if there is any anomalous activity relative to the typical behavior. Each wire is analyzed against a wide range of prior account activity such as frequency, velocity, originating channel, originator and beneficiary information, business function code, destination location, method of payment, amount, timing, and more.

With FraudMAP Wire, financial institutions can prevent fraudulent wires, reduce the costs of manual wire reviews, and offer expedited wire services.

## About Guardian Analytics

Guardian Analytics is the leader in behavior-based anomaly detection solutions for preventing fraud. The result is banks and credit unions that have the confidence to offer the banking services their clients want while protecting their assets, reputation, and trust. Hundreds of banks and credit unions and millions of account holders rely on Guardian Analytics to protect individual and business account assets. To learn more about Guardian Analytics and FraudMAP Wire, please go to www.GuardianAnalytics.com.

© Copyright 2013 Guardian Analytics, Inc. All rights reserved. Guardian Analytics, FraudMAP and the Guardian Analytics logo are registered trademarks and Dynamic Account Modeling is a trademark of Guardian Analytics, Inc. All other trademarks are the property of their respective owners. FraudMAP solutions are protected by U.S. Patent 8,280,833. Additional patents pending.

*Send By Fax*

*708-447-373c*

**Darrell Brown**

From: Jennifer Molina [jmolina@runnionequpment.com]
Sent: April 18, 2016 2:23 PM
To: darrell@landalesigns.com
Cc: prunnion@runnionequpment.com
Subject: REVISED Invoice 136316 from Runnion Equipment Company
Attachments: Inv_136316_from_Runnion_Equipment_Company_8360.pdf; Wiring Instructions BB&T.pdf

Darrell,

Find the REVISED attached Invoice 136316 and wire instructions. Let me know when we should expect your wire so we can look out for it.

Thank you for your business - we appreciate it very much.

Sincerely,

Jennifer Molina

Runnion Equipment Company

800 824 6704

www.runnionequipment.com

1975 – 41 YEARS OF SERVICE – 2016

Crane & Equipment Solutions

For Contractors, Government, Rail, Utilities, or Agriculture/

Sales, Service, Parts, Rental/ Custom Mounting, Rebuilding

*To: Pat RUNNION - this is what we got from Jennifer. DB.*



Δ JI EXHIBIT 16
Deponent
Date 6-28 Rpt
www.depobook.com



7950 WEST 47TH STREET * LYONS, ILLINOIS 60534

EQUIPMENT COMPANY

www.unionequipment.com

## WIRE TRANSFER INFORMATION

Account Name:

Michael Mitch LLC

Bank: BB&T Bank

Bank Address: 3531 Kildaire Farms Rd.,

City: Cary, NC 27518

Rou ng #:

Account #:

Bene ciary: MICHAEL MITCH LLC

Bene ciary Add: 7950 West 47th Street

Lyons, ILLINOIS 60534

*Please note there are Wire Fees apply —

6/1/2016.                                                    Print

To: michael@technicalsupportspeciali......net
Subject: FW: FINAL REVISED INVOICE ATTACHED AND UPDATED WIRE INFO

Michael – this is a copy of documents Willie and I exchanged

Darrell

The attached was sent to us from Willie , we sent the money as requested in the attached.

Darrell

From: Willie Messuck [mailto:wmessuck@runnlonequpment.com]
Sent: May 12, 2016 2:00 PM
To: Darrell Brown
Cc: prunnlon@runnlonequpment.com
Subject: FINAL REVISED INVOICE ATTACHED AND UPDATED WIRE INFO

Darrell,

Find the attached revised invoice and updated wiring instructions. Let me know when wire is sent so we can proceed.

Thank you

Willie Messuck

Virus-free. www.avast.com

8/1/2018                                                Print

Virus-free. www.avast.com

## Attachments

- image001.jpg (4.53KB)
- Inv_136316_from_Runnion_Equipment_Company_3720.pdf (84.23KB)
- Updated Wiring Instructions SunTrust.pdf (1.11MB)



EQUIPMENT COMPANY

www.runnionequipment.com

7950 WEST 47TH STREET • LYONS, ILLINOIS 60534

PHONE 708-447-3169
800-824-6704
FAX 708-447-3730

# Invoice

| INVOICE DATE: | 4/18/2016 |
|---|---|
| INVOICE NO. | 136316 |

**SOLD TO:**

LANDALE SIGNS AND NEON LTD
8525 ARGYLL RD. NW
EDMONTON, AB T6C 4B2
CANADA

**SHIPPED TO:**

LANDALE SIGNS AND NEON LTD
8525 ARGYLL RD. NW
EDMONTON AB T6C 4B2
CANADA

| F.O.B. POINT | CUSTOMER ORDER NO. | SHIP VIA | Terms | SALESPERSON | S.O. No. |
|---|---|---|---|---|---|
| LYONS, IL | DARRELL BROWN | DRIVEAWAY | Due on receipt | PR | |

| ITEM CODE | U/M | QTY | DESCRIPTION | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| | | | PURCHASE OF A USED ELLIOTT G85R, S/N - FR3245 MOUNTED ON A 2005 STERLING LT8500 S/N - 2FZHCHDCX5AU20053 | | |
| USED CRA... | | 1 | UNIT # 3974U | $6,000.00 | $6,000.00 |
| SALES DISC... | ea | 1 | SALES DISCOUNT | -500.00 | -500.00 |
| DOC FEE | ea | 1 | DOCUMENT FEE | 125.00 | 125.00 |
| PICKUP/DE... | | 1 | FREIGHT | 2,000.00 | 2,000.00 |
| | | | "THE ABOVE EQUIPMENT IS SOLD AS IS WITHOUT ANY WARRANTY EXPRESS OR IMPLIED. THE PURCHASER WILL BEAR THE ENTIRE EXPENSE OF REPAIRING ANY LATENT OR PATENT DEFECTS THAT MAY PRESENTLY EXIST OR THAT MAY OCCUR IN THE VEHICLE NOTWITHSTANDING ANY PROMISE EXPRESS OR IMPLIED." | | |

Thank you for your business.

| | SALES TAX | $0.00 |
|---|---|---|
| **Total** | | **$7,625.00** |

 7950 WEST 47TH STREET * LYONS, ILLINOIS 60534

EQUIPMENT COMPANY
PRIME C. CONTRACTORS
www.runnionequipment.com

WIRE TRANSFER INFORMATION

Account Name/Beneficiary:
PRIME C. CONTRACTORS

Bank: Sun Trust Bank
Address: 3610h King Str.
City: Alexandria, VA 22302

Routing #: ▮▮▮▮▮▮▮

Beneficiary: PRIME C. CONTRACTORS
Beneficiary Add: 7950 West 47th Street
Lyons, ILLINOIS 60534

Account # ▮▮▮▮▮▮▮

*Please note there are Wire Fees apply –

SALES ORDER



# RUNNION EQUIPMENT COMPANY

7950 WEST 47th STREET • LYONS, ILLINOIS 60534
PHONE (708) 447-3169 • 1-800-824-6704 • FAX (708) 447-3730
www.runnionequipment.com

*Truck Mounted Cranes & Equipment*
*Sales, Service & Rentals*

| | | | |
|---|---|---|---|
| **Sold To** | Landale Signs and Neon Ltd. | **Date** | 4/11/16 |
| **Address** | 8525 Argyll Rd. NW | | |
| | Edmonton, AB T6C 4B2, Canada | **Quote No.** | 4952 |
| | 780-437-3730 | | |
| | Attn: Darrell Brown | | Unit #3974U |

Page 1 of 2

| QUANTITY | DESCRIPTION | PRICE |
|---|---|---|
| One (1) | **Used 2005 Elliott G85F equipped as follows:** | |
| | - 90' working height | |
| | - 5,900# maximum boom capacity | |
| | - Out and down main outriggers | |
| | - A-frame style rear stabilizers | |
| | - Single front outrigger | |
| | - 600# platform capacity | |
| | - Hydraulic circuit in basket | |
| | - Strobe lights mounted on crane pedestal | |
| | **MOUNTED ON** | |
| One (1) | **2005 Sterling LT8500 equipped as follows:** | |
| | - 56,000# GVW | |
| | - CAT C7 Engine | |
| | - Automatic transmission | |
| | - Front axle 16,000# | |
| | - Front wheels - 22.5x12.2 steel | |
| | - Front tires - 385/65R22.5 | |
| | - Rear axle - 40,000# | |
| | - Rear wheels - 22.5x8.25 | |
| | - Rear tires - 11R22.5 | |
| | - Continued on Page 2 - | |

Δ π **EXHIBIT** 17

Deponent
Date
WWW.DEPOBOOK.com

The terms and conditions appearing on the reverse side of this Sales Order
are made a part hereof the same as if rewritten at length herein.

| REC SALES SIGNATURE | 4-11-16 | PURCHASER SIGNATURE | April 12/16 |
|---|---|---|---|
| | DATE | | DATE |

SALES ORDER



# RUNNION EQUIPMENT COMPANY

**Truck Mounted Cranes & Equipment
Sales, Service & Rentals**

7950 WEST 47th STREET • LYONS, ILLINOIS 60534
PHONE (708) 447-3169 • 1-800-824-6704 • FAX (708) 447-3730
www.runnionequipment.com

| Sold To | Landale Signs and Neon Ltd. | Date | 4/11/16 |
| Address | 8525 Argyll Rd. NW | Quote No | 4952 |
| | Edmonton. AB T6C 4B2. Canada | | |
| | 780-437-3730 | | Unit #3974U |
| | Attn: Darrell Brown | | |

Page 2 of 2

| QUANTITY | DESCRIPTION | PRICE |
|---|---|---|
| | - Differential lock on both axles | |
| | - Trailer package with pintle hook | |
| | - AM/FM/CD stereo | |
| | - Air conditioning | |
| | - Spotlight mounted on top of cab | |
| | Price: | $86,000.00 |
| | | $2,000.00 |
| | *Freight to Portal North Dakota not to exceed $2,000.00 | |
| | | 88,000.00 |
| | All prices F.O.B. Lyons, IL and subject to all applicable tax | f.o.b. Portal |
| | Quote firm for 30 days TERMS. 10% deposit at time of order | N.D. |
| | Balance due upon notification that unit is ready for delivery | |

Seller will supply as clean a title for the unit and a recall clearance letter from the manufacturer. (original copies)

The terms and conditions appearing on the reverse side of this Sales Order
are made a part hereof the same as if rewritten at length herein.

| REC SALES SIGNATURE | DATE 4-11-16 | PURCHASER SIGNATURE X | DATE April 14/16 |

SALES ORDER – SIGNATURE PAGE



# RUNNION EQUIPMENT COMPANY

Sold To: LAnd∉le Signs & Neon

Address:

Date: 4-11-16

Quote No. 4952

## SALES ORDER - TERMS AND CONDITIONS OF SALE

This document contains the terms of sale. The entire contract between Seller and Buyer is contained in this Sales Order; no alleged oral promises or conditions not set forth herein shall be binding upon Seller or Buyer, and any prior negotiations between the parties are merged into the terms of this document.

Prices quoted are subject to change without notice in conformity with the Manufacturer's Price List effective at the time of delivery. Prices do not include taxes. Any tax, impost, levy, duty or other charge hereinafter imposed by any government or other authority on this sale will be added to the purchase price as herein noted or any later revision of the purchase price, and will be paid by Buyer unless Buyer provides Seller with a proper tax exemption certificate.

Upon acceptance of this order by Seller, if Buyer fails to perform the terms and conditions hereof, or refuses to accept delivery of the equipment, accessories or other items ordered within ten (10) days after notification that same are ready for delivery, the Seller, at its option may retain as liquidated damages all money, trade-ins or other property delivered to Seller by Buyer as down payment hereunder. Buyer will pay any cost of collection for any amount owed to Seller, including without limitation reasonable attorney's fees, court costs and interest in the amount of 1% per month (12% per annum) from the date the amount is due.

Payment is due Seller from the date when Seller is prepared to make delivery. All equipment and material is delivered FOB Seller's plant and late and liability for loss or damage passes to Buyer upon Seller's delivery of the goods to a carrier or shipment to Buyer and any loss or damage thereafter shall not relieve Buyer from any obligation hereunder. Risk of loss for goods shall pass to the Buyer once payment is received by Seller.

Buyer may terminate this contract in whole upon thirty (30) days advance written notice to Seller. In such event, Buyer shall be liable for termination charges. If goods ordered are a standard manufacturer catalog item, Buyer will pay a cancellation charge for each unit cancelled equal the greater of 20% of the purchase order item price or forfeiture of down payment track in. If goods are non-standard items due to the Buyer's custom order, Buyer will pay for all cost, direct and indirect incurred and committed for this contract, together with a reasonable allowance for prorated expenses and anticipated profits.

Buyer agrees to comply fully and with all laws and regulations concerning the purchase and sale of goods. In particular, Buyer agrees to comply with all applicable export administration regulations of the United States, including but not limited to, the Export Administration Act, insofar as they apply to the sale of products

Buyer shall indemnify and hold harmless Seller, its employees, officers and directors and the respective successors and assigns, from and against any and all liability damages, claims, causes of actions, losses, costs and expenses (including attorneys' fees) of any kind arising out of injuries to any person (including death) or damage to any property caused by or related to the goods or any negligent act or omission of Buyer, its employees and agents

The validity, performance and construction of this Sales Order shall be governed by the laws of the State of Illinois of the United States of America

Seller shall not be liable and shall be free from any potential liability for delay in delivery or non-delivery or any failure in shipment caused in whole or in part by the occurrence of any contingency beyond control or other Seller or Seller's suppliers including but not limited to act of war (whether an actual declaration thereof is made or not), act of any governmental or non-governmental authority, judicial action, sabotage, insurrection, terrorism, riot or other act of civil disobedience, act of a public entity, failure or delay of transportation, strikes, lockouts, shortage of labor or labor troubles of any kind, accidents, explosion, perils of the sea, fire, earthquake, flood, storm or any other act of God, restrictions or requisitions, shortage of labor, fuel, raw material or machinery or technical failure where Seller has exercised ordinary care in the prevention thereof, failure of manufacturers to deliver, bankruptcy or insolvency of manufacturers or suppliers, suspension of shipping facilities, act or default of any carrier or any other contingency of whatsoever nature beyond Sellers' control affecting production, transportation or financing peril, loading, forwarding or unloading in such a situation at destination of the goods covered by this contract including disbursement, cancelling of the time this contract was made. In such a situation, of shipments or delivery is not made during the period contracted for, Buyer shall accept delivery under this contract when shipment is made; provided, however, Buyer shall not be obligated to accept delivery if shipment is not made within a reasonable time after the cessation of the aforementioned impediments or causes. Seller may allocate delivery among Seller's customers

This order shall not be binding upon Seller until accepted by Seller in writing hereon and when so accepted the original order with original signatures as given Seller and in Seller's possession shall be conclusive and binding upon the parties hereto

The Buyer hereby acknowledges receipt of a copy of this Sales Order and Terms and Conditions

Customer Signature

Runnion Equipment Co

Date Accepted

4-11-16

Date



EQUIPMENT COMPANY

www.runnionequipment.com

7950 WEST 47TH STREET • LYONS, ILLINOIS 60534

PHONE 708-447-3169
800-824-6704
FAX 708-447-3730

# Invoice

| | |
|---|---|
| INVOICE DATE: | 4/18/2016 |
| INVOICE NO. | 136316 |

**SOLD TO:**

LANDALE SIGNS AND NEON LTD
8525 ARGYLL RD. NW
EDMONTON. AB T6C 4B2
CANADA

**SHIPPED TO:**

LANDALE SIGNS AND NEON LTD
8525 ARGYLL RD. NW
EDMONTON AB T6C 4B2
CANADA

| F.O.B. POINT | | CUSTOMER ORDER NO. | SHIP VIA | Terms | SALESPERSON | S.O. No |
|---|---|---|---|---|---|---|
| LYONS, IL | | DARRELL BROWN | DRIVEAWAY | Due on receipt | PR | |

| ITEM CODE | U/M | QTY | DESCRIPTION | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| | | | PURCHASE OF A USED ELLIOTT G85R, S/N - FR3245 MOUNTED ON A 2005 STERLING LT8500 S/N - 2FZHCHDCX5AU20053 | | |
| USED CRA. | ea | 1 | UNIT # 39740 | 86,000.00 | 86,000.00 |
| DOC FEE | | 1 | DOCUMENT FEE | 125.00 | 125.00 |
| PICKUP/DE.. | | 1 | FREIGHT | 2,000.00 | 2,000.00 |
| | | | *THE ABOVE EQUIPMENT IS SOLD AS IS WITHOUT ANY WARRANTY EXPRESS OR IMPLIED. THE PURCHASER WILL BEAR THE ENTIRE EXPENSE OF REPAIRING ANY LATENT OR PATENT DEFECTS THAT MAY PRESENTLY EXIST OR THAT MAY OCCUR IN THE VEHICLE NOTWITHSTANDING ANY PROMISE EXPRESS OR IMPLIED.* | | |

Thank you for your business.

| | |
|---|---|
| SALES TAX | $0.00 |
| **Total** | **$88,125.00** |



EQUIPMENT COMPANY

www.runnionequipment.com

7950 WEST 47TH STREET • LYONS, ILLINOIS 60534

PHONE 708-447-3169
800-824-6704
FAX 708-447-3730

# Invoice

| | |
|---|---|
| INVOICE DATE: | 4/18/2016 |
| INVOICE NO. | 136316 |

**SOLD TO:**

LANDALE SIGNS AND NEON LTD
8525 ARGYLL RD. NW
EDMONTON, AB T6C 4B2
CANADA

**SHIPPED TO:**

LANDALE SIGNS AND NEON LTD
8525 ARGYLL RD. NW
EDMONTON AB T6C 4B2
CANADA

| F.O.B. POINT | CUSTOMER ORDER NO. | SHIP VIA | Terms | SALESPERSON | S.O. No. |
|---|---|---|---|---|---|
| LYONS, IL | DARRELL BROWN | DRIVEAWAY | Due on receipt | PR | |

| ITEM CODE | U/M | QTY | DESCRIPTION | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| | | | PURCHASE OF A USED ELLIOTT G85R, S/N - FR3245 MOUNTED ON A 2005 STERLING LT8500 S/N - 2FZHCHDCX5AU20053 | | |
| USED CRA... | | 1 | UNIT # 3974U | 86,000.00 | 86,000.00 |
| SALES DISC... | ea | 1 | SALES DISCOUNT | -500.00 | -500.00 |
| DOC FEE | ea | 1 | DOCUMENT FEE | 125.00 | 125.00 |
| PICKUP/DE... | | 1 | FREIGHT | 2,000.00 | 2,000.00 |
| | | | *THE ABOVE EQUIPMENT IS SOLD AS IS WITHOUT ANY WARRANTY EXPRESS OR IMPLIED. THE PURCHASER WILL BEAR THE ENTIRE EXPENSE OF REPAIRING ANY LATENT OR PATENT DEFECTS THAT MAY PRESENTLY EXIST OR THAT MAY OCCUR IN THE VEHICLE NOTWITHSTANDING ANY PROMISE EXPRESS OR IMPLIED.* | | |

Thank you for your business.

| | | |
|---|---|---|
| SALES TAX | | $0.00 |
| **Total** | | **$87,625.00** |

Canada Border Agence des services
Services Agency frontaliers du Canada

PROTECTED **B** (When Completed)

## NORTH AMERICAN FREE TRADE AGREEMENT

### CERTIFICATE OF ORIGIN

(Instructions Attached)

*Please print or type*

| 1 Exporter's Name and Address | 2 Blanket Period |
|---|---|
| Runnion Equipment Company 7950 47th Street Lyons, IL. 60534 | From DD-MM-YY 04/25/16 To DD-MM-YY 12/31/2016 |
| Tax Identification Number ▶ 36-2825271 | |
| 3 Producer's Name and Address | 4 Importer's Name and Address |
| Runnion Equipment Company 7950 47th Street Lyons, IL. 60534 | Landale Signs & Neon Ltd. 8525 Argyll Rd. NW Edmonton, AB T6C4B2 |
| Tax Identification Number ▶ 36-2825271 | Tax Identification Number ▶ |

| 5 Description of Good(s) | 6 HS tariff Classification Number | 7 Preference Criterion | 8 Producer | 9 Net Cost | 10 Country of Origin |
|---|---|---|---|---|---|
| 2005 Sterling LT8500 Vin 2FZHCHDCX5AU20053 | | | | | |

11    I certify that:

– the information on this document is true and accurate and I assume the responsibility for proving such representations. I understand that I am liable for any false statements or material omissions made on or in connection with this document;

– I agree to maintain, and present upon request, documentation necessary to support this Certificate, and to inform, in writing, all persons to whom the Certificate was given of any changes that would affect the accuracy or validity of this Certificate;

– the goods originated in the territory of one or more of the Parties, and comply with the origin requirements specified for those goods in the North American Free Trade Agreement, and unless specifically exempted in Article 411 or Annex 401, there has been no further production or any other operation outside the territories of the Parties; and

– this Certificate consists of          pages, including all attachments.

| Authorized Signature | Company |
|---|---|
| Name | Title |
| Date (dd-mm-yy) | Telephone | Fax. |

B232 E (06)                    (Ce formulaire existe aussi en français)                    BSF314 E

Canada

# U.S. Customs and Border Protection
## Vehicle/Equipment Export Worksheet

| Description of Vehicle or Equipment | |
|---|---|
| VIN / Serial Number: | 2 FZHCHDX 5AU 20053 |
| Year: | 2005 |
| Make: | STERLING |
| Model: | LT 8500 |

ITN = NUMBER _____

| Title Information | |
|---|---|
| Title Issuing State: | WISCONSIN |

| Transporting Information | |
|---|---|
| Name:<br>(Person / Company / Individual transporting the vehicle) | Mama Transportation, INC. |
| Telephone: | 888 - 618 - 6885 - Ext. 4112 or 411 |
| Name of U.S. Border Crossing: | PORTAL N. DAKOTA |
| Estimated Date of Export:<br>(Can be NO MORE than 50 days from the filing of this worksheet) | MAY 27, 2016 |

| U.S. Address of Seller / Owner | |
|---|---|
| Name: | RUNNION EQUIPMENT COMPANY |
| Address : | 7980 - 47th Street |
| City: | LYONS |
| State: | ILL. |
| Zip Code: | 60534 |
| Telephone: | 800 - 824 - 6104 |
| Cellular: | 708 - 341 - 3169 |

| Canadian Address of Purchaser / Owner / Ultimate Consignee | |
|---|---|
| Name: | LANDALE SIGNS & NEON LTD. |
| Address : | 8525 ARGYLL Rd. NW. |
| City: | EDMONTON, ALBERTA |
| Province: | ALBERTA |
| Postal Code: | T6C 4B2 |
| Telephone: | 780 - 437 - 3730 |
| Cellular: | 780 - 717 - 2699 |

**NORTH AMERICAN FREE TRADE AGREEMENT**
**CERTIFICATE OF ORIGIN INSTRUCTIONS**

For purposes of obtaining preferential tariff treatment, this document must be completed legibly and in full by the exporter and be in the possession of the importer at the time the declaration is made. This document may also be completed voluntarily by the producer for use by the exporter. Please print or type.

**Field 1** State the full legal name, address (including country) and legal tax identification number of the exporter. Legal tax identification number is: In Canada, employer number assigned by the Canada Revenue Agency to the importer/exporter number assigned by the Canada Border Services Agency, in Mexico, federal taxpayer's registry number (RFC) and the United States, employer's identification number or Social Security Number

**Field 2** Complete field if the Certificate covers multiple shipments of identical goods as described in Field 5 that are imported into a NAFTA country for a specified period of up to one year (blanket period). "FROM" is the date upon which the Certificate becomes applicable to the good covered by the blanket Certificate (it may be prior to the date of signing this Certificate). "TO" is the date upon which the blanket period expires. The importation of a good for which preferential tariff treatment is claimed based on this Certificate must occur between these dates.

**Field 3** State the full legal name, address (including country) and legal tax identification number, as defined in Field 1, of the producer. If more than one producer's good is included on the Certificate, attach a list of the additional producers, including the legal name, address (including country) and legal tax identification number, cross referenced to the good described in Field 5. If you wish this information to be confidential, it is acceptable to state "Available to Customs upon request". If the producer and the exporter are the same, complete field with "SAME". If the producer is unknown, it is acceptable to state "UNKNOWN".

**Field 4** State the full legal name, address (including country) and legal tax identification number, as defined in Field 1, of the importer. If importer is not known, state "UNKNOWN". If multiple importers, state "VARIOUS".

**Field 5** Provide a full description of each good. The description should be sufficient to relate it to the invoice description and to the Harmonised System (HS) description of the good. If the Certificate covers a single shipment of a good, include the invoice number as shown on the commercial invoice. If not known, indicate another unique reference number, such as the shipping order number.

**Field 6** For each good described in Field 5, identify the HS tariff classification to six digits. If the good is subject to a specific rule of origin in Annex 401 that requires eight digits identify to eight digits, using the HS tariff classification of the country into whose territory the good is imported.

**Field 7** For each good described in Field 5, state which criterion (A through F) is applicable. The rules of origin are contained in Chapter Four and Annex 401. Additional rules are described in Annex 703.2 (certain agricultural goods), Annex 300-B, Appendix 6A (certain textile goods) and Annex 308.1 (certain automatic data processing goods and their parts). Note: In order to be entitled to preferential tariff treatment, each good must meet at least one of the criteria below.

**Preference Criteria**

A   The good is "wholly obtained or produced entirely" in the territory of one or more of the NAFTA countries, as referred to in Article 415. Note: The purchase of a good in the territory does not necessarily render it "wholly obtained or produced". If the good is an agricultural good, see also criterion F and Annex 703.2 (Reference: Article 401(a) and 415)

B   The good is produced entirely in the territory of one or more of the NAFTA countries and satisfies the specific rule of origin, set out in Annex 401, that applies to its tariff classification. The rule may include a tariff classification change, regional value-content requirement or a combination thereof. The good must also satisfy all other applicable requirements of Chapter Four. If the good is an agricultural good, see also criterion F and Annex 703.2 (Reference: Article 401(b))

C   The good is produced entirely in the territory of one or more of the NAFTA countries exclusively from originating materials. Under this criterion, one or more of the materials may not fall within the definition of "wholly produced or obtained", as set out in Article 415. All materials used in the production of the good must qualify as "originating" by meeting the rules of Article 401(a) through (d). If the good is an agricultural good, see also criterion F and Annex 703.2 (Reference: Article 401(c))

D   Goods are produced in the territory of one or more of the NAFTA countries but do not meet the applicable rule of origin set out in Annex 401 because certain non-originating materials do not undergo the required change in tariff classification. The goods do nonetheless meet the regional value-content requirement specified in Article 401(d). This criterion is limited to the following two circumstances:

   1   the good was imported into the territory of a NAFTA country in an unassembled or disassembled form but was classified as an assembled good, pursuant to HS General Rule of Interpretation 2(a); or

   2   the good incorporated one or more non-originating materials, provided for as parts under the HS, which could not undergo a change in tariff classification because the heading provided for both the good and its parts and was not further subdivided into subheadings, or the subheading provided for both the good and its parts and was not further subdivided

   Note: This criterion does not apply to Chapters 61 through 63 of the HS (Reference: Article 401(d))

E   Certain automatic data processing goods and their parts, specified in Annex 308.1, that do not originate in the territory are considered originating upon importation into the territory of a NAFTA country from the territory of another NAFTA country when the Most-Favoured-Nation Tariff rate of the good conforms to the rate established in Annex 308.1 and is common to all NAFTA countries. (Reference: Annex 308.1)

F   The good is an originating agricultural good under preference criterion A, B or C above and is not subject to a quantitative restriction in the importing NAFTA country because it is a "qualifying good" as defined in Annex 703.2, Section A or B (please specify). A good listed in Appendix 703.2.B.7 is also exempt from quantitative restrictions and is eligible for NAFTA preferential tariff treatment if it meets the definition of "qualifying good" in Section A of Annex 703.2. Note 1: This criterion does not apply to goods that wholly originate in Canada or the United States and are imported into either country. Note: A tariff rate quota is not a quantitative restriction.

**Field 8** For each good described in field 5, state "YES" if you are the producer of the good. If you are not the producer of the good, state "NO" followed by (1), (2), or (3), depending on whether this certificate was based upon: (1) your knowledge of whether the good qualifies as an originating good, (2) your reliance on the producer's written representation (other than a Certificate of Origin) that the good qualifies as an originating good, or (3) a completed and signed Certificate for the good voluntarily provided to the exporter by the producer

**Field 9** For each good described in Field 5, where the good is subject to a regional value content (RVC) requirement, indicate "NC" if the RVC is calculated according to the net cost method, otherwise, indicate "NO". If the RVC is calculated according to the net cost method over a period of time, further identify the beginning and ending dates (DD/MM/YY) of that period. (Reference: Articles 402.1, 402.5)

**Field 10** Identify the name of the country ("MX" or "US" for agricultural and textile goods exported to Canada, "US" or "CA" for all goods exported to Mexico, or "CA" or "MX" for all goods exported to the United States) to which the preferential rate of customs duty applies, as set out in Annex 302.2, in accordance with the Marking Rules or in each Party's schedule of tariff elimination.

   For all other originating goods exported to Canada, indicate appropriately "MX" or "US" if the goods originate in that NAFTA country, within the meaning of the NAFTA Rules of Origin Regulations, and any subsequent processing in the other NAFTA country does not increase the transaction value of the goods by more than 7%, otherwise indicate as "JNT" for joint production. (Reference: Annex 302.2)

**Field 11** This field must be completed, signed and dated by the exporter. When the Certificate is completed by the producer for use by the exporter, it must be completed, signed and dated by the producer. The date must be the date the Certificate was completed and signed.

# WISCONSIN CERTIFICATE OF TITLE

| Vehicle Identification Number | Year | Make |
|---|---|---|
| 2FZHCHDCX5AU20053 | 2005 | STERLING INDUSTRIAL CORP |

| Title Number | Issue Date | Chassis Type | Odometer Reading | Odometer Status | Odometer Date |
|---|---|---|---|---|---|
| 16102Q1015-2 | 04/11/2016 | TRUK | | EXEMPT | |

| Product Number | Body Style | Color | Fleet No. |
|---|---|---|---|
| 14081161027 | UNKNOWN | WHITE | |

**Titled Owner(s)**
PME EQUIPMENT INC
500 RANDOLPH DR
APPLETON, WI 54913-9293

The person, firm or corporation named on this Title is the lawful owner of the vehicle described, subject to any Security Interest (liens) shown. The order in which the Lien Holders appear on this Title does not necessarily represent their priority. The Wisconsin Department of Transportation will not be responsible for false or fraudulent odometer statements made in the assignment of the Certificate of Title or for errors in recording mileage, brand disclosures or the history of the vehicle. The department has no actual knowledge about the history of the vehicle and makes no warranty that the title brands or mileage disclosures on prior titles have been carried forward onto this document.

2FZHCHDCX5AU20053

**Lien Holder(s)**
NONE,

**Additional Vehicle Detail**
PREVIOUSLY TITLED IN IA

**SELLER:** When the vehicle is sold, complete the ASSIGNMENT OF CERTIFICATE OF TITLE on the top back of this title and deliver the title to the purchaser with the vehicle. You may wish to retain a copy of this title with the purchaser's information and signature as proof of sale for your records.

**PURCHASER:** Apply for a new title with the Wisconsin Division of Motor Vehicles immediately. To legally operate this vehicle, you are required to register it with the Division of Motor Vehicles.

**MAIL ADDRESS:**
Wisconsin Department of Transportation
PO Box 7949, Madison, WI 53707-7949

QUESTIONS:
Contact the Division of Motor Vehicles at:
414-266-1000, 608-266-1466
wisconsindmv.gov

15 - 1 - 0890435

KEEP IN SAFE PLACE    DO NOT KEEP IN VEHICLE

## ASSIGNMENT OF CERTIFICATE OF TITLE

The seller is required to state the mileage and provide written vehicle checks in connection with the transfer of ownership. Failure to complete a mileage statement or providing a false mileage statement (actual mileage) statement information, or providing a false statement may result in fines and/or imprisonment and may make you liable for damages to the purchaser. See Federal 49 USC and Ch. 342 Wisconsin Laws.

I the seller certify that to the best of my knowledge the information contained on this document is true and correct and that I have entered the vehicle odometer reading (using brand disclosure, and selling price in compliance with federal and state law as referenced above. For value received I/we assign or transfer the vehicle described on this document and warrant title to purchaser.

| ODOMETER NOW READS (No Tenths) | 8 0 6 5 3 | ☐ The odometer reading reflects the amount of mileage in excess of its mechanical limit | ☐ The odometer reading is NOT actual mileage. WARNING ODOMETER DISCREPANCY |
|---|---|---|---|

and to the best of my knowledge is actual mileage of this vehicle unless one of the following statements is checked.

BRAND DISCLOSURE: will be posted to future titles (check all that apply)

☐ Salvage vehicle ☐ Flood damaged ☐ Hail damaged ☐ Previous police vehicle ☐ Previous taxicab

Print Purchaser Name: **RUNNION EQUIPMENT COMPANY**

Print Seller Name: **PME EQUIPMENT INC**

Purchaser Address, City, State, ZIP Code: **7950 47th ST LYONS, IL 60534**

Print Seller Address, City, State, ZIP Code: **500 RANDOLF DR, APPLETON, WI 54913**

X **Well Mand/Agent** 4/11/16   X **Pete Mula** 4/11/16

### Sections 2-3 For Dealer Use Only

#### 2.

| ODOMETER NOW READS (No Tenths) | | ☐ The odometer reading reflects the amount of mileage in excess of its mechanical limit | ☐ The odometer reading is NOT actual mileage. WARNING ODOMETER DISCREPANCY |
|---|---|---|---|

BRAND DISCLOSURE

☐ Salvage vehicle ☐ Flood damaged ☐ Hail damaged ☐ Previous police vehicle ☐ Previous taxicab ☐ Manufacturer buyback

#### 3.

| ODOMETER NOW READS (No Tenths) | | ☐ The odometer reading reflects the amount of mileage in excess of its mechanical limit | ☐ The odometer reading is NOT actual mileage. WARNING ODOMETER DISCREPANCY |
|---|---|---|---|

BRAND DISCLOSURE

☐ Salvage vehicle ☐ Flood damaged ☐ Hail damaged ☐ Previous police vehicle ☐ Previous taxicab ☐ Manufacturer buyback

NO additional dealer reassignments permitted





# ⬤ LANDALE SIGNS™

8525 ARGYLL ROAD
EDMONTON, AB T6C 4B2
PH (780)437-3730 FAX (780)435-9285
WWW.LANDALESIGNS.COM

### FACSIMILE TRANSMITTAL SHEET

| | |
|---|---|
| TO PAT RUNNION *prunnion@runnionequipment* | FROM: Darrell Brown |
| COMPANY Runnion Equipment Company | DATE 4 / 13 / 16 |
| FAX NUMBER 1 708 447-3730 | TOTAL NO. OF PAGES INCLUDING COVER: |
| PHONE NUMBER 1-800 824-6704 | SENDER'S REFERENCE NUMBER: |
| RE Used 2005 Elliott and truck | YOUR REFERENCE NUMBER: |

☐ URGENT  ☐ FOR REVIEW  ☐ PLEASE COMMENT  ☐ PLEASE REPLY  ☐ PLEASE RECYCLE

NOTES/COMMENTS:

Pat

I have signed and attached the 3 pages of the sales order as well as a copy of my memo to you of yesterday.

Please send me the invoice for the equipment as discussed and I'll get it signed and back to you immediately.

Thanks again

Regards

Darrell

π EXHIBIT 15
Deponent
Date 6-28 Rptr.
WWW.DEPOBOOK.COM

**Darrell Brown**

| | |
|---|---|
| **From:** | Darrell Brown <darrell@landalesigns.com> |
| **Sent:** | April-11-16 4:25 PM |
| **To:** | 'Pat Runnion' |
| **Subject:** | RE: quote |

Pat,

Thanks. — I'll get the signed copies back to you in the morning.

We discussed the dyno and as far as I was concerned this is included the final price of $86,000.00 plus delivery . You looked up what the total expenses were against the truck, this included truck repairs, bucket repairs and you added in $700.00 for the dyno to come up with a total (I believe -57,700.00). This was all in as part of your offer of $88,000.00 plus $2,000.00 for delivery. My counter was $86,000.00 plus a maximum of $2,000.00 for delivery which we settled upon.

I also said that I wanted as part of the sale agreement that the truck and crane would be your responsibility up to the border when I take possession. This basically means your warranty covers the unit until I take possession at Portal.

One other question – you show the Elliott as having a hydraulic circuit in the basket. Is this the upper control levers that are used by the operator in the basket ?

Thanks
DADrrell

**From:** Pat Runnion [mailto:prunnion@runnionequipment.com]
**Sent:** April-11-16 12:06 PM
**To:** darrell@landalesigns.com
**Subject:** quote

Darrell, attached is the quote with freight for the Elliott you are buying. Please sign all three pages and return back to me, I will then get you an invoice put together. One thing we talked about was that you had offered to pay for the $500 dyno of the truck, I did not include that in this pricing.


Thank you.


*Patrick Runnion*

**Runnion Equipment Company**
**800 824 6704**
**708 341 3169 cell**
www.runnionequipment.com

**1975 – 41 YEARS OF SERVICE – 2016**

**Crane & Equipment Solutions**
**For Contractors, Government, Rail, Utilities, or Agriculture/**
**Sales, Service, Parts, Rental/ Custom Mounting, Rebuilding**

1

## ANNUAL VEHICLE INSPECTION REPORT

| VEHICLE HISTORY RECORD | | |
|---|---|---|
| REPORT NUMBER | FLEET UNIT NUMBER | |
| 120450 | N/A | |
| DATE 2/17/16 | | |

**MOTOR CARRIER OPERATOR** Hudson Equipment

**ADDRESS** 7500 W 44th Street

**CITY, STATE, ZIP CODE** Lyons IL 60534

**VEHICLE TYPE** ☐ TRACTOR ☐ TRAILER ☒ TRUCK ☐ BUS ☐ (OTHER)

**INSPECTOR'S NAME (PRINT OR TYPE)** Joe Ross

**THIS INSPECTOR MEETS THE QUALIFICATION REQUIREMENTS IN SECTION 396.19** ☒ YES

**VEHICLE IDENTIFICATION (✓ AND COMPLETE)** ☐ LIC. PLATE NO. ☐ VIN ☐ OTHER
3FZHCHDX5AU2005

**INSPECTION AGENCY/LOCATION (OPTIONAL)**

### VEHICLE COMPONENTS INSPECTED

| OK | NEEDS REPAIR | REPAIRED DATE | ITEM | OK | NEEDS REPAIR | REPAIRED DATE | ITEM | OK | NEEDS REPAIR | REPAIRED DATE | ITEM |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | **1. BRAKE SYSTEM** | | | | **6. SAFE LOADING** | | | | **10. TIRES** |
| ✓ | | | a. Service Brakes | | | | a. Part(s) of vehicle or | | | | a. Tires on any steering axle |
| ✓ | | | b. Parking Brake System | | | | condition of loading such | | | | of a power unit. |
| ✓ | | | c. Brake Drums or Rotors | | | | that the spare tire or any | | | | b. All other tires. |
| ✓ | | | d. Brake Hose | | | | part of the load or dunnage | | | | **11. WHEELS AND RIMS** |
| ✓ | | | e. Brake Tubing | | | | can fall onto the roadway. | | | | a. Lock or Side Ring |
| ✓ | | | f. Low Pressure Warning Device | | | | b. Protection against shifting cargo. | | | | b. Wheels and Rims |
| ✓ | | | g. Tractor Protection Valve | | | | c. Container securement | | | | c. Fasteners |
| ✓ | | | h. Air Compressor | | | | devices on intermodal | | | | d. Welds |
| ✓ | | | i. Electric Brakes | | | | equipment. | | | | **12. WINDSHIELD GLAZING** |
| ✓ | | | j. Hydraulic Brakes | | | | **7. STEERING MECHANISM** | | | | Requirements and exceptions |
| ✓ | | | k. Vacuum Systems | | | | a. Steering Wheel Free Play | | | | as stated pertaining to any |
| | | | **2. COUPLING DEVICES** | ✓ | | | b. Steering Column | | | | crack, discoloration or vision |
| N/A | | | a. Fifth Wheels | | | | c. Front Axle Beam and All | | | | reducing matter (reference |
| N/A | | | b. Pintle Hooks | | | | Steering Components | | | | 393.60 for exceptions). |
| | | | c. Drawbar/Towbar Eye | | | | Other Than Steering | | | | **13. WINDSHIELD WIPERS** |
| | | | d. Drawbar/Towbar Tongue | | | | Column | | | | Any power unit that has an |
| | | | e. Safety Devices | ✓ | | | d. Steering Gear Box | | | | inoperative wiper, or missing |
| N/A | | | f. Saddle-Mounts | | | | e. Pitman Arm | ✓ | | | or damaged parts that render |
| | | | **3. EXHAUST SYSTEM** | | | | f. Power Steering | | | | it ineffective. |
| | | | a. Exhaust system leaking | | | | g. Ball and Socket Joints | | | | **14. OTHER** |
| | | | forward of or directly below | | | | h. Tie Rods and Drag Links | | | | List any other condition(s) |
| | | | the driver/sleeper | | | | i. Nuts | | | | which may prevent safe |
| | | | compartment. | | | | j. Steering System | | | | operation of this vehicle |
| N/A | | | b. Bus exhaust system | | | | **8. SUSPENSION** | | | | |
| | | | leaking or discharging in | | | | a. Any U-bolt(s), spring | | | | |
| | | | violation of standard. | | | | hanger(s), or other axle | | | | |
| | | | c. Exhaust system likely to | | | | positioning part(s) cracked, | | | | |
| | | | burn, char, or damage the | | | | broken, loose or missing | | | | |
| | | | electrical wiring, fuel supply | | | | resulting in shifting of an | | | | |
| | | | or any combustible part of | | | | axle from its normal position. | | | | |
| | | | the motor vehicle. | ✓ | | | b. Spring Assembly | | | | |
| | | | **4. FUEL SYSTEM** | | | | c. Torque, Radius or Tracking | | | | |
| ✓ | | | a. Visible leak. | | | | Components | | | | |
| ✓ | | | b. Fuel tank filler cap missing. | | | | **9. FRAME** | | | | |
| ✓ | | | c. Fuel tank securely attached. | ✓ | | | a. Frame Members | | | | |
| | | | **5. LIGHTING DEVICES** | ✓ | | | b. Tire and Wheel Clearance | | | | |
| | | | All lighting devices and | ✓ | | | c. Adjustable Axle | | | | |
| | | | reflectors required by Part 393 | | | | Assemblies (Sliding | | | | |
| | | | shall be operable. | | | | Subframes) | | | | |

**INSTRUCTIONS** MARK COLUMN ENTRIES TO VERIFY INSPECTION ✓ OK, X NEEDS REPAIR, NA IF ITEMS DO NOT APPLY, REPAIRED DATE

**CERTIFICATION: THIS VEHICLE HAS PASSED ALL THE INSPECTION ITEMS FOR THE ANNUAL VEHICLE INSPECTION IN ACCORDANCE WITH 49 CFR PART 396.**

© Copyright 2010 J J KELLER & ASSOCIATES, INC.®
Neenah, WI • USA • (800) 327-6868
jjkeller.com • Printed in the United States

400-FS-C3 3126
Rev 6/10

**DUPLICATE**





SALES

PREFER E-MAIL
DARRELL@LANDALESIGNS
.COM

ON CALL
780-437-3730

DARRELL BROWN

85FT _ ELLIOTT

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action



# UNITED STATES DISTRICT COURT
## for the
### Northern District of Illinois

| | |
|---|---|
| Landale Signs and Neon, Ltd. | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. 1:16-cv-7619 |
| Runnion Equipment Co., et al. | ) |
| | ) |
| *Defendant* | ) |

## AMENDED SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:     Patrick Runnion, c/o Steven Polick, 155 N. Michigan, Ste 700, Chicago, IL 60601, spolick@sbcglobal.net

*(Name of person to whom this subpoena is directed)*

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place: | Patterson Law Firm, LLC <br> 1 N. LaSalle, Suite 2100 <br> Chicago, IL 60602 | Date and Time: <br> 08/07/2018 11:00 am |
|---|---|---|

The deposition will be recorded by this method:     Court Reporter

☑ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material: By 8/1/18 produce the documents requested in attached rider to: Michael Haeberle, 1 N. LaSalle, Suite 2100, Chicago, IL 60602

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:     07/25/2018

CLERK OF COURT

                                                    OR

_____                          *Michael Haeberle*
*Signature of Clerk or Deputy Clerk*              *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Landale Signs and Neon, Ltd. _____ , who issues or requests this subpoena, are:

Michael Haeberle, 1 N. LaSalle, Ste. 2100, Chicago, IL 60602, (312) 223-1699, mhaeberle@pattersonlawfirm.com

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No. 1:16-cv-7619

## PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)*

on *(date)*

☑ I served the subpoena by delivering a copy to the named individual as follows: via U.S. mail & e-mail

on *(date)*   07/25/2018   ; or

☐ I returned the subpoena unexecuted because:

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$      56.10

My fees are $                for travel and $                for services, for a total of $      0.00

I declare under penalty of perjury that this information is true.

Date:   07/25/2018

*Paul Harris-Hertel*

*Server's signature*

Paul Harris-Hertel, Paralegal

*Printed name and title*

1 N. LaSalle, Suite 2100
Chicago, IL 60602

*Server's address*

Additional information regarding attempted service, etc.:

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

(1) *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:

(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or

(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person

(i) is a party or a party's officer; or

(ii) is commanded to attend a trial and would not incur substantial expense.

(2) *For Other Discovery.* A subpoena may command:

(A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and

(B) inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

(1) *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

(2) *Command to Produce Materials or Permit Inspection.*

(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) *Quashing or Modifying a Subpoena.*

(A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information; or

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.

(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

(1) *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) *Claiming Privilege or Protection.*

(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**

The court for the district where compliance is required — and also, after a motion is transferred, the issuing court — may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**Rider**

1. All communications with any real estate agent or broker from January 1, 2012 to the present.

2. All communications or documents involving any real estate transaction (whether consummated or not, whether authorized by you or not) from January 1, 2012 to the present.

3. All documents or communications involving wire fraud, spoofing, or any scam from January 1, 2012 to the present.

4. All communications from January 1, 2012 to present to and/or from you or any person regarding the following subjects:

    a. Landale;
    b. Phishing or other cyber scams;
    c. Cyber security;
    d. Interference with Patrick Runnion's emails;
    e. Interception of Patrick Runnion's emails;
    f. Data breaches; or
    g. Malfunctions in Patrick Runnion's computer technology.

| | |
|---|---|
| **From:** | Darrell Brown <darrell.landalesigns@gmail.com> |
| **Sent:** | Wednesday, April 13, 2016 1:27 PM |
| **To:** | prunnion@runnionequipment.com |
| **Subject:** | FW: Message from KM_C284e |
| **Attachments:** | SKM_C284e16041311061.pdf |

Pat – attached signed sales order for the 2005 Elliott and Sterling truck.

Darrell



1



# LANDALE SIGNS.

8525 ARGYLL ROAD
EDMONTON, AB   T6C 4B2
PH (780)437-3730  FAX (780)435-9285
WWW.LANDALESIGNS.COM

## FACSIMILE TRANSMITTAL SHEET

| | |
|---|---|
| TO: PAT RUNNION *Prunnion@runnionequipment* | FROM: Darrell Brown |
| COMPANY: Runnion Equipment Company | DATE: 4/13/16 |
| FAX NUMBER: 1 708 447-3730 | TOTAL NO. OF PAGES INCLUDING COVER: |
| PHONE NUMBER: 1-800 824-6704 | SENDER'S REFERENCE NUMBER: |
| RE: Used 2005 Elliott and truck | YOUR REFERENCE NUMBER: |

☐ URGENT   ☐ FOR REVIEW   ☐ PLEASE COMMENT   ☐ PLEASE REPLY   ☐ PLEASE RECYCLE

NOTES/COMMENTS:

Pat
I have signed and attached the 3 pages of the sales order as well as a copy of my memo to you of yesterday.
Please send me the invoice for the equipment as discussed and I'll get it signed and back to you immediately.

Thanks again
Regards
Darrell

## Darrell Brown

**From:**       Darrell Brown <darrell@landalesigns.com>
**Sent:**       April-11-16 4:25 PM
**To:**         'Pat Runnion'
**Subject:**    RE. quote

Pat,
Thanks, -- I'll get the signed copies back to you in the morning.

We discussed the dyno and as far as I was concerned this is included the final price of $86,000.00 plus delivery . You looked up what the total expenses were against the truck, this included truck repairs, bucket repairs and you added in $700.00 for the dyno to come up with a total. (I believe -$7,700..00 ). This was all in as part of your offer of $88,000.00 plus $2,000.00 for delivery. My counter was $86,000.00 plus a maximum of $2,000.00 for delivery which we settled upon.
I also said that I wanted as part of the sale agreement that the truck and crane would be your responsibility up to the border when I take possession. This basically means your warranty covers the unit until I take possession at Portal.

One other question – you show the Elliott as having a hydraulic circuit in the basket. Is this the upper control levers that are used by the operator in the basket ?

Thanks
DADrrell

**From:** Pat Runnion [mailto:prunnion@runnionequipment.com]
**Sent:** April-11-16 12:06 PM
**To:** darrell@landalesigns.com
**Subject:** quote

Darrell, attached is the quote with freight for the Elliott you are buying. Please sign all three pages and return back to me, I will then get you an invoice put together. One thing we talked about was that you had offered to pay for the $500 dyno of the truck, I did not include that in this pricing.


Thank you,


*Patrick Runnion*

**Runnion Equipment Company**
**800 824 6704**
**708 341 3169 cell**
**www.runnionequipment.com**

**1975 – 41 YEARS OF SERVICE – 2016**

**Crane & Equipment Solutions**
**For Contractors, Government, Rail, Utilities, or Agriculture/**
**Sales, Service, Parts, Rental/ Custom Mounting, Rebuilding**

[SALES ORDER]



# RUNNION EQUIPMENT COMPANY

**Truck Mounted Cranes & Equipment Sales, Service & Rentals**

7950 WEST 47th STREET • LYONS, ILLINOIS 60534
PHONE (708) 447-3169 • 1-800-824-6704 • FAX (708) 447-3730
www.runnionequipment.com

Sold To: Landale Signs and Neon Ltd.

Address: 8525 Argyll Rd. NW
Edmonton, AB T6C 4B2, Canada
780-437-3730
Attn: Darrell Brown

Date: 4/11/16

Quote No. 4952

Unit #3974U

Page 1 of 2

| QUANTITY | DESCRIPTION | PRICE |
|---|---|---|
| One (1) | **Used 2005 Elliott G85F equipped as follows:** | |
| | - 90' working height | |
| | - 5,900# maximum boom capacity | |
| | - Out and down main outriggers | |
| | - A-frame style rear stabilizers | |
| | - Single front outrigger | |
| | - 600# platform capacity | |
| | - Hydraulic circuit in basket | |
| | - Strobe lights mounted on crane pedestal | |
| | MOUNTED ON | |
| One (1) | **2005 Sterling LT8500 equipped as follows:** | |
| | - 56,000# GVW | |
| | - CAT C7 Engine | |
| | - Automatic transmission | |
| | - Front axle 16,000# | |
| | - Front wheels – 22.5x12.2 steel | |
| | - Front tires – 385/65R22.5 | |
| | - Rear axle - 40,000# | |
| | - Rear wheels – 22.5x8.25 | |
| | - Rear tires – 11R22.5 | |
| | - Continued on Page 2 – | |

- Continued on Page 2 –

The terms and conditions appearing on the reverse side of this Sales Order
are made a part hereof the same as if rewritten at length herein.

REC SALES SIGNATURE          DATE          4-11-16          PURCHASER SIGNATURE          April 12/16          DATE

[SALES ORDER]



# RUNNION EQUIPMENT COMPANY

7950 WEST 47th STREET • LYONS, ILLINOIS 60534
PHONE (708) 447-3169 • 1-800-824-6704 • FAX (708) 447-3730
www.runnionequipment.com

**Truck Mounted Cranes & Equipment
Sales, Service & Rentals**

| | | | |
|---|---|---|---|
| Sold To: | Landale Signs and Neon Ltd. | Date: | 4/11/16 |
| Address: | 8525 Argyll Rd. NW | | |
| | Edmonton, AB T6C 4B2, Canada | Quote No. | 4952 |
| | 780-437-3730 | | |
| | Attn: Darrell Brown | | Unit #3974U |

Page 2 of 2

| QUANTITY | DESCRIPTION | PRICE |
|---|---|---|
| | - Differential lock on both axles<br>- Trailer package with pintle hook<br>- AM/FM/CD stereo<br>- Air conditioning<br>- Spotlight mounted on top of cab | |
| | Price: | $86,000.00 |
| | | $ 2,000.00 |
| | *Freight to Portal North Dakota not to exceed $2,000.00 | |
| | | 88,000.00 |
| | All prices F.O.B. Lyons, IL and subject to all applicable tax<br>Quote firm for 30 days TERMS: 10% deposit at time of order<br>Balance due upon notification that unit is ready for delivery | f.o.b. Portal<br>ND. |

*Seller will supply a clean original copies title for the unit and a recall clearance letter from the manufacturer. BB*

The terms and conditions appearing on the reverse side of this Sales Order
are made a part hereof the same as if rewritten at length herein.

| | | | |
|---|---|---|---|
| REC SALES SIGNATURE | 4-11-16 | X PURCHASER SIGNATURE | april 11/16 |
| | DATE | | DATE |

SALES ORDER – SIGNATURE PAGE

 **RUNNION EQUIPMENT COMPANY**
7050 WEST 47th STREET • LYONS ILLINOIS 60534 PHONE • (708) 447-3169
1 800 824-6704      FAX (708) 447-3730      www.runnionequipment.com

Sold To: *LAndale Signs & Neon*

Address:

Date: *4-11-16*

Quote No. *4952*

### SALES ORDER - TERMS AND CONDITIONS OF SALE

This document contains the terms of sale. The entire contract between Seller and Buyer is contained in this Sales Order; no alleged oral promises or conditions not set forth herein shall be binding upon Seller or Buyer, and any prior negotiations between the parties are merged into the terms of this document.

Prices quoted are subject to change without notice in conformity with the Manufacturer's Price List effective at the time of delivery. Prices do not include taxes. Any tax, impost, levy, duty or other charge hereinafter imposed by any government or other authority on this sale will be added to the purchase price as herein noted or any later revision of the purchase price, and will be paid by Buyer unless Buyer provides Seller with a proper tax exemption certificate.

Upon acceptance of this order by Seller, if Buyer fails to perform the terms and conditions hereof, or refuses to accept delivery of the equipment, accessories or other items ordered within ten (10) days after notification that same are ready for delivery, the Seller, at its option may retain as liquidated damages all money, trade-ins or other property delivered to Seller by Buyer as down payment hereunder. Buyer will pay any cost of collection for any amount owed to Sellers, including, without limitation, reasonable attorney's fees, court costs and interest in the amount of 1% per month (12% per annum), from the date the amount is due.

Payment is due Seller from the date when Seller is prepared to make delivery. All equipment and material is delivered FOB Seller's plant and title and liability for loss or damage passes to Buyer upon Seller's delivery of the goods to a carrier for shipment to Buyer and any loss or damage thereafter shall not relieve Buyer from any obligation hereunder. Risk of loss for goods shall pass to the Buyer once payment is received by Seller.

Buyer may terminate this contract in whole upon thirty (30) days advance written notice to Seller. In such event, Buyer shall be liable for termination charges. If goods ordered are a standard manufacturer catalog item, Buyer will pay a cancellation charge for each unit cancelled equal the greater of 20% of the purchase order item price or forfeiture of down payment/trade-in. If goods are non-standard items built to the Buyer's custom order, Buyer will pay for all cost, direct and indirect incurred and committed for this contract, together with a reasonable allowance for prorated expenses and anticipated profits.

Buyer agrees to comply fully with all laws and regulation concerning the purchase and sale of goods. In particular, Buyer agrees to comply with all applicable export administration regulations of the United States including, but not limited to, the Export Administration Act, insofar as they apply to the sale of products.

Buyer shall indemnify and hold harmless Seller, its employees, officers and directors and the respective successors and assigns, from and against any and all liability, damages, claims, causes of actions, losses, costs and expenses (including attorneys' fees) of any kind arising out of injuries to any person (including death) or damage to any property caused by or related to the goods or any negligent act or omission of Buyer, its employees and agents.

The validity, performance and construction of this Sales Order, shall be governed by the laws of the State of Illinois, of the United States of America.

Seller shall not be liable, and shall be free from any potential liability for delay in delivery or non-delivery or any failure in shipment caused in whole, or in part, by the occurrence of any contingency beyond control of either Seller or Seller's suppliers including, but not limited to act of war (whether an actual declaration thereof is made or not), act of any government or any agency or subdivision thereof, judicial action, sabotage, insurrection, terrorism, riot or other act of civil disobedience, act of a public enemy, failure or delay in transportation, strikes, lockouts, shortage of labor or labor troubles of any kind, accidents, explosion, perils of the sea, fire, earthquake, flood, storm or any other act of God, restrictions or requisitions, shortage of labor, fuel, raw material or machinery or technical failure where Seller has exercised ordinary care in the prevention thereof, failure of manufacturers to deliver, bankruptcy or insolvency of manufacturers or suppliers, suspension of shipping facilities, act or default of any carrier or any other contingency of whatsoever nature beyond Seller's control affecting production, transportation to boarding point, loading, forwarding or unloading in such a situation at destination of the goods covered by this contract including disturbances existing at the time this contract was made. In such a situation, if shipments or delivery is not made during the period contracted for, Buyer shall accept delivery under this contract when shipment is made; provided, however, Buyer shall not be obligated to accept delivery if shipment is not made within a reasonable time after the cessation of the aforementioned impediments or causes. Seller may allocate delivery among Seller's customers.

This order shall not be binding upon Seller until accepted by Seller in writing hereon and when so accepted, the original order with original signatures as given Seller and in Seller's possession shall be conclusive and binding upon the parties hereto.

The Buyer hereby acknowledges receipt of a copy of this Sales Order and Terms and Conditions.

Customer Signature

Runnion Equipment Co.

Date Accepted *April 10/16*

Date *4-11-16*

| | |
|---|---|
| **From:** | Darrell Brown <darrell.landalesigns@gmail.com> |
| **Sent:** | Friday, April 22, 2016 2:08 PM |
| **To:** | Pat Runnion |
| **Subject:** | FW: Message from KM_C284e |
| **Attachments:** | SKM_C284e16042212290.pdf |

Pat – it seems to never end –

I was going to fill out the attached NAFTA CERTIFICATE OF ORIGAN this is for Canada Customs - but I was told it must be done by Runnion .

I have sent a copy of the NAFTA cert. that I received from Elliott to show you as an example only and a letter I received from Daimler thru the Elliott people. I really don't need the Elliott NAFTA information as the crane was (and is) permanently attached to the truck.

The letter from Daimler is not a NAFTA cert. I can't get this from them – apparently that must be done by the vendor (Runnion). You may have more luck with this as you deal with lots of Freightliner dealers.

Again this is definitely required so that we do not have to pay duty on the truck when we cross the border, This truck is covered under the North American Free Trade Agreement so duty is not required unless we can't get a NAFTA cert . letter from Sterling .

Thanks

Darrell

