Page 2

**Page 1**

```
1          UNITED STATES DISTRICT COURT
2         NORTHERN DISTRICT OF ILLINOIS
3              EASTERN DIVISION

4
5
6
7   LANDALE SIGNS AND NEON, LTD., )
                                  )
8            Plaintiff,           )
                                  )  Case No.:  16-cv-07619
9            -v-                  )
                                  )
10  RUNNION EQUIPMENT CO. and     )
    JOHN DOE,                     )
11                                )
             Defendants.          )
12                                )
                                  )
13
14
15          (See attached for appearances)

16
            DEPOSITION OF
17       NEIL EDWARD SWINDLEHURST
         (by Mr. S. P. Polick, Esq.)
18
            Edmonton, Alberta
19           July 20, 2018
20             Volume 1
21
22
23
24
25
```

**Page 2**

```
1   APPEARANCES OF COUNSEL:
2   FOR THE PLAINTIFF, LANDALE SIGNS AND NEON, LTD.:
3   M. Haeberle, Esq.
    Patterson Law Firm
4   One North LaSalle Street, Suite 2100
    Chicago, IL 60602
5   312.223.1699
    mhaeberle@pattersonlawfirm.com
6
    FOR THE DEFENDANT, RUNNION EQUIPMENT CO.:
7
    Steven P. Polick, Esq.
8   Steven P. Polick & Associates, P.C.
    155 N. Michigan Avenue, Suite 700
9   Chicago, IL 60601
    312.729.5414
10  spolick@sbcglobal.net
11  Danielle Harmata, CSR(A)                    Court Reporter
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

**Page 3**

```
1   (PROCEEDINGS COMMENCED AT 1:28 P.M.)
2   NEIL EDWARD SWINDLEHURST, having been duly sworn, examined
3   by Mr. S. P. Polick, Esq., testified as follows:
4   Q MR. POLICK:        Sir, would you please state
5     your full name for the record and spell your last name?
6   A Neil Edward Swindlehurst, S-w-i-n-d-l-e-h-u-r-s-t.
7   Q And Neil is N-e-i-l?
8   A N-e-i-l, yes.
9   Q Please have the record reflect that this is the
10    deposition of Neil Edward Swindlehurst taken pursuant
11    to notice and set for today's date by agreement of the
12    parties.  Is it -- did I pronounce it correctly,
13    Swindlehurst?
14  A Yes.
15  Q Have you ever been in a deposition before?
16  A I have been in court, being deposed on matrimonial
17    matters.
18  Q Okay.  All right, divorce case.  Were you a witness or
19    a party, or how did that happen?
20  A I was involved in it as a party.
21  Q There you go.  Well, that happens.  Aside from that
22    experience, have you ever testified under oath before?
23  A No.
24  Q Okay, well, this will be far different.  We can
25    guarantee you that.  I'm going to ask you questions
```

**Page 4**

```
1   about your knowledge of this, the facts giving rise to
2   this lawsuit of Landale versus Runnion Equipment
3   Company.  And when I'm done, counsel might ask you some
4   questions as well.
5           If at any time you're asked a
6   question that you don't hear, you don't understand, or
7   you have any difficulty responding to, you should stop
8   us and let us know the nature of the difficulty so that
9   we can correct it.  Will you do that?
10  A Absolutely.
11  Q The court reporter has to make a record of everything
12    that's said here today, so we have to speak up loud
13    enough so she can take everything down correctly.  We
14    have to try to avoid talking at the same time, which we
15    always do in everyday conversation, and then we have to
16    make sure to answer audibly as opposed to head nods,
17    uh-huhs, things of that nature.
18  A Okay.
19  Q Are we clear on all the ground rules?
20  A Yes.
21  Q Do you have any conditions that would affect your
22    ability to hear or understand questions?
23  A No.
24  Q Are you on any kind of medication today that would
25    affect your ability to hear or understand questions?
```

LANDALE SIGNS AND NEON -v-
RUNNION EQUIPMENT and JOHN DOE

Neil Edward Swindlehurst - 1
July 20, 2018

Page 5

1   A  No.
2   Q  What's your address?
3   A  15122-110A Avenue, Edmonton, Alberta.
4   Q  And how long have you lived there?
5   A  Four years.
6   Q  And with whom do you live?
7   A  Wanda Scherer, my partner.
8   Q  Okay.  And what's your date of birth and place of
9     birth?
10  A  November 13th, 1963, in Edmonton, Alberta.
11  Q  So how old are you today?
12  A  54.
13  Q  Okay.  And you were married just the one time?
14  A  Technically I've never been married.  Common-law divorces
15    with children, so...
16  Q  Okay.  How many kids do you have?
17  A  I have one.
18  Q  What's the name and age of your child?
19  A  Robert Stephen Swindlehurst, and his age is 32.
20  Q  Can you summarize for us your educational background,
21    where you went to school, when you got out?
22  A  Oh, high school was taken through Harry Ainlay Composite
23    High School.
24  Q  Okay.
25  A  University education was done through

Page 6

1     Athabasca University, and a bunch of courses through
2     U of A, and also specialized programs through Microsoft,
3     Novell, and the like.
4   Q  What kind of degrees do you have?
5   A  I have not finished a degree.
6   Q  Okay.  What's been your course of study generally?
7   A  Course of study.  Initially started out as general
8     studies as first-year universities [sic] want to be, and
9     basically slid over to computers at an early age and fell
10    in love with them and been doing that ever since.
11  Q  Okay.  And then you said you've taken a number of -- we
12    call them "continuing legal education courses" for
13    lawyers, but you've taken a number of courses that are
14    put out by manufacturers --
15  A  Yes.
16  Q  -- in the computer industry?
17  A  Yes.
18  Q  Did I state that correctly?
19  A  Correct.
20  Q  And what do you get when you take one of those courses?
21    Certificate?
22  A  The knowledge, that's about it.  Sometimes there's a
23    certificate; sometimes there's not.  Depending on the
24    nature of the course.
25  Q  And do you have to -- well, are you licenced?

Page 7

1   A  There is no licencing required for my position.
2   Q  I know.  Just thought I'd ask.  You never know.
3   A  Yeah.
4   Q  Some places they licence everything.  Okay.  So you're
5     not required to take any kind of continuing studies?
6   A  It's a matter of course that I have to do continuing
7     education just because of the dynamic nature of computers
8     in general.
9   Q  Okay.  But no requirement, but it's a good idea if you
10    want to stay in the business?
11  A  You don't have any choice.  It just changes that fast.
12  Q  And what's the last course you took?
13  A  Basically there's just more online learning rather than
14    regular course work at this point.
15  Q  Okay.
16  A  Because -- basically keeping up on news, industry trends,
17    looking at specific case scenarios as far as applications
18    on programs, software as required.
19  Q  Okay.  Is it a -- is it a course in the traditional
20    sense where you have to observe or read certain
21    materials and then be tested on it later, or is it just
22    the kind of thing that you --
23  A  No.
24  Q  -- you examine or watch and try to -- try to --
25  A  Most of it's not audited.  So most of it is just

Page 8

1     basically taken for the knowledge, directly applied to
2     what I need to learn at the time.
3   Q  Okay.  And "audit" is probably the term I was looking
4     for.  When is the last time you took an audited course,
5     you know, where you're scored, graded, whatever?
6   A  In computers?  Or in general?
7   Q  Computers.
8   A  Probably over ten years ago.
9   Q  And just generally what was that course of study?
10  A  I believe it was database management and structure
11    layouts.
12  Q  And where are you employed now?
13  A  I'm self-employed.
14  Q  And do you do business under any particular name?
15  A  The Flattened Toad Limited.
16  Q  And how long have you done business under that name?
17  A  Since 2009.
18  Q  And is it an incorporated --
19  A  Yes.
20  Q  -- company?  Are you the sole owner?
21  A  I am the sole owner.
22  Q  Okay.  And then how long generally have you -- strike
23    that.
24          What field are you in?  What is
25    your occupation?

LANDALE SIGNS AND NEON -v-
RUNNION EQUIPMENT and JOHN DOE

Neil Edward Swindlehurst - 1
July 20, 2018

Page 9

1 A IT management and support.
2 Q Information technology management and support?
3 A Correct.
4 Q And how long have you worked in that field?
5 A Since late '80s, early '90s.
6 Q And have you worked for other outfits that, you know --
7 A Yes, I looked after Hebdo Mag's computer systems over
8    western Canada for a number of years.
9 Q I'm not familiar with the name. What's the name of the
10    company?
11 A Hebdo Mag.
12 Q Yeah, how do you spell that?
13 A H-e-b-d-o Mag.
14 Q And what is their business?
15 A Basically publications. So they ran the Bargain Finder,
16    the Auto Trader, the Home Renter's Guide, Home Buyer's
17    Guide, printing plants, presses. Basically the whole
18    gambit [sic] on publications. They had at that point
19    approximately 60 publications that I looked after all the
20    IT support for.
21 Q It's almost a vanishing industry with the hard copy.
22 A Yes.
23 Q How long did you work for that outfit?
24 A The Auto Trader, in several positions. Probably
25    ten years.

Page 10

1 Q And just give us a timeline. Which ten years?
2 A Would have been from the early '80s to the late '80s. So
3    basically 1980 to 1990. Some -- pretty much all in
4    there.
5 Q And where did you go after that?
6 A At that point, I started up my own firm, which was
7    Clockwork Consulting, and that was started in 1992.
8 Q But the same -- the same industry?
9 A Yes.
10 Q And how long did you do business under Clockwork --
11 A I did business under Clockwork until 2009, and at that
12    point, I changed it over to the new company.
13 Q So same -- same company, different -- same business,
14    different name?
15 A Yes.
16 Q Any other reason for the changeover?
17 A I had bought a purchase -- or purchased land about an
18    hour out of town, and because it was over ten acres, I
19    had to incorporate a company to run the place. And
20    talking to Revenue Canada, was advised to centre the
21    company out there so I could deduct my gas mileage back
22    and forth.
23 Q Okay. So it was a more reasonable business purpose
24    there tax-wise to --
25 A Yes.

Page 11

1 Q -- do it in that fashion?
2 A Yeah.
3 Q Okay. Do you have any other employees?
4 A No.
5 Q Have you ever had any other employees?
6 A I was up to about six employees with
7    Clockwork Consulting, and after the stress of dealing
8    with employees, I shut that down fairly quickly. I have
9    three or four people that I work with that I bring in as
10    independent contractors if I need them.
11 Q Okay. So otherwise you're the chief cook, so to speak?
12 A Yes.
13 Q And so if you get stuck or you need a little backup,
14    you call on people that you've worked with before?
15 A Correct.
16 Q Whether they work on a per diem basis or whatever it
17    might be?
18 A Correct.
19 Q Okay. And how did you start in the industry again?
20 A Basically when I worked with the Auto Trader and
21    Hebdo Mag, it's -- they kind of morphed from one to the
22    other over the years. I got involved with the computers
23    at that point and fell in love with them and kept on
24    going from there. I've got a pretty vast computer
25    background because I basically grew up with them, as my

Page 12

1    father worked at the University of Alberta. So I had
2    computer access ever since I was probably five years old.
3 Q And they were wood burning in that stage, but, yeah.
4 A Tape driven by sound, so...
5 Q Yes. I remember. All right. So have you had any
6    other jobs since -- you know, since you finished any
7    formal schooling in any other industry aside from
8    information technology?
9 A Growing up I had lots of jobs in lots of industries, but
10    since I've settled with the IT, that's been pretty much
11    the sole...
12 Q Since you've been 18 or so? Or whereabouts?
13 A No, about probably -- let's see. Probably around
14    20 years old, 20, 21.
15 Q So most of your adult life certainly?
16 A Yes.
17 Q Do you have any other special skills?
18 A Oh, I have a very varied skill set. I'm very handy with
19    my hands. I've been a finishing carpenter; I've been an
20    iron worker; I've been an electrician. And this was all
21    growing up.
22 Q Okay. So you picked up some skills in the trades?
23 A Yes.
24 Q All right. And how long have you worked for Landale?
25 A Probably '94, '95.

LANDALE SIGNS AND NEON -v-
RUNNION EQUIPMENT and JOHN DOE

Neil Edward Swindlehurst - 1
July 20, 2018

Page 13

1 Q And who do you principally report to over there?

2 A Darrell and Carol and their daughter Laura.

3 Q And just generally describe for us what you do there.

4 A Basically manage their information systems, look after

5    their computers, and make -- all the processes that they

6    involve.

7 Q Okay. So periodically -- I mean, you would install new

8    systems, new software?

9 A I install, update, reload, modify, whatever's needed to

10   keep the systems up and running.

11 Q Okay. Come up -- keep the systems current, running --

12 A Yes.

13 Q -- and, as the need might arise, upgrade?

14 A Correct.

15 Q Okay. And that's generally been your involvement over

16   there since 1994 or so?

17 A Correct.

18 Q Okay. And how often are you at Landale?

19 A Probably at least once a week.

20 Q Okay. And how long is a visit typically?

21 A Minimum one hour. Sometimes up to four or five hours

22   depending what's needed.

23 Q Okay. So if there's a glitch, obviously you stay

24   longer?

25 A Yes.

Page 14

1 Q But usually it's a one-hour visit, just a quick

2   tune-up?

3 A Yeah. Most of the systems, once you set them up, they're

4   pretty much hands-off. So it's -- user errors is the

5   Number 1 thing that I end up having to correct. And then

6   there's just periodic updating as required.

7 Q Okay. And some of that you -- can you do some of that

8   offshore too away from Landale?

9 A Yes. I do have remote access into their server, which I

10   can verify the backups and making sure that patches are

11   up to date and everything's running solidly on a regular

12   basis.

13 Q All right. Have you ever been involved in a lawsuit

14   before aside from this one?

15 A No.

16 Q And, again, not a divorce thing, but I mean more where

17   you were contacted as a consultant or an expert with

18   regard to information technology.

19 A No, I haven't.

20 Q All right. So this is the first time around. Did you

21   review any materials to get ready for your deposition

22   today?

23 A Yes. I did meet with Darrell and the lawyer here

24   yesterday. And at that point, we went through a few of

25   the emails.

Page 15

1 Q Okay. Aside from looking at a few of the emails, what

2   else did you look at?

3 A That was pretty much it. It was about an hour and a half

4   just kind of going through the emails, seeing if I

5   remembered certain things, whether it was my writing on

6   stuff, et cetera.

7 Q Okay. Do you have a file yourself that you've kept or

8   generated as a result of this --

9 A There is a file of the original copies that I pulled off

10   that I've got in my office.

11 Q Okay. Original copies of what?

12 A Of the emails that --

13 Q Okay. So -- and we'll look at some of these things in

14   a little bit, but generally speaking, some of -- all

15   the emails that have already been disseminated here,

16   you've either given them to Darrell, who's given them

17   to the lawyers, who presumably gave them to me too?

18 A Correct.

19 Q Okay. So anything else that's in your file aside from

20   these emails?

21 A No.

22 Q Have you consulted with anybody else about, you know,

23   this -- you know, the fraudulent wire transfer?

24 A No.

25 Q So you never spoke to the police, for example, anything

Page 16

1   like that?

2 A The police I did. Once we figured out what was --

3   happened, I did make a call into the police, and then

4   Darrell followed that up with the police from there.

5 Q All right. So you talked to the Edmonton --

6 A Edmonton --

7 Q -- Police?

8 A -- city police.

9 Q You never contacted the Royal Canadian Mounted Police?

10 A No.

11 Q Or the Federal Bureau of Investigation?

12 A No.

13 Q Or any other agency?

14 A No.

15 Q And what was the extent of your report or your initial

16   contact with the Edmonton Police?

17 A Basically it was a matter of reporting the fraud and

18   pulling documents on what we had as an email chain

19   throughout the whole process.

20 Q And did you forward those to the Edmonton Police or

21   meet with the Edmonton officer?

22 A I think we printed out copies. I don't think I

23   personally met with the officer. I think that was

24   Darrell that did that. I believe I contacted him and

25   explained what had happened, and initially they were very

LANDALE SIGNS AND NEON -v-
RUNNION EQUIPMENT and JOHN DOE

Neil Edward Swindlehurst - 1
July 20, 2018

Page 17

1 reluctant to even open up a case on it.
2 Q Yeah, that's what Mr. Brown said. Little arm twisting.
3 A And it was only because of the amount of money involved
4 that they agreed to open up a case.
5 Q Okay. Have you ever been involved in the -- strike
6 that. Let me ask it again.
7 What other companies do you
8 work for aside from Landale?
9 A I've got a whole slew of different companies that I work
10 for.
11 Q Well, I don't want any trade secrets in case I get in
12 the business. Don't want me showing up on your
13 accounts. But just generally, what other kinds of
14 companies?
15 A I run a gambit of different companies. Landale is the
16 only signed company I run with or I work with. I work
17 with machine shops. STAMCO Specialty Tool. GT Metal is
18 a metal fabrication outfit. Heart Lake Construction is a
19 construction firm that I work with. And Air Tech
20 Industries, which is a compressed air manufacturer. And
21 there's several others. I mean, there's lots of
22 different companies.
23 Q I was just trying to get an idea as to what percentage
24 of your business Landale is.
25 A Landale is probably 5 percent of the business.

Page 18

1 Q Okay.
2 MR. POLICK:         Off the record.
3       (DISCUSSION OFF THE RECORD)
4 Q MR. POLICK:      We're back on the record.
5    Well, you said you've been involved in the industry
6    since you were at least 20, and you're 54 today. Have
7    you ever been involved in, you know, similar instances
8    where somebody's been defrauded?
9 A No.
10 Q So this is the first?
11 A This is the first fraud that I've had to deal with.
12 Q Okay. And nothing since, I assume?
13 A No.
14 Q Why don't --
15 A Well, borderline on fraud is I have had customers that
16    have undergone ransomware attacks, which would be, I
17    guess, fraud if you actually paid them or followed
18    through.
19 Q It's still a criminal act, yeah, for sure.
20 A Yeah, so that happens along with, you know, just people
21    opening infected emails, et cetera. So I have had to
22    deal with different virus attacks and ransomware attacks.
23 Q And more than the emails that come from Nigeria that --
24    you know, "Send us a million dollars." But these
25    hostage matters --

Page 19

1 A Yes.
2 Q -- how many times have you been involved in those?
3 A Maybe five or six.
4 Q Okay. But this is the only one that involves a
5    significant wire-transfer-of-funds --
6 A Right.
7 Q -- fraud?
8 A This is the only one that's accumulated in a large
9    financial loss. Most other companies are backed up
10    regularly and often, and any time they've suffered
11    attacks, it's just a matter of restoring the data back to
12    the last day's state. Usually takes about two hours,
13    which is the effect of their exposure and...
14 Q Okay. So you had the brief conversation with the
15    police; you made copies of documents for Darrell
16    basically to take to the Edmonton Police and complete
17    the report?
18 A As soon as we found out that there was a theft and I got
19    called in to Darrell's office and he explained kind of
20    what happened, the first thing I did was pulled all the
21    relevant emails and did a backup of his system as far as
22    the emails, Outlook, and then started running full scans
23    on his system.
24 Q Okay. And as long as we've verged into that topic,
25    from the results of the scan, what did you find?

Page 20

1 A I found no malicious software anywhere on his machine.
2 Q Okay. And how long did it take to do a scan?
3 A Probably took about two hours all told.
4 Q Okay.
5 A Because there are several scans to run.
6 Q Okay. Yeah, I just want a ballpark idea. And all this
7    was done within a few days of when you learned of the
8    fraudulent wire transfer?
9 A This was done on the Wednesday after -- basically as soon
10    as they found out what had happened, I got called in to
11    start looking at it.
12 Q Yeah, and I think we established from Mr. Brown's
13    deposition that the second set of wiring instructions
14    and the money that was transferred pursuant to that
15    second wiring instruction was Friday the 13th. And
16    then -- so you were saying it would be Wednesday the
17    18th when you were doing the scans?
18 A Correct.
19 Q If we're on the same timeline. And is that -- was
20    Wednesday the first day you were notified or called in?
21 A Yes.
22 Q Okay. I'm just curious, and I won't belabour the
23    point, but why didn't you get any national agency
24    involved like the Royal Canadian Mounted Police or the
25    Federal Bureau of Investigation?

LANDALE SIGNS AND NEON -v-
RUNNION EQUIPMENT and JOHN DOE

Neil Edward Swindlehurst - 1
July 20, 2018

Page 21

1 A Because it was very evident from the Edmonton Police that
2 because there was no felony or no injury in place, you
3 couldn't transfer across country boundaries.
4 Q Okay.
5 A Loosely translated, because nobody got murdered, they
6 couldn't go across borders.
7 Q Well, no, I understand that, but, I mean, you know, a
8 part of the crime happened in the United States, so to
9 me, the first thing, I would contact the Federal Bureau
10 of Investigation.
11 A No, I did not do that.
12 Q Okay. All right. What else did you do with reference
13 to, you know, your first involvement on that Wednesday,
14 the 18th, aside from doing a scan for a couple hours
15 and...
16 A Basically I went through and printed off all the emails
17 that I found on his system, including the headers, and
18 then sort of started going through the header information
19 trying to figure out what had actually transpired.
20 Q Okay. So for the most part, you scanned and say,
21 "Okay, everything seems to be okay here. Now I'm going
22 to go back and try to track where this stuff came
23 from"?
24 A Correct.
25 Q In very general terms, I assume?

Page 22

1 A Yes.
2 Q And how long did that process take?
3 A Pretty much I think that was the rest of the afternoon.
4 Probably at least three and a half, four hours.
5 Q Okay. So aside from -- or after the work you did on
6 Wednesday, have you had any other involvement in trying
7 to investigate this fraudulent wire transfer?
8 A I did try to search up some of the IP addresses that had
9 come through, and didn't get too much success tracking
10 them back.
11 Q Okay. And when did you do that?
12 A That would have been that day, the next -- within the
13 next couple of days afterwards.
14 Q Okay. So either on the 18th or the 19th or 20th,
15 thereabouts?
16 A Correct.
17 Q And how long did it take to try to track the -- what
18 are we tracking, the ISP, or what do they call it?
19 A The IP addresses.
20 Q Okay.
21 A And that probably took me a couple hours to find out that
22 they were all pretty much all -- what's the best way to
23 phrase that? There wasn't any privately owned IPs within
24 the whole works.
25 Q Okay. Somewhere there's an indication they were

Page 23

1 apparently -- there was some source that was offshore?
2 I saw a note to -- reference to the British Virgin
3 Islands. Is that part of your research?
4 A Yeah, I don't recall that. Most of the tracking that I
5 did was all centred down into the States.
6 Q Okay. So what happens, you track it, and then suddenly
7 the trail ends, or how does it stop?
8 A Pretty much I just documented what I could, and that was
9 given to the police.
10 Q Okay. But how far were you able to track the source of
11 any of these?
12 A Not very bloody far.
13 Q And, again, I'm not in your business, and, you know,
14 I'm a paper and pencil guy, so why -- why were you not
15 successful? How was it -- how did this thief, you
16 know, try to cover his tracks?
17 A Basically, on the internet, tracing IPs is -- extremely
18 easy to forge IP addresses and to mask your trail.
19 Q Okay. So just like creating a false corporation, and
20 then closing shop and opening up another one?
21 A Effectively. A lot of the internet is -- routes traffic
22 all through routers. Surprisingly, a large number of
23 routers are manufactured by Cisco and an extremely
24 large percentage still have "Cisco" as their default
25 password. So anybody on the internet can basically log

Page 24

1 into a router, change the routing on it; and you track it
2 back, you get back to that router.
3 As far as an IT management goes,
4 any time you have something weird with the router, you
5 just reload the firmware from scratch. You don't even
6 bother trying to figure out what happened.
7 Q What went wrong?
8 A Yes.
9 Q Huh.
10 A So there's a limit to how far you can pull back IPs.
11 Q Okay.
12 A Occasionally you do have IP addresses that are centred to
13 a physical location, and that was more what I was trying
14 to find.
15 Q And how far were you able to track --
16 A They were basically --
17 Q -- that?
18 A -- put back to internet providers with a large pool of
19 addresses.
20 Q Okay. And did you keep any kind of record of that
21 search?
22 A No.
23 Q How come?
24 A Basically it was just easy -- it was non-fruitful and
25 nonproductive, so I couldn't get anywhere with it. The

LANDALE SIGNS AND NEON -v-
RUNNION EQUIPMENT and JOHN DOE

Neil Edward Swindlehurst - 1
July 20, 2018

Page 25

1 IPs themselves are easy enough to look up with the
2 headers on all the emails.
3 **Q Okay. Any other investigative work you did as a result**
4 **of this fraudulent wire transfer that we haven't**
5 **summarized somehow?**
6 A I did do a bunch of reading on the different fraud types
7 and cases like this, trying to get a better handle on how
8 it actually happened.
9 **Q Okay. So part of -- well, and it's also, yeah,**
10 **follow-up education.**
11 A The other thing that I did was instantly -- or pretty
12 much one of the first things I did is changed the
13 passwords on Darrell's accounts. And at that point,
14 contacted our ISP, which was Look Communications,
15 inquiring about if they had any problems with their
16 system or any glitches or anything else and explained
17 exactly what happened. And they put up a trouble case,
18 and basically they said, no, their system was fine and
19 just do the usual things to change your password and set
20 it up with SSL, and that was their boilerplate response.
21 **Q Okay. And you said you also reviewed some articles or**
22 **some sources of information about how this crime occurs**
23 **and recurs?**
24 A Right.
25 **Q What were the results of that continuing education?**

Page 26

1 **What did you learn?**
2 A Basically most of the stuff is all done offshore.
3 Usually it's done through intercepting emails and
4 infecting local machines. Because Darrell's did not have
5 any infection or malware or anything else, basically we
6 kind of figured it was on the other side running inside,
7 was the upshot that I got out of it.
8 **Q And there's some notes out there that basically say,**
9 **well, you know, it wasn't a Landale machine from our**
10 **search.**
11 A Right.
12 **Q So therefore, it must have been Runnion.**
13 A Basically.
14 **Q Simple terms?**
15 A Yeah.
16 **Q And that's -- is that generally the conclusion you came**
17 **to?**
18 A Yes.
19 **Q What's the basis for that conclusion?**
20 A By testing all the systems, finding nothing adverse in
21 any of them, if there's nothing here, it's got to be on
22 the other end. That's the long and short of it.
23 **Q Okay. But did you consider any other potential sources**
24 **that were hacked besides Runnion?**
25 A Well, it -- basically there's very few pieces in the

Page 27

1 chain where you've got from the originating computer to
2 the ISP to the ISP to the destination computer.
3 **Q Yeah, but did you consider any other sources -- I mean**
4 **entities that may have been hacked aside from Landale**
5 **and Runnion?**
6 A I don't understand the question.
7 **Q Okay. Well, we can come back around to it here in a**
8 **bit.**
9 **Any other basis for your**
10 **conclusion that the Runnion system must have somehow**
11 **been hacked aside from what you told us?**
12 A We did have a conversation with Mr. Runnion that had
13 called in to Darrell's -- or into Landale, and we had a
14 conversation on speaker phone where he alluded to they
15 had some problems in the past before.
16 **Q Okay. And when do you think that conversation**
17 **occurred?**
18 A That would have been probably on the Wednesday.
19 **Q Okay, probably -- the 18th?**
20 A The Wednesday afternoon on the 18th.
21 **Q Okay. And who else was present for this conversation?**
22 A Would have been Darrell and myself.
23 **Q In Mr. Brown's office?**
24 A In Mr. Brown's office.
25 **Q And then Patrick Runnion on the phone you believe?**

Page 28

1 A Yes.
2 **Q Is this the only time you ever spoke with**
3 **Patrick Runnion?**
4 A It was.
5 **Q And did you make any kind of record of that**
6 **conversation?**
7 A No, I didn't.
8 **Q Did Mr. Brown?**
9 A Not that I'm aware of.
10 **Q And just how long did the conversation take?**
11 A It was probably five or ten minutes. It basically
12 rehashed what happened. I think he was going to give the
13 information to his IT guy so his IT guy could follow up.
14 I believe he was also going to send us copies of the
15 emails he had on his end so we could actually prepare --
16 or look at them back and forth to see where -- we could
17 figure out where it all went off the rails.
18 **Q Right. This is where you're trying to do your**
19 **tracking?**
20 A Right.
21 **Q Okay. And what else was said -- and by "he," you're**
22 **referring to Patrick Runnion?**
23 A Yes.
24 (DISCUSSION OFF THE RECORD)
25 **Q MR. POLICK:** We're back on the record after

LANDALE SIGNS AND NEON -v-
RUNNION EQUIPMENT and JOHN DOE

Neil Edward Swindlehurst - 1
July 20, 2018

Page 29

1  a brief break here.
2          What else was said as best you
3  recall, you know, of this phone conversation between
4  Pat Runnion, you, and Darrell Brown on the 18th, the
5  Wednesday after the wire fraud?
6  A  Well, basically it was trying to figure out what had
7    happened, and that's where Mr. Runnion was quite helpful
8    in agreeing to do certain other items to provide us with
9    the information so we could try to figure out what had
10   happened.
11         He had also mentioned at the
12   time that he had a problem where his lawyer had been
13   emailed from his account instructions to wire money some
14   place. The lawyer thought it was rather bizarre, called
15   him up personally, and then he found out that, you know,
16   that was not a valid email. And that's where we kind of
17   got an indication that the problem was on Runnion's end,
18   just because of that.
19  Q  Okay. And just as best as you can, describe the
20   wording that was used by Pat Runnion about his lawyer
21   getting some kind of email asking for money. Any other
22   details about --
23  A  Well, I think he --
24  Q  -- what this entailed?
25  A  -- had mentioned that, you know, we have had a problem --

Page 30

1    we had a situation in the past where his lawyer had
2    gotten instructions from him that were not valid, that
3    weren't sent from him.
4  Q  Okay. Any further detail about what this involved?
5  A  As far as I remember, it was something to do with
6    instructions for a real estate purchase that -- the email
7    had instructed the lawyer to send money to some account
8    to finalize a real estate purchase.
9  Q  Okay. Any other -- any other language you remember
10   from that conversation with Pat Runnion that -- about
11   this?
12  A  No. That's about all that it was, just kind of a couple
13   of remarks sort of in passing on the conversation.
14  Q  Okay. So did Pat say he personally experienced this,
15   that it was his company, or that it was individually,
16   or was his lawyer's issue?
17  A  From what I understand, it was an email from him to his
18   lawyer.
19  Q  But do you know if it was -- had to deal with the
20   Runnion company or Pat Runnion individually?
21  A  That was -- my understanding, it was the Runnion company.
22  Q  All right. Any further conversation or details about
23   that that --
24  A  No, it's just that he was agreeable to send up whatever
25   information he had, and he was contact -- going to

Page 31

1    contact his IT person to go through all their systems at
2    the same time to find out.
3  Q  Right. You said Pat Runnion wanted to get all this --
4  A  Yeah.
5  Q  He wanted to find out too.
6  A  Yes.
7  Q  And he did send whatever you just referenced as well as
8    have you contact his information technology guy?
9  A  I don't believe I ever talked to their IT guy.
10  Q  Okay. You didn't talk on the phone or certainly not in
11   person?
12  A  Not that I remember.
13  Q  Did you communicate with the other information
14   technology person? Runnion's?
15  A  I'm not sure. I don't think I did. I'm not quite sure
16   on that one. If I did talk to him -- yeah, I can't
17   recall ever talking to their IT guy.
18  Q  Okay. Well, you don't remember any phone conversation
19   with the information technology guy for Runnion. Do
20   you remember exchanging any kind of correspondence with
21   him, whether electronic, you know, hard copy, or any --
22  A  No, I don't think --
23  Q  -- other communication?
24  A  -- I ever talked to him directly at all.
25  Q  Did you ever swap emails?

Page 32

1  A  No.
2  Q  No other form of communication with the information
3    technology guy?
4  A  No.
5  Q  All right. So it sounds like you never talked to each
6    other in one fashion or the other?
7  A  I don't believe we did.
8  Q  Okay. What other things have you done in terms of
9    trying to, you know, help find this fraud aside from
10   what you already told us?
11  A  Yeah, my primary job was to pull all the information I
12   could, document it together, and just hold onto it.
13   Basically we took a quick look at it, sent it to the
14   police, and left it in their hands.
15  Q  All right. I know we've marked as -- Brown Exhibit 1
16   earlier today. It's documentation that was forwarded
17   over by Landale's attorney quite some time ago. You're
18   not going to have to read the whole thing, but we are
19   going to -- which there are additional copies here
20   somewhere.
21  MR. POLICK:          Did you guys --
22  MR. HAEBERLE:         I've got my copy.
23  MR. POLICK:          Okay.
24  Q  I'll give you the originals here in a second after I
25   find out where I want to start off. Here. Let me give

LANDALE SIGNS AND NEON -v-
RUNNION EQUIPMENT and JOHN DOE

Neil Edward Swindlehurst - 1
July 20, 2018

Page 33

1  you Exhibit 1 to look at while I look for my other
2  copy. And if you start paging through there, you're
3  going to get beyond the original contract or purchase
4  documents, and you're going to eventually come down to
5  these wire-transfer instructions. And I'm sure you'll
6  know it when you see it. Here we go. I found my copy.
7          If you look at the page, it's
8  numbered by -- counsel for Landale numbered it as --
9  A "C" 3.
10 Q -- "C" 3.
11 A "C" 3, yes.
12 Q All right. And you've I assume had an opportunity to
13   review this before?
14 A I have seen it before, yes.
15 Q When is the last time you looked at any of the
16   documentation with reference to this wire transfer?
17 A We did briefly go through the emails, which is part and
18   parcel of all this, yesterday. I did not study them in
19   depth or anything else recently.
20 Q And this is a meeting between you and Darrell Brown and
21   counsel?
22 A Yes.
23 Q Okay. And just -- but what was said with reference to
24   this first wire instruction, for example, yesterday?
25 A I believe I saw it within the package of emails, but we

Page 34

1  never addressed it directly.
2  Q All right. Well, what else did you talk about
3   yesterday?
4  A It was just basically confirming that I had put my
5   initials and comments on the emails and whether I
6   remember seeing them --
7  Q Okay.
8  A -- et cetera.
9  Q All right. Any other discussions you had yesterday?
10 A Not of any note.
11 Q Well, if it had to do with this case, it would be of
12   note, but anything else about this case?
13 A No, nothing else about the case. It was just more of a
14   meeting, saying hello, introducing, and kind of showing
15   what emails and the package that was happening.
16 MR. POLICK:          Go off the record.
17      (DISCUSSION OFF THE RECORD)
18 Q MR. POLICK:        All right. Let's go to a few
19   preceding pages there. I think it's numbered as -- it
20   should be "C" 1, but it's 1 "C."
21 A Okay.
22 Q And is this one of the emails you were talking about
23   that --
24 A Yes.
25 Q Yeah, it refers to the first wiring instructions?

Page 35

1  A Yeah.
2  Q And it's dated --
3  A April 18th.
4  Q At 1:02 p.m., sent from someone who says they're
5   Jennifer Molina, and it's runnionequpment company?
6  A Correct.
7  Q Yeah. Did you catch that the first time you saw that?
8  A No, I didn't.
9  Q Okay. But obviously somebody changed the spelling of
10   "equipment"?
11 A Yes.
12 Q And we can assume that's because of some kind of
13   fraudulent intent, I would anticipate, or you tell me.
14 A In retrospect, knowing what happened, yes, it would be
15   for fraudulent intent.
16 Q Right. Because the addresses obviously got misspelled,
17   a common name or a common word?
18 A Yes.
19 Q Anyhoo, this was sent to Darrell at his email address,
20   and here you got a copy to Pat Runnion, again at
21   "equipment" spelled wrong?
22 A Yeah.
23 Q And this is just an "enclosed, please find the wiring
24   instructions" basically, is the gist of this
25   communication. Right?

Page 36

1  A Yeah.
2  Q Now, the handwriting on top, is any -- or on this page,
3   is any of this handwriting yours?
4  A I believe the "1st instructions with routing" --
5  Q That's your handwriting?
6  A Yeah, I believe that is my writing.
7  Q Okay. Good. That's what Mr. Brown said. No one can
8   recognize my handwriting, so...
9          Back to "C" 3, the
10   wire-transfer information.
11 A Yes.
12 Q And we're not going to go through this, but obviously
13   there's all kinds of -- it's again directed to a bank
14   in North Carolina for a guy by the -- Michael Mitch
15   LLC. Did you investigate this bank in North Carolina
16   or try to investigate Michael Mitch LLC?
17 A No, I did not.
18 Q Okay. So your purpose, then, was just to try to track
19   where these communications came from?
20 A Correct.
21 Q And is that the next three pages here starting at
22   "C" 4?
23 A This is the header off the email itself. Every email has
24   information embedded in the header of the email which
25   points out directions, how it goes, what servers it hits,

LANDALE SIGNS AND NEON -v-
RUNNION EQUIPMENT and JOHN DOE

Neil Edward Swindlehurst - 1
July 20, 2018

Page 37

1   et cetera.
2   Q  Okay. So, in essence, it's collapsed in the header?
3   A  Yes.
4   Q  And you've opened it up here in this two and a half
5      pages?
6   A  Correct.
7   Q  That's what you're saying? All right. So then just
8      explain or interpret what you found.
9   A  Basically this gives you your actual mail servers on
10     where it was received from and where it's shipped from.
11  Q  So, again, just tells us runnionequpment.
12  A  Yeah.
13  Q  J. Molina.
14  A  Yeah, and it basically tells you who was copied in on it
15     and the mail flow settings.
16  Q  And so -- and then it talks outbound through a
17     mailhost.com?
18  A  Which would have been the server that it went through.
19  Q  And how -- do you know -- we know where that's at, or
20     how do we find that?
21  A  If you do a search on the IP of 208.91.198.232, it will
22     tell you the location of the address.
23  Q  And so did you find that out?
24  A  Yeah, it was in the States some place.
25  Q  Okay. But I assume not at Runnion Equipment Company?

Page 38

1   A  Correct.
2   Q  All right. So then it just continues. It's like a
3      chain; right? It goes then through --
4   A  Mm-hm.
5   Q  -- from one mega -- from outbound.mailboxhost [sic] to
6      megamailservers. That sounds like a big -- a big,
7      what, a --
8   A  Yes. That is, I believe -- megamailservers is TELUS,
9      which is one of the largest providers in Canada.
10  Q  So just a large collection of addresses run through
11     that site?
12  A  Yep. Occasionally through the headers themselves you can
13     get detailed information as to corporately owned or
14     private IPs, which would enable somebody to track them
15     back. In this case, it seemed to be a common pool
16     through regular ISP providers.
17  Q  And if I understand, he's basically running it through
18     very crowded providers?
19  A  Yes.
20  Q  So you have a -- anybody would have a harder time
21     tracking the individual who --
22  A  Yes, that's --
23  Q  -- did this? Trying to blend in with the crowd?
24  A  Basically on any of these, most of the major providers
25     own several large subnets of IP addresses. So a subnet

Page 39

1      is a collection of IPs ranging anywhere from 256 up to
2      basically a million IPs. So...
3   Q  Okay. So if I understand really what you're saying on
4      these two and a half pages, it kind of tells us, again,
5      the route all these communications travel through but
6      doesn't really tell you who the bad guy was --
7   A  Correct.
8   Q  -- and where exactly he might be located?
9   A  Right.
10  Q  And, again, I'm using the common idea of somebody -- an
11     individual just walking into, you know, a crowd of
12     1,000 people to try to disappear.
13  A  Right.
14  Q  In essence, that's what this person's doing?
15  A  Right.
16  Q  Any other significant information from this
17     two-and-a-half-page routing?
18  A  No, the routing I believe was consistent through pretty
19     much all of these spoofed emails.
20  Q  So you mean the same mega servers --
21  A  Yes.
22  Q  -- and --
23  A  Were pretty much used consistently.
24  Q  Okay.
25  A  Yeah, they're -- they may have slightly different

Page 40

1      numbers, but that's normal, because in large corporate
2      environments, they have multiple machines to run as
3      servers for outgoing and incoming mail.
4   Q  Okay. But it's still a consistent pattern of conduct
5      or modus operandi that this guy is using?
6   A  They were using consistent equipment to send their
7      emails.
8   Q  Okay. So are we done with the routing -- the
9      information from the routing summary of that first
10     email? And wiring instructions of -- it's --
11  A  On "C"?
12  Q  -- April 18, 2016.
13  A  Yes.
14  Q  Okay. I just want to make sure you --
15  A  Yeah.
16  Q  -- we've got all the significant information out of
17     there that you were able to secure.
18         Then I think we're up to what's
19     marked as 1 "D" there?
20  A  Correct.
21  Q  Now, this is a -- it should be the second set of wiring
22     instructions.
23  A  Yeah.
24  Q  Where it's of the -- the cover sheet for it, the email.
25     This one's dated May 12, 2016, again, from

LANDALE SIGNS AND NEON -v-
RUNNION EQUIPMENT and JOHN DOE

Neil Edward Swindlehurst - 1
July 20, 2018

Page 41

1  runnionequpment?

2  A  Yeah.

3  Q  Which -- copied to Pat Runnion at equpment and directed

4     to Darrell Brown.  And, again, it's just an "enclosed,

5     please find."  But then there's handwriting above it.

6  A  "Changed bank info"?

7  Q  Yeah.

8  A  That was mine.

9  Q  Okay.  Any other parts that are your handwriting?

10 A  Probably seven -- "2nd instructions.  See routing."

11 Q  "2nd"?

12 A  "Instructions."

13 Q  -- "instructions.  See routing"?

14 A  "See routing."

15 Q  Okay.  Anything else on there you wrote?

16 A  Do not believe so.

17 Q  Okay.  All right.  Then we jump ahead to "D" 3, which

18    is the second set of wire-transfer information.

19 A  Right.

20 Q  In the upper left-hand corner there under the Runnion

21    logo, they also printed in "Prime C. Contractors," and

22    that of course is who is listed as a beneficiary in the

23    wiring instructions.  Do you see that up in the

24    left-hand corner too?

25 A  Yes, I do.

Page 42

1  Q  Did you ever try to find where Prime C. Contractors is?

2  A  I believe I did do a name search on it, and it wasn't

3     very helpful.

4  Q  Did you find anything or any location?

5  A  I found lots of Prime Contractors, but no Prime C.

6     Contractor.

7  Q  Okay.  Of the ones you found, do you remember one in

8     Duluth, Georgia?

9  A  I don't recall where any of them were from directly.

10 Q  Okay.  Did you keep a record of whoever you -- whatever

11    you did find?

12 A  No, I did not.

13 Q  Did you ever come across a name Jeffrey Gensemer?  Did

14    I say it right?

15 A  Not that I recall.

16 Q  Gensemer, G-e-n-s-e-m-e-r.

17 A  Name does not ring a bell.

18 Q  I just wanted to not fracture the name.

19           Okay.  So then you did a

20    similar search and tracking effort with regard to these

21    second set of wiring instructions?

22 A  Yes.

23 Q  And that's the next few pages starting at "D" 4?

24 A  Correct.

25 Q  Through "D" 6?

Page 43

1  A  Yep.

2  Q  Any information you can interpret in there for us?

3  A  Using the same outbound servers, we had an addition of

4     having a yahoo account, which was supposedly supposed to

5     be Livingston International, which is a broker for

6     bringing stuff across the border, I believe.

7  Q  Okay.  So, again, they start with

8     outbound.mailhostbox.com?

9  A  Yes.

10 Q  And then they go through again the megamailserver and

11    some of --

12 A  Yeah, so the actual routing of the document is pretty

13    much consistent with the earlier one.

14 Q  Same pattern?

15 A  Yes.

16 Q  Where do you find the reference -- or where do we find

17    the reference to yahoo?

18 A  On the second page.

19 Q  Ah.  No wonder I couldn't find it.  Okay.  Very top?

20 A  Yes.

21 Q  JavaMail, yahoo mail, yahoo -- yahoo.com, and -- all

22    right, just interpret that.  What does that tell us?

23 A  I believe that was the routing for -- see on the actual

24    email.  Yeah, I'm not sure why it would have had a

25    reference to yahoo on there unless they blind carbon

Page 44

1  copied something to yahoo on that.  Because it seemed to

2  be out of place with everything else for some reason.

3  Q  All right.  But this is the first time you saw yahoo

4     being listed in the --

5  A  Within the header.

6  Q  -- path of travel --

7  A  Yes.

8  Q  -- so to speak?  Okay.  And on this three-page-route

9     investigation, is it dated as to when you do this

10    search?

11 A  They would all --

12 Q  In the written printout?

13 A  -- have been -- they would have all have been probably

14    within the 20 -- 48 hours of when the incident happened.

15 Q  Okay.  No, I understand.  You said you did it on

16    May 18th or so.

17 A  Yeah.

18 Q  But it's not written on here though?  The dates you did

19    it isn't?

20 A  No, it is not.

21 Q  Okay.  Anyway, we were back to this yahoo reference on

22    page 2, so that's the first time that popped up.

23    That's different from the first wire-transfer

24    instructions?

25 A  Correct.

LANDALE SIGNS AND NEON -v-
RUNNION EQUIPMENT and JOHN DOE

Neil Edward Swindlehurst - 1
July 20, 2018

Page 45

1  Q  Anything else that's significant about this second
2     routing search?
3  A  No, there's nothing else different from that. The
4     servers are pretty much the same throughout and
5     consistent. Again, running on the Runnion Equipment
6     domain without the "i" in "equipment."
7  Q  Right. Everything says "equpment." Does the thief
8     here have to be pretty conversant in your field or not
9     so?
10 A  It's dependent on where he had control. As long as they
11    had access to a mail server, they could route as they saw
12    fit. Technical knowledge, yes, they would have had to
13    have some technical knowledge, otherwise they would have
14    blazed a path back to their front door.
15 Q  Okay. So they knew enough to at least stay hidden for
16    the most part? Well...
17 A  Yes.
18 Q  Anything else significant about the second routing
19    investigation or the investigation relating to the
20    second wire-transfer instruction?
21 A  No.
22 Q  So then I'm down to pages "E" 1. Did you find it?
23 A  Yep.
24 Q  Again, from Willie Messuck, runnionequpment. May 16.
25    So this is the Monday, actually.

Page 46

1  A  Yeah.
2  Q  At 12:03 p.m. And now, the handwriting at the top, is
3     that yours too?
4  A  Yes, it is.
5  Q  And just read your handwriting. What's it saying?
6  A  (Quoted):
7        "Probably not from Runnion, email header
8        attached? See routing attached. "
9  Q  Okay. So is that -- is that the conclusion you drew
10    after you performed a routing search?
11 A  I can't recall how I made that determination at the time.
12 Q  That's fine. The next few pages after that "E" 2, 3
13    and 4 --
14 A  Mm-hm.
15 Q  -- those again are a routing --
16 A  That --
17 Q  -- that's a routing summary?
18 A  That would be the header off the email, yes.
19 Q  Right, the email we just discussed at "E" 1?
20 A  Correct.
21 Q  All right. And anything significant you can tell us
22    from that?
23 A  They were using the same host still. So nothing much had
24    changed on that.
25 Q  So they're staying with their same pattern?

Page 47

1  A  Correct.
2  Q  Now, this one -- there's no yahoo in this one, is
3     there?
4  A  No, there is not.
5  Q  Okay. Anything else significant from that set of
6     routing --
7  A  Not that I see.
8  Q  -- information? Okay. Now we're on to "1" F.
9  MR. HAEBERLE:          1 "G" or "B"?
10 THE WITNESS:           1 "F."
11 MR. HAEBERLE:          1 "F."
12 Q  MR. POLICK:          All right. Now, the
13    handwriting on top there, is that yours?
14 A  Yes.
15 Q  And it says what, refer to Mike or "Ref to Mike"?
16 A  Reference to Mike, who is at Livingston International,
17    and it's not at a yahoo.ca address.
18 Q  So what's that mean?
19 A  Basically I'm saying, just by looking at the address on
20    here, that is not a legitimate address for Livingston.
21 Q  Just because you're familiar with the company, or it's
22    just --
23 A  Livingston International is a huge company. They would
24    not use an address through yahoo ever.
25 Q  Right. Looks fairly clumsy, especially for a large

Page 48

1     company?
2  A  Correct.
3  Q  Okay. So that's your first glance, just because it
4     says Mike Maciolek -- it looks like dot livingstonintl,
5     which again seems kind of unprofessional and kind of
6     clumsy, at yahoo.com?
7  A  Right.
8  Q  So --
9  A  So right off the hop, that is not a valid email address
10    for any customs broker.
11 Q  Right. But now -- here's the second time we have a
12    note about yahoo somehow being in the chain?
13 A  Yes.
14 Q  Okay. Now, there's some -- also on 1 "F" it says, that
15    handwriting down there in the right quadrant, lower
16    quadrant -- it says (quoted as read):
17       "May 18/16. D. Brown received email from
18       Willie of Runnion. Cc Livingston
19       - Note: Yahoo address (probably hacked)."
20 A  Yes.
21 Q  All right. And is that the conclusion you drew as
22    well?
23 A  That -- yes. This was not a valid email from
24    Runnion Equipment. Hence, the "probably hacked."
25 Q  And then the next two pages, I think it is, is the

LANDALE SIGNS AND NEON -v-
RUNNION EQUIPMENT and JOHN DOE

Neil Edward Swindlehurst - 1
July 20, 2018

Page 49

1    routing or the tracking of the routing?
2    A  Yeah, the header of the emails.
3    Q  All right.  Anything significant from that summary?
4      Actually runs through 4 "F."
5    A  Consistent with the other ones.
6    Q  Same pattern?
7    A  Same pattern.  Outbound.mailboxhost - or
8      mailhostbox.com.
9    Q  Did you ever contact Livingston about this?
10   A  No, I did not.
11   Q  1 "G."
12   A  Yes.
13   Q  We're moving through the documents here.  Is your
14     handwriting on -- this is an email of May 18, 2016, at
15     10 o'clock a.m.  So this is Wednesday morning from
16     Janice Ryce, R-y-c-e, at Runnion Equipment Company --
17     or runnionequipment.com correctly spelled; right?
18   A  Correct.
19   Q  I'm just saying that so the transcript's accurate.
20            This is a third set of wiring
21     instructions.
22   A  Yes.
23   Q  Or it's an "enclosed, please find" cover letter for
24     those instructions.  Now, is your handwriting on this
25     email?

Page 50

1    A  I believe the third instructions are my handwriting.
2    Q  Okay.  And "See routing," is that you too?
3    A  I do not believe so.  No, that is not my writing.  I do
4      not make a "G" like that.
5    Q  How about that sentence with the arrow?  What's that
6      first word?
7    A  "Landale notes of May 18/16."
8    Q  Oh.  Should have figured.  Okay.  All right.  So then
9      you also did a tracking of Janice Ryce's email of
10     May 18, 2016.  Have I got that correct?
11   A  Yes.
12   Q  And, again, 2 "G" is the -- you know, Runnion's wiring
13     instructions.
14   A  Yes.
15   Q  Okay.  And then the pages after that -- and I've been
16     calling it a "tracking report" or "routing report."
17     What do you call this summary?
18   A  Email headers.
19   Q  Okay.  So these three pages of email headers are with
20     reference to Runnion's wiring instructions.  What is
21     significant from that?
22   A  Different servers.  So at this point, we know it's a
23     different server that it's running through than the
24     hacked set.
25   Q  Than the fraud?

Page 51

1    A  Correct.
2    Q  Okay.  Anything else significant from that header?
3    A  No.  Just the different originating server for the
4      emails.
5    Q  Okay.  And then I think we're almost done with these
6      exhibits, but there's a -- when you go to "H" series,
7      it -- well, there's a bunch of handwriting.  Is your
8      handwriting on the page "H" 1, for example?
9    A  Yes, I see it.
10   Q  What did you write?
11   A  I would have written the "May 18th by fax" -- or did I?
12     Just a minute.
13   MR. POLICK:          Off the record.
14         (DISCUSSION OFF THE RECORD)
15   A  "Other email with spoofed address faxed direct" would be
16     my handwriting there.  "May 18th by fax" is not my
17     writing.
18   Q  MR. POLICK:          So "Other email with spoofed
19     address faxed direct" --
20   A  Would be my writing.
21   Q  Okay.  Nothing else on that page is your writing?
22   A  No.
23   Q  Now, this is -- what happens on this page and the next
24     few pages is these -- you know, there's some emails
25     here that purported to be from Darrell Brown using a

Page 52

1      gmail account.
2    A  Yeah, so this would have been the information that
3      Runnion had faxed back to Landale.
4    Q  Right.  Exactly.
5    A  So this would be after the conversation with Pat Runnion
6      that -- or Patrick Runnion -- that he had taken copies of
7      his emails, printed them out, and then forwarded them on
8      by fax.  And yes, at this point here, we have
9      darrell.landalesigns@gmail.com.
10   Q  All right.  And did you ever try to investigate the --
11     you know, the gmail account?
12   A  I did a quick look at it, but gmail, as you may be aware,
13     is quite concerned with privacy, and because I didn't set
14     up the email, there's nothing I can do to get the
15     information off the email.
16   Q  So you tried to find out, but you can't --
17   A  Yes.
18   Q  -- can't get through the wall from --
19   A  Right.
20   Q  -- from Google or gmail?
21   A  It would be the same sort of thing as trying to trace
22     your address back to a person.  Just nobody would play
23     ball with that one.
24   Q  Okay.  And what's involved in creating a gmail account
25     or --

LANDALE SIGNS AND NEON -v-
RUNNION EQUIPMENT and JOHN DOE

Neil Edward Swindlehurst - 1
July 20, 2018

Page 53

1  A  Basically --
2  Q  -- address?
3  A  -- log into gmail, and pick your user name and account
4     name and a password, and you'll have an account.
5  Q  All right.  And do you have a gmail account?
6  A  No, I do not.
7  Q  And you're saying basically if I was a bad guy, I could
8     open a gmail account and use your name?
9  A  Yes.
10 Q  And then gmail wouldn't even tell you?
11 A  Correct.
12 Q  All right.
13 A  And that is not unique just to gmail.  That's used -- all
14    the providers.
15 Q  I understand.  All right.  So that continues with the
16    rest of these documents that were sent over by
17    Pat Runnion by fax because at that point that seemed
18    more secure than email?
19 A  Correct.
20 Q  So he collected all these gmail emails, which I didn't
21    mean to rhyme, and sent those over.  So this is part of
22    the things you're looking at when you're doing your
23    investigation that May 18th or in the day or two after?
24 A  Correct.
25 Q  2 "l" is a Landale Sign cover sheet for a fax?

Page 54

1  A  Yes.
2  Q  Do you find that?
3  A  Yes.
4  Q  And it's an out -- from Darrell Brown to Pat Runnion
5     basically saying enclosed is the signed contract.
6  A  Yes.
7  Q  Now, it's -- here's what I'm trying to figure out,
8     because I'm not smart enough to figure it out on my
9     own.  I don't know, did this go through a fax machine,
10    or does the fact that it's got Pat's email address on
11    it indicate that it went through email, or is it the
12    kind of thing you scan it to your computer and fax it?
13    How was this sent, or do you know?  It's not an artful
14    question.  Do you want me to try that again?
15 A  I don't know whether this was faxed or emailed.  Usually
16    when you fax something, it does have a fax header on it.
17    So without a fax header, if I had to guess, I would say
18    this would be emailed.
19 Q  Well, and that's what I was trying to figure out.
20 A  Yeah, because there's no headers on any of these.
21 Q  Okay.  And I'm sorry, I know you said you took a -- you
22    took a brief look at trying to find Prime C.
23    Contractors, LLC, whatever the name of that --
24 A  Yes.
25 Q  -- one company is on the -- the wire transfer that was

Page 55

1     actually effective.
2  A  Yes.
3  Q  The fraudulent one.  Did you ever look -- do anything
4     with reference to contacting Sun Trust or trying to
5     find out what the bank had?
6  A  No, I did not.
7  Q  All right.  Any other work you've done with reference
8     to trying to investigate this fraudulent wire transfer
9     that we haven't somehow covered today?
10 A  Not that I can recall.
11 Q  Aside from -- well, I know you mentioned you did some
12    research into how these things occur --
13 A  Yes.
14 Q  -- after --
15 A  After the fact.
16 Q  -- this fraud happened.  Anything else you've learned
17    from that course of study that we haven't somehow
18    discussed?
19 A  It's a lot more common than you would be led to believe.
20    Generally speaking, most people are quite embarrassed by
21    it, so a lot of them don't report it because it's not
22    worth their time, effort, and embarrassment.
23 Q  Right.  Depends on the amount that's involved
24    certainly, I guess.
25 A  Yes.

Page 56

1  Q  Okay.
2  A  Most of these tend to come from an infected computer
3     where somebody has gained access to somebody else's
4     computer to get the passwords, et cetera.
5  Q  Meaning if I'm a crook, I want to use somebody else's
6     computer, not my own?
7  A  Yes.
8  Q  So that's it.  It's just a front?
9  A  Yeah.
10 Q  Okay.  I'll look at my notes, but I don't know that I
11    have any further questions, sir.  Thank you.
12 MR. HAEBERLE:            Do you want a few, otherwise
13    I've got a few.  Do you want to have a few-minute break
14    so you can look at your notes?  Otherwise --
15 MR. POLICK:            Go ahead.
16         (DISCUSSION OFF THE RECORD)
17 MR. HAEBERLE EXAMINES THE WITNESS:
18 Q  MR. HAEBERLE:            If I'm summarizing correctly,
19    you -- after your investigation, you came to the
20    conclusion and the opinion that Landale's systems were
21    not compromised; is that fair?
22 A  That is correct.
23 Q  Did anything about how Landale's email servers were set
24    up inform that opinion?
25 A  Try that again.

Page 57

1  Q  Sure. Is there anything about how Landale's email
2     server is set up that leads you to believe that the
3     intrusion was not on Landale's end?
4  A  Well, part of that is due to the practices that I use on
5     emails and passwords, et cetera, that I don't use common
6     names. I usually use scratch-pack passwords because
7     emails are a one-time setup. That's it. One I've set it
8     up, the email is -- password is saved within the program,
9     and nobody ever uses it.
10 Q  And in terms of how the -- does Landale use an exchange
11    server?
12 A  No, Landale uses the company called "EasyHosting," which
13    is in Montreal, and they've been looking after Landale's
14    email services and web services since probably '94, '95.
15 Q  And the fact that you use them as opposed to an
16    exchange server, does that bolster your conclusion that
17    Landale was not compromised?
18 A  Well, the better the server, the more -- more tools you
19    have with the server. An exchange server you can modify
20    in several different ways for routing and packaging, and
21    you can basically do whatever you want within an email
22    environment. With EasyHosting, they are very limited on
23    what we can do as far as any mail operations.
24 Q  So because of the conclusion that the intrusion was not
25    on Landale's end and the steps that you took, is it

Page 58

1     correct that you are of the opinion that the intrusion,
2     as well as the limited steps an email takes to get to
3     its destination, your conclusion is that the intrusion
4     was on Runnion's end; correct?
5  A  That is correct.
6  Q  The methods that you used to reach your opinions and
7     conclusions today, are they methods that are commonly
8     used and relied on by individuals in the information
9     technology field?
10 A  Yes. Moreover than anything else, it's a process of
11    elimination. Can I get there from here? No. Well, then
12    that can't be the problem.
13 Q  And that's a standard methodology --
14 A  Yes.
15 Q  -- within the field?
16 A  Yes.
17 Q  In your opinions and conclusions today, are they to a
18    reasonable degree of professional certainty?
19 A  Yes.
20 MR. HAEBERLE:          I have nothing further.
21 MR. POLICK EXAMINES THE WITNESS:
22 Q  MR. POLICK:          Now, I take it you have no --
23    you've done no investigation into formulating an
24    opinion as to whether Livingston was hacked aside from
25    what -- the observations you made on some of those

Page 59

1     emails?
2  A  I did not confirm or deny that the yahoo address was
3     Livingston. Just by looking at it, I would say no
4     professional company would have an outside address like
5     that.
6  Q  Right. And you had a note in there saying, you know,
7     they were -- yahoo was hacked or Livingston's yahoo was
8     hacked.
9  MR. HAEBERLE:          Objection. Misstates the
10    testimony.
11 MR. POLICK:          It's a written document.
12 MR. HAEBERLE:          Misstates the document.
13 MR. POLICK:          Objection's noted.
14 A  Sorry, can you rephrase that again?
15 Q  Sure. You made a couple notations about yahoo, and you
16    made a couple notations that suggest certainly that
17    Livingston had been hacked or the yahoo address had
18    been hacked.
19 A  No, I believe I put the word "hacked" on there as it was
20    an indication that it was a hacked email because
21    Livingston would not use a --
22 Q  Right, you made that --
23 A  -- yahoo --
24 Q  -- observation when you first saw the address even?
25 A  Right.

Page 60

1  Q  Okay.
2  A  Yeah, so that's nothing to do with Livingston itself.
3     Just by looking at it, you know that's not a legitimate
4     email because nobody would have that address in there for
5     a firm.
6  Q  Gotcha. But you never made any investigation to see
7     whether Livingston had in fact been hacked by the
8     fraudulent person?
9  A  No, I did not.
10 Q  Or any of its employees, Mike Maciolek or Ken Ginter,
11    G-i-n-t-e-r?
12 A  No.
13 Q  And you've never been asked to try to investigate
14    Jeffrey Gensemer?
15 A  No, I don't recognize that name.
16 Q  Or Prime C. Contractors, LLC?
17 A  Again, I did a quick search on it. As far as
18    investigation per se, that was more in line to be left up
19    to the police department with the tools and toys.
20 Q  Well, and back to my point, when you get a national
21    police investigative agency that specializes in this
22    involved -- here's my point, and we'll go to the -- go
23    to it quickly. It's from Brown Exhibit 6.
24 A  Okay.
25 Q  And I'll represent to you these were records that were

LANDALE SIGNS AND NEON -v-
RUNNION EQUIPMENT and JOHN DOE

Neil Edward Swindlehurst - 1
July 20, 2018

**Page 61**

1  subpoenaed from Sun Trust Bank back in -- well, they
2  were responded to by Sun Trust on October 28, 2016.
3  And follow the money. All right. The trouble is, the
4  money was taken on, what was it, May 13, Friday the
5  13th, of 2016.
6  A Right.
7  Q So May, June, July, August, September, five months
8  later -- Chicago public schools. But anyway, the
9  subpoena's received, and you don't have to read all of
10 this, but what it shows from the bank is where did the
11 money go, who created this account; and it clearly
12 lists a company called Prime C. Controls -- or
13 "Prime Controls Contractors, LLC." It lists them out
14 of I think Duluth, Georgia. Lists their tax
15 identification number. Lists them as a limited
16 liability company. And also shows the principal of the
17 company is a guy by the name of Jeffrey Gensemer. So
18 that's my point. You were never asked to investigate,
19 try to track --
20 A No, that's the first time I believe I've seen that
21 document.
22 Q Okay. All right. And just on the assumption that this
23 is where the money went, and then the money
24 disappeared, because there's also a bank statement that
25 accompanies it, we know that Mr. Gensemer, or someone

**Page 62**

1  who calls himself Mr. Gensemer, is in fact the fraud,
2  and this is the company that he set up for that fraud.
3  MR. HAEBERLE: Objection. Foundation. If you
4  know, you can answer that question.
5  A That -- was that a question or a statement on your end?
6  Q MR. POLICK: A little of both.
7  Well, just from what you --
8  well, you take a moment and look at it. But, I mean,
9  just from what we know, that would appear to be the
10 person who took the money and the company that took the
11 money.
12 A If you say so, I would have to agree. I am not familiar
13 with bank records or anything else, so --
14 Q Well, no, you'd have to read the whole thing.
15 A Yeah, yeah. I've never --
16 Q You'll see it says I represented, and then -- this
17 isn't even a question. But when he set up the account,
18 he answered all the questions "do not contact me by
19 phone, by email." Bit of an indicator there. And
20 you've never been asked to check with -- anything about
21 Sun Trust Bank?
22 A No, I have not.
23 Q Okay. Any other people you talked to about this aside
24 from, you know, Darrell Brown?
25 MR. HAEBERLE: Any other people we've talked

**Page 63**

1  about earlier?
2  Q MR. POLICK: Or anyone else we haven't
3  mentioned?
4  A Not in direct into aspects of the case. I've talked to
5  Darrell, Carol, counsel. That's about it.
6  Q Okay. What other conversations did you have with
7  counsel, or what else did you discuss that
8  we haven't --
9  A Well, as we --
10 Q -- somehow discussed?
11 A -- mentioned earlier, he had just basically shown the
12 documents and did a brief run-through on what I can
13 expect from a deposition, and that was about it.
14 Q Okay. All right. Have we covered everything you know
15 about this case?
16 A Pretty much, and then some.
17 Q Okay. All right. Well, thank you for your time.
18 A Great.
19     (DISCUSSION OFF THE RECORD)
20 MR. POLICK: Yes, I just want to explain
21 signature real quick. The court reporter is going to
22 type up everything that was said here today, and then
23 it's important to determine that it's accurate. You have
24 the right to review the transcript to make certain the
25 court reporter took everything down correctly. If the

**Page 64**

1  court reporter makes a mistake, which they seldom do, you
2  could then correct the mistake on a separately provided
3  errata sheet, and then you sign it and certify it as
4  accurate. And you normally will read it and find no
5  mistakes, and then sign off and certify as accurate.
6  A Okay.
7  MR. POLICK: That's if you reserve signature.
8  And it has to be done within a timeframe, you know,
9  30 days after the transcript is done. Okay? So you
10 can't just put it in the drawer and forget about it for
11 six months.
12 A Not a problem.
13 MR. POLICK: Because then it's the same as if
14 you read it and signed it.
15 A Right. Okay.
16 MR. POLICK: So alternatively, you can waive
17 the right and then rely on the court reporter's expertise
18 and experience. So I know counsel suggested that you
19 reserve signature. I just want to make sure you
20 understood.
21 A Okay. Yes, I will reserve signature.
22 MR. POLICK: Okay. Thank you very much.
23     (PROCEEDINGS CONCLUDED AT 2:52 P.M.)
24
25     * * * * * * * * * * * * * *

LANDALE SIGNS AND NEON -v-
RUNNION EQUIPMENT and JOHN DOE

Neil Edward Swindlehurst - 1
July 20, 2018

**Page 65**

1   Certificate of Transcript

2

3       I, the undersigned, hereby certify that the foregoing

4   pages 1 to 65 are a complete and accurate transcript of

5   the proceedings taken down by me in shorthand and

6   transcribed from my shorthand notes to the best of my

7   skill and ability.

8                           Dated at the City of Edmonton,

9   Province of Alberta, this 26th day of July, A.D. 2018.

10

11

12

13

14

15

16                          Danielle Harmata, CSR(A)

17                          Official Court Reporter

18

19

20      //

21   Mr. Polick examines from 1:28 to 2:38

     Mr. Haeberle examines from 2:38 to 2:41

22   Mr. Polick examines from 2:41 to 2:52

23

24

25

**Page 66**

1   SIGNATURE OF WITNESS

2   I, (NEIL EDWARD SWINDLEHURST), the witness in the above
    deposition have read the within transcript of my testimony,

3   I have made _____ changes in said testimony, and have
    stated such changes (if any) and the reason for each change

4   on a separate sheet attached hereto.

5

    My testimony as given herein is true and correct, to the

6   best of my knowledge and belief.

7

8   _____

    (NEIL EDWARD SWINDLEHURST)

9

    Subscribed and sworn to before me this _____ day of

10  _____, AD, 2018.

11

12  _____

13

14

15

16

17

18

19

20

21

22

23

24

25

**Page 67**

1   TRANSCRIPT CHANGES

2   Page  Line    Change

3   ____  ____   _____

4   ____  ____   _____

5   ____  ____   _____

6   ____  ____   _____

7   ____  ____   _____

8   ____  ____   _____

9   ____  ____   _____

10  ____  ____   _____

11  ____  ____   _____

12  ____  ____   _____

13  ____  ____   _____

14  ____  ____   _____

15  ____  ____   _____

16  ____  ____   _____

17  ____  ____   _____

18  ____  ____   _____

19  ____  ____   _____

20  ____  ____   _____

21  ____  ____   _____

22  ____  ____   _____

23  ____  ____   _____

24  ____  ____   _____

25  ____  ____   _____

LANDALE SIGNS AND NEON -v-
RUNNION EQUIPMENT and JOHN DOE

Neil Edward Swindlehurst - 1
July 20, 2018

**1**

**1** 14:5 32:15 33:1 34:20 40:19 45:22 46:19 47:8,9,10,11 48:14 49:11 51:8

**1,000** 39:12

**10** 49:15

**12** 40:25

**12:03** 46:2

**13** 61:4

**13th** 5:10 20:15 61:5

**15122-110A** 5:3

**16** 45:24

**18** 12:12 40:12 49:14 50:10

**18/16** 48:17 50:7

**18th** 20:17 21:14 22:14 27:19,20 29:4 35:3 44:16 51:11,16 53:23

**1963** 5:10

**1980** 10:3

**1990** 10:3

**1992** 10:7

**1994** 13:16

**19th** 22:14

**1:02** 35:4

**1:28** 3:1

**1st** 36:4

**2**

**2** 44:22 46:12 50:12 53:25

**20** 12:14 18:6 44:14

**2009** 8:17 10:11

**2016** 40:12,25 49:14 50:10 61:2,5

**208.91.198.232** 37:21

**20th** 22:14

**21** 12:14

**256** 39:1

**28** 61:2

**2nd** 41:10,11

**3**

**3** 33:9,10,11 36:9 41:17 46:12

**32** 5:19

**4**

**4** 36:22 42:23 46:13 49:4

**48** 44:14

**5**

**5** 17:25

**54** 5:12 18:6

**6**

**6** 42:25 60:23

**60** 9:19

**8**

**80s** 9:5 10:2

**9**

**90s** 9:5

**94** 12:25 57:14

**95** 12:25 57:14

**A**

**a.m.** 49:15

**ability** 4:22,25

**Absolutely** 4:10

**access** 12:2 14:9 45:11 56:3

**accompanies** 61:25

**account** 29:13 30:7 43:4 52:1,11,24

**53:3,4,5,8** 61:11 62:17

**accounts** 17:13 25:13

**accumulated** 19:8

**accurate** 49:19 63:23

**acres** 10:18

**act** 18:19

**actual** 37:9 43:12,23

**addition** 43:3

**additional** 32:19

**address** 5:2 35:19 37:22 47:17,19,20, 24 48:9,19 51:15,19 52:22 53:2 54:10 59:2,4,17,24 60:4

**addressed** 34:1

**addresses** 22:8,19 23:18 24:12,19 35:16 38:10,25

**adult** 12:15

**adverse** 26:20

**advised** 10:20

**affect** 4:21,25

**afternoon** 22:3 27:20

**age** 5:18,19 6:9

**agency** 16:13 20:23 60:21

**agree** 62:12

**agreeable** 30:24

**agreed** 17:4

**agreeing** 29:8

**agreement** 3:11

**ahead** 41:17 56:15

**Ainlay** 5:22

**air** 17:19,20

**Alberta** 5:3,10 12:1

**alluded** 27:14

**amount** 17:3 55:23

**anticipate** 35:13

**Anyhoo** 35:19

**apparently** 23:1

**applications** 7:17

**applied** 8:1

**approximately** 9:19

**April** 35:3 40:12

**arise** 13:13

**arm** 17:2

**arrow** 50:5

**artful** 54:13

**articles** 25:21

**aspects** 63:4

**assume** 18:12 21:25 33:12 35:12 37:25

**assumption** 61:22

**Athabasca** 6:1

**attached** 46:8

**attacks** 18:16,22 19:11

**attorney** 32:17

**audibly** 4:16

**audit** 8:3

**audited** 7:25 8:4

**August** 61:7

**Auto** 9:16,24 11:20

**Avenue** 5:3

**avoid** 4:14

**aware** 28:9 52:12

**B**

**back** 10:21 18:4 19:11 21:22 22:10 24:2,10,18 27:7 28:16,25 36:9 38:15 44:21 45:14 52:3,22 60:20 61:1

**backed** 19:9

**background** 5:20 11:25

**backup** 11:13 19:21

**backups** 14:10

**bad** 39:6 53:7

**ball** 52:23

**ballpark** 20:6

**bank** 36:13,15 41:6 55:5 61:1,10,24 62:13,21

**Bargain** 9:15

**basically** 6:9 7:13, 16 8:1 9:15,17 10:3 11:20,25 13:4 16:17 19:16 20:9 21:16 23:17,25 24:16,24 25:18 26:2,5,8,13,25 28:11 29:6 32:13 34:4 35:24 37:9,14 38:17,24 39:2 47:19 53:1,7 54:5 57:21 63:11

**basis** 11:16 14:12 26:19 27:9 27:9

**belabour** 20:22

**bell** 42:17

**beneficiary** 41:22

**big** 38:6

**birth** 5:8,9

**bit** 15:14 27:8 62:19

**bizarre** 29:14

**blazed** 45:14

**blend** 38:23

**blind** 43:25

**bloody** 23:12

**boilerplate** 25:20

**bolster** 57:16

**border** 43:6

**borderline** 18:15

**borders** 21:6

**bother** 24:6

**bought** 10:17

**boundaries** 21:3

**break** 29:1 56:13

**briefly** 33:17

**bring** 11:9

LANDALE SIGNS AND NEON -v-
RUNNION EQUIPMENT and JOHN DOE

Neil Edward Swindlehurst - 1
July 20, 2018

**bringing** 43:6

**British** 23:2

**broker** 43:5 48:10

**Brown** 17:2 28:8 29:4 32:15 33:20 36:7 41:4 48:17 51:25 54:4 60:23 62:24

**Brown's** 20:12 27:23,24

**bunch** 6:1 25:6 51:7

**Bureau** 16:11 20:25 21:9

**burning** 12:3

**business** 7:10 8:14, 16 9:14 10:10,11,13, 23 17:12,24,25 23:13

**Buyer's** 9:16

**C**

**call** 6:12 11:14 16:3 22:18 50:17

**called** 19:19 20:10, 20 27:13 29:14 57:12 61:12

**calling** 50:16

**calls** 62:1

**Canada** 9:8 10:20 38:9

**Canadian** 16:9 20:24

**carbon** 43:25

**Carol** 13:2 63:5

**Carolina** 36:14,15

**carpenter** 12:19

**case** 3:18 7:17 17:1, 4,11 25:17 34:11,12, 13 38:15 63:4,15

**cases** 25:7

**catch** 5:7

**centre** 10:20

**centred** 23:5 24:12

**certainty** 58:18

**certificate** 6:21,23

**cetera** 15:6 18:21 34:8 37:1 56:4 57:5

**chain** 16:18 27:1 38:3 48:12

**change** 24:1 25:19

**changed** 10:12 25:12 35:9 41:6 46:24

**changeover** 10:16

**check** 62:20

**Chicago** 61:8

**chief** 11:11

**child** 5:18

**children** 5:15

**choice** 7:11

**Cisco** 23:23,24

**city** 16:8

**clear** 4:19

**Clockwork** 10:7,10, 11 11:7

**closing** 23:20

**clumsy** 47:25 48:6

**collapsed** 37:2

**collected** 53:20

**collection** 38:10 39:1

**COMMENCED** 3:1

**comments** 34:5

**common** 35:17 38:15 39:10 55:19 57:5

**Common-law** 5:14

**commonly** 58:7

**communicate** 31:13

**communication** 31:23 32:2 35:25

**communications** 25:14 36:19 39:5

**companies** 17:7,9, 14,15,22 19:9

**company** 4:3 8:20

9:10 10:12,13,19,21 17:16 30:15,20,21 35:5 37:25 47:21,23 48:1 49:16 54:25 57:12 59:4 61:12,16, 17 62:2,10

**complete** 19:16

**Composite** 5:22

**compressed** 17:20

**compromised** 56:21 57:17

**computer** 6:16 9:7 11:24 12:2 27:1,2 54:12 56:2,4,6

**computers** 6:9 7:7 8:6,7 11:22 13:5

**concerned** 52:13

**conclusion** 26:16, 19 27:10 46:9 48:21 56:20 57:16,24 58:3

**conclusions** 58:7, 17

**conditions** 4:21

**conduct** 40:4

**confirm** 59:2

**confirming** 34:4

**consistent** 39:18 40:4,6 43:13 45:5 49:5

**consistently** 39:23

**construction** 17:18,19

**consultant** 14:17

**consulted** 15:22

**Consulting** 10:7 11:7

**contact** 16:16 21:9 30:25 31:1,8 49:9 62:18

**contacted** 14:17 16:9,24 25:14

**contacting** 55:4

**continues** 38:2 53:15

**continuing** 6:12 7:5,6 25:25

**contract** 33:3 54:5

**Contractor** 42:6

**contractors** 11:10 41:21 42:1,5 54:23 60:16 61:13

**control** 45:10

**Controls** 61:12,13

**conversant** 45:8

**conversation** 4:15 19:14 27:12,14,16, 21 28:6,10 29:3 30:10,13,22 31:18 52:5

**conversations** 63:6

**cook** 11:11

**copied** 37:14 41:3 44:1

**copies** 15:9,11 16:22 19:15 28:14 32:19 52:6

**copy** 9:21 31:21 32:22 33:2,6 35:20

**corner** 41:20,24

**corporate** 40:1

**corporately** 38:13

**corporation** 23:19

**correct** 4:9 6:19 9:3 11:15,18 13:14,17 14:5 15:18 20:18 21:24 22:16 35:6 36:20 37:6 38:1 39:7 40:20 42:24 44:25 46:20 47:1 48:2 49:18 50:10 51:1 53:11,19,24 56:22 58:1,4,5

**correctly** 3:12 4:13 6:18 49:17 56:18 63:25

**correspondence** 31:20

**counsel** 4:3 33:8,21 63:5,7

**country** 21:3

**couple** 21:14 22:13, 21 30:12 59:15,16

**courses** 6:1,12,13, 20

**court** 3:16 4:11 63:21,25

**cover** 23:16 40:24 49:23 53:25

**covered** 55:9 63:14

**created** 61:11

**creating** 23:19 52:24

**crime** 21:8 25:22

**criminal** 18:19

**crook** 56:5

**crowd** 38:23 39:11

**crowded** 38:18

**curious** 20:22

**current** 13:11

**customers** 18:15

**customs** 48:10

**D**

**Darrell** 13:2 14:23 15:16 16:4,24 19:15 27:22 29:4 33:20 35:19 41:4 51:25 54:4 62:24 63:5

**Darrell's** 19:19 25:13 26:4 27:13

**darrell. landalesigns@ gmail.com.** 52:9

**data** 19:11

**database** 8:10

**date** 3:11 5:8 14:11

**dated** 35:2 40:25 44:9

**dates** 44:18

**daughter** 13:2

**day** 20:20 22:12 53:23

**day's** 19:12

**days** 20:7 22:13

**deal** 18:11,22 30:19

LANDALE SIGNS AND NEON -v-
RUNNION EQUIPMENT and JOHN DOE

Neil Edward Swindlehurst - 1
July 20, 2018

**dealing** 11:7

**deduct** 10:21

**default** 23:24

**defrauded** 18:8

**degree** 6:5 58:18

**degrees** 6:4

**deny** 59:2

**department** 60:19

**dependent** 45:10

**depending** 6:23
13:22

**Depends** 55:23

**deposed** 3:16

**deposition** 3:10,15
14:21 20:13 63:13

**depth** 33:19

**describe** 13:3 29:19

**destination** 27:2
58:3

**detail** 30:4

**detailed** 38:13

**details** 29:22 30:22

**determination**
46:11

**determine** 63:23

**diem** 11:16

**difficulty** 4:7,8

**direct** 51:15,19 63:4

**directed** 36:13 41:3

**directions** 36:25

**directly** 8:1 31:24
34:1 42:9

**disappear** 39:12

**disappeared** 61:24

**discuss** 63:7

**discussed** 46:19
55:18 63:10

**DISCUSSION** 18:3
28:24 34:17 51:14
56:16 63:19

**discussions** 34:9

**disseminated**
15:15

**divorce** 3:18 14:16

**divorces** 5:14

**document** 32:12
43:12 59:11,12
61:21

**documentation**
32:16 33:16

**documented** 23:8

**documents** 16:18
19:15 33:4 49:13
53:16 63:12

**dollars** 18:24

**domain** 45:6

**door** 45:14

**dot** 48:4

**drew** 46:9 48:21

**driven** 12:4

**due** 57:4

**Duluth** 42:8 61:14

**duly** 3:2

**dynamic** 7:7

**E**

**earlier** 32:16 43:13
63:1,11

**early** 6:9 9:5 10:2

**easy** 23:18 24:24
25:1

**Easyhosting**
57:12,22

**Edmonton** 5:3,10
16:5,6,16,20,21
19:16 21:1

**education** 5:25
6:12 7:7 25:10,25

**educational** 5:20

**Edward** 3:2,6,10

**effect** 19:13

**effective** 55:1

**Effectively** 23:21

**effort** 42:20 55:22

**electrician** 12:20

**electronic** 31:21

**elimination** 58:11

**else's** 56:3,5

**email** 16:18 29:16,
21 30:6,17 35:19
36:23,24 40:10,24
43:24 46:7,18,19
48:9,17,23 49:14,25
50:9,18,19 51:15,18
52:14,15 53:18
54:10,11 56:23 57:1,
8,14,21 58:2 59:20
60:4 62:19

**emailed** 29:13
54:15,18

**emails** 14:25 15:1,4,
12,15,20 18:21,23
19:21,22 21:16 25:2
26:3 28:15 31:25
33:17,25 34:5,15,22
39:19 40:7 49:2
51:4,24 52:7 53:20
57:5,7 59:1

**embarrassed**
55:20

**embarrassment**
55:22

**embedded** 36:24

**employed** 8:12

**employees** 11:3,5,
6,8 60:10

**enable** 38:14

**enclosed** 35:23
41:4 49:23 54:5

**end** 14:5 26:22
28:15 29:17 57:3,25
58:4 62:5

**ends** 23:7

**entailed** 29:24

**entities** 27:4

**environment** 57:22

**environments** 40:2

**equipment** 4:2
35:10,21 37:25 40:6
45:5,6 48:24 49:16

**equpment** 41:3
45:7

**errors** 14:4

**Esq** 3:3

**essence** 37:2 39:14

**established** 20:12

**estate** 30:6,8

**eventually** 33:4

**everyday** 4:15

**everything's** 14:11

**evident** 21:1

**examine** 7:24

**examined** 3:2

**EXAMINES** 56:17
58:21

**exchange** 57:10,16,
19

**exchanging** 31:20

**Exhibit** 32:15 33:1
60:23

**exhibits** 51:6

**expect** 63:13

**experience** 3:22

**experienced** 30:14

**expert** 14:17

**explain** 37:8 63:20

**explained** 16:25
19:19 25:16

**exposure** 19:13

**extent** 16:15

**extremely** 23:17,23

**F**

**fabrication** 17:18

**fact** 54:10 55:15
57:15 60:7 62:1

**facts** 4:1

**fair** 56:21

**fairly** 11:8 47:25

**false** 23:19

**familiar** 9:9 47:21
62:12

**fashion** 11:1 32:6

**fast** 7:11

**father** 12:1

**fax** 51:11,16 52:8
53:17,25 54:9,12,16,
17

**faxed** 51:15,19 52:3
54:15

**Federal** 16:11 20:25
21:9

**fell** 6:9 11:23

**felony** 21:2

**few-minute** 56:13

**field** 8:24 9:4 45:8
58:9,15

**figure** 21:19 24:6
28:17 29:6,9 54:7,8,
19

**figured** 16:2 26:6
50:8

**file** 15:7,9,19

**finalize** 30:8

**financial** 19:9

**find** 19:25 22:21
24:14 31:2,5 32:9,25
35:23 37:20,23 41:5
42:1,4,11 43:16,19
45:22 49:23 52:16
54:2,22 55:5

**Finder** 9:15

**finding** 26:20

**fine** 25:18 46:12

**finished** 6:5 12:6

**finishing** 12:19

**firm** 10:6 17:19 60:5

**firmware** 24:5

**first-year** 6:8

**fit** 45:12

**Flattened** 8:15

**flow** 37:15

**follow** 28:13 61:3

**follow-up** 25:10

**forge** 23:18

**form** 32:2

LANDALE SIGNS AND NEON -v-
RUNNION EQUIPMENT and JOHN DOE

Neil Edward Swindlehurst - 1
July 20, 2018

**formal** 12:7

**formulating** 58:23

**forward** 16:20

**forwarded** 32:16 52:7

**found** 19:18 20:1,10 21:17 29:15 33:6 37:8 42:5,7

**Foundation** 62:3

**fracture** 42:18

**fraud** 16:17 18:11, 15,17 19:7 25:6 29:5 32:9 50:25 55:16 62:1,2

**fraudulent** 15:23 20:8 22:7 25:4 35:13,15 55:3,8 60:8

**Friday** 20:15 61:4

**front** 45:14 56:8

**full** 3:5 19:22

**G**

**G-E-N-S-E-M-E-R** 42:16

**G-I-N-T-E-R** 60:11

**gained** 56:3

**gambit** 9:18 17:15

**gas** 10:21

**gave** 15:17

**general** 6:7 7:8 8:6 21:25

**generally** 6:6 8:9,22 13:3,15 15:14 17:13 26:16 55:20

**generated** 15:8

**Gensemer** 42:13,16 60:14 61:17,25 62:1

**Georgia** 42:8 61:14

**get all** 31:3

**Ginter** 60:10

**gist** 35:24

**give** 10:1 28:12 32:24,25

**giving** 4:1

**glance** 48:3

**glitch** 13:23

**glitches** 25:16

**gmail** 52:1,11,12,20, 24 53:3,5,8,10,13,20

**good** 7:9 36:7

**Google** 52:20

**Gotcha** 60:6

**graded** 8:5

**Great** 63:18

**grew** 11:25

**ground** 4:19

**growing** 12:9,21

**GT** 17:17

**guarantee** 3:25

**guess** 18:17 54:17 55:24

**Guide** 9:16,17

**guy** 23:14 28:13 31:8,9,17,19 32:3 36:14 39:6 40:5 53:7 61:17

**guys** 32:21

**H**

**H-E-B-D-O** 9:13

**hacked** 26:24 27:4, 11 48:19,24 50:24 58:24 59:7,8,17,18, 19,20 60:7

**HAEBERLE** 32:22 47:9,11 56:12,17,18 58:20 59:9,12 62:3, 25

**half** 15:3 22:4 37:4 39:4

**handle** 25:7

**hands** 12:19 32:14

**hands-off** 14:4

**handwriting** 36:2, 3,5,8 41:5,9 46:2,5 47:13 48:15 49:14, 24 50:1 51:7,8,16

**handy** 12:18

**happen** 3:19

**happened** 16:3,25 19:20 20:10 21:8 24:6 25:8,17 28:12 29:7,10 35:14 44:14 55:16

**happening** 34:15

**hard** 9:21 31:21

**harder** 38:20

**Harry** 5:22

**head** 4:16

**header** 21:18 36:23, 24 37:2 44:5 46:7,18 49:2 51:2 54:16,17

**headers** 21:17 25:2 38:12 50:18,19 54:20

**hear** 4:6,22,25

**Heart** 17:18

**Hebdo** 9:7,11 11:21

**helpful** 29:7 42:3

**hidden** 45:15

**high** 5:22,23

**hits** 36:25

**hold** 32:12

**Home** 9:16

**hop** 48:9

**host** 46:23

**hostage** 18:25

**hour** 10:18 13:21 15:3

**hours** 13:21 19:12 20:3 21:14 22:4,21 44:14

**huge** 47:23

**I**

**idea** 7:9 17:23 20:6 39:10

**identification** 61:15

**important** 63:23

**incident** 44:14

**including** 21:17

**incoming** 40:3

**incorporate** 10:19

**incorporated** 8:18

**independent** 11:10

**indication** 22:25 29:17 59:20

**indicator** 62:19

**individual** 38:21 39:11

**individually** 30:15, 20

**individuals** 58:8

**industries** 12:9 17:20

**industry** 6:16 7:16 9:21 10:8 11:19 12:7 18:5

**infected** 18:21 56:2

**infecting** 26:4

**infection** 26:5

**info** 41:6

**inform** 56:24

**information** 9:2 12:8 13:4 14:18 21:18 25:22 28:13 29:9 30:25 31:8,13, 19 32:2,11 36:10,24 38:13 39:16 40:9,16 41:18 43:2 47:8 52:2,15 58:8

**initial** 16:15

**initially** 6:7 16:25

**initials** 34:5

**injury** 21:2

**inquiring** 25:15

**inside** 26:6

**install** 13:7,9

**instances** 18:7

**instantly** 25:11

**instructed** 30:7

**instruction** 20:15 33:24 45:20

**instructions** 20:13 29:13 30:2,6 33:5 34:25 35:24 36:4 40:10,22 41:10,12, 13,23 42:21 44:24 49:21,24 50:1,13,20

**intent** 35:13,15

**intercepting** 26:3

**International** 43:5 47:16,23

**internet** 23:17,21, 25 24:18

**interpret** 37:8 43:2, 22

**introducing** 34:14

**intrusion** 57:3,24 58:1,3

**investigate** 22:7 36:15,16 52:10 55:8 60:13 61:18

**investigation** 16:11 20:25 21:10 44:9 45:19 53:23 56:19 58:23 60:6,18

**investigative** 25:3 60:21

**involve** 13:6

**involved** 3:20 11:22 14:13 17:3,5 18:5,7 19:2 20:24 30:4 52:24 55:23 60:22

**involvement** 13:15 21:13 22:6

**involves** 19:4

**IP** 22:8,19 23:18 24:12 37:21 38:25

**IPS** 22:23 23:17 24:10 25:1 38:14 39:1,2

**iron** 12:20

**Islands** 23:3

**ISP** 22:18 25:14 27:2 38:16

**issue** 30:16

**items** 29:8

LANDALE SIGNS AND NEON -v-
RUNNION EQUIPMENT and JOHN DOE

Neil Edward Swindlehurst - 1
July 20, 2018

**J**

Janice 49:16 50:9

Javamail 43:21

Jeffrey 42:13 60:14
61:17

Jennifer 35:5

job 32:11

jobs 12:6,9

July 61:7

jump 41:17

June 61:7

**K**

keeping 7:16

Ken 60:10

kids 5:16

kind 4:24 6:4 7:5,22
11:21 15:4 19:19
24:20 26:6 28:5
29:16,21 30:12
31:20 34:14 35:12
39:4 48:5 54:12

kinds 17:13 36:13

knew 45:15

knowing 35:14

knowledge 4:1
6:22 8:1 45:12,13

**L**

Lake 17:18

land 10:17

Landale 4:2 12:24
13:18 14:8 17:8,15,
24,25 26:9 27:4,13
33:8 50:7 52:3 53:25
57:10,12,17

Landale's 32:17
56:20,23 57:1,3,13,
25

language 30:9

large 19:8 23:22,24
24:18 38:10,25 40:1
47:25

largest 38:9

late 9:5 10:2

Laura 13:2

lawsuit 4:2 14:13

lawyer 14:23 29:12,
14,20 30:1,7,18

lawyer's 30:16

lawyers 6:13 15:17

layouts 8:11

leads 57:2

learn 8:2 26:1

learned 20:7 55:16

learning 7:13

led 55:19

left 32:14 60:18

left-hand 41:20,24

legal 6:12

legitimate 47:20
60:3

letter 49:23

liability 61:16

licence 7:4

licenced 6:25

licencing 7:1

life 12:15

limit 24:10

limited 8:15 57:22
58:2 61:15

listed 41:22 44:4

lists 61:12,13,14,15

live 5:6

lived 5:4

Livingston 43:5
47:16,20,23 48:18
49:9 58:24 59:3,17,
21 60:2,7

Livingston's 59:7

livingstonintl 48:4

LLC 36:15,16 54:23
60:16 61:13

local 26:4

located 39:8

location 24:13
37:22 42:4

log 23:25 53:3

logo 41:21

long 5:4 8:16,22 9:4,
23 10:10 12:24
13:20 19:24 20:2
22:2,17 26:22 28:10
45:10

longer 13:24

looked 9:7,19 33:15

Loosely 21:5

loss 19:9

lot 23:21 55:19,21

lots 12:9 17:21 42:5

loud 4:12

love 6:10 11:23

lower 48:15

**M**

machine 17:17 20:1
26:9 54:9

machines 26:4 40:2

Maciolek 48:4
60:10

made 19:15 46:11
58:25 59:15,16,22
60:6

Mag 9:11,13 11:21

Mag's 9:7

mail 37:9,15 40:3
43:21 45:11 57:23

mailhost.com
37:17

mailhostbox.com.
49:8

major 38:24

make 4:11,16 13:5
16:3 28:5 40:14 50:4
63:24

making 14:10

malicious 20:1

malware 26:5

manage 13:4

management 8:10
9:1,2 24:3

manufactured
23:23

manufacturer
17:20

manufacturers
6:14

marked 32:15 40:19

married 5:13,14

mask 23:18

materials 7:21
14:21

matrimonial 3:16

matter 7:6 16:17
19:11

matters 3:17 18:25

Meaning 56:5

medication 4:24

meet 14:23 16:21

meeting 33:20
34:14

mega 38:5 39:20

megamailserver
43:10

megamailservers
38:6,8

mentioned 29:11,
25 55:11 63:3,11

Messuck 45:24

met 16:23

metal 17:17,18

methodology
58:13

methods 58:6,7

Michael 36:14,16

Microsoft 6:2

Mike 47:15,16 48:4
60:10

mileage 10:21

million 18:24 39:2

mine 41:8

Minimum 13:21

minute 51:12

minutes 28:11

misspelled 35:16

Misstates 59:9,12

Mitch 36:14,16

Mm-hm 38:4 46:14

modify 13:9 57:19

modus 40:5

Molina 35:5 37:13

moment 62:8

Monday 45:25

money 17:3 20:14
29:13,21 30:7 61:3,
4,11,23 62:10,11

months 61:7

Montreal 57:13

morning 49:15

morphed 11:21

Mounted 16:9
20:24

moving 49:13

multiple 40:2

murdered 21:5

**N**

N-E-I-L 3:7,8

names 57:6

national 20:23
60:20

nature 4:8,17 6:24
7:7

needed 13:9,22

Neil 3:2,6,7,10

news 7:16

Nigeria 18:23

nods 4:16

non-fruitful 24:24

nonproductive
24:25

LANDALE SIGNS AND NEON -v-
RUNNION EQUIPMENT and JOHN DOE

Neil Edward Swindlehurst - 1
July 20, 2018

normal 40:1

North 36:14,15

notations 59:15,16

note 23:2 34:10,12
48:12,19 59:6

noted 59:13

notes 26:8 50:7
56:10,14

notice 3:11

notified 20:20

Novell 6:3

November 5:10

number 6:11,13 9:8
14:5 23:22 61:15

numbered 33:8
34:19

numbers 40:1

**O**

oath 3:22

Objection 59:9 62:3

Objection's 59:13

observation 59:24

observations
58:25

observe 7:20

Occasionally
24:12 38:12

occupation 8:25

occur 55:12

occurred 27:17

occurs 25:22

October 61:2

office 15:10 19:19
27:23,24

officer 16:21,23

offshore 14:8 23:1
26:2

one's 40:25

one-hour 14:1

one-time 57:7

online 7:13

open 17:1,4 53:8

opened 37:4

opening 18:21
23:20

operandi 40:5

operations 57:23

opinion 56:20,24
58:1,24

opinions 58:6,17

opportunity 33:12

opposed 4:16
57:15

original 15:9,11
33:3

originals 32:24

originating 27:1
51:3

outbound 37:16
43:3

outbound.
mailboxhost 38:5
49:7

outbound.
mailhostbox.com
43:8

outfit 9:23 17:18

outfits 9:6

outgoing 40:3

Outlook 19:22

owned 22:23 38:13

owner 8:20,21

**P**

p.m. 3:1 35:4 46:2

package 33:25
34:15

packaging 57:20

pages 34:19 36:21
37:5 39:4 42:23
45:22 46:12 48:25
50:15,19 51:24

paging 33:2

paid 18:17

paper 23:14

parcel 33:18

part 21:8,20 23:3
25:9 33:17 45:16
53:21 57:4

parties 3:12

partner 5:7

parts 41:9

party 3:19,20

passing 30:13

password 23:25
25:19 53:4 57:8

passwords 25:13
56:4 57:5,6

past 27:15 30:1

Pat 29:4,20 30:10,
14,20 31:3 35:20
41:3 52:5 53:17 54:4

Pat's 54:10

patches 14:10

path 44:6 45:14

Patrick 27:25 28:3,
22 52:6

pattern 40:4 43:14
46:25 49:6,7

pencil 23:14

people 11:9,14
18:20 39:12 55:20
62:23,25

percent 17:25

percentage 17:23
23:24

performed 46:10

periodic 14:6

periodically 13:7

person 31:1,11,14
52:22 60:8 62:10

person's 39:14

personally 16:23
29:15 30:14

phone 27:14,25
29:3 31:10,18 62:19

phrase 22:23

physical 24:13

pick 53:3

picked 12:22

pieces 26:25

place 5:8 10:19 21:2
29:14 37:24 44:2

places 7:4

plants 9:17

play 52:22

point 7:14 9:18
10:6,12 11:23 14:24
20:23 25:13 50:22
52:8 53:17 60:20,22
61:18

points 36:25

police 15:25 16:2,3,
4,7,8,9,16,20 19:15,
16 20:24 21:1 23:9
32:14 60:19,21

Polick 3:3,4 18:2,4
28:25 32:21,23
34:16,18 47:12
51:13,18 56:15
58:21,22 59:11,13
62:6 63:2,20

pool 24:18 38:15

popped 44:22

position 7:1

positions 9:24

potential 26:23

practices 57:4

preceding 34:19

prepare 28:15

present 27:21

presses 9:17

pretty 10:3 11:24
12:10 14:4 15:3
22:3,22 23:8 25:11
39:18,23 43:12 45:4,
8 63:16

primary 32:11

Prime 41:21 42:1,5
54:22 60:16 61:12,
13

principal 61:16

principally 13:1

printed 16:22 21:16
41:21 52:7

printing 9:17

printout 44:12

privacy 52:13

private 38:14

privately 22:23

problem 29:12,17,
25 58:12

problems 25:15
27:15

PROCEEDINGS
3:1

process 16:19 22:2
58:10

processes 13:5

professional 58:18
59:4

program 57:8

programs 6:2 7:18

pronounce 3:12

provide 29:8

providers 24:18
38:9,16,18,24 53:14

public 61:8

publications 9:15,
18,19

pull 24:10 32:11

pulled 15:9 19:20

pulling 16:18

purchase 10:17
30:6,8 33:3

purchased 10:17

purported 51:25

purpose 10:23
36:18

pursuant 3:10
20:14

put 6:14 24:18 25:17
34:4 59:19

LANDALE SIGNS AND NEON -v-
RUNNION EQUIPMENT and JOHN DOE

Neil Edward Swindlehurst - 1
July 20, 2018

**Q**

**quadrant** 48:15,16

**question** 4:6 27:6
54:14 62:4,5,17

**questions** 3:25 4:4,
22,25 56:11 62:18

**quick** 14:1 32:13
52:12 60:17 63:21

**quickly** 11:8 60:23

**quoted** 46:6 48:16

**R**

**R-Y-C-E** 49:16

**rails** 28:17

**ran** 9:15

**ranging** 39:1

**ransomware** 18:16,
22

**reach** 58:6

**read** 7:20 32:18 46:5
48:16 61:9 62:14

**reading** 25:6

**ready** 14:21

**real** 30:6,8 63:21

**reason** 10:16 44:2

**reasonable** 10:23
58:18

**recall** 23:4 29:3
31:17 42:9,15 46:11
55:10

**received** 37:10
48:17 61:9

**recently** 33:19

**recognize** 36:8
60:15

**record** 3:5,9 4:11
18:2,3,4 24:20 28:5,
24,25 34:16,17
42:10 51:13,14
56:16 63:19

**records** 60:25
62:13

**recurs** 25:23

**Ref** 47:15

**refer** 47:15

**reference** 21:12
23:2 33:16,23 43:16,
17,25 44:21 47:16
50:20 55:4,7

**referenced** 31:7

**referring** 28:22

**refers** 34:25

**reflect** 3:9

**regard** 14:18 42:20

**regular** 7:14 14:11
38:16

**regularly** 19:10

**rehashed** 28:12

**relating** 45:19

**relevant** 19:21

**relied** 58:8

**reload** 13:9 24:5

**reluctant** 17:1

**remarks** 30:13

**remember** 12:5
30:5,9 31:12,18,20
34:6 42:7

**remembered** 15:5

**remote** 14:9

**Renter's** 9:16

**rephrase** 59:14

**report** 13:1 16:15
19:17 50:16 55:21

**reporter** 4:11 63:21,
25

**reporting** 16:17

**represent** 60:25

**represented** 62:16

**required** 7:1,5,18
14:6

**requirement** 7:9

**research** 23:3
55:12

**responded** 61:2

**responding** 4:7

**response** 25:20

**rest** 22:3 53:16

**restoring** 19:11

**result** 15:8 25:3

**results** 19:25 25:25

**retrospect** 35:14

**Revenue** 10:20

**review** 14:21 33:13
63:24

**reviewed** 25:21

**rhyme** 53:21

**ring** 42:17

**rise** 4:1

**Robert** 5:19

**route** 39:5 45:11

**router** 24:1,2,4

**routers** 23:22,23

**routes** 23:21

**routing** 24:1 36:4
39:17,18 40:8,9
41:10,13,14 43:12,
23 45:2,18 46:8,10,
15,17 47:6 49:1
50:2,16 57:20

**Royal** 16:9 20:24

**rules** 4:19

**run** 10:19 17:15,16
20:5 38:10 40:2

**run-through** 63:12

**running** 13:10,11
14:11 19:22 26:6
38:17 45:5 50:23

**Runnion** 4:2 26:12,
24 27:5,10,12,25
28:3,22 29:4,7,20
30:10,20,21 31:3,19
35:20 37:25 41:3,20
45:5 46:7 48:18,24
49:16 52:3,5,6 53:17
54:4

**Runnion's** 29:17
31:14 50:12,20 58:4

**runnionequipment
.com** 49:17

**runnionequpment**

35:5 37:11 41:1
45:24

**runs** 49:4

**Ryce** 49:16

**Ryce's** 50:9

**S**

**S-W-I-N-D-L-E-H-
U-R-S-T** 3:6

**saved** 57:8

**scan** 19:25 20:2
21:14 54:12

**scanned** 21:20

**scans** 19:22 20:5,17

**scenarios** 7:17

**Scherer** 5:7

**school** 5:21,22,23

**schooling** 12:7

**schools** 61:8

**scored** 8:5

**scratch** 24:5

**scratch-pack** 57:6

**search** 22:8 24:21
26:10 37:21 42:2,20
44:10 45:2 46:10
60:17

**secrets** 17:11

**secure** 40:17 53:18

**self-employed**
8:13

**send** 18:24 28:14
30:7,24 31:7 40:6

**sense** 21:20

**sentence** 50:5

**September** 61:7

**series** 51:6

**server** 14:9 37:18
45:11 50:23 51:3
57:2,11,16,18,19

**servers** 36:25 37:9
39:20 40:3 43:3 45:4
50:22 56:23

**services** 57:14

**set** 3:11 12:18 14:3
20:13 25:19 40:21
41:18 42:21 47:5
49:20 50:24 52:13
56:23 57:2,7 62:2,17

**settings** 37:15

**settled** 12:10

**setup** 57:7

**sheet** 40:24 53:25

**shipped** 37:10

**shop** 23:20

**shops** 17:17

**short** 26:22

**showing** 17:12
34:14

**shown** 63:11

**shows** 61:10,16

**shut** 11:8

**sic** 6:8 9:18 38:5

**side** 26:6

**Sign** 53:25

**signature** 63:21

**signed** 17:16 54:5

**significant** 19:5
39:16 40:16 45:1,18
46:21 47:5 49:3
50:21 51:2

**similar** 18:7 42:20

**Simple** 26:14

**sir** 3:4 56:11

**site** 38:11

**situation** 30:1

**skill** 12:18

**skills** 12:17,22

**slew** 17:9

**slid** 6:9

**slightly** 39:25

**smart** 54:8

**software** 7:18 13:8
20:1

**sole** 8:20,21 12:11

**solidly** 14:11

**somebody's** 18:8

**sort** 21:18 30:13 52:21

**sound** 12:4

**sounds** 32:5 38:6

**source** 23:1,10

**sources** 25:22 26:23 27:3

**speak** 4:12 11:11 44:8

**speaker** 27:14

**speaking** 15:14 55:20

**special** 12:17

**specialized** 6:2

**specializes** 60:21

**Specialty** 17:17

**specific** 7:17

**spell** 3:5 9:12

**spelled** 35:21 49:17

**spelling** 35:9

**spoke** 15:25 28:2

**spoofed** 39:19 51:15,18

**SSL** 25:20

**stage** 12:3

**STAMCO** 17:17

**standard** 58:13

**start** 11:19 20:11 32:25 33:2 43:7

**started** 6:7 10:6,7 19:22 21:18

**starting** 36:21 42:23

**state** 3:4 6:18 19:12

**statement** 61:24 62:5

**States** 21:8 23:5 37:24

**stay** 7:10 13:23 45:15

**staying** 46:25

**Stephen** 5:19

**steps** 57:25 58:2

**stop** 4:7 23:7

**stress** 11:7

**strike** 8:22 17:5

**structure** 8:10

**stuck** 11:13

**studies** 6:8 7:5

**study** 6:6,7 8:9 33:18 55:17

**stuff** 15:6 21:22 26:2 43:6

**subnet** 38:25

**subnets** 38:25

**subpoena's** 61:9

**subpoenaed** 61:1

**success** 22:9

**successful** 23:15

**suddenly** 23:6

**suffered** 19:10

**suggest** 59:16

**summarize** 5:20

**summarized** 25:5

**summarizing** 56:18

**summary** 40:9 46:17 49:3 50:17

**Sun** 55:4 61:1,2 62:21

**support** 9:1,2,20

**supposed** 43:4

**supposedly** 43:4

**Surprisingly** 23:22

**swap** 31:25

**Swindlehurst** 3:2, 6,10,13 5:19

**sworn** 3:2

**system** 19:21,23 21:17 25:16,18 27:10

**systems** 9:7 13:4,8, 10,11 14:3 26:20

**31:1** 56:20

---

**T**

---

**takes** 19:12 58:2

**talk** 31:10,16 34:2

**talked** 16:5 31:9,24 32:5 62:23,25 63:4

**talking** 4:14 10:20 31:17 34:22

**talks** 37:16

**Tape** 12:4

**tax** 61:14

**tax-wise** 10:24

**Tech** 17:19

**technical** 45:12,13

**Technically** 5:14

**technology** 9:2 12:8 14:18 31:8,14, 19 32:3 58:9

**tells** 37:11,14 39:4

**TELUS** 38:8

**ten** 8:8 9:25 10:1,18 28:11

**tend** 56:2

**term** 8:3

**terms** 21:25 26:14 32:8 57:10

**tested** 7:21

**testified** 3:3,22

**testimony** 59:10

**testing** 26:20

**theft** 19:18

**thereabouts** 22:15

**thief** 23:15 45:7

**thing** 7:22 14:5,16 19:20 21:9 25:11 32:18 52:21 54:12 62:14

**things** 4:17 15:5,13 25:12,19 32:8 53:22 55:12

**thought** 7:2 29:14

**three-page-route** 44:8

**time** 4:5,14 5:13 8:2, 14:20 19:10 24:4 28:2 29:12 31:2 32:17 33:15 35:7 38:20 44:3,22 46:11 48:11 55:22 61:20 63:17

**timeline** 10:1 20:19

**times** 19:2

**Toad** 8:15

**today** 4:12,24 5:11 14:22 18:6 32:16 55:9 58:7,17 63:22

**today's** 3:11

**told** 20:3 27:11 32:10

**Tool** 17:17

**tools** 57:18 60:19

**top** 36:2 43:19 46:2 47:13

**topic** 19:24

**town** 10:18

**toys** 60:19

**trace** 52:21

**tracing** 23:17

**track** 21:22 22:17 23:6,10 24:1,15 36:18 38:14 61:19

**tracking** 22:9,18 23:4 28:19 38:21 42:20 49:1 50:9,16

**tracks** 23:16

**trade** 17:11

**Trader** 9:16,24 11:20

**trades** 12:22

**traditional** 7:19

**traffic** 23:21

**trail** 23:7,18

**transcript** 63:24

**transcript's** 49:19

**transfer** 15:23 20:8 21:3 22:7 25:4 33:16

**54:25 55:8**

**transferred** 20:14

**translated** 21:5

**transpired** 21:19

**travel** 39:5 44:6

**trends** 7:16

**trouble** 25:17 61:3

**Trust** 55:4 61:1,2 62:21

**tune-up** 14:2

**twisting** 17:2

**two-and-a-half-page** 39:17

**type** 63:22

**types** 25:6

**typically** 13:20

---

**U**

---

**uh-huhs** 4:17

**undergone** 18:16

**understand** 4:6,22, 25 21:7 27:6 30:17 38:17 39:3 44:15 53:15

**understanding** 30:21

**unique** 53:13

**United** 21:8

**universities** 6:8

**University** 5:25 6:1 12:1

**unprofessional** 48:5

**update** 13:9

**updating** 14:6

**upgrade** 13:13

**upper** 41:20

**upshot** 26:7

**user** 14:4 53:3

**usual** 25:19

LANDALE SIGNS AND NEON -v-
RUNNION EQUIPMENT and JOHN DOE

Neil Edward Swindlchurst - 1
July 20, 2018

## V

**valid** 29:16 30:2
48:9,23

**vanishing** 9:21

**varied** 12:18

**vast** 11:24

**verged** 19:24

**verify** 14:10

**versus** 4:2

**Virgin** 23:2

**virus** 18:22

**visit** 13:20 14:1

## W

**walking** 39:11

**wall** 52:18

**Wanda** 5:7

**wanted** 31:3,5
42:18

**watch** 7:24

**ways** 57:20

**web** 57:14

**Wednesday** 20:9,
16,20 21:13 22:6
27:18,20 29:5 49:15

**week** 13:19

**weird** 24:4

**western** 9:8

**whatever's** 13:9

**whereabouts**
12:12

**Willie** 45:24 48:18

**wire** 15:23 20:8 22:7
25:4 29:5,13 33:16,
24 54:25 55:8

**wire-transfer** 33:5
36:10 41:18 44:23
45:20

**wire-transfer-of-
funds** 19:5

**wiring** 20:13,15

34:25 35:23 40:10,
21 41:23 42:21
49:20 50:12,20

**wood** 12:3

**word** 35:17 50:6
59:19

**wording** 29:20

**work** 7:14 9:23 11:9,
16 17:8,9,16,19 22:5
25:3 55:7

**worked** 9:4,6 11:14,
20 12:1,24

**worker** 12:20

**works** 22:24

**worth** 55:22

**write** 51:10

**writing** 15:5 36:6
50:3 51:17,20,21

**written** 44:12,18
51:11 59:11

**wrong** 24:7 35:21

**wrote** 41:15

## Y

**yahoo** 43:4,17,21,
25 44:1,3,21 47:2,24
48:12,19 59:2,7,15,
17,23

**yahoo.ca** 47:17

**yahoo.com** 43:21
48:6

**years** 5:5 8:8 9:8,25
10:1 11:22 12:2,14

**yesterday** 14:24
33:18,24 34:3,9